# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

———————

PHILADELPHIA YEARLY MEETING OF THE RELIGIOUS SOCIETY
OF FRIENDS, *et al.*,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,

Defendants-Appellants.

———————

On Appeal from the United States District Court
for the District of Maryland

———————

## BRIEF FOR APPELLANTS

———————

BRETT A. SHUMATE
  *Assistant Attorney General*

KELLY O. HAYES
  *United States Attorney*

MICHAEL S. RAAB
LOWELL V. STURGILL JR.
SARAH N. SMITH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7533*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-0173*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................... 1

STATEMENT OF JURISDICTION ................................................... 3

STATEMENT OF THE ISSUE .......................................................... 3

STATEMENT OF THE CASE ............................................................ 3

    A.   Statutory Background ............................................... 3

    B.   Regulatory Background ............................................ 5

    C.   Prior Proceedings .................................................... 8

SUMMARY OF ARGUMENT ......................................................... 10

STANDARD OF REVIEW ............................................................... 15

ARGUMENT ..................................................................................... 15

I.    Plaintiffs Are Unlikely to Succeed on the Merits ......................... 15

    A.   Plaintiffs Lack Standing ......................................... 15

        1.   Plaintiffs have not shown an injury-in-fact that is fairly traceable to the Huffman Memorandum ...... 17

        2.   Vacating the Huffman Memorandum would not address plaintiffs' alleged injuries ............................. 30

    B.   Plaintiffs Are Unlikely to Succeed on Their RFRA Claim ................................................................. 33

       1.     The Huffman Memorandum Does Not Impose a Substantial Burden on Plaintiffs' Exercise of Religion .......................................................................... 34

       2.     The Huffman Memorandum is the Least Restrictive Means to Further a Compelling Government Interest ..................................................... 40

   C.   Plaintiffs Are Unlikely to Succeed on their Expressive Association Claim .................................................................. 43

II.   The Remaining Injunction Factors Weigh Against an Injunction ........................................................................ 49

   A.   Plaintiffs Have Not Demonstrated Irreparable Harm Absent Preliminary Relief ....................................... 49

   B.   Plaintiffs Have Not Shown That the Balance of Equities Tips in their Favor................................................ 51

III.   The District Court Erred in Enjoining the Vitello Memorandum .............................................................. 53

CONCLUSION ............................................................................ 54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** <span style="float:right">**<u>Page(s)</u>**</span>

*American Fed'n of Teachers v. Bessent*, ---F.4th---,
No. 25-1282, 2025 WL 2313244 (4th Cir. Aug. 12, 2025)..................16

*Apache Stronghold v. United States*,
101 F.4th 1036 (9th Cir. 2024) ........................................................ 36

*Arizona v. United States*,
567 U.S. 387 (2012) ................................................................... 3, 41

*Benham v. City of Charlotte*,
635 F.3d 129 (4th Cir. 2011) ........................................................... 25

*Benisek v. Lamone*,
585 U.S. 155 (2018) ....................................................................... 49

*Blackie's House of Beef, Inc. v. Castillo*,
659 F.2d 1211 (D.C. Cir. 1981) ...................................................... 41

*Bowen v. Roy*,
476 U.S. 693 (1986) ...................................................... 12, 34, 35, 37

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ....................................................................... 42

*California v. Texas*,
593 U.S. 659 (2021) ....................................................................... 22

*City of Boerne v. Flores*,
521 U.S. 507 (1997) ....................................................................... 38

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ................................................................. 24, 25

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ....................................................................... 32

*Department of Comm. v. New York*,
588 U.S. 752 (2019) .................................................................. 22-23

iii

*El Ali v. Barr*,
    473 F. Supp. 3d 479 (D. Md. 2020) ................................................... 44

*Employment Div., Dep't of Hum. Servs. of Or. v. Smith*,
    494 U.S. 872 (1990) ....................................................................... 36

*FDA v. Alliance for Hippocratic Med.*,
    602 U.S. 367 (2024) ........................................................ 27, 28, 29, 30

*Fighting Finest, Inc. v. Bratton*,
    95 F.3d 224 (2d Cir. 1996) ............................................................ 44

*Garland v. Aleman Gonzalez*,
    596 U.S. 543 (2022) ........................................................................ 5

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
    565 U.S. 171 (2012) ....................................................................... 44

*INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Labor*,
    510 U.S. 1301 (1993) ..................................................................... 52

*Kaemmerling v. Lappin*,
    553 F.3d 669 (D.C. Cir. 2008) ........................................................ 40

*Laird v. Tatum*,
    408 U.S. 1 (1972) .......................................................................... 24

*Lane v. Holder*,
    703 F.3d 668 (4th Cir. 2012) .......................................................... 18

*Liberty Univ., Inc. v. Lew*,
    733 F.3d 72 (4th Cir. 2013) ............................................................ 34

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020) ....................................................................... 36

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ........................................................................ 25

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................. 16, 31

*Lyng v. International Union, United Auto., Aerospace & Agric. Implement Workers of Am.*,
485 U.S. 360 (1988) ............................................................... 44, 47, 48

*Lyng v. Northwest Indian Cemetery Protective Ass'n*,
485 U.S. 439 (1988) .................................................... 35, 36, 37, 39, 48

*Maryland v. King*,
567 U.S. 1301 (2012) ............................................................................... 51

*Mennonite Church USA v. U.S. Dep't of Homeland Sec.*,
778 F. Supp. 3d 1 (D.D.C. 2025) ............................................. 22, 26, 33

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
915 F.3d 197 (4th Cir. 2019) ............................................................. 15

*Murthy v. Missouri*,
603 U.S. 43 (2024) ........................................................ 16, 17, 27, 30

*National Ass'n for Advancement of Colored People v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958) .................................................................. 45, 46

*National Treasury Emps. Union v. Von Raab*,
489 U.S. 656 (1989) ............................................................................ 41

*Nken v. Holder*,
556 U.S. 418 (2009) ............................................................................ 41

*Noem v. Vasquez Perdomo*,
No. 25A169, 2025 WL 2585637 (2025) ................................... 41, 42

*Penegar v. Liberty Mut. Ins. Co.*,
115 F.4th 294 (4th Cir. 2024) ......................................................... 16

*Presbyterian Church (U.S.A.) v. United States*,
870 F.2d 518 (9th Cir. 1989) .................................................... 26, 27

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) ................................................................... 43, 45

*Scotts Co. v. United Indus. Corp.*,
315 F.3d 264 (4th Cir. 2002) ...................................................... 49-50

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ........................................................................... 25

*Tabbaa v. Chertoff,*
509 F.3d 89 (2d Cir. 2007) ......................................................... 43, 46

*Thomas v. Review Bd. of Ind. Emp. Sec. Div.,*
450 U.S. 707 (1981) ............................................................................ 34

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ............................................................................ 15

*Trump v. CASA, Inc.,*
606 U.S. 831 (2025) ............................................................................ 51

*United Presbyterian Church v. Reagan,*
738 F.2d 1375 (D.C. Cir. 1984) ........................................................ 24

*United States v. Brignoni-Ponce,*
422 U.S. 873 (1975)............................................................................ 42

*United States v. Iowa,*
126 F.4th 1334 (8th Cir. 2025) ................................................... 13, 43

*United States v. Texas,*
599 U.S. 670 (2023) ................................................................ 16, 29, 30

*Winter v. Natural Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ......................................................... 15, 16, 49, 51

**Statutes:**

8 U.S.C. § 1103(a)(1) .................................................................... 4

8 U.S.C. § 1226 ............................................................................... 41

8 U.S.C. § 1226(a) ..................................................................... 9, 31

8 U.S.C. § 1231 ............................................................................... 41

8 U.S.C. § 1252(f)(1) ............................................... 5, 8, 10, 12, 31, 32

8 U.S.C. § 1357 ............................................................ 4, 9, 41

8 U.S.C. § 1357(e) ........................................................ 4

8 U.S.C. §§ 1221-1231 .................................................. 5

28 U.S.C. § 1292(a)(1) .................................................. 3

28 U.S.C. § 1331 ........................................................... 3

42 U.S.C. § 2000bb-1(b) .............................................. 40

42 U.S.C. § 2000bb-1(b)(1) .......................................... 33

42 U.S.C. § 2000bb-1(b)(2) .......................................... 33

**Regulatory Materials:**

Exec. Order No. 14159,
   90 Fed. Reg. 8443 (Jan. 20, 2025)................................41-42

Exec. Order No. 14165,
   90 Fed. Reg. 8467 (Jan. 20, 2025).........................................42

Proclamation 10886,
   90 Fed. Reg. 8327 (Jan. 20, 2025).........................................42

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ....................................................... 3

## INTRODUCTION

On January 20, 2025, the Department of Homeland Security (DHS) issued new internal guidance (the Huffman Memorandum) advising immigration officers to exercise their "common sense" and "discretion" when conducting enforcement activities near sensitive locations, such as places of worship. Plaintiffs, a coalition of Quaker, Baptist, and Sikh religious communities, sued one week later, arguing that DHS's guidance violates the Religious Freedom Restoration Act (RFRA), the First Amendment, and the Administrative Procedure Act (APA). Days later, U.S. Immigration and Customs Enforcement (ICE) issued follow-on guidance charging supervisors with the responsibility of determining whether enforcement actions should occur at sensitive locations (the Vitello Memorandum). The district court preliminarily enjoined DHS from acting in accordance with either memorandum (together, the 2025 Guidance). The district court erred, and its injunction should be vacated.

Although many errors infected the district court's analysis, they all derive from the district court's fundamental misunderstanding of the Huffman Memorandum. The district court understood the memorandum to mark a significant shift in DHS policy that dramatically increased the

likelihood that enforcement actions would occur at plaintiffs' houses of worship. In fact, the memorandum reflects a modest change in DHS's internal processes. The memorandum does not direct immigration agents to take enforcement actions at houses of worship or any other location. The memorandum simply superseded prior guidance directing agents to obtain approval from headquarters before taking enforcement actions at specific locations and instead entrusted that determination to agents' discretion and common sense, as is the case for all other locations.

The district court's misunderstanding led it to erroneously conclude that plaintiffs had standing and were likely to succeed on the merits. The district court's reasoning is wrong as a matter of first principles, as its implications confirm. Under the district court's reasoning, religious communities would have standing—and suffer constitutional injury—whenever the government takes any action that incidentally reduces attendance at their services, from the enforcement of criminal laws resulting in the arrest of congregants to economic policies that prompt individuals to work rather than worship. That result is plainly untenable. This Court should reverse.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. JA18. The court granted plaintiffs' motion for a preliminary injunction in part on February 24, 2025. JA323. The government filed a timely notice of appeal on April 24, 2025. JA333; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

On January 20, 2025, then-acting DHS Secretary Huffman issued a memorandum concerning immigration enforcement actions in or near sensitive locations, such as houses of worship. On January 31, the acting Director of ICE issued follow-on guidance. The question presented is whether the district court erred in preliminarily enjoining DHS from acting according to those memoranda in or near plaintiffs' houses of worship.

## STATEMENT OF THE CASE

### A. Statutory Background

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Congress has directed DHS to

3

enforce the Nation's immigration laws, 8 U.S.C. § 1103(a)(1), and has granted immigration officers broad authority to arrest and detain removable aliens, *id.* § 1357.

Congress has not placed location-based restrictions on that authority, with one exception: section 1357(e) requires immigration officers to obtain a warrant or the owner's consent before entering a farm or other outdoor agricultural operation for the purpose of interrogating a person believed to be an alien about his right to be in or remain in the United States. 8 U.S.C. § 1357(e). But Congress has not otherwise imposed any location-based restrictions—such as those relating to places of worship—on the general arrest and detention authority of immigration officers.

Congress has, however, limited the power of lower courts to enjoin DHS from acting pursuant to certain statutory provisions that authorize immigration agents to detain and remove aliens. Except in a case brought by "an individual alien" in removal proceedings, and "[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the

operation of [8 U.S.C. §§ 1221-1231]." 8 U.S.C. § 1252(f)(1). Those provisions "charge the Federal Government with the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of aliens." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022).

## B. Regulatory Background

For decades, federal agencies charged with enforcing immigration laws have issued internal guidance to immigration officers governing the factors they should consider, and the approvals they should obtain, before conducting enforcement actions in or near sensitive locations, including places of worship. Over that time, federal agencies have consistently instructed officers that they may conduct immigration enforcement actions in or near places of worship under exigent circumstances or with prior supervisor approval. *See, e.g.*, JA125-127 (Puleo Memorandum); JA136-137 (Myers Memorandum); JA139-141 (Morton Memorandum). As the Morton Memorandum explained, the agency's guidance was "meant to ensure that ICE officers and agents exercise sound judgment when enforcing federal law at or focused on sensitive locations" but was "not intended to categorically prohibit lawful enforcement operations

when there is an immediate need for enforcement action."  JA140 (emphasis omitted).

In 2021, DHS updated its guidance regarding enforcement activities near sensitive locations.  JA148-152 (Mayorkas Memorandum). Consistent with prior memoranda, the Mayorkas Memorandum urged agents to avoid taking enforcement actions in or near sensitive locations but recognized that there were circumstances "under which an enforcement action" in or near a sensitive location "needs to be taken." JA150.  The guidance identified several circumstances that would justify action in or near a sensitive location but stressed that the list was "not complete" and that "the exercise of judgment is required."  JA151.  The guidance instructed immigration officers, "[a]bsent exigent circumstances," to "seek prior approval from their Agency's headquarters, or as" otherwise delegated before conducting an enforcement action.  JA151.  Finally, the guidance expressly stated that it "does not limit an agency's or employee's statutory authority" and "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party." JA151-152.

On January 20, 2025, DHS rescinded the Mayorkas Memorandum and issued superseding guidance. JA195 (Huffman Memorandum). The Huffman Memorandum explained that immigration officers routinely use their "enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location." JA195. The guidance directs agents to "continue to use that discretion along with a healthy dose of common sense," but explained that it is "not necessary . . . for the head of the agency to create bright line rules regarding where our immigration laws are permitted to be enforced." JA195. The guidance acknowledged, however, that component heads "may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion." JA195.

On January 31, 2025, ICE issued follow-on guidance charging "Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area." JA260-261 (Vitello Memorandum).

## C.    Prior Proceedings

Plaintiffs, a coalition of Quaker, Baptist, and Sikh religious communities, sued DHS and Secretary Noem on January 27, alleging that the Huffman Memorandum violates the First Amendment, RFRA, and the APA.  JA6, JA265.  One week later, plaintiffs amended their complaint and moved for a temporary restraining order and preliminary injunction barring DHS from implementing the Huffman Memorandum and enjoining DHS from carrying out immigration enforcement actions at houses of worship absent a judicial warrant or exigent circumstances.  JA15, JA278.

The district court granted plaintiffs' motion for a preliminary injunction in part.  First, the court determined that plaintiffs had standing to challenge the 2025 Guidance, reasoning that reductions in attendance at plaintiffs' worship services and ministry programs constituted an injury that was, in part, traceable to the 2025 Guidance and would be at least partially redressed by reinstatement of the Mayorkas Memorandum.  JA279-292.  The court then addressed whether it had jurisdiction to enjoin DHS in light of the jurisdictional bar created by 8 U.S.C. § 1252(f)(1).  The court concluded that because some of the

enforcement activities at issue are authorized by 8 U.S.C. § 1357, which is outside the scope of section 1252(f)(1), it could. JA293. The court recognized, however, that it could not enjoin DHS from acting pursuant to section 1226(a), which authorizes the arrest and detention of aliens pursuant to administrative warrant. JA294; *see* 8 U.S.C. § 1226(a).

The district court then found that plaintiffs had established a likelihood of success on the merits of both their First Amendment and RFRA claims.[1] The court determined that plaintiffs were likely to succeed in establishing that the 2025 Guidance significantly burdened plaintiffs' First Amendment rights to expressive association and their religious exercise by (1) reducing attendance at plaintiffs' services and ministry programs, thereby undermining their ability to worship communally and serve immigrants, as their faiths require, and (2) requiring plaintiffs to accept "intrusions by armed law enforcement officers" at their services in contravention of the Quaker plaintiffs' pacifist beliefs. JA302-303, JA311. As the government did not argue that the 2025 Guidance served a compelling governmental interest and was

---

[1] Plaintiffs did not raise their APA claims in their motion for a temporary restraining order and preliminary injunction, and so the district court did not address those claims. JA294.

narrowly tailored, the district court concluded that plaintiffs had shown a likelihood of success on their First Amendment and RFRA claims. JA305-308, JA315-316.  The court also concluded that plaintiffs satisfied the remaining preliminary injunction factors.  JA316-318.

As to the scope of relief, the district court denied plaintiffs' request for a nationwide injunction, as well as their request for an injunction prohibiting immigration enforcement actions at houses of worship absent a judicial warrant or exigent circumstances.  JA319.  The court instead enjoined DHS from acting pursuant to the Huffman Memorandum or the Vitello Memorandum and ordered the Department to abide by the terms of the Mayorkas Memorandum with respect to any enforcement action in or near plaintiffs' houses of worship.  JA324-325.  Consistent with 8 U.S.C. § 1252(f)(1), the district court's injunction does not prohibit DHS from conducting arrests in or near plaintiffs' houses of worship when acting pursuant to an administrative or judicial warrant.  JA325.

## SUMMARY OF ARGUMENT

**I.**  The district court's injunction enjoining DHS from implementing the Huffman Memorandum should be vacated because plaintiffs cannot show a likelihood of success on the merits.

**A.** Plaintiffs have not shown that they have suffered any cognizable injury traceable to the Huffman Memorandum. The district court accepted the theory that the Huffman Memorandum inflicts an organizational injury on plaintiffs by reducing attendance at their worship services and ministry programs. But plaintiffs cannot demonstrate that they suffered declines in attendance in a single week that are directly traceable to the Huffman Memorandum, as opposed to the Administration's broader efforts to increase immigration enforcement. And it is doubtful that plaintiffs could make such a showing, as the Huffman Memorandum does not target houses of worship or any other location for enforcement, but instead alters the allocation of responsibility within DHS for approving enforcement actions in or near sensitive locations.

Plaintiffs also cannot demonstrate redressability. The district court believed that enjoining the Huffman Memorandum would restore DHS's prior policy and thereby reduce the likelihood of enforcement actions at plaintiffs' houses of worship and their members' fears and concern over such actions. But it is speculative that enjoining the memorandum will cause plaintiffs' members, who are independent third

parties, to return to worship services. Moreover, enforcement actions near sensitive locations were permitted under DHS's prior guidance and any injunction entered by a lower court cannot constrain DHS when it acts pursuant to an administrative warrant. 8 U.S.C. § 1252(f)(1). Consequently, the possibility of immigration enforcement actions in or near plaintiffs' locations will remain, even if the Huffman Memorandum is enjoined.

**B.** Plaintiffs are also unlikely to succeed on their RFRA claim because they have failed to identify a substantial burden on the free exercise of religion. The district court held that reduced attendance at plaintiffs' worship and ministry activities qualifies as a substantial burden, but that is incorrect for multiple reasons. To begin, the Free Exercise Clause "does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Bowen v. Roy*, 476 U.S. 693, 693 (1986). Determining the proper level of prior supervisory approval for law enforcement activity is a paradigm example of an internal government procedure.

In addition, the Supreme Court has held that the incidental effects of religiously neutral government action do not impose a substantial

burden on free exercise. The Huffman Memorandum treats houses of worship the same as other common locations. It does not bar anyone from attending church, and plaintiffs' parishioners' alleged fear of immigration enforcement at plaintiffs' houses of worship is no more than the incidental result of neutral and generally applicable government action. To hold otherwise would lead to absurd results, requiring strict scrutiny of, *e.g.*, government economic policies that may cause parishioners to need to work and thus forgo gathering for worship.

Plaintiffs also have failed to demonstrate a likelihood of success on their RFRA claim because the Huffman Memorandum is the least restrictive means to further the government's compelling interest in enforcing the Nation's immigration laws. Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The Huffman Memorandum empowers agents to use their discretion, and "[d]iscretion in the enforcement of federal immigration law is vital for accomplishing the purposes of federal immigration law." *United States v. Iowa*, 126 F.4th 1334, 1347 (8th Cir. 2025).

**C.** Plaintiffs' expressive association claim fails for similar reasons. Plaintiffs' allegations of reduced attendance at their worship and ministry activities do not demonstrate a "significant" burden on their expressive association for the same reasons those allegations do not show a substantial burden on their exercise of religion, and any such burden would in any event be the least restrictive means to further the government's compelling interest in enforcing the Nation's immigration laws.

**II.** The equitable factors do not support preliminary relief. Plaintiffs have not established an injury-in-fact to support Article III standing, much less irreparable harm. Nor have plaintiffs demonstrated that the Huffman Memorandum inflicts irreparable harm by violating RFRA or the First Amendment. On the other side of the balance, the district court's injunction works irreparable harm on the government by interfering with the inner workings of DHS and constraining the Department's ability to enforce this Nation's immigration laws.

**III.** Because plaintiffs have not demonstrated that they are entitled to preliminary relief enjoining the Huffman Memorandum, they have necessarily failed to demonstrate that they are entitled to an

injunction enjoining the Vitello Memorandum. That memorandum further guides ICE agents' enforcement discretion. The district court's injunction should be vacated.

## STANDARD OF REVIEW

This Court reviews an order regarding preliminary relief for abuse of discretion. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 213 (4th Cir. 2019). A "clear error in factual findings or a mistake of law is grounds for reversal." *Id.*

## ARGUMENT

To obtain the "extraordinary remedy" of a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20, 22 (2008). Plaintiffs do not succeed on any factor.

## I. Plaintiffs Are Unlikely to Succeed on the Merits

### A. Plaintiffs Lack Standing

The requirement that plaintiffs demonstrate Article III standing "is built on a single basic idea—the idea of separation of powers." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021) (quotation marks

omitted). Federal courts do not exercise "general legal oversight" of the Executive Branch. *Murthy v. Missouri*, 603 U.S. 43, 76 (2024) (quotation marks omitted). Standing doctrine thus "helps safeguard the Judiciary's proper—and properly limited—role in our constitutional system." *United States v. Texas*, 599 U.S. 670, 675-76 (2023).

To establish standing, a plaintiff must demonstrate (1) that it has suffered or will imminently suffer an injury-in-fact, (2) that its alleged injury is "fairly traceable" to the challenged conduct of the defendant, and (3) that it is "likely" that its injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Standing is assessed under the facts in existence at the time the lawsuit was filed. *Penegar v. Liberty Mut. Ins. Co.*, 115 F.4th 294, 303 (4th Cir. 2024).

"At the preliminary injunction stage," plaintiffs "must make a 'clear showing'" that they are "'likely' to establish each element of standing." *Murthy*, 603 U.S. at 58 (quoting *Winter*, 555 U.S. at 22); *see also American Fed'n of Teachers v. Bessent*, ---F.4th---, No. 25-1282, 2025 WL 2313244, at *2 n.3 (4th Cir. Aug. 12, 2025) (explaining that "'likelihood of success

on the merits' refers to the party's likelihood of success *in the lawsuit before the court*, including both merits *and* jurisdictional issues").

### 1. Plaintiffs have not shown an injury-in-fact that is fairly traceable to the Huffman Memorandum

**a.** Plaintiffs have not made a "'clear showing'" that they are "'likely'" to establish an actual or imminent injury-in-fact traceable to the Huffman Memorandum. *Murthy*, 603 U.S. at 58. The district court held that the memorandum imposed an organizational injury on plaintiffs by reducing attendance at their worship services and ministry programs. JA279-283. The court reasoned that "[s]uch reductions in attendance cause injury to Plaintiffs," because they result in reduced financial contributions to plaintiffs' congregations, fewer volunteers running their services and programs, and the impairment of plaintiffs' religious exercise, which requires communal worship and ministry to immigrants and refugees. JA280-281. That analysis suffers from several flaws.

First, plaintiffs have not shown that any reductions in attendance occurred or were imminent when they filed suit on January 27—a mere seven days after the Huffman Memorandum was issued. The district court credited declarations submitted by plaintiffs that reported declines

in attendance at plaintiffs' worship services and ministry programs following DHS's new guidance. JA280-282. But these declarations offer only vague and conclusory assertions that are insufficient to support their claims of noticeable and substantial attendance declines in the seven days after DHS changed its guidance. *See, e.g.*, JA220 ("some congregations have reported that fewer people, especially immigrants, are attending worship"); JA208 ("Since DHS changed its policy and started allowing ICE enforcement at houses of worship, attendance at [ESL] classes has declined because people are afraid of immigration enforcement at the church."); JA202 ("DHS's new policy is . . . reducing Gurdwara attendance"). The only specific allegation of reduced attendance is a 66% decline in one congregation's ESL program. JA221-222. But the declaration in question does not provide sufficient information to demonstrate that the congregation's ESL program experienced a sustained decline in attendance—in a single week—that is of the sort that "impede[s] its efforts to carry out its mission." *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012).

Second, plaintiffs cannot trace any such declines to the Huffman Memorandum in particular, as opposed to general concerns about

increased immigration enforcement after the presidential inauguration on January 20. In the first week of the new Administration, news reporting indicated that DHS planned to increase its immigration enforcement considerably. *See, e.g.*, JA167 (January 26, 2025 article reporting that ICE officials have been directed to "aggressively ramp up the number of people they arrest"). In response to the Administration's enhanced enforcement, people fearing encounters with immigration authorities stayed home, avoiding, among other locations, barber shops, grocery stores, schools, work sites, and shopping malls. JA175, JA180 (January 30, 2025 article reporting fewer customers at barber shops and grocery stores and decreased attendance at schools because "[p]eople think ICE is everywhere"); JA188 (January 22, 2025 article reporting that people did not show up to work and customers "all but disappeared" from a popular shopping spot in the early days of the Administration). In that context, it is not surprising that people fearing encounters with immigration enforcement avoided houses of worship as well. Plaintiffs have not carried their burden of demonstrating that any decline in attendance at their services is traceable to the Huffman Memorandum in particular, rather than increased immigration enforcement generally.

Indeed, it would be difficult for plaintiffs to carry that burden given that the Huffman Memorandum represents a modest change in internal DHS guidance and does not direct enforcement action at any location. While the Mayorkas Memorandum stated that "to the fullest extent possible," agents should avoid taking enforcement actions in or near sensitive locations, it recognized that there are some circumstances in which such "enforcement action needs to be taken" and it required agents, absent exigent circumstances, to obtain approval from Agency headquarters, or as otherwise delegated, before taking such actions. JA150. Consistent with the fact that the Mayorkas Memorandum was internal guidance simply directing agents how they should best exercise their enforcement discretion, the memorandum expressly states that it does not "limit an agency's or employee's statutory authority" and cannot be "relied upon to create any right or benefit." JA151-152. The memorandum also states that the Department does not "tolerate violations of law in or near a protected area." JA151.

The Huffman Memorandum removed the "bright line rules" put in place by the Mayorkas Memorandum but encourages agents to "continue to use" their enforcement discretion before taking enforcement actions,

which includes consideration of "the degree to which any law enforcement action occurs in a sensitive location." JA195. As permitted by the Huffman Memorandum, ICE has issued follow-on guidance charging Assistant Field Office Directors and Assistant Special Agents in Charge with "making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area." JA261. Plaintiffs have not demonstrated that any declines in attendance at their services are fairly traceable to these relatively nuanced differences in internal procedure.

The district court seemed to think that plaintiffs satisfied their burden simply by asserting in declarations that declines in attendance were attributable to the change in DHS guidance. JA286 (reasoning that "Reverend Baxley has specifically attributed the decline in [Cooperative Baptist Fellowship's] attendance to 'DHS's new policy'," the Sikh Temple "also directly attributes the decline in attendance to 'DHS's new policy,'" and the Quaker plaintiffs similarly "link the concerns about imminent reductions in attendance" to DHS's new policy). But plaintiffs do not satisfy their burden by asserting, in a conclusory fashion, that purported declines in attendance were caused by the Huffman Memorandum. *See*

*Mennonite Church USA v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 1, 11 (D.D.C. 2025) (concluding that declarations "summarily attest[ing]" that declines in attendance were caused by the Hufman Memorandum were too "limited and conclusory" to establish causation).

Plaintiffs' conclusory declarations are particularly insufficient given the record evidence, discussed *supra*, indicating that many people were staying home and avoiding any location in which they might encounter immigration enforcement. To establish standing to challenge the Huffman Memorandum, plaintiffs would need to show that their congregants would have attended their worship services, notwithstanding their fear of leaving their homes to go anywhere else, but for the memorandum. Plaintiffs have not made that showing and it is unlikely they could, given that the Huffman Memorandum treats houses of worship no differently than any other location.

Further, because plaintiffs' theory of injury depends on the independent actions of third parties, standing is "substantially more difficult to establish." *California v. Texas*, 593 U.S. 659, 675 (2021). Plaintiffs must show that their injury arises from the "predictable effect of Government action on the decisions of third parties." *Department of*

*Comm. v. New York*, 588 U.S. 752, 768 (2019).  Reduced attendance is not a predictable effect of the Huffman Memorandum.  As discussed, the memorandum does not target any location for enforcement but simply treats houses of worship and other sensitive locations like other common locations.

Reduced attendance is also not a predictable consequence of the memorandum because it does not grant DHS any new authority.  DHS guidance has consistently permitted immigration enforcement actions at houses of worship and other sensitive locations.  *See supra* pp. 5-7. Nevertheless, several of plaintiffs' declarants appear to understand the Huffman Memorandum as permitting immigration enforcement actions at places of worship for the first time.  *See* JA201 ("DHS's new policy allowing immigration enforcement at houses of worship allows ICE agents to conduct surveillance, investigate, raid and make arrests at Gurdwaras . . . ."); JA208 (asserting that "[s]ince DHS changed its policy to allow ICE enforcement at churches" people are fearful of attending ministry programs); JA220 (asserting that DHS's "new policy that allows immigration enforcement at or near houses of worship" has caused harm).  Reduced attendance at plaintiffs' services is not a predictable

consequence of a memorandum that merely alters internal agency procedures regarding the necessary approvals agents must obtain before taking enforcement action at certain locations.

Even if plaintiffs could demonstrate that they had suffered substantial declines in attendance and that their members were avoiding worship services because of the Huffman Memorandum, rather than increased immigration enforcement more generally, their theory of standing runs headlong into Supreme Court decisions explaining that plaintiffs cannot establish standing based on the alleged chilling effect of a policy that "does not regulate, constrain, or compel any action on [the plaintiffs'] part." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 419 (2013); *see also Laird v. Tatum,* 408 U.S. 1, 11 (1972) (finding no injury where a challenged policy was not "regulatory, proscriptive, or compulsory in nature").

As previously explained, the Huffman Memorandum, like the Mayorkas Memorandum, "does not *direct*" immigration enforcement officers to take actions in or near sensitive locations. *United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1380 (D.C. Cir. 1984). Nor have plaintiffs demonstrated that any enforcement action at their locations

has occurred or is "sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014). Consequently, plaintiffs "can only speculate as to how" immigration enforcement officers "will exercise their discretion" and common sense in determining whether to carry out enforcement operations in or near their places of worship. *Clapper*, 568 U.S. at 412. That is insufficient. It "is the *reality* of the threat . . . that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." *Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983).

In rejecting this argument, the district court reasoned that plaintiffs are not relying on an "abstract chilling effect" to establish injury but instead on "objective harm in the form of a reduction in attendance" at their services. JA283-284. But standing cannot properly be recognized for plaintiffs based on the nonattendance of their members where the members themselves lack standing based on their fears of enforcement that are not "objectively reasonable." *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011) (To demonstrate that one's First Amendment activities have been chilled, the plaintiff must show that "[a]ny chilling effect" is "objectively reasonable." (quotation marks omitted)). And any chill experienced by plaintiffs' members in response

to the Huffman Memorandum is not "objectively reasonable" because the memorandum does not target plaintiffs' places of worship.

*Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 520 (9th Cir. 1989), on which the district court relied, is not to the contrary. *See* JA282. There, four churches sued after it was publicly revealed that immigration officers had surreptitiously recorded their church services over a 10-month period, without a warrant and without probable cause. *Presbyterian Church*, 870 F.2d at 520. The churches alleged that after the surveillance became public, their members withdrew from active participation in services and were less open in prayers and confessions, that a bible study group was canceled for lack of participation, and that clergy time was diverted from regular pastoral duties. *Id.* at 521-22. The Ninth Circuit held that plaintiffs had sufficiently alleged an organizational injury and, in rejecting the government's argument that plaintiffs' asserted harms were too speculative and subjective, emphasized that plaintiffs had alleged a "concrete, demonstrable decrease in attendance" at their worship services. *Id.* at 522; *see also Mennonite Church*, 778 F.Supp. 3d at 10 (reasoning, in a similar challenge to the Huffman Memorandum, that "significant" attendance

declines are "likely necessary to plead an injury under *Presbyterian Church*").

Plaintiffs here have not made a "'clear showing,'" *Murthy*, 603 U.S. at 58, that they can likely establish that they experienced a "concrete, demonstrable decrease" in attendance at their services and programs over a single week, *Presbyterian Church*, 870 F.2d at 522. And unlike the plaintiffs in *Presbyterian Church*, plaintiffs here have not demonstrated that their houses of worship have been or will be imminently targeted such that it is objectively reasonable and predictable that their members would stop attending. Indeed, the plaintiffs in *Presbyterian Church* sued to challenge the lawfulness of specific acts of law enforcement surveillance that occurred at their houses of worship. By contrast, plaintiffs here challenge an internal guidance memorandum that does not target them and that they do not allege has resulted in any enforcement actions at their houses of worship.

**b.** Further, plaintiffs cannot establish standing because their theory of causation is too attenuated. "The causation requirement . . . rules out attenuated links," including "distant (even if predictable) ripple effects." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024).

For example, in *Alliance for Hippocratic Medicine*, the Court declined to recognize standing for plaintiff-doctors to challenge drug approvals merely because "use of the drugs by others may cause more visits to doctors." *Id.* at 392. The Court explained that finding causation in such circumstances would be both "unprecedented and limitless" and would "allow doctors to sue in federal court to challenge almost any policy affecting public health." *Id.* at 391-92. The Court further explained that there would be no "principled way to cabin" such a doctrinal change to doctors: firefighters, police officers, and teachers would also have standing to challenge policies that affected their work, and the "path would seemingly not end until virtually every citizen had standing to challenge virtually every government action that they do not like." *Id.* at 392.

That same logic applies here. The Huffman Memorandum provides internal guidance to DHS agents; it does not regulate or constrain plaintiffs' conduct. To find that reductions in attendance at plaintiffs' worship services are fairly traceable to such a memorandum would grant religious communities like plaintiffs standing to challenge virtually *any* governmental action that predictably reduces attendance at their

services—from a military deployment to a federal highway project that increases traffic on Sunday mornings. This Court should not endorse such an "unprecedented and limitless approach" to standing. *Alliance for Hippocratic Med.*, 602 U.S. at 391.

    **c.** Finally, the Supreme Court has indicated that parties challenging the downstream effects of the government's immigration enforcement policies—as plaintiffs do here—lack a cognizable Article III injury. *Texas*, 599 U.S. at 676-77. In *Texas*, the Court held that the plaintiff States lacked standing to challenge DHS guidelines that they argued resulted in too few immigration arrests. *Id.* The Court reasoned that federal courts lack jurisdiction over such suits, which "run up against the Executive's Article II authority to enforce federal law." *Id.* at 678. Aside from interfering with the Executive's Article II authority, such suits are also improper because courts "lack meaningful standards for assessing the propriety of enforcement choices" with respect to arrest and detention, given the needs of the Executive to weigh "resource constraints and regularly changing public-safety and public-welfare needs" when devising policy. *Id.* at 679-80.

The district court reasoned that *Texas* only applies to challenges asserting that the government is under-enforcing federal immigration law, JA284-285, but the Court's reasoning applies equally where, as here, plaintiffs attempt to superintend the Executive's enforcement authority by dictating where and under what circumstances immigration enforcement actions may occur. And just as courts are ill-equipped to "assess[] the propriety" of the government's discretionary decisions about who (and who not) to target for arrest, they are equally ill-equipped to decide how immigration officers should exercise their enforcement discretion, or where the government should allocate limited enforcement resources. *Texas*, 599 U.S. at 679.

### 2. Vacating the Huffman Memorandum would not address plaintiffs' alleged injuries

Plaintiffs have also not made a "'clear showing,'" *Murthy*, 603 U.S. at 58, that their asserted injuries will likely "be redressed by the requested judicial relief," *Alliance for Hippocratic Med.*, 602 U.S. at 380. Plaintiffs asked the district court to (1) enjoin the Huffman Memorandum and (2) enjoin DHS from carrying out immigration enforcement actions at houses of worship, absent a judicial warrant or exigent circumstances. JA278. The district court correctly determined that it could not order the

second form of requested relief, which would "effectively impose an injunction on DHS's authority under 8 U.S.C. § 1226(a) to make arrests pursuant to an administrative warrant," which is barred by 8 U.S.C. § 1252(f)(1). JA319. But the district court thought that enjoining enforcement of the Huffman Memorandum would provide plaintiffs some relief because it would effectively restore the prior policy under which plaintiffs had operated "without experiencing the kind of concern and reduced attendance that they are currently experiencing." JA291. That is incorrect for two reasons.

First, because the likelihood of plaintiffs' claimed injuries being redressed is grounded in the "unfettered choices" made by independent third parties not before the Court, "whose exercise of broad and legitimate discretion the [C]ourt[] cannot presume either to control or to predict," plaintiffs must show that those choices by third parties "will be made in such manner as to . . . permit redressability of injury." *Lujan*, 504 U.S. at 562 (quotation marks omitted). Here, plaintiffs cannot show that enjoining the Huffman Memorandum will predictably result in their members returning to worship services and ministry programs. That is particularly so because the Huffman Memorandum does not target

houses of worship, and the Mayorkas Memorandum does not prohibit DHS from conducting enforcement actions at houses of worship. Indeed, because plaintiffs' alleged injuries seem to be driven in large part by their members' incorrect belief that immigration enforcement at houses of worship was forbidden under DHS's prior guidance, *see supra* p. 23, it is entirely speculative that they would return to plaintiffs' services if the Huffman Memorandum is enjoined. "[R]edressability [that] requires speculat[ion]" is insufficient to support standing. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006).

Second, the district court seemed to believe that it could order a "return" to the policy outlined in the Mayorkas Memorandum. JA291. But that is not true. Under 8 U.S.C. § 1252(f)(1), any injunction entered by the district court cannot "restrict or enjoin DHS's ability to engage in arrests pursuant to an administrative warrant." JA294. The district court, therefore, cannot properly subject DHS to the "specific restrictions" set out in the Mayorkas Memorandum, at least when it acts pursuant to an administrative warrant. JA291. Further, it is not necessarily the case that restoring the Mayorkas Memorandum will "reduce . . . the number of enforcement actions" occurring in or near places of worship or the "level

of fear and concern over such actions." JA291. On its face, "the Mayorkas Memorandum creates no legally enforceable rights and confers only limited protections against immigration officers' exercise of discretion." *Mennonite Church*, 778 F. Supp.3d at 12; JA151-152. The Mayorkas Memorandum does not define, and expressly leaves to officers' discretion to determine, what enforcement actions are "near" a place of worship. JA150-151. And the Mayorkas Memorandum allows agents to take enforcement action with approval from Agency headquarters or a delegee. JA150-151. The possibility of immigration enforcement at plaintiffs' houses of worship will thus remain under any relief the district court can provide, and so it is not "reasonable to infer" that an injunction will reverse declines in attendance. JA291.

## B. Plaintiffs Are Unlikely to Succeed on Their RFRA Claim

RFRA provides that "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b)(1), (2). "A substantial burden" on the exercise of religion "requires 'substantial

pressure on an adherent to modify his behavior and to violate his beliefs.'"

*Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 100 (4th Cir. 2013) (quoting

*Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981)).

### 1. The Huffman Memorandum Does Not Impose a Substantial Burden on Plaintiffs' Exercise of Religion

The district court held that the Huffman Memorandum imposes a

substantial burden on plaintiffs' exercise of religion because plaintiffs

"can reasonably expect to face immigration enforcement actions at their

places of worship pursuant to the [Huffman Memorandum]" and because

"such actions will likely result in declines in attendance at their worship

and ministry services." JA310. That ruling conflicts with Supreme Court

precedent.

The free exercise of religion "affords an individual protection from

certain forms of governmental compulsion" but "does not afford an

individual a right to dictate the conduct of the [g]overnment's internal

procedures." *Bowen v. Roy*, 476 U.S. 693, 700 (1986). Applying that rule,

*Bowen* held that the federal government's use of a child's social security

number in determining the child's parents' eligibility for federal benefits

did not impose a substantial burden on the child's exercise of religion.

*See id.* at 701-02.  The parents argued that the government's use of the child's social security number would "'rob' the spirit'" of the child and prevent her from attaining greater spiritual power.  *Id.* at 696.  The Supreme Court accepted the parents' religious beliefs as the parents expressed them, but held that the First Amendment does not "require the [g]overnment *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family," *id.* at 699.

The Court reaffirmed those principles in *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988), where three American Indian tribes argued that the Free Exercise Clause barred the U.S. Forest Service from constructing a road through a portion of a National Forest the tribes used for religious purposes.  The tribes argued that the road would render any meaningful continuation of traditional Indian religious practices in the area impossible.  *See id.* at 451.  The Supreme Court accepted that premise but held that whether the government has imposed a substantial burden on the exercise of religion "cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development."  *Id.*  The Court explained that the "incidental

effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs," do not impose a substantial burden on religion.  *Id.* at 450-51.

Under *Bowen* and *Lyng*, plaintiffs' fear that the Huffman Memorandum may lead to reduced attendance at plaintiffs' worship and ministry activities does not constitute a RFRA substantial burden.[2]  Like the government action challenged in *Bowen* and *Lyng*, the Huffman Memorandum neither prohibits plaintiffs from conducting worship or ministry services nor imposes any financial or other penalty on plaintiffs for engaging in such activity.  And while the Huffman Memorandum provides that law enforcement actions in or near sensitive locations (including houses of worship) may occur without approval from agency

_____

[2] While *Lyng* and *Bowen* involved Free Exercise Clause challenges, the substantial burden analysis in those cases properly inform the interpretation of RFRA because those cases were decided under the pre-*Employment Division, Department of Human Services of Oregon v. Smith*, 494 U.S. 872 (1990) substantial burden/compelling interest test RFRA restored as a matter of federal statutory right.  *See, e.g., Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 687, 692 (2020) (Alito & Gorsuch, JJ. Concurring) (citing *Bowen* in analyzing a RFRA claim); *Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir. 2024) (per curiam) (same).

headquarters (or a designee), determining approval levels for government action is a classic type of internal affair that does not substantially burden the exercise of religion. The Free Exercise Clause "affords an individual protection from certain forms of governmental compulsion but does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Bowen*, 476 U.S. at 693.

In addition, plaintiffs have not identified any immigration enforcement activities occurring at their houses of worship, and RFRA affords plaintiffs no more right to restrict how the government chooses to enforce the Nation's immigration laws near their own property than the plaintiff Indian tribes had in *Lyng*. *See* 485 U.S. at 452-53. Any other conclusion would provide plaintiffs with a free-exercise veto over otherwise permissible law enforcement activity, similar to the "religious servitude" on the government's use of its own land the Supreme Court ruled out in *Lyng*. *Id.* at 452.

The district court's understanding of what constitutes a RFRA substantial burden also would lead to absurd results and inappropriately restrict the government's ability to enforce the law. *See Lyng*, 485 U.S. at 452 (noting that "[a] broad range of government activities—from social

welfare programs to foreign aid to conservation projects—will always be considered essential to the spiritual well-being of some citizens, often on the basis of sincerely held religious beliefs"). For example, under the district court's reasoning, the government's decision to close a key highway exit near a church for public safety reasons would impose a RFRA substantial burden if the closure would prevent people from attending church, and would require the government to prove that its action was the least restrictive means to further a compelling government interest, the "most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). The court's substantial-burden theory also would require strict scrutiny of religiously neutral criminal laws that result in the imprisonment of congregants, *any* increase in immigration enforcement that may result in deportation of would-be attendees, and economic policies that may cause parishioners to need to work and forgo gathering for worship. Under the court's theory, for example, a religious entity that distributes illegal substances to its congregants for use during religious ceremonies could challenge stepped-up government enforcement of the drug laws by reciting that fear of enforcement has caused some participants to forgo attending those

38

services. No court has ever suggested RFRA reaches that far. The implications of the court's substantial-burden theory confirm its invalidity. *See Lyng*, 485 U.S. at 452 (noting that "government simply could not operate" if strict scrutiny were to be required of religiously neutral government action that burdens the exercise of religion only incidentally).

Moreover, while conducting immigration enforcement activities "at" a house of worship could potentially substantially burden the free exercise of religion, plaintiffs do not allege that any such activity has yet occurred at their houses of worship, and plaintiffs' assertion of reduced attendance at their worship and ministry activities is far too speculative to constitute a RFRA substantial burden. *See supra* pp. 24-26. Plaintiffs' declarations also do not plausibly allege that any reduced attendance at their worship services is the result of the Huffman Memorandum rather than other factors, such as publicity regarding the government's overall stepped-up efforts to properly enforce the Nation's immigration laws. For all these reasons, plaintiffs have failed to identify a substantial burden on their exercise of religion.

## 2. The Huffman Memorandum is the Least Restrictive Means to Further a Compelling Government Interest

Even if the Court were to conclude that the Huffman Memorandum imposes a substantial burden on plaintiffs, there is no RFRA violation if the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). Here, defendants have a compelling interest in the uniform enforcement of the Nation's immigration laws in light of the overwhelming surge of illegal immigration over the past several years, and the Huffman Memorandum is the least restrictive means of advancing those interests. *See generally Kaemmerling v. Lappin*, 553 F.3d 669, 684-85 (D.C. Cir. 2008) (noting RFRA does not require the government to adopt an alternative that is "less effective" at accomplishing its compelling interest than the government action challenged).

**a.** Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. "The Supreme Court has recognized that the public interest in enforcement of

the immigration laws is significant." *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) (citing cases); *see National Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 672 (1989). Congress, through the Immigration and Nationality Act (INA), delegated to the Secretary of Homeland Security significant authority to administer and enforce the immigration and nationality laws, without placing any limitations on the Executive's arrest authority on property owned or operated by religious organizations. *See, e.g.*, 8 U.S.C. §§ 1226, 1231, 1357; *see also Arizona v. United States*, 567 U.S. 387, 396 (2025). "The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings [Congress] established, and permits and prolongs a continuing violation of United States law." *Nken v. Holder*, 556 U.S. 418, 436 (2009) (cleaned up).

"[A]t least 15 million people are in the United States illegally, many of whom entered (or legally overstayed) just in the last few years." *Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637 *1 (2025) (Kavanaugh, J., concurring in the grant of the application for stay). The recent influx has "cost taxpayers billions of dollars at the Federal, State, and local levels," Exec. Order No. 14159, 90 Fed. Reg. 8443, 8443 (Jan.

20, 2025), resulting in "[d]eadly narcotics and other illicit materials [flowing] across the border," Exec. Order No. 14165, 90 Fed. Reg. 8467 (Jan. 20, 2025). "Foreign criminal gangs and cartels" have extended their influence beyond the southern border into American cities, Proclamation 10886, 90 Fed. Reg. 8327 (Jan. 20, 2025), presenting "significant threats to national security and public safety," Exec. Order No. 14165, 90 Fed. Reg. at 8467. The Huffman Memorandum furthers the government's compelling interest in addressing "myriad 'significant economic and social problems' caused by illegal immigration," *Vasquez-Perdomo*, 2025 WL 2585637 at *4 (Kavanaugh, J.) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)).

**b.** The Huffman Memorandum is the least restrictive means of furthering that compelling interest. An alternative qualifies as a less-restrictive alternative only where it furthers the government's compelling interests "equally well" as the government's chosen approach, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 731 (2014). The district court held that the Mayorkas Memorandum is a less-restrictive alternative here, but requiring law enforcement officials to obtain prior high-level approval before conducting immigration enforcement in or

42

near sensitive locations (including but not limited to houses of worship) is unduly restrictive and far less timely and effective than allowing those officials to rely on their common sense and discretion. *See United States v. Iowa*, 126 F.4th 1334, 1347 (8th Cir. 2025) (noting that "[d]iscretion in the enforcement of federal immigration law is vital for accomplishing the purposes of federal immigration law)." The government has determined that the Huffman Memorandum's turn toward common sense and discretion is essential to effectively address the significant harms the recent massive increase in illegal immigration have imposed on Americans. That determination is reasonable, and the government is entitled to deference in determining how best to enforce the Nation's immigration laws and address those harms, including in a RFRA suit. *See Tabbaa v. Chertoff*, 509 F.3d 89, 106 (2d Cir. 2007).

## C.     Plaintiffs Are Unlikely to Succeed on their Expressive Association Claim

The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). "To be cognizable," however, "the

interference with associational rights must be 'direct and substantial' or 'significant.'" *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996) (quoting *Lyng v. International Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 485 U.S. 360, 367 & n.5 (1988)); *see also El Ali v. Barr*, 473 F. Supp. 3d 479, 523 (D. Md. 2020) (citing *Fighting Finest*).

The Huffman Memorandum does not directly and substantially, or significantly, burden plaintiffs' rights of expressive association for the same reasons the memorandum does not substantially burden plaintiffs' exercise of religion in that respect. Plaintiffs' asserted right of expressive association to engage in religious activity is no broader than plaintiffs' rights to engage in similar activity under the Free Exercise Clause, *see Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 189 (2012), and as demonstrated, plaintiffs have failed to show that the Huffman Memorandum substantially burdens their free exercise of religion.

The Supreme Court's jurisprudence regarding the right of expressive association confirms that plaintiffs have failed to make a clear showing of a likely violation of that right here. The Supreme Court has

held that interferences with the right of expressive association that qualify as "direct and substantial" include "impos[ing] penalties or withhold[ing] benefits from individuals because of membership in a disfavored group," "attempt[ing] to require disclosure of the fact of membership in a group seeking anonymity," and "interfer[ing] with the internal organization or affairs of the group." *U.S. Jaycees*, 468 U.S. at 622-23.

Plaintiffs allege none of those kinds of interferences here, and allowing law enforcement officials to use their discretion in determining whether it is appropriate to forgo otherwise lawful enforcement activities near sensitive locations does not impose any kind of significant burden on expressive association. Moreover, the Supreme Court has never held that neutral and generally applicable government action occurring near expressive association significantly burdens that activity by discouraging participation. That includes *National Ass'n for Advancement of Colored People v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958), on which the district court relied. *See* JA298. *Patterson* involved a court order requiring the NAACP to provide the Alabama Attorney General with the names and addresses of all the NAACP's Alabama members and agents.

*See* 357 U.S. at 451. The Alabama Attorney General sought that information to support a requested injunction barring the NAACP from conducting business within the State, including furnishing assistance to black students. *See id.* at 452. Unlike this case, the government action in *Patterson* was directed at and penalized the NAACP for engaging in expressive association.

*Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007), which the district court also cited, *see* JA298, is similarly inapposite. In *Tabbaa*, Muslim travelers alleged that the government violated their right to expressive association by subjecting them to enhanced screening when they re-entered the United States after attending an Islamic conference in Toronto, Canada. The government conducted that screening because it had become aware that persons with known terrorist ties would be attending the conference. *See Tabbaa*, 509 F.3d at 92. The Second Circuit held that the enhanced searches substantially burdened the plaintiffs' expressive association because they were "detained for a lengthy period of time, interrogated, fingerprinted, and photographed when others, who had not attended the conference, did not have to endure th[o]se measures." *Id.* at 102.

Unlike the government action at issue in *Tabbaa*, the Huffman Memorandum does not single out houses of worship for enhanced law enforcement activity. Instead, the memorandum merely supersedes the prior administration's guidance that an agent obtain prior approval from agency headquarters (or a delegee) before taking enforcement action in or near places of worship, along with numerous other sensitive locations including, *inter alia*, schools, playgrounds, and medical facilities. No decision of which we are aware holds that treating expressive association the same as other activity imposes a significant burden on that First Amendment right, at least where the government action occurs near rather than at the expressive activity.

*Lyng v. International Union*, 485 U.S. 360, which the district court also cited, *see* JA298, further confirms that the district court's understanding of a significant burden on the right of expressive association is overbroad. *International Union* held that a federal statute that disqualified any household from the federal food stamp program during the time any member of the household was on strike did not implicate the right of expressive association. The Supreme Court acknowledged that "[d]enying such benefits makes it harder for strikers

to maintain themselves and their families during the strike and exerts pressure on them to abandon their union." *International Union*, 485 U.S. at 368. The Court nevertheless held that the statute did not directly and substantially burden union members' expressive association rights because it did not "'order' [union members] not to associate together for the purpose of conducting a strike, or for any other purpose," and did not "'prevent' them from associating together or burden their ability to do so in any significant manner." *Id.* at 366.

Likewise, the Huffman Memorandum neither orders plaintiffs to alter or forgo worship services or ministries nor prevents them from conducting those activities. Neither *International Union* nor any other case of which we are aware concludes that law enforcement activity prevents expressive association merely by discouraging attendance, and as explained, the government "simply could not operate" if that idea were accepted. *Lyng*, 485 U.S. at 452.

Moreover, the absurd results of concluding that decreased worship attendance allegedly flowing from fears of enforcement activity occurring near houses of worship, *see supra* pp. 37-39, would be even more

pronounced in the expressive-association context than RFRA, since expressive association is not limited to religious speech or association.

Plaintiffs also have failed to show a likelihood of success on their expressive association claim because, even if they could show a significant burden, the Huffman Memorandum is the least restrictive means to further a compelling government interest. *See supra* pp.40-43.

## II. The Remaining Injunction Factors Weigh Against an Injunction

Even if plaintiffs could establish a likelihood of success on the merits, "a preliminary injunction does not follow as a matter of course." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam). Plaintiffs have not demonstrated that the equitable factors weigh in favor of injunctive relief.

### A. Plaintiffs Have Not Demonstrated Irreparable Harm Absent Preliminary Relief

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Conclusory or speculative allegations do not establish a likelihood of irreparable harm. *Scotts Co. v. United Indus. Corp.,* 315 F.3d 264, 283

(4th Cir. 2002) (The movant "must make a clear showing of irreparable harm" that is "neither remote nor speculative, but actual and imminent." (quotation marks omitted)).

For the same reasons plaintiffs lack standing to bring this lawsuit, *see supra,* pp. 15-33, they fail to carry their burden of establishing irreparable harm. Plaintiffs have not established that they have experienced reductions in attendance of the sort that impair their ministry that are fairly traceable to the Huffman Memorandum. Nor can they show they will imminently suffer such declines, because the choice whether to attend lies with their members, not with DHS, and the Huffman Memorandum does not regulate plaintiffs or restrict attendance at their services. Because plaintiffs' alleged harm is speculative, they have not established irreparable harm.

Plaintiffs also cannot establish irreparable injury by alleging RFRA and First Amendment violations. Plaintiffs have not shown that they are likely to succeed on the merits of those claims because any reductions in attendance at plaintiffs' worship services amounts to only an indirect and incidental effect on their religious practice, which neither substantially

affects their ability to gather nor substantially burdens their religious exercise.

## B. Plaintiffs Have Not Shown That the Balance of Equities Tips in their Favor

The final two preliminary injunction factors, the public interest and the balance of the equities, also weigh against preliminary relief. As discussed above, plaintiffs have not established an actual or imminent injury sufficient to confer Article III standing, let alone the much higher standard of an irreparable injury required for a preliminary injunction. *Winter*, 555 U.S. at 21-22. Nor have they demonstrated that they are likely to succeed on the RFRA and First Amendment claims as discussed above.

On the other side of the balance, the government is irreparably injured when it "is enjoined by a court from effectuating statutes enacted by representatives of its people." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). Congress has directed DHS to enforce the Nation's immigration laws and has placed very few location-based restrictions on that authority. And as discussed *supra*, pp. 40-42, the government has a compelling interest in ensuring uniform enforcement of immigration

laws.  Further, section 1252(f)(1) reflects Congress's determination that the public interest supports avoiding judicial interference with enforcement by immigration officers carrying out their arrest and removal functions.  The district court's injunction improperly impedes those efforts.

The injunction also harms the government by intruding on the internal workings of DHS.  *INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Labor*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers) ("[A]n improper intrusion by a federal court into the workings of a coordinate branch of the [g]overnment" weighs against equitable relief.).  As explained, the Mayorkas and Huffman Memoranda both permit enforcement actions in or near sensitive locations and both acknowledge that whether an enforcement action occurs in or near a sensitive location is an important factor immigration agents must consider.  Where the memoranda differ is in their allocation of responsibility regarding who decides whether an enforcement action in or near a sensitive location is warranted.  That allocation of responsibility is properly left to the Department, not the courts.

## III. The District Court Erred in Enjoining the Vitello Memorandum

For the same reasons that the district court erred in enjoining the Huffman Memorandum, it also erred in enjoining the Vitello Memorandum. That follow-on guidance charged ICE supervisors with the responsibility for determining "whether, where, and when to conduct an immigration enforcement action in or near" a sensitive location and directed them to provide "authorization for such actions either verbally or in writing." JA261. Because the Vitello Memorandum only offers "further guidance to assist" agents "in exercising appropriate enforcement discretion," JA260, it imposes no Article III injury on plaintiffs and does not violate RFRA or the First Amendment.

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

KELLY O. HAYES
*United States Attorney*

MICHAEL S. RAAB
LOWELL V. STURGILL JR.

*s/ Sarah N. Smith*
SARAH N. SMITH
*Attorneys, Appellate Staff*
*Civil Division, Room 7533*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-0173*
*Sarah.N.Smith@usdoj.gov*

September 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9839 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Sarah N. Smith*
Sarah N. Smith

**CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Sarah N. Smith*
Sarah N. Smith