No. 25-1512

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

PHILADELPHIA YEARLY MEETING OF THE RELIGIOUS SOCIETY
OF FRIENDS, *et al.*,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,

Defendants- Appellants.

———————————

On Appeal from the United States District Court
for the District of Maryland

———————————

JOINT APPENDIX

———————————

BRADLEY GIRARD
SARAH GOETZ
ALETHEA ANNE SWIFT
J. STERLING MOORE
ANDREW BOOKBINDER
AUDREY WIGGINS
  *Democracy Forward Foundation*
  *P.O. Box 34553*
  *Washington, D.C. 20043*
  *(202) 448-9090*


*Counsel for Plaintiffs*

BRETT A. SHUMATE
  *Assistant Attorney*
  *General*
KELLY O. HAYES
  *United States Attorney*
MICHAEL S. RAAB
LOWELL V. STURGILL JR.
SARAH N. SMITH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7533*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-0173*

  *Counsel for Defendants*

# TABLE OF CONTENTS

**Page**

Docket Sheet, No. 8:25-cv-00243 (D. Md.) ......................................................JA1

Amended Complaint, Dkt. No. 28..................................................................JA15

Declaration of Michael Levi, Dkt. No. 28-2 ..................................................JA55

Declaration of Noah Merrill, Dkt. No. 28-3..................................................JA68

Declaration of Ruby Steigerwald, Dkt. No. 28-4 ..........................................JA75

Declaration of Roni J. Kingsley, Dkt. No. 28-5..............................................JA83

Declaration of Francie Marbury, Dkt. No. 28-6 ............................................JA92

Declaration of Christie Duncan-Tessmer, Dkt. No. 28-7.............................JA99

Declaration of Sarah Gillooly, Dkt. No. 28-8..............................................JA107

Declaration of Robin Mohr, Dkt. No. 28-9 .................................................JA115

1/21/1993 Sector Policy Regarding Entry Into Places of Worship, Schools and Private Residences Memo, Jose B. Garza, Dkt. No. 28-10 ....................................................................................................JA122

5/17/1993 Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies Memo, James A. Puleo, Dkt. No. 28-12.............................................................................................JA124

Excerpt from 4/20/2004 Compilation of Memoranda: Enforcement Activities at Schools, Places of Worship, and at Funeral or Other Religious Ceremonies, Luis E. Barker & Robert A. Wallis, Dkt. No. 28-14........................................................................................JA128

12/26/2007, Enforcement Actions at Schools, Marcy M. Forman, Dkt. No. 28-15..................................................................................JA133

7/3/2008 Field Guidance on Enforcement Actions or Investigative Activities At or Near Sensitive Community Locations, Julie Myers, Dkt. No. 28-16.........................................................................JA135

10/24/2011 Enforcement Actions at or Focused on Sensitive Locations, John Morton, Dkt. No. 28-17..........................................JA138

1/18/2013 Enforcement Actions at or Near Certain Community Locations, David V. Aguilar, Dkt. No. 28-18...................................JA142

Excerpt from 7/2021 Immigration Enforcement: Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations (GAO-21-487), Dkt. No. 28-20...........................................................JA145

10/27/2021 Guidelines for Enforcement Actions in or Near Protected Areas, Alejandro N. Mayorkas, Dkt. No. 28-21...............................JA147

Excerpts from 4/18/2022 Immigrant Enforcement at Sensitive Locations, Tae D. Johnson, Dkt. No. 28-22......................................JA153

Excerpt from 1/25/2025 Protected Areas Enforcement Actions, Dkt. No. 28-23................................................................................JA160

Excerpts from 9/17/2023 Understanding the U.S. Immigrant Experience: The 2023 KFF/LA Times Survey of Immigrants, Dkt. No. 28-24......................................................................................JA164

Nick Miroff & Maria Sacchetti, The Washington Post, Trump officials issue quotas to ICE officers to ramp up arrests, Dkt. No. 28-27...JA166

Excerpt from DHS Directive Enforcement Actions in or Near Protected Areas (Jan. 20, 2025), Dkt. No. 28-30...............................JA171

Statement from a DHS Spokesperson on Directives Expanding Law
Enforcement and Ending the Abuse of Humanitarian Parole,
Dkt. No. 28-31 ........................................................................................ JA172

Miriam Jordan, et al., N.Y. Times, Immigrant Communities in
Hiding: 'People Think ICE Is Everywhere', Dkt. No. 28-34 .......... JA174

Michael Hiltzik, Los Angeles Times, Column: Inside the Bakersfield
raids that showed how Trump's immigration policies will sow
chaos, Dkt. No. 28-38 .......................................................................... JA184

Memorandum for Enforcement Actions in or Near Protected Areas
from Benjamine C. Huffman (Jan. 20, 2025), Dkt. No. 28-44 ......... JA194

Excerpts from Karoline Leavitt, White House Press Secretary, Press
Briefing (Jan. 29, 2025), Dkt. No. 28-45 ............................................ JA196

Declaration of Amar Shergill, Dkt. No. 28-48 ........................................... JA198

Declaration of Reverend Dr. Jeff Hayes, Dkt. No. 28-49 ......................... JA204

Declaration of Reverend Dr. Paul Baxley, Dkt. No. 28-50 ....................... JA211

Declaration of Reverend Dr. Randall Carter, Dkt. No. 28-51 .................. JA225

Declaration of Reverend Juan L. Garcia, Dkt. No. 28-52 .......................... JA236

Declaration of Nancy Black, Dkt. No. 28-53 ............................................... JA241

Declaration of Steven Mohlke, Dkt. No. 28-54 ......................................... JA248

Excerpts from Karen Hacker et al., The Impact of Immigration and
Customs Enforcement on Immigrant Health: Perceptions of
Immigrants in Everett, Massachusetts, USA, 73(4) Social Science
& Medicine 586 (2011), Dkt. No. 28-55 ............................................ JA255

1/31/2025 Memorandum Common Sense Enforcement Actions in or
    Near Protected Areas, Caleb Vitello, Dkt. No. 34-1 ........................ JA259

Kristi Noem Tweet, Dkt. No. 45-4 ............................................................. JA262

Memorandum Opinion, Dkt. No. 60 ........................................................... JA264

Order Granting in Part and Denying in Part Plaintiffs' Motion for a
    Temporary Restraining Order and a Preliminary Injunction,
    Dkt. No. 61 ............................................................................................ JA323

Preliminary Injunction, Dkt. No. 62 ........................................................... JA324

Notice of Appeal, Dkt. No. 79 ..................................................................... JA333

# U.S. District Court
## District of Maryland (Greenbelt)
## CIVIL DOCKET FOR CASE #: 8:25−cv−00243−TDC

Philadelphia Yearly Meeting of the Religious Society of Friends et al v. U.S. Department of Homeland Security et al
Assigned to: Judge Theodore D. Chuang
Case in other court:  Fourth Circuit Court of Appeals, 25−01512
Cause: 05:551 Administrative Procedures Act

Date Filed: 01/27/2025
Jury Demand: Plaintiff
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

## Plaintiff

**Philadelphia Yearly Meeting of the Religious Society of Friends**

represented by

**Alethea Anne Swift**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202−899−9065
Fax: 202−701−1775
Email: aswift@democracyforward.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bradley Girard**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202−812−3840
Email: bgirard@democracyforward.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Liang Bookbinder**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202−448−9090
Email: abookbinder@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
201−824−1347
Email: awiggins@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J. Sterling Moore**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202−448−9090
Email: smoore@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043

202–383–0794
Email: sgoetz@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Skye Lynn Perryman**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
254–722–5745
Email: sperryman@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

| | | |
|---|---|---|
| **New England Yearly Meeting of the Religious Society of Friends** | represented by | **Alethea Anne Swift** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Bradley Girard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Liang Bookbinder**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J. Sterling Moore**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Skye Lynn Perryman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

| | | |
|---|---|---|
| **Baltimore Yearly Meeting of the Religious Society of Friends, Inc.** | represented by | **Alethea Anne Swift** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Bradley Girard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Liang Bookbinder**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J. Sterling Moore**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Skye Lynn Perryman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Adelphi Friends Meeting of the Religious Society of Friends** | represented by | **Alethea Anne Swift**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Bradley Girard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Liang Bookbinder**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J. Sterling Moore**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Skye Lynn Perryman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Richmond Friends Meeting of the Religious Society of Friends** | represented by | **Alethea Anne Swift**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Bradley Girard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Liang Bookbinder**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J. Sterling Moore**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Skye Lynn Perryman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**New York Yearly Meeting of the Religious Society of Friends, Inc.**      represented by   **Bradley Girard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alethea Anne Swift**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Sikh Temple Sacramento**     represented by   **Bradley Girard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alethea Anne Swift**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Cooperative Baptist Fellowship**     represented by   **Bradley Girard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alethea Anne Swift**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **U.S. Department of Homeland Security** | represented by | **Kristina A. Wolfe**<br>DOJ–Civ<br>1100 L Street, N.W.<br>Washington, DC 20530<br>202–353–4519<br>Fax: 202–616–8470<br>Email: kristina.wolfe@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Andrew Warden**
DOJ–Civ
1100 L St., N.W.
Ste 7301
Washington, DC 20005
202–616–5084
Email: andrew.warden@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Karima A. Ortolano**
DOJ–Atr
DOJ
1100 L Street, NW
Washington, DC 20005
202–451–7467
Email: karima.ortolano2@usdoj.gov
*TERMINATED: 06/09/2025*

**Defendant**

| | | |
|---|---|---|
| **Kristi Noem**<br>*in her official capacity as Secretary of the Department of Homeland Security* | represented by | **Kristina A. Wolfe**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Andrew Warden**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karima A. Ortolano**
(See above for address)
*TERMINATED: 06/09/2025*

**Amicus**

| | | |
|---|---|---|
| **Immigration Reform Law Institute** | represented by | **Daniel Alan Stein**<br>MD<br>10215 Lakestone Place<br>Rockville<br>Rockville, MD 20850<br>202–674–5314<br>Email: dstein@gowebway.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Christopher J. Hajec**
Immigration Reform Law Institute
25 Massachusetts Ave., NW
Suite 335
Washington, DC 20001
202–232–5590
Email: chajec@irli.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gabriel R. Canaan**
25 Massachusetts Ave NW
Suite 335
Washington, DC 20001
202–642–4374
Email: gcanaan@irli.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/27/2025 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against All Defendants, filed by Philadelphia Yearly Meeting of the Religious Society of Friends, New England Yearly Meeting of the Religious Society of Friends, Adelphi Friends Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc., Richmond Friends Meeting of the Religious Society of Friends. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Summons, # 11 Summons)(Swift, Alethea) (Entered: 01/27/2025) |
| 01/27/2025 | 2 | NOTICE of Appearance by Alethea Anne Swift on behalf of All Plaintiffs (Swift, Alethea) (Entered: 01/27/2025) |
| 01/27/2025 | 3 | MOTION to Appear Pro Hac Vice for Andrew Bookbinder (Filing fee $100, receipt number AMDDC–11731675.) by Richmond Friends Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, New England Yearly Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc., Adelphi Friends Meeting of the Religious Society of Friends(Swift, Alethea) (Entered: 01/27/2025) |
| 01/27/2025 | 4 | MOTION to Appear Pro Hac Vice for Skye Perryman (Filing fee $100, receipt number AMDDC–11731706.) by Richmond Friends Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, New England Yearly Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc., Adelphi Friends Meeting of the Religious Society of Friends(Swift, Alethea) (Entered: 01/27/2025) |
| 01/27/2025 | 5 | MOTION to Appear Pro Hac Vice for Sarah Goetz (Filing fee $100, receipt number AMDDC–11731735.) by Richmond Friends Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, New England Yearly Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc., Adelphi Friends Meeting of the Religious Society of Friends(Swift, Alethea) (Entered: 01/27/2025) |
| 01/27/2025 | 6 | MOTION to Appear Pro Hac Vice for Audrey Wiggins (Filing fee $100, receipt number AMDDC–11731745.) by Richmond Friends Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, New England Yearly Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc., Adelphi Friends Meeting of the Religious Society of Friends(Swift, Alethea) (Entered: 01/27/2025) |
| 01/27/2025 | | The case of **Philadelphia Yearly Meeting of the Religious Society of Friends et al v. U.S. Department of Homeland Security et al**, has been opened in the District of Maryland. The case number is **8:25–cv–243–TDC**. PLEASE NOTE: You must pay the case filing fee **within 48 hours**. To pay online, select the event *Civil Case Filing Fee* which is found under *Civil Events −−> Other Filings −−> Other Documents*. Otherwise, forward a check made payable to *Clerk, U.S. District Court* and note the assigned case number on the check or cover letter. (av4s, Deputy Clerk) (Entered: 01/28/2025) |
| 01/28/2025 | 7 | CASE MANAGEMENT ORDER. Signed by Judge Theodore D. Chuang on 1/28/2025. (ols, Deputy Clerk) (Entered: 01/28/2025) |
| 01/29/2025 | 8 | PAPERLESS ORDER granting 3 Motion to Appear Pro Hac Vice on behalf of Andrew Bookbinder. Directing attorney Andrew Bookbinder to register for pro hac |

| | | |
|---|---|---|
| | | vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 1/29/2025. (mh4s, Deputy Clerk) (Entered: 01/29/2025) |
| 01/29/2025 | 9 | PAPERLESS ORDER granting 4 Motion to Appear Pro Hac Vice on behalf of Skye Lynn Perryman. Directing attorney Skye Lynn Perryman to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 1/29/2025. (mh4s, Deputy Clerk) (Entered: 01/29/2025) |
| 01/29/2025 | 10 | PAPERLESS ORDER granting 5 Motion to Appear Pro Hac Vice on behalf of Sarah Goetz. Directing attorney Sarah Goetz to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 1/29/2025. (mh4s, Deputy Clerk) (Entered: 01/29/2025) |
| 01/29/2025 | 11 | PAPERLESS ORDER granting 6 Motion to Appear Pro Hac Vice on behalf of Audrey Wiggins. Directing attorney Audrey Wiggins to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 1/29/2025. (mh4s, Deputy Clerk) (Entered: 01/29/2025) |
| 01/30/2025 | 12 | NOTICE by Richmond Friends Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, New England Yearly Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc., Adelphi Friends Meeting of the Religious Society of Friends (Attachments: # 1 Exhibit A)(Swift, Alethea) (Entered: 01/30/2025) |
| 01/30/2025 | | CIVIL CASE FILING FEE: $ 405, receipt number AMDDC−11738913(Swift, Alethea) (Entered: 01/30/2025) |
| 01/31/2025 | 13 | QC NOTICE: 1 Complaint,, filed by New England Yearly Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, Richmond Friends Meeting of the Religious Society of Friends, Adelphi Friends Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc. was filed incorrectly. *\*\*The following attachments are missing – Summons for U.S. Attorney General and U.S. Attorney for the District of Maryland. To correct this problem, file Summons for U.S. Attorney General and U.S. Attorney for the District of Maryland using the event Notice (Other) and link Summons for U.S. Attorney General and U.S. Attorney for the District of Maryland to 1 Complaint.* (av4s, Deputy Clerk) (Entered: 01/31/2025) |
| 01/31/2025 | 14 | Case Management Conference held on 1/31/2025 before Judge Theodore D. Chuang. (Court Reporter: FTR Recording\2B) (ds2s, Deputy Clerk) (Entered: 01/31/2025) |
| 01/31/2025 | 15 | PAPERLESS NOTICE. A CASE MANAGEMENT CONFERENCE is scheduled for January 31, 2025 at 3:00 p.m. to discuss 12 NOTICE OF INTENT TO FILE AN APPLICATION FOR EMERGENCY RELIEF. Instructions to join the call have been provided. The call will be recorded, so please do not use speakerphones as they compromise sound quality. Also, we ask that parties not remain on the conference line after the Judge has left the call, to ensure that the line is free for other calls that may be on the Judge's calendar. The parties should also be prepared to address whether they consent to have all further proceedings before a Magistrate Judge and whether they wish to participate in a mediation session with a Magistrate Judge, whether before, during, or after discovery. Parties are expected to consult with their clients and confer with each other on these issues in advance of the Case Management Conference and, if possible, present joint views to the Court. (ds2s, Deputy Clerk) (Entered: 01/31/2025) |
| 01/31/2025 | 16 | NOTICE by Richmond Friends Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, New England Yearly Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc., Adelphi Friends Meeting of the Religious Society of Friends re 1 Complaint,, *For the clerk to issue summons* (Swift, Alethea) (Additional attachment(s) added on 2/3/2025: # 1 Flattened Summons) (ols). (Entered: 01/31/2025) |

| 01/31/2025 | 17 | NOTICE by Richmond Friends Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, New England Yearly Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc., Adelphi Friends Meeting of the Religious Society of Friends *For the clerk to issue summons* (Swift, Alethea) (Additional attachment(s) added on 2/3/2025: # 1 Flattened Summons) (ols). (Entered: 01/31/2025) |
|---|---|---|
| 01/31/2025 | 18 | MOTION to Appear Pro Hac Vice for J. Sterling Moore (Filing fee $100, receipt number AMDDC−11741683.) by Richmond Friends Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, New England Yearly Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc., Adelphi Friends Meeting of the Religious Society of Friends(Swift, Alethea) (Entered: 01/31/2025) |
| 02/03/2025 | 19 | QC NOTICE: 17 Notice (Other), filed by New England Yearly Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, Richmond Friends Meeting of the Religious Society of Friends, Adelphi Friends Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc., 16 Notice (Other), filed by New England Yearly Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, Richmond Friends Meeting of the Religious Society of Friends, Adelphi Friends Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc. was filed incorrectly. **Not all pdf documents were flattened prior to filing. All pdfs uploaded to CM/ECF MUST BE FLATTENED for all future filings. Failure to comply may result in rejected filings and delays in case processing.* **This filing has been corrected by court staff and no further corrective action is required. Please ensure all future documents are flattened prior to uploading to CM/ECF using the following steps: Select File −−> Print −−> Adobe PDF or Microsoft Print to PDF.* (ols, Deputy Clerk) (Entered: 02/03/2025) |
| 02/03/2025 | 20 | Summons Issued 60 days as to Kristi Noem, U.S. Department of Homeland Security, U.S. Attorney and U.S. Attorney General (ols, Deputy Clerk) (Entered: 02/03/2025) |
| 02/03/2025 | 21 | PAPERLESS ORDER granting 18 Motion to Appear Pro Hac Vice on behalf of J. Sterling Moore. Directing attorney J. Sterling Moore to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/3/2025. (mh4s, Deputy Clerk) (Entered: 02/03/2025) |
| 02/04/2025 | 22 | ORDER granting Plaintiffs leave to file an Amended Complaint and a Motion for Temporary Restraining Order and Preliminary Injunction. The Amended Complaint and Motion will be deemed timely if filed by 02/04/2025; scheduling a hearing on the motion for 02/12/2025. Signed by Judge Theodore D. Chuang on 2/4/2025. (ols, Deputy Clerk) (Entered: 02/04/2025) |
| 02/04/2025 | 23 | NOTICE of Appearance by Andrew Warden on behalf of All Defendants (Warden, Andrew) (Entered: 02/04/2025) |
| 02/04/2025 | 24 | NOTICE of Appearance by Kristina A. Wolfe on behalf of All Defendants (Wolfe, Kristina) (Entered: 02/04/2025) |
| 02/04/2025 | 25 | −FILED IN ERROR− AMENDED COMPLAINT against Kristi Noem, U.S. Department of Homeland Security, New York Yearly Meeting of the Religious Society of Friends, Inc., Sikh Temple Sacramento, Cooperative Baptist Fellowship, filed by New England Yearly Meeting of the Religious Society of Friends, Adelphi Friends Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, Richmond Friends Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc., New York Yearly Meeting of the Religious Society of Friends, Inc., Sikh Temple Sacramento, Cooperative Baptist Fellowship. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 |

| | | Exhibit 34, # <u>35</u> Exhibit 35, # <u>36</u> Exhibit 36, # <u>37</u> Exhibit 37, # <u>38</u> Exhibit 38, # <u>39</u> Exhibit 39, # <u>40</u> Exhibit 40, # <u>41</u> Exhibit 41, # <u>42</u> Exhibit 42, # <u>43</u> Exhibit 43, # <u>44</u> Exhibit 44, # <u>45</u> Exhibit 45, # <u>46</u> Exhibit 46, # <u>47</u> Exhibit 47, # <u>48</u> Exhibit 48, # <u>49</u> Exhibit 49, # <u>50</u> Exhibit 50, # <u>51</u> Exhibit 51, # <u>52</u> Exhibit 52, # <u>53</u> Exhibit 53)(Swift, Alethea) Modified on 2/5/2025 (ols). (Entered: 02/04/2025) |
|---|---|---|
| 02/04/2025 | <u>26</u> | MOTION for Temporary Restraining Order *and Preliminary Injunction* by New York Yearly Meeting of the Religious Society of Friends, Inc., Sikh Temple Sacramento, Cooperative Baptist Fellowship, Richmond Friends Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, New England Yearly Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc., Adelphi Friends Meeting of the Religious Society of Friends (Attachments: # <u>1</u> Memorandum in Support, # <u>2</u> Text of Proposed Order)(Swift, Alethea) (Entered: 02/04/2025) |
| 02/05/2025 | 27 | QC NOTICE: <u>25</u> Amended Complaint,,,,,, filed by New England Yearly Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, Sikh Temple Sacramento, Richmond Friends Meeting of the Religious Society of Friends, Adelphi Friends Meeting of the Religious Society of Friends, New York Yearly Meeting of the Religious Society of Friends, Inc., Cooperative Baptist Fellowship, Baltimore Yearly Meeting of the Religious Society of Friends, Inc. needs to be corrected. It has been noted as FILED IN ERROR, and the document link has been disabled. The following corrective actions are needed regarding missing or incomplete information: <br>**Redline copy has not been filed. Please re−file the clean version of the amended complaint as the main document and the redline version as an attachment to the amended complaint.* (ols, Deputy Clerk) (Entered: 02/05/2025) |
| 02/05/2025 | <u>28</u> | AMENDED COMPLAINT against Kristi Noem, U.S. Department of Homeland Security, filed by Cooperative Baptist Fellowship, New England Yearly Meeting of the Religious Society of Friends, Adelphi Friends Meeting of the Religious Society of Friends, Sikh Temple Sacramento, Philadelphia Yearly Meeting of the Religious Society of Friends, Richmond Friends Meeting of the Religious Society of Friends, New York Yearly Meeting of the Religious Society of Friends, Inc., Baltimore Yearly Meeting of the Religious Society of Friends, Inc.. (Attachments: # <u>1</u> Comparison Copy, # <u>2</u> Exhibit, # <u>3</u> Exhibit, # <u>4</u> Exhibit, # <u>5</u> Exhibit, # <u>6</u> Exhibit, # <u>7</u> Exhibit, # <u>8</u> Exhibit, # <u>9</u> Exhibit, # <u>10</u> Exhibit, # <u>11</u> Exhibit, # <u>12</u> Exhibit, # <u>13</u> Exhibit, # <u>14</u> Exhibit, # <u>15</u> Exhibit, # <u>16</u> Exhibit, # <u>17</u> Exhibit, # <u>18</u> Exhibit, # <u>19</u> Exhibit, # <u>20</u> Exhibit, # <u>21</u> Exhibit, # <u>22</u> Exhibit, # <u>23</u> Exhibit, # <u>24</u> Exhibit, # <u>25</u> Exhibit, # <u>26</u> Exhibit, # <u>27</u> Exhibit, # <u>28</u> Exhibit, # <u>29</u> Exhibit, # <u>30</u> Exhibit, # <u>31</u> Exhibit, # <u>32</u> Exhibit, # <u>33</u> Exhibit, # <u>34</u> Exhibit, # <u>35</u> Exhibit, # <u>36</u> Exhibit, # <u>37</u> Exhibit, # <u>38</u> Exhibit, # <u>39</u> Exhibit, # <u>40</u> Exhibit, # <u>41</u> Exhibit, # <u>42</u> Exhibit, # <u>43</u> Exhibit, # <u>44</u> Exhibit, # <u>45</u> Exhibit, # <u>46</u> Exhibit, # <u>47</u> Exhibit, # <u>48</u> Exhibit, # <u>49</u> Exhibit, # <u>50</u> Exhibit, # <u>51</u> Exhibit, # <u>52</u> Exhibit, # <u>53</u> Exhibit, # <u>54</u> Exhibit, # <u>55</u> Exhibit)(Swift, Alethea) (Entered: 02/05/2025) |
| 02/06/2025 | <u>29</u> | ORDER directing that the parties shall submit a courtesy copy of <u>7</u> the Joint Record for the Motion by 2/11/2025 at 12:00 noon. Signed by Judge Theodore D. Chuang on 2/6/2025. (ols, Deputy Clerk) (Entered: 02/07/2025) |
| 02/07/2025 | <u>30</u> | Local Rule 103.3 Disclosure Statement by New York Yearly Meeting of the Religious Society of Friends, Inc., Sikh Temple Sacramento, Cooperative Baptist Fellowship, Richmond Friends Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, New England Yearly Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc., Adelphi Friends Meeting of the Religious Society of Friends identifying Corporate Parent Adelphi Friends Meeting of the Religious Society of Friends for Adelphi Friends Meeting of the Religious Society of Friends.(Swift, Alethea) (Entered: 02/07/2025) |
| 02/07/2025 | <u>31</u> | Local Rule 103.3 Disclosure Statement by Cooperative Baptist Fellowship identifying Corporate Parent Cooperative Baptist Fellowship for Cooperative Baptist Fellowship.(Swift, Alethea) (Entered: 02/07/2025) |
| 02/07/2025 | <u>32</u> | Local Rule 103.3 Disclosure Statement by Sikh Temple Sacramento identifying Corporate Parent Sikh Temple Sacramento for Sikh Temple Sacramento.(Swift, |

| | | |
|---|---|---|
| | | Alethea) (Entered: 02/07/2025) |
| 02/07/2025 | 33 | Local Rule 103.3 Disclosure Statement by New England Yearly Meeting of the Religious Society of Friends identifying Corporate Parent New England Yearly Meeting of the Religious Society of Friends for New England Yearly Meeting of the Religious Society of Friends.(Swift, Alethea) (Entered: 02/07/2025) |
| 02/07/2025 | 34 | RESPONSE in Opposition re 26 MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Kristi Noem, U.S. Department of Homeland Security. (Attachments: # 1 Exhibit #55, # 2 Text of Proposed Order)(Wolfe, Kristina) (Entered: 02/07/2025) |
| 02/09/2025 | 35 | NOTICE of Appearance by Daniel Alan Stein on behalf of Immigration Reform Law Institute (Stein, Daniel) (Entered: 02/09/2025) |
| 02/09/2025 | 36 | Consent MOTION for Leave to File *Amicus Brief* by Immigration Reform Law Institute (Attachments: # 1 Amicus Brief, # 2 Proposed Order)(Stein, Daniel) (Entered: 02/09/2025) |
| 02/09/2025 | 37 | MOTION to Appear Pro Hac Vice for Christopher J. Hajec (Filing fee $100, receipt number AMDDC–11773023.) by Immigration Reform Law Institute(Stein, Daniel) (Entered: 02/09/2025) |
| 02/09/2025 | 38 | MOTION to Appear Pro Hac Vice for Gabriel R. Canaan (Filing fee $100, receipt number AMDDC–11773024.) by Immigration Reform Law Institute(Stein, Daniel) (Entered: 02/09/2025) |
| 02/10/2025 | 39 | PAPERLESS ORDER granting 37 Motion to Appear Pro Hac Vice on behalf of Christopher J. Hajec. Directing attorney Christopher J. Hajec to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/10/2025. (mh4s, Deputy Clerk) (Entered: 02/10/2025) |
| 02/10/2025 | 40 | PAPERLESS ORDER granting 38 Motion to Appear Pro Hac Vice on behalf of Gabriel R. Canaan. Directing attorney Gabriel R. Canaan to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/10/2025. (mh4s, Deputy Clerk) (Entered: 02/10/2025) |
| 02/10/2025 | 41 | SUMMONS Returned Executed by Cooperative Baptist Fellowship, New England Yearly Meeting of the Religious Society of Friends, Sikh Temple Sacramento, Adelphi Friends Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, Richmond Friends Meeting of the Religious Society of Friends, New York Yearly Meeting of the Religious Society of Friends, Inc., Baltimore Yearly Meeting of the Religious Society of Friends, Inc.. Kristi Noem served on 2/4/2025, answer due 4/7/2025; U.S. Department of Homeland Security served on 2/4/2025, answer due 4/7/2025.(Swift, Alethea) (Entered: 02/10/2025) |
| 02/10/2025 | 42 | SUMMONS Returned Executed by Cooperative Baptist Fellowship, New England Yearly Meeting of the Religious Society of Friends, Sikh Temple Sacramento, Adelphi Friends Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, Richmond Friends Meeting of the Religious Society of Friends, New York Yearly Meeting of the Religious Society of Friends, Inc., Baltimore Yearly Meeting of the Religious Society of Friends, Inc.. (Swift, Alethea) (Entered: 02/10/2025) |
| 02/10/2025 | 43 | SUMMONS Returned Executed by Cooperative Baptist Fellowship, New England Yearly Meeting of the Religious Society of Friends, Sikh Temple Sacramento, Adelphi Friends Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, Richmond Friends Meeting of the Religious Society of Friends, New York Yearly Meeting of the Religious Society of Friends, Inc., Baltimore Yearly Meeting of the Religious Society of Friends, Inc.. (Swift, Alethea) (Entered: 02/10/2025) |
| 02/10/2025 | 44 | SUMMONS Returned Executed by Cooperative Baptist Fellowship, New England Yearly Meeting of the Religious Society of Friends, Sikh Temple Sacramento, Adelphi |

| | | Friends Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, Richmond Friends Meeting of the Religious Society of Friends, New York Yearly Meeting of the Religious Society of Friends, Inc., Baltimore Yearly Meeting of the Religious Society of Friends, Inc.. (Swift, Alethea) (Entered: 02/10/2025) |
|---|---|---|
| 02/10/2025 | 45 | REPLY to Response to Motion re 26 MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Adelphi Friends Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc., Cooperative Baptist Fellowship, New England Yearly Meeting of the Religious Society of Friends, New York Yearly Meeting of the Religious Society of Friends, Inc., Philadelphia Yearly Meeting of the Religious Society of Friends, Richmond Friends Meeting of the Religious Society of Friends, Sikh Temple Sacramento. (Attachments: # 1 Exhibit 56, # 2 Exhibit 57, # 3 Exhibit 58, # 4 Exhibit 59)(Swift, Alethea) (Entered: 02/10/2025) |
| 02/11/2025 | 46 | ORDER granting 36 Immigration Reform Law Institute's Unopposed Motion for Leave to File as amicus curiae. Signed by Judge Theodore D. Chuang on 2/11/2025. (ols, Deputy Clerk) (Entered: 02/11/2025) |
| 02/11/2025 | 47 | AMICUS BRIEF re 26 MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Immigration Reform Law Institute. (ols, Deputy Clerk) (Entered: 02/11/2025) |
| 02/11/2025 | 48 | PAPERLESS NOTICE that a HEARING on 26 Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction Hearing is rescheduled from February 12, 2025 at 9:00 a.m. to February 13, 2025 at 10:30 a.m. before Judge Theodore D. Chuang at the United States Courthouse located at 6500 Cherrywood Lane in Greenbelt, Maryland. The specific courtroom for the motions hearing will be available the week of the proceeding on the Court's website. (ds2s, Deputy Clerk) (Entered: 02/11/2025) |
| 02/11/2025 | 49 | NOTICE by Adelphi Friends Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc., Cooperative Baptist Fellowship, New England Yearly Meeting of the Religious Society of Friends, New York Yearly Meeting of the Religious Society of Friends, Inc., Philadelphia Yearly Meeting of the Religious Society of Friends, Richmond Friends Meeting of the Religious Society of Friends, Sikh Temple Sacramento re 7 Order *of Case Management* (Attachments: # 1 Appendix Joint Record Exhibit Table, # 2 Appendix Joint Record Volume I – Ex 1−33 – JA 1−346, # 3 Appendix Joint Record Volume II – Ex 34−59 – JA 344−693)(Swift, Alethea) (Entered: 02/11/2025) |
| 02/13/2025 | 50 | Motion Hearing held on 2/13/2025 before Judge Theodore D. Chuang re 26 MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by New England Yearly Meeting of the Religious Society of Friends, Philadelphia Yearly Meeting of the Religious Society of Friends, Sikh Temple Sacramento, Richmond Friends Meeting of the Religious Society of Friends, Adelphi Friends Meeting of the Religious Society of Friends, New York Yearly Meeting of the Religious Society of Friends, Inc., Cooperative Baptist Fellowship, Baltimore Yearly Meeting of the Religious Society of Friends, Inc. (Court Reporter: Paula Leeper\2B) (ds2s, Deputy Clerk) (Entered: 02/13/2025) |
| 02/14/2025 | 51 | Local Rule 103.3 Disclosure Statement by Baltimore Yearly Meeting of the Religious Society of Friends, Inc. (Swift, Alethea) (Entered: 02/14/2025) |
| 02/14/2025 | 52 | Local Rule 103.3 Disclosure Statement by New York Yearly Meeting of the Religious Society of Friends, Inc. (Swift, Alethea) (Entered: 02/14/2025) |
| 02/14/2025 | 53 | Local Rule 103.3 Disclosure Statement by Philadelphia Yearly Meeting of the Religious Society of Friends (Swift, Alethea) (Entered: 02/14/2025) |
| 02/15/2025 | 54 | NOTICE of Appearance by Bradley Girard on behalf of All Plaintiffs (Girard, Bradley) (Entered: 02/15/2025) |
| 02/15/2025 | 55 | Supplement to *Notice of Supplemental Authority* (Attachments: # 1 Attachment Dep't of Com. v. New York)(Girard, Bradley) (Entered: 02/15/2025) |

| 02/18/2025 | 56 | RESPONSE re 55 Supplement *to Notice of Supplemental Authority* filed by Kristi Noem, U.S. Department of Homeland Security.(Wolfe, Kristina) (Entered: 02/18/2025) |
|---|---|---|
| 02/18/2025 | 57 | Local Rule 103.3 Disclosure Statement by Richmond Friends Meeting of the Religious Society of Friends (Swift, Alethea) (Entered: 02/18/2025) |
| 02/22/2025 | 58 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings – TRO Hearing – held on 02/13/2025, before Judge Theodore D. Chuang. Court Reporter Paula J. Leeper, Telephone number (301)344–3229. Total number of pages filed: 114. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 3/17/2025. Redacted Transcript Deadline set for 3/25/2025. Release of Transcript Restriction set for 5/23/2025.(pl, Court Reporter) (Entered: 02/22/2025) |
| 02/24/2025 | 59 | ORDER re: Supplemental Filing. Signed by Judge Theodore D. Chuang on 2/24/2025. (ols, Deputy Clerk) (Entered: 02/24/2025) |
| 02/24/2025 | 60 | MEMORANDUM OPINION. Signed by Judge Theodore D. Chuang on 2/24/2025. (ols, Deputy Clerk) (Entered: 02/24/2025) |
| 02/24/2025 | 61 | ORDER granting in part and denying in part 26 Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction. Signed by Judge Theodore D. Chuang on 2/24/2025. (ols, Deputy Clerk) (Entered: 02/24/2025) |
| 02/24/2025 | 62 | PRELIMINARY INJUNCTION. Signed by Judge Theodore D. Chuang on 2/24/2025. (Attachments: # 1 Exhibit A) (ols, Deputy Clerk) (Entered: 02/24/2025) |
| 02/27/2025 | | Check Received on 2/27/2025 from Democracy Forward Foundation. Check Number: 2291. Amount: $100.00. (ols, Deputy Clerk) (Entered: 02/27/2025) |
| 02/27/2025 | 63 | Joint MOTION for Extension of Time *to provide Defendants a list of Plaintiffs' houses of worship* by Adelphi Friends Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc., Cooperative Baptist Fellowship, New England Yearly Meeting of the Religious Society of Friends, New York Yearly Meeting of the Religious Society of Friends, Inc., Philadelphia Yearly Meeting of the Religious Society of Friends, Richmond Friends Meeting of the Religious Society of Friends, Sikh Temple Sacramento (Attachments: # 1 Text of Proposed Order proposed order granting extension)(Girard, Bradley) (Entered: 02/27/2025) |
| 02/27/2025 | 64 | ORDER granting 63 the Parties' Joint Motion for Extension of Time. Signed by Judge Theodore D. Chuang on 2/27/2025. (ols, Deputy Clerk) (Entered: 02/28/2025) |
| 02/28/2025 | 65 | Joint MOTION for Extension of Time *to provide Defendants a list of Plaintiffs' houses of worship or move for a protective order* by Adelphi Friends Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc., Cooperative Baptist Fellowship, New England Yearly Meeting of the Religious Society of Friends, New York Yearly Meeting of the Religious Society of Friends, Inc., Philadelphia Yearly Meeting of the Religious Society of Friends, Richmond Friends Meeting of the Religious Society of Friends, Sikh Temple Sacramento (Attachments: # 1 Text of Proposed Order)(Girard, Bradley) (Entered: 02/28/2025) |
| 03/03/2025 | 66 | ORDER granting 65 the parties' Joint Motion for Extension of Time. Signed by Judge Theodore D. Chuang on 3/3/2025. (ols, Deputy Clerk) (Entered: 03/03/2025) |
| 03/04/2025 | 67 | NOTICE by Adelphi Friends Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Inc., Cooperative Baptist Fellowship, New England Yearly Meeting of the Religious Society of Friends, New York Yearly Meeting of the Religious Society of Friends, Inc., Philadelphia Yearly Meeting of the Religious Society of Friends, Richmond Friends Meeting of the Religious Society of Friends, Sikh Temple Sacramento *of Intent to File Motion for Protective Order* (Attachments: # 1 Proposed Protective Order)(Swift, Alethea) (Entered: 03/04/2025) |
| 03/05/2025 | 68 | PAPERLESS NOTICE. A CASE MANAGEMENT CONFERENCE is scheduled for March 5, 2025 at 2:30 p.m. to discuss 67 NOTICE OF INTENT TO FILE A MOTION |

| | | |
|---|---|---|
| | | FOR PROTECTIVE ORDER. The call will be recorded, so please do not use speakerphones as they compromise sound quality. Also, we ask that parties not remain on the conference line after the Judge has left the call, to ensure that the line is free for other calls that may be on the Judge's calendar. The parties should also be prepared to address whether they consent to have all further proceedings before a Magistrate Judge and whether they wish to participate in a mediation session with a Magistrate Judge, whether before, during, or after discovery. Parties are expected to consult with their clients and confer with each other on these issues in advance of the Case Management Conference and, if possible, present joint views to the Court. (ds2s, Deputy Clerk) (Entered: 03/05/2025) |
| 03/05/2025 | 69 | Case Management Conference held on 3/5/2025 before Judge Theodore D. Chuang. (Court Reporter: FTR Recording\2B) (ds2s, Deputy Clerk) (Entered: 03/05/2025) |
| 03/06/2025 | 70 | Correspondence from Defendants re: Revised Proposed Protective Order (Attachments: # 1 Proposed Protective Order, # 2 Comparison Copy) (ols, Deputy Clerk) (Entered: 03/06/2025) |
| 03/06/2025 | 71 | PROTECTIVE ORDER. Signed by Judge Theodore D. Chuang on 3/6/2025. (ols, Deputy Clerk) (Entered: 03/06/2025) |
| 04/04/2025 | 72 | NOTICE of Appearance by Karima A. Ortolano on behalf of All Defendants (Ortolano, Karima) (Entered: 04/04/2025) |
| 04/04/2025 | 73 | NOTICE by Kristi Noem, U.S. Department of Homeland Security *of Intent to File Partial Motion to Dismiss* (Ortolano, Karima) (Entered: 04/04/2025) |
| 04/07/2025 | 74 | PAPERLESS NOTICE. A CASE MANAGEMENT CONFERENCE is scheduled for April 9, 2025 at 3:00 p.m. to discuss 73 NOTICE OF INTENT TO FILE A PARTIAL MOTION TO DISMISS. The call will be recorded, so please do not use speakerphones as they compromise sound quality. Also, we ask that parties not remain on the conference line after the Judge has left the call, to ensure that the line is free for other calls that may be on the Judge's calendar. The parties should also be prepared to address whether they consent to have all further proceedings before a Magistrate Judge and whether they wish to participate in a mediation session with a Magistrate Judge, whether before, during, or after discovery. Parties are expected to consult with their clients and confer with each other on these issues in advance of the Case Management Conference and, if possible, present joint views to the Court. (ds2s, Deputy Clerk) (Entered: 04/07/2025) |
| 04/09/2025 | 75 | Case Management Conference held on 4/9/2025 before Judge Theodore D. Chuang. For a TRANSCRIPT conatact nadine_bachmann@mdd.uscourts.gov (Court Reporter: FTR Recording\2B) (ds2s, Deputy Clerk) Modified on 4/10/2025 (nb). (Entered: 04/09/2025) |
| 04/10/2025 | 76 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 04–09–2025, before Judge Chuang. Court Reporter Nadine Bachmann, Telephone number 410–962–4753 nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 5/1/2025. Redacted Transcript Deadline set for 5/12/2025. Release of Transcript Restriction set for 7/9/2025.(nb, Court Reporter) (Entered: 04/10/2025) |
| 04/10/2025 | 77 | ORDER granting Defendants leave to file the Partial Motion to Dismiss proposed in ECF No. 73 , which will be deemed timely if filed by 4/17/2025. Signed by Judge Theodore D. Chuang on 4/9/2025. (ols, Deputy Clerk) (Entered: 04/11/2025) |
| 04/17/2025 | 78 | MOTION to Dismiss by Kristi Noem, U.S. Department of Homeland Security (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Wolfe, Kristina) (Entered: 04/17/2025) |
| 04/24/2025 | 79 | Interlocutory NOTICE OF APPEAL as to 60 Memorandum Opinion, 62 Preliminary Injunction, 61 Order on Motion for TRO by Kristi Noem, U.S. Department of Homeland Security. (Wolfe, Kristina) (Entered: 04/24/2025) |
| 05/01/2025 | 80 | RESPONSE in Opposition re 78 MOTION to Dismiss filed by Adelphi Friends Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the |

| | | Religious Society of Friends, Inc., Cooperative Baptist Fellowship, New England Yearly Meeting of the Religious Society of Friends, New York Yearly Meeting of the Religious Society of Friends, Inc., Philadelphia Yearly Meeting of the Religious Society of Friends, Richmond Friends Meeting of the Religious Society of Friends, Sikh Temple Sacramento. (Attachments: # 1 Text of Proposed Order)(Goetz, Sarah) (Entered: 05/01/2025) |
|---|---|---|
| 05/05/2025 | 81 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 79 Interlocutory Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) (Entered: 05/05/2025) |
| 05/06/2025 | 82 | USCA Case Number 25–1512 for 79 Notice of Appeal filed by U.S. Department of Homeland Security and Kristi Noem – Case Manager – Anisha Walker. (slss, Deputy Clerk) (Entered: 05/07/2025) |
| 05/15/2025 | 83 | REPLY to Response to Motion re 78 MOTION to Dismiss filed by Kristi Noem, U.S. Department of Homeland Security.(Wolfe, Kristina) (Entered: 05/15/2025) |
| 06/06/2025 | 84 | MOTION to Withdraw as Attorney by Kristi Noem, U.S. Department of Homeland Security (Attachments: # 1 Attachment Proposed Order)(Ortolano, Karima) (Entered: 06/06/2025) |
| 06/09/2025 | 85 | ORDER granting 84 Motion to Withdraw as Attorney. Attorney Karima A. Ortolano terminated. Signed by Judge Theodore D. Chuang on 6/9/2025. (heps, Deputy Clerk) (Entered: 06/09/2025) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*,

and

**New York Yearly Meeting of the Religious Society of Friends, Inc.,**
15 Rutherford Place, New York, NY 10003

**Cooperative Baptist Fellowship**,
160 Clairemont Ave. Suite 300
Decatur, GA 30030

and

**Sikh Temple Sacramento**,
2301 Evergreen Ave
West Sacramento, CA 95691

Plaintiffs,

**v.**

**U.S. Department of Homeland Security**, *et al.*,

Defendants.

Civil Case No. 8:25-cv-243-TDC

Jury Trial Demanded

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Philadelphia Yearly Meeting of the Religious Society of Friends, New England

Yearly Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious

Society of Friends, New York Yearly Meeting of the Religious Society of Friends, Adelphi Friends

Meeting of the Religious Society of Friends, Richmond Friends Meeting of the Religious Society

JA15

of Friends, Cooperative Baptist Fellowship, and Sikh Temple Sacramento, on their own behalf and on behalf of their members, allege as follows:

## INTRODUCTION

1.    Whether it's to sit in expectant waiting, to deliver or receive a weekly sermon, to join a langer, or to participate in religious observances requiring a minyan, communal worship is fundamental to the religious exercise of many.

2.    For over 30 years, it has been the government's official policy to not enforce immigration laws in "protected areas," which include houses of worship (and other religious ceremonies like weddings and funerals), absent exigent circumstances or internal supervisory approval. That is because enforcement in protected areas like houses of worship would, in the government's own words, "restrain people's access to essential services or engagement in essential activities."

3.    Despite this longstanding policy, the Department of Homeland Security has now reversed course—authorizing agents to conduct immigration-enforcement operations at protected areas, including houses of worship. The 2025 Policy neither limits such operations to situations involving exigent circumstances nor requires agents seeking to conduct such operations to seek supervisory approval. Instead, the 2025 Policy gives agents unfettered authority to carry out enforcement in formerly protected areas, bound only by individual agents' own subjective "common sense."

4.    Allowing armed government agents wearing ICE-emblazoned jackets to park outside a religious service and monitor who enters or to interrupt the service and drag a congregant out during the middle of worship is anathema to Plaintiffs' religious exercise. The very threat of that enforcement deters congregants from attending services, especially members of immigrant communities. Losing congregants is a substantial burden on Plaintiffs' religious exercise,

2

especially when those congregants would bring to worship different backgrounds and life experiences. And deterring worshippers from attending services chills Plaintiffs' First Amendment rights of association.

5.    Because "attending religious services" is "at the very heart" of the "guarantee of religious liberty," *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19-20 (2020), if the government is going to impede that guarantee, it must meet the strictest of justifications. With respect to the 2025 Policy, it cannot. After all, DHS has already acknowledged that it can accomplish its enforcement mission without limiting individuals' access to protected areas, including places of worship.

6.    In all events, if an agency is going to upend a longstanding policy, it must follow specific procedures, which include explaining the reason for its about-face and considering alternatives. DHS's new policy does not acknowledge that houses of worship are sacred spaces. It does not acknowledge that for many, religious exercise is an essential activity (as the previous policy did). And it does not even consider what unconstrained immigration enforcement at houses of worship would mean as a result. Instead, it treats houses of worship as nothing more than places where "criminal aliens—including murderers and rapists" go to "hide." Ex. 30, Press Release, Department of Homeland Security, *Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole* (Jan. 21, 2025), https://tinyurl.com/28yjjvpy ["2025 Policy Press Release"], PYM-000329.

7.    As such, and as further explained below, this Court should declare unconstitutional any policy permitting government agents to carry out immigration-enforcement activities at or near houses of worship when the policy is limited only by individual agents' subjective "common

sense," vacate the 2025 Policy, and enjoin DHS and its constituent agencies from implementing or enforcing the policy.

## JURISDICTION AND VENUE

8.   This Court has federal-question jurisdiction under 28 U.S.C. § 1331. Plaintiffs allege violations of the First Amendment of the United States Constitution, U.S. Const. amend. I; the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb(a)- 2000bb-4; and the Administrative Procedure Act, 5. U.S.C. § 701, *et seq.*

9.   Venue is proper under 28 U.S.C. § 1391(e)(1) because at least one of the plaintiffs resides in this district and no real property is involved in the action.

10.  This Court has the authority to grant the relief requested by Plaintiffs under Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the Administrative Procedure Act, 5. U.S.C. § 701, *et seq.*; and under the Court's inherent equitable authority.

## PARTIES

11.  Plaintiff Philadelphia Yearly Meeting of the Religious Society of Friends is the formal and legal association of more than 100 local Quaker congregations throughout parts of Pennsylvania, Maryland, Delaware, and New Jersey. It was established in 1682, when William Penn arrived in Pennsylvania. It is located in Philadelphia, Pennsylvania.

12.  Plaintiff New England Yearly Meeting of the Religious Society of Friends is the formal and legal association of local Quaker congregations in the six New England states: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont. It is the oldest Yearly

4

Meeting in the world and has met continuously since 1661. It is located in Worcester, Massachusetts.

13.  Plaintiff Baltimore Yearly Meeting of the Religious Society of Friends is the formal and legal association of more than 40 local Quaker congregations throughout parts of Pennsylvania, Maryland, Virginia, West Virginia, and Washington, D.C. It was established in 1672 and, with the exception of one year due to the 1918 influenza pandemic, has met annually since. It is located in Sandy Spring, Maryland.

14.  Plaintiff New York Yearly Meeting of the Religious Society of Friends is a not-for-profit religious corporation that is the governing and advisory umbrella organization for 65 Quaker congregations across New York, New Jersey, and Connecticut. It has existed since 1695. It is located in New York, New York.

15.  Plaintiff Adelphi Friends Meeting of the Religious Society of Friends is a religious corporation located in Adelphi, Maryland. It is part of the Baltimore Yearly Meeting of the Religious Society of Friends.

16.  Plaintiff Richmond Friends Meeting of the Religious Society of Friends is a religious corporation located in Richmond, Virginia. It is part of the Baltimore Yearly Meeting of the Religious Society of Friends.

17.  Plaintiff Cooperative Baptist Fellowship, which is incorporated in Georgia, is a religious network that includes Baptist churches, individuals, and partners. It includes more than 1,400 individual congregations among numerous other field personnel, chaplains and pastoral counselors, and partner organizations.

18.  Plaintiff Sikh Temple Sacramento is a *gurdwara*: a Sikh place of worship, learning, and community. It is a religious corporation located in West Sacramento, California.

19.  Defendant Department of Homeland Security is the federal agency responsible for enforcing United States immigration laws and policies. DHS is an agency within the meaning of 5 U.S.C. § 551(1).

20.  DHS contains component agencies, including U.S. Citizenship and Immigration Services, U.S. Immigration and Customs Enforcement, and U.S. Customs and Border Patrol.

21.  Defendant Kristi Noem is sued in her official capacity as the Secretary of the Department of Homeland Security.

## FACTUAL ALLEGATIONS

### DHS abandons protected areas for "common sense."

22.  For more than 30 years, it has been the government's policy to not conduct immigration-enforcement operations in "protected areas," also referred to as "sensitive locations." *See* Ex. 20, Memorandum from Alejandro N. Mayorkas, Secretary, Department of Homeland Security, to Tae D. Johnson, *et al.*, Guidelines for Enforcement Actions in or Near Protected Areas (Oct. 27, 2021), https://tinyurl.com/mrykx3j4 ["Mayorkas Memo"].

23.  In 1993, Acting Associate Commissioner of the Immigration and Naturalization Service James Puleo directed that enforcement operations at places of worship, funerals, or other religious ceremonies "require advance written approval by the District Director of Chief Patrol Agent." Ex. 11, Memorandum from James A. Puleo, Immigration and Naturalization Service Acting Associate Commissioner, "Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies" HQ 807-P (May 17, 1993), at PYM-000067. The memo outlined the

standards by which a district director or chief patrol agent should decide whether a proposed enforcement action was appropriate, including "[t]he availability of alternative measures," "[t]he importance of the enforcement objective," and how agents could "minimize the impact on operation of the … place of worship." *Id.* at PYM-000068. The memo explained that exceptions to the policy must be approved beforehand in writing unless certain exigent circumstances arose that require an officer to proceed—for those, "the matter must be reported immediately" up the chain of command. *Id.*

24.  In a 1993 memo, for example, the Chief Patrol Agent in Laredo, Texas, directed field agents that "[p]laces of worship will not be entered for the purpose of apprehending illegal aliens even if in hot pursuit unless an Assistant Chief or above has authorized it." Ex. 9, Memorandum from Jose E. Garza, Chief Patrol Agent for Laredo, Texas, "Sector Policy Regarding Entry Into Places of Worship, Schools and Private Residence" LRT 40/4-P (Jan. 21, 1993).

25.  In 2008, Assistant Secretary of U.S. Immigration and Customs Enforcement Julie Myers reiterated the importance of avoiding enforcement "at or near sensitive community locations such as schools, places of worship, and funerals or other religious ceremonies, except in limited circumstances." Ex. 15, Memorandum from Julie L. Myers, Assistant Secretary, U.S. Immigration and Customs Enforcement, "Field Guidance on Enforcement Actions or Investigative Activities At or Near Sensitive Community Locations" 10029.1 (July 3, 2008), at PYM-00080. According to Assistant Secretary Myers, "[p]recedent for this approach is clear." *Id.* And while the 2008 memo indicated that "ICE policies and procedures" did not otherwise prohibit enforcement at protected areas, the 1993 memo "remains in effect." *Id.* at PYM-000081. Once again, the memo outlined the kinds of extreme situations that would require ICE personnel to act at or near sensitive

locations, including "terrorism-related investigations, matters of public safety, or actions where no enforcement activity is involved." *Id.*

26.  In 2011, ICE Director John Morton issued a memo superseding the 1993 and 2008 memos. Ex. 16, Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement, "Enforcement Actions at or Focused on Sensitive Locations" 10029.2 (Oct. 24, 2011), PYM-000082-84. The 2011 policy was designed to ensure that enforcement actions neither occurred at nor were focused on sensitive locations such as schools and churches absent either exigent circumstances (such as terrorism, imminent risk of death, pursuit of a dangerous felon, or an imminent risk of destruction of evidence material to a criminal case) or prior written approval. *Id.* at PYM-000082. Under the 2011 memo, even enforcement actions not initiated at or focused on sensitive locations required ICE agents at or near such locations to "conduct themselves in a discrete manner, maintain surveillance if no threat to officer safety exists, and immediately consult their supervisor prior to taking other enforcement action(s)." *Id.* at PYM-000084.

27.  In 2021, Department of Homeland Security Secretary Alejandro Mayorkas rescinded and superseded the prior memos while reaffirming the government's longstanding policy. Ex. 20, Mayorkas Memo, at PYM-000188-89. Secretary Mayorkas's memo described a "fundamental" and "bedrock" principle: DHS can accomplish its mission "without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more." *Id.* at PYM-000189. The memo explicitly recognized that enforcement actions even near sensitive locations could "restrain people from accessing the protected area to receive essential services or engage in essential activities." *Id.* at PYM-000190. DHS agents thus have an "obligation to refrain, to the

8

fullest extent possible, from conducting a law enforcement action in or near a protected area." *Id*. Enforcement actions "include, but are not limited to, such actions as arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance." *Id.* at PYM-000191.

28.    The 2021 memo, like those before it, recognized that certain exigent circumstances might require immigration enforcement at protected areas. But outside of those exigent circumstances, "an Agent or Officer must seek prior approval" before conducting an enforcement operation at or near a sensitive location. *Id.* The memo contained a boilerplate paragraph at the end averring that the memo "does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at PYM-000192.

29.    Despite the boilerplate language, ICE's website on protected areas explained that "[a]bsent exigent circumstances, DHS officers and agents *must* seek prior approval" before taking enforcement actions at protected areas. Ex. 22, Immigration and Customs Enforcement, Protected Areas Enforcement Actions, https://tinyurl.com/h4u5hfrv (last accessed Jan. 27, 2025) (emphasis added), at PYM-000249. And it explains that individuals who believe DHS officers violated the protected-areas policy should file complaints with ICE, CBP, Office of the Inspector General, or DHS Office for Civil Rights and Civil Liberties. *Id.* at PYM-000250*.*

30.    What's more, Congress itself has required ICE to submit public reports on enforcement activities at protected areas, including "the total number of enforcement actions at sensitive locations, broken down by field office; type of sensitive location; whether prior approval was given; what type of exigent circumstances existed, if any; and the number of non-targeted

individuals who were also apprehended." Ex. 21, Department of Homeland Security, *Immigration Enforcement at Sensitive Locations, Fiscal Year 2020 Report to Congress*, at PYM-000196 (April 18, 2022) (quoting House Report 116-180, part of the Fiscal Year 2020 Department of Homeland Security Appropriations Act (P.L. 116-93)).

31. On January 21, 2025, Fox News reported the not-yet-public rescission of the protected-areas policy. Ex. 27, Adam Shaw & Bill Melugin, *Trump DHS Repeals Key Mayorkas Memo Limiting ICE Agents, Orders Parole Review*, Fox News (Jan. 21, 2025), https://tinyurl.com/an68p3ex. Fox's story quoted unnamed ICE agents who said that rescinding the memo would "free them up" to aggressively conduct immigration-enforcement operations. *Id.* at PYM-000315.

32. Later that day, DHS issued a statement officially announcing that it had rescinded the existing policy governing protected areas and had replaced it with one that removes all guardrails limiting agents' ability to carry out enforcement actions at or near houses of worship. The new policy contains no replacement constraints on agents' authority at these formerly protected areas, which DHS's statement described as places that "criminal aliens" use "to hide." Instead, DHS now merely put its trust in individual agents "to use common sense." Ex. 30, 2025 Policy Press Release.

33. Although it has not yet been posted publicly, on January 31, counsel for DHS supplied Plaintiffs' counsel with a copy of a January 20, 2025, memo from acting DHS secretary Benjamin Huffman. *See* Ex. 43, Memorandum from Benjamine C. Huffman, Acting Secretary, Department of Homeland Security, "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025).

34. The memo officially rescinds and supersedes the Mayorkas Memo. *Id*. In line with DHS's public statement, the memo does away with any designation of protected areas, does not require

any internal process for enforcement at or near protected areas, and has no mention at all of exigent circumstances justifying enforcement at or near protected areas. *Id.* Instead, the memo states that enforcement officers "frequently apply enforcement discretion to balance a variety of interests" and directs that they should keep using that discretion "along with a healthy dose of common sense."

35.  Although DHS undid more than 30 years of policy, it did not explain why the previous policy had failed. It did not address how people may have come to rely on the policy. And it did not outline any alternatives that it considered.

**Plaintiffs' religious beliefs and their connection to immigrant communities**

***The Religious Society of Friends***

36.  Quakers, or Friends, are members of the Religious Society of Friends, a religious movement dating to the seventeenth century. *See* Ex. 28, *The Quaker Story*, Quaker.org, https://tinyurl.com/25fu7z4k.

37.  Quakerism emerged from the Christian tradition. Today, many Friends consider themselves Christians, though many do not. *See* Ex. 1, Levi Decl. ¶ 10.

38.  While Quakers have no formal hierarchy, they are generally organized into Yearly Meetings, Quarterly Meetings, and Monthly Meetings. A "meeting" is an association, a gathering held at a certain interval (*i.e.*, yearly, quarterly, or monthly), and a way of describing Quakers within a certain region. *See* Ex. 2, Merrill Decl. ¶ 3.

39.  Monthly meetings are the basic organizational unit in the Quaker religion. They are local congregations that hold weekly worship services and, once a month, hold a meeting for worship with attention to business. *See id.* ¶ 6.

40. The Yearly Meeting is the highest organizational body in the Quaker religion. Yearly Meetings are regional associations of local Quaker meetings. As their name suggests, Yearly Meetings gather at least annually to worship and make decisions about issues affecting their constituent quarterly and monthly meetings. *Id.* ¶¶ 12-13.

41. The Quaker faith does not have any spiritual leader, creed, catechism, or canonical statement of belief. *See* Ex. 1, Levi Decl. ¶ 14.

42. Because tenets of the Quaker faith are neither determined by a religious authority nor codified into a universal creed, specific beliefs vary among different Quaker branches and from person to person.

43. Generally speaking, there are four core insights into what it means to be a Quaker: encounter, worship, discernment, and testimony. *Id.* ¶ 12.

44. Quakers believe that humans can and do experience God directly—known as "encounter." Encounter is sometimes referred to as seeking the inner light, inner voice, or the Christ within. *Id.* ¶ 16; Ex. 3, Steigerwald Decl. ¶ 11.

45. Quakers believe that everyone has their own connection to spirit, or access to the divine.

46. In the Quaker tradition, different life experiences, backgrounds, and cultures lead people to hear and experience God differently. Having a diversity and richness of human experience yields a fuller understanding of how God speaks to the Quakers, individually and as a community. *See, e.g.*, Ex. 1, Levi Decl. ¶ 17.

47. Quaker worship, which consists of sitting in silence and waiting to hear the voice of God, is designed to encourage that encounter.

12

48.  Opening meetings to anyone who desires to attend is an important aspect of Quaker worship, because every individual who attends presents an opportunity for God to speak to worshippers through them.

49.  Quakers believe that everyone who attends worship meetings is participating in worship, whether they speak or not.

50.  The communal aspect of worship is central to the exercise of the Quaker faith. Ex. 1, Levi Decl. ¶ 25.

51.  Quakers have also developed practices—known as "discernment"—to help understand their encounters with God. *Id.* ¶ 26.

52.  For Quakers, discernment is the process of interpreting God's will and making decisions. Such decisions may be personal or may be for the sake of the community. *Id.* ¶ 27.

53.  Quakers have a set of values, known as testimonies, that inform and guide how they live and worship. *Id.* ¶¶ 30-34.

54.  Some Quakers use the acronym SPICES to help explain some core beliefs of Quaker testimony: simplicity, peace, integrity, community, equality (both social and spiritual), and stewardship. *Id.* ¶ 34; Ex. 4, Kingsley Decl. ¶ 29.

55.  Pacifism is deeply ingrained in the Quaker faith. The Friends have a religious commitment to oppose violence in all forms. They do not take up arms, and the presence of arms inside their meeting houses would violate this founding principle of their faith. *See, e.g.*, Ex. 3, Steigerwald Decl. ¶¶ 42-43.

56. Given the Quaker values of welcoming strangers, worshipping with all-comers from diverse backgrounds, community, and service, many Quaker meetings, including Plaintiffs, have built deep and meaningful connections to immigrant communities.

57. Plaintiff Adelphi Friends Meeting, for example, is located in an area with a significant immigrant population. Ex. 3, Steigerwald Decl. ¶ 24. It has "had a large number of immigrants come to worship" and has been "enriched" by their presence. Ex. 1, Levi Decl. ¶¶ 64-65. To foster inclusivity for its immigrant members and others in the community, Adelphi Friends Meeting translates committee minutes into Spanish and includes Spanish-language materials about the faith in its foyer. Ex. 3, Steigerwald Decl. ¶ 24. It has, at times, hung a banner to welcome immigrants—reading "Do not mistreat strangers. Treat them as citizens. Love them as yourself." *Id.* ¶ 26. Adelphi Friends Meeting has likewise supported immigrant families settling into the community, including families from Afghanistan, Burundi, Kenya, and Nicaragua, many of whom were refugees. *Id.* ¶ 27. Some of those families joined the meeting for worship. *Id.*

58. Plaintiff Richmond Friends Meeting has likewise developed important ties to nearby immigrant communities. It hosts English classes at its meeting house that are taught by a local community group; it has provided financial and other assistance to immigrant women to help them develop livelihoods; and its members help settle new immigrants, including by driving them to immigration appointments. Ex. 4, Kingsley Decl. ¶¶ 22-26. These acts are exercises of the Richmond Friends Meeting's and its members' religious beliefs. *Id.* ¶ 26-27.

59. Plaintiff New England Yearly Meeting provides interpretative services at its large meetings because the Quaker faith has strong ties to Central and South America and, as a result, there are attendees (both citizens and noncitizens) for whom Spanish is their first language. Ex. 2,

Merrill Decl. ¶ 30. There is also a strong Quaker presence in Africa. New England Yearly Meeting has a monthly meeting that consists of members of the African diaspora. *Id.* ¶ 30.

60.  One of New England Yearly Meeting's constituent monthly meetings, the Putney Friends Meeting, has a decades-long history of supporting its local immigrant community as an exercise of Quaker religious beliefs and commitments. It fulfills those commitments by, among other things, welcoming immigrant families to the area and volunteering with and providing financial assistance to local organizations that support asylum seekers. Ex. 5, Marbury Decl. ¶¶ 21-26.

61.  Likewise, Quaker religious beliefs led Plaintiff Philadelphia Yearly Meeting to adopt strategic directions—"connecting" and "belonging"—aimed at building community with Quakers across the region and beyond, including among immigrant populations. Ex. 6, Duncan-Tessmer Decl. ¶¶ 23-25. One of its monthly meetings, for example, is located in an area with a large immigrant population and is deeply involved with local immigrant organizations in the community. *Id.* ¶ 32. Another of its monthly meetings hosts a fellow Quaker congregation started by a family of East African Friends in its meeting house. *Id.* ¶ 31.

62.  Plaintiff Baltimore Yearly Meeting's members are called by God to build relationships with fellow Quakers across geographical and theological lines, which its members carry out by gathering with a range of diverse Quaker communities, including some largely Spanish-speaking congregations. Some of Baltimore Yearly Meeting's constituent monthly meetings are located in areas with large populations of immigrants, and some of the monthly meetings have substantial numbers of active members who are immigrants, particularly African immigrants. Ex. 7, Gillooly Decl. ¶¶ 26-27. Its monthly meetings, including Adelphi Friends Meeting and Richmond Friends Meeting, have developed close connections to their immigrant communities, as described above.

15

63.  Plaintiff New York Yearly Meeting, too, has close ties to the immigrant communities near its monthly meetings. One of its meetings is made up almost entirely of refugees; another is closely engaged with the migrant community that lives nearby; and another is considering whether to add a Spanish-language weekly meeting to accommodate the large and growing Spanish-speaking population in the region. *See* Ex. 53, Mohlke Decl. ¶¶ 25-27. Yet another of its monthly meetings, located in downtown Brooklyn, welcomes immigrants and refugees into its meeting house with a large sign out front, holds monthly dinners for members of the community, and hosts at its meeting house an organization that provides services to immigrants. *See* Ex. 52, Black Decl. ¶¶ 25, 27-28.

***Cooperative Baptist Fellowship***

64.  CBF is a network of churches, individuals, and partners inviting each other into deeper community, equipping each other for ministry, and seeking the transformation of God's world. Ex. 49, Baxley Decl. ¶ 2.

65.  CBF is made up of more than 1,400 individual congregations, more than 40 field personnel (what some other religions refer to as missionaries) bearing witness to Jesus Christ around the world, nearly 1,200 endorsed chaplains and pastoral counselors, 15 state and regional organizations, dozens of theological schools and partner organizations, and much more. *Id.* ¶ 3.

66.  CBF's 1,400 congregations operate in 37 states, Puerto Rico and the District of Columbia in the United States. *Id.* ¶ 5.

67.  The relationship between CBF and its member congregations involves mutual participation and contribution. Congregations contribute to CBF financially, serve on its governance bodies, and participate in missions and advocacy. CBF supports congregations in

16

myriad ways, including through financial assistance and field personnel. CBF also seeks to help pastors and other congregational leaders thrive through offering leadership development, educational materials, spiritual formation support and opportunities for networking and renewal. *Id.* ¶ 4.

68.    As Baptists,[1] CBF and its members believe that God invites them and equips them to share and spread the hope of Christ. *Id.* ¶ 14.

69.    And as followers of Jesus, Baptists believe it is most essential to do what Jesus tells them to do. Most directly, Jesus said in Matthew 25: "I was a stranger and you welcomed me." Baptists understand that Jesus was himself a refugee. *Id.* ¶ 16.

70.    In the faces of immigrants and refugees who are fleeing political or religious persecution, or who are seeking sanctuary from tyrants, Baptists see nothing less than the face of Jesus. To welcome a stranger is to welcome Jesus. *Id.* ¶ 17.

71.    In his first mission sermon, Jesus announced that his calling was to "bring good news to the poor, release to the captives, recovery of sight to the blind and to let the oppressed go free." Baptists fulfill that mission of Jesus by, among other things, showing hospitality to immigrants and refugees. *Id.* ¶ 18.

72.    CBF and its members are therefore spiritually committed to ministry among immigrants and refugees. These ministries with immigrants and refugees are matters of deep faith in that they flow from the commands of Jesus and the teachings of Scripture. *Id.* ¶ 26.

---

[1] There are a variety of Baptist denominations in the United States and throughout the world. References to "Baptists" throughout this Amended Complaint are to congregations and individuals affiliated with CBF.

17

73.  For more than two decades CBF has had a team of field personnel serving in the United States doing ministry with people from other countries. Ex. 49, Baxley Decl. ¶ 27. Several field personnel work directly with immigrants including asylum seekers, refugees, visa holders and those without documentation. *Id.* ¶ 12. They do so without regard to legal immigration status. *Id.* ¶ 30. CBF members generally do not inquire about their congregants' immigration statuses, though some are aware that their congregations include undocumented immigrants. *See* Ex. 48, Hayes Decl. ¶ 21.

74.  CBF members have built relationships with CBF's field personnel to support their ministries and learn firsthand how immigration issues in border states impact the rest of the country. Ex. 49, Baxley Decl. ¶ 12. A significant number of CBF members are also engaged in direct ministry with immigrants and refugees. *Id.* ¶ 28; Ex. 50, Carter Decl. ¶ 36; Ex. 48, Hayes Decl., ¶¶ 16-18; Ex. 51, Garcia Decl. ¶ 12.

75.  CBF members offer a broad array of services and classes to minister to their local communities—including immigrants. Those ministries include, but are not limited to, food pantries, children's ministry, clothing closets, job-training programs, housing assistance, child-care assistance, medical and dental clinics, addition recovery programs, hypothermia-prevention shelters, and mental-health counseling. Most of these ministries take place in the same church building used for worship services. *Id.* ¶ 31.

76.  Some of CBF's members' ministries are specifically geared to immigrant communities. The most prominent are English as a Second Language classes. The majority of ESL classes are held in the same church buildings used for worship services. Ex. 49, Baxley Decl. ¶ 32; Ex. 48, Hayes Decl. ¶ 18.

77.  CBF's ministry provides immigrants with community, a sense of belonging, connection to other people, temporary housing, and other things necessary for anyone to grow and flourish in a new country. Creating the conditions for people to thrive—not just survive—is an expression of Baptist religious beliefs. *Id.* ¶ 34.

### Sikh Temple Sacramento

78.  Sikh Temple Sacramento is a *Gurdwara*. Gurdwaras are Sikh places of worship, learning, and community gathering. Ex. 47, Shergill Decl., ¶ 6.

79.  Gurdwaras are sacred and sovereign institutions where Sikhs gather for fellowship, worship, and *langar* (sharing in a communal meal). *Id.* ¶ 7. They are central to all major life events for Sikhs. *Id.* ¶ 8.

80.  Central to the concept of a gurdwara, including Sikh Temple Sacramento, is that all people must be welcomed without fear. Sikh Temple Sacramento flies the Sikh flag, or *Nishaan Sahib*, as a beacon of refuge and hope. The *Nishaan Sahib* signals that anyone from any religion, community, or background is welcome. *Id.* ¶¶ 9-10.

81.  The Sikh faith is centered around *Ik Onkar*, or oneness. Sikhs believe that people of all faiths worship one divine being who created this world and lives within it. The divine is equally present in all people, and every human being is equal in the eyes of God—whatever their religion, social identity, or immigration status. *Id.* ¶ 11.

82.  The *Guru Granth Sahib*, Sikh scripture, is at the center of Sikh life. The Guru Granth Sahib is written as poetry and music, so part of Sikh worship services are conducted via communal singing. *Id.* ¶ 12.

19

83. The community is essential to worship at gurdwaras, including Sikh Temple Sacramento. Community members and musicians, including children, lead the congregation in singing and prayer and explain basic ideas and lessons. *Id.* ¶ 13.

84. While most of Sikh Temple Sacramento's larger gatherings take place on Sunday, langar is always available. *Id.* ¶ 14.

85. The community with whom Sikhs gather for worship and communal meals is known as a *Sangat*. *Id.* ¶ 16. The presence of the sangat is necessary for Sikhs to meaningfully express their faith. *Id.* ¶¶ 17-18. For example, *Amrit* is an initiation rite that is a core component of Sikh practice. Amrit must be received from others, and the congregation of those who have received Amrit is known as the *Khalsa*. *Id.* ¶¶ 18-19.

86. For these reasons and others, communal effort, worship, and fellowship are key to gurdwaras and to Sikh religious practice.

**The 2025 Policy has chilled religious exercise nationwide.**

87. The new DHS policy "has sown fear within . . . migrant friendly congregations," and faith leaders have made clear that it has caused many immigrants to fear attending houses of worship. Ex. 25, Giovanna Dell'Orto *et al.*, *Trump won't ban immigration arrests at churches. Now clergy are weighing how to resist*, Associated Press (Jan 23, 2025), https://tinyurl.com/mvbp3txu.

88. Some houses of worship even canceled in-person services before DHS's official announcement, fearing that their congregations would be subject to ICE raids without warning. *See, e.g.*, Ex. 39, Laura Rodríguez Presa, *Chicago church stops hosting in-person Spanish services amid fears of mass deportations from Trump administration*, Chicago Tribune (Jan. 2, 2025), https://tinyurl.com/2cp62xrn.

89.   Indeed, within days of DHS announcing the recission of the protected-areas policy, three of the largest Catholic organizations in the United States—the U.S. Conference of Catholic Bishops, the Catholic Health Association of the United States, and Catholic Charities USA—stated publicly that, "[w]ith the mere rescission of the protected areas guidance," they were "already witnessing reticence among immigrants to engage in daily life, including . . . attending religious services." Ex. 42, *Human Dignity is Not Dependent on a Person's Citizenship or Immigration Status*, U.S. Conference of Catholic Bishops (Jan. 23, 2025), https://tinyurl.com/mwrrr98e. The National Association of Evangelicals similarly addressed the new DHS policy, stating that "[e]ven the announcement of this policy has caused fear, deterring some from attending church." Ex. 32, Press Release, National Association of Evangelicals, National Association of Evangelicals Responds to New Executive Orders (Jan. 22, 2025), https://tinyurl.com/277svcma.

90.   These fears are coming to fruition. On January 26, the first Sunday following implementation of the 2025 Policy, ICE agents attempted to enter Fuente de Vida Church in Tucker, Georgia, while its pastor was actively preaching to approximately 70 congregants. Ex. 34, Billal Rahman, *ICE Strikes During Church Service to Arrest Migrant*, Newsweek (Jan. 30, 2025), https://tinyurl.com/y82np8vn. Fear of DHS's new policy had led the church to lock its doors, so the agents waited outside until the congregant they sought—a father of two—exited the church. *Id.*

91.   The deterrent effect of the new policy extends far beyond undocumented congregants. Ample data shows "[f]ears of detention and deportation are a concern for immigrants across immigration statuses." Ex. 23, Shannon Schumacher et al., *Understanding the U.S. Immigrant Experience: The 2023/KFF LA Times Survey of Immigrants*, KFF (Sep. 17, 2023),

21

JA35

https://tinyurl.com/bdeh6dju. For example, a 2023 study described as "the largest and most representative survey of immigrants living in the U.S. to date" found that that 26% of all immigrants, regardless of their own legal status, "worry they or a family member could be detained or deported." *Id.* at PYM-000259-61. That finding echoed previous research showing that even those with legal status fear immigration enforcement because they are "fearful for their family members or because their own 'status' might be questioned." Ex. 54, Karen Hacker et al., *The Impact of Immigration and Customs Enforcement on Immigrant Health: Perceptions of Immigrants in Everett, Massachusetts, USA*, 73(4) Social Science & Medicine 586 (2011), https://tinyurl.com/5p4xr7af.

92.  Such fears are reasonable. In 2021, the Government Accountability Office reported that ICE "arrested 674, detained 121, and removed 70 potential U.S. citizens from fiscal year 2015 through the second quarter of fiscal year 2020." Ex. 19, U.S. Gov't Accountability Office, GAO-21-487, *Immigration Enforcement: Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations*, at PYM-000092 (2021). The same year, ICE arrested Brian Bukle, who had at that point been a citizen for over 50 years, and detained him for 36 days before acknowledging his citizenship. Ex. 24, Yesenia Amaro, *He's a U.S. citizen, but ICE detained him and tried to deport him. Now he's getting $150k*, Fresno Bee (Dec. 14, 2022), https://tinyurl.com/2p9mzhmz. Just this month, U.S. Border Patrol agents conducting a four-day dragnet operation slashed the tires of a naturalized citizen who they subsequently arrested, despite having confirmed his status. Ex. 37, Michael Hiltzik, *Column: Inside the Bakersfield raids that showed how Trump's immigration policies will sow chaos*, L.A. Times (Jan. 22, 2025), https://tinyurl.com/uywz9mjy. And just this month, ICE agents conducting a warrantless raid in

New Jersey detained a U.S. military veteran. Ex. 31, *Mayor Ras. J. Baraka's Statement on ICE Raid on Newark Business Establishment*, City of Newark (Jan. 23, 2025), https://tinyurl.com/yjdy7pf9.

**The 2025 Policy has burdened Plaintiffs' religious exercise.**

*Religious Society of Friends*

93. Government enforcement actions that "stop[] people from entering" meeting houses affect Quakers "personally, viscerally, emotionally, and theologically." Ex. 1, Levi Decl. ¶ 69. The same is true for enforcement actions that scare people away. *Id.*

94. A diversity of worshippers is an essential component of the Quaker value of "experience[ing] God in a broader, more encompassing way," as "one's life experience affects how one hears the spirit and what conclusions one might draw." *Id.* ¶ 60. Deterring immigrants from worshipping in-person with a Quaker meeting would therefore directly interfere with Plaintiffs' religious exercise by lessening their "ability to hear God and what God is trying to tell [them]." *Id.* ¶ 67.

95. Moreover, Plaintiffs' Quaker beliefs make it essential that they "encourage others for whom [that] path is meaningful to join." Ex. 6, Duncan-Tessmer Decl. ¶ 26. But DHS's new policy, by opening meeting houses to immigration-enforcement activities, inhibits Plaintiffs from doing just that. *See, e.g.*, Ex. 1, Levi Decl. ¶ 70; Ex. 2, Merrill Decl. ¶ 43, PYM-000019 (explaining that he "cannot be as encouraging of immigrants joining us for worship" under DHS's new policy). Knowingly putting a person in harm's way or subjecting them to the possibility of a violent encounter with an armed law-enforcement officer would violate Quaker beliefs in peace and nonviolence.

96.  Quakers have held a religious commitment against violence for hundreds of years. For many Quakers, "[t]he presence of a weapon in a Quaker meeting would be absolutely unacceptable." Ex. 6, Duncan-Tessmer Decl. ¶ 45. The presence of armed immigration officers at meeting houses—which the new policy allows—would thus significantly hamper Plaintiffs' ability to exercise their faith. Importantly, even the *threat* of armed government agents at meeting houses—which has existed since the moment DHS announced its new policy—does the same. *See, e.g.*, Ex. 1, Levi Decl. ¶ 73.

**Cooperative Baptist Fellowship**

97.  Communal worship, including with people of different backgrounds, is a core aspect of CBF and its congregations' religious exercise.

98.  The threat of immigration-enforcement activities at CBF's congregations is deterring some congregants from attending worship. Ex. 49, Baxley Decl. ¶ 46. Immigrant members have expressed that they fear for their safety. Ex. 48, Hayes Decl. ¶ 20. Congregations have also reported that fewer people are engaging with ministry for immigrant communities. Ex. 49, Baxley Decl. ¶ 52.

99.  Some members, while they do not inquire about their congregants' immigration status, are aware of congregants whose statuses are in jeopardy. Ex. 48, Hayes Decl. ¶ 20. These congregants—who have also performed work for the church in various capacities—are fearful of attending services because ICE is now able to enter houses of worship. *Id.*

100. On top of that, the policy has created such confusion and fear that even congregants who believe their immigration status to be legal now question their place and safety within churches.

24

JA38

Ex. 50, Carter Decl. ¶ 48. Some of these congregants fear that their Hispanic appearance will make them a target. *Id.* ¶ 49.

101. Having fewer people in worship harms congregants' religious exercise because it diminishes their ability to worship freely with others, and it reduces the number of people singing, praying, and worshipping together. Since congregants are often volunteers or even employees of churches, their absence also reduces the church's ability to carry out its religious mission.

102. And having fewer immigrant worshippers harms congregants' religious exercise because it "diminish[es] the ways in which [they] can learn from those who have lived courageously and had different experiences of the Holy Spirit" and reduces the diversity that brings congregations "closer to resembling the body of Christ." *Id.* ¶ 58; Ex. 49, Baxley Decl. ¶ 50.

103. What's more, some Baptists have a spiritual duty of hospitality—referred to by some as "radical hospitality"—that requires them to use their "tangible resources" such as space in their buildings, campuses, and land to welcome immigrants into their communities. Ex. 50, Carter Decl. ¶ 32. These members' spiritual commitments are reflected in their ministries with refugees and immigrants, including through offering temporary housing on church property.

104. When immigrants are fearful of houses of worship because of DHS's new policy, they are less willing to be served by church ministries on church property. And so churches are left less able to serve them in accordance with their Baptist obligations.

105. The threat of armed immigration agents in sacred spaces also interferes with congregants' ability to attend services with a clear mind. *Id.* ¶ 60.

106. The threat of immigration enforcement at CBF congregations has also forced congregations to choose whether to lock their church doors—and thereby violate their core belief

that a congregation's doors should be open to anyone who wants to join for worship—or else risk armed officers entering their churches and subjecting congregants to harm.

***Sikh Temple Sacramento***

107. Fully and meaningfully practicing the Sikh faith requires joining with the community in service and prayer. Ex. 47, Shergill Decl. ¶ 16.

108. Because subjecting Gurdwaras to government surveillance and raids by armed agents deters attendance, the threat of that activity impedes Sikhs' ability to carry out essential religious practices. *Id.* ¶¶ 21-23.

109. At Sikh Temple Sacramento, approximately half of the congregation are first-generation immigrants. *Id.* ¶ 25.

110. After DHS announced the 2025 Policy, Sikh Temple Sacramento saw an "immediate chilling effect on worship and fellowship." *Id.* ¶ 22.

111. The Gurdwara's management committee has already heard from people who are "concerned that participation in Sikh religious life at the Gurdwara may put them at risk." *Id.* ¶ 23. While some of these people lack legal immigration status, "even people with legal immigration status are unsure whether it is safe to attend." *Id.* ¶ 24.

112. Even putting aside immigration status, the 2025 Policy reduces Gurdwara attendance and interferes with Sikh religious practices by renewing that community's collective concern, based on its history of having the sanctity of Gurdwaras violated, of "government interference in [their] ability to freely practice [their] faith." *Id.* ¶ 28.

26

JA40

113. Deterring community members from attending the Gurdwara "harms not just those who are too fearful to attend but also everyone else," as communal worship and fellowship is central to Sikh practice. *Id.* ¶ 27.

114. Sikhs' ability to practice their faith freely and without fear will be impaired "as long as DHS's new policy is in effect." *Id.* ¶ 30.

## CLAIMS FOR RELIEF

### COUNT I

**Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-2000bb-4**

115. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

116. In RFRA, Congress concluded that because "free exercise of religion" is "an unalienable right," "governments should not substantially burden religious exercise without compelling justification." 42 U.S.C. § 2000bb. Even "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise." *Id.*

117. As such, "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

118. Anyone "whose religious exercise has been burdened in violation" of RFRA may raise a RFRA claim and "obtain appropriate relief" against the government. 42 U.S.C. § 2000bb-1(c).

119. All Plaintiffs' beliefs insist that worship be open to all who wish to join, and all Plaintiffs' religious practices depend on communal worship.

27

120. Quakers believe that the presence of worshippers from different backgrounds is integral to hearing messages from God, since every person is a source of the divine. Everyone who attends worship, whether they speak or not, offers another avenue to speak to and hear from God.

121. Fully and meaningfully practicing the Sikh faith requires joining with the *Sangat* in service and prayer. Part of every Sikh worship service is conducted with communal singing, and community members often lead the congregation or explain basic ideas and lessons. It is essential to the Sikh faith that every Gurdwara welcomes all people.

122. Foundational theological and scriptural commands instruct CBF's members to practice "radical hospitality" by welcoming all, including by worshipping, singing, and praying together. CBF churches recognize the infinite worth of all people, and their faith compels them to share the love of Christ with others—including the immigrant and refugee communities—through worship and ministry.

123. DHS's new policy allows its agents to conduct enforcement operations—including arrests, investigations, interviews, and surveillance—at and near houses of worship and religious ceremonies.

124. Permitting immigration-enforcement operations at and near houses of worship, including those in which Plaintiffs practice, deters people from attending religious services, even if they are lawful permanent residents or citizens.

125. DHS's new policy thus substantially burdens Plaintiffs' free exercise of religion by reducing the number and diversity of worshippers and interfering with their ability to practice communally, as their religious beliefs call them to do.

126. Because it creates a constant threat of federal officers surveilling and carrying out enforcement actions against worshippers, DHS's new policy also substantially burdens Plaintiffs' free exercise of religion by rendering Plaintiffs unable to encourage all to join without contradicting their faith.

127. The 2025 Policy puts Plaintiffs to an impossible choice: either violate their core religious belief in welcoming all to worship or violate their core religious beliefs by not placing others in harm's way.

128. For more than three hundred years, Quakers have held a religious commitment against violence. The presence of armed government agents at or near meeting houses would be incredibly disruptive to the Quakers' ability to worship—as is the mere threat of such action, which DHS's change in policy immediately created.

129. DHS's rescission of the protected areas policy thus substantially burdens Quaker Plaintiffs' free exercise of religion by violating their commitment to anti-violence.

130. Sikhs know the pain of having the sanctity of Gurdwaras violated, especially by the government. The threat of armed interference with their religious practice, which DHS's new policy created, reduces attendance and interferes with Sikh practice by renewing that collective concern.

131. DHS's new policy thus substantially burdens Plaintiff Sikh Temple Sacramento's free exercise of religion by renewing that community's collective concern of government interference and decreasing attendance at the Gurdwara.

132. To justify DHS's new policy, the government must satisfy strict scrutiny. It cannot.

133. The government has itself said that DHS can accomplish its mission "without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more." Ex. 20, Mayorkas Memo, at PYM-000189.

134. DHS's new policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

## COUNT II

### First Amendment—Freedom of Expressive Association

135. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

136. The First Amendment of the U.S. Constitution safeguards the freedom of expressive association: the right to associate with others for the purpose of engaging in activities protected by the First Amendment, including speech, assembly, petition for the redress of grievances, and exercise of religion.

137. Government cannot interfere in protected First Amendment activity in ways that are "'direct and substantial' or 'significant.'" *El Ali v. Barr*, 473 F. Supp. 3d 479, 523 (D. Md. 2020) (quoting *Lyng v. Int'l Union*, 485 U.S. 360, 366, 367 n.5 (1988)).

138. Nor can government chill gathering to exercise First Amendment rights. Government action chills an individual's or entity's expressive-association freedom when it interferes, whether directly or indirectly, with the ability to associate for the purpose of engaging in expressive activity, including by making membership or participation in the association more difficult or less desirable.

139. Plaintiffs and their congregants engage in protected expressive association when they gather for communal religious worship, an activity that is a core aspect of their religious exercise.

140. Plaintiffs suffer injury to their expressive-association rights because, among other reasons, DHS's new policy—which allows the presence of armed, uniformed federal agents in and around houses of worship—directly and substantially limits who will attend meetings. The policy is already resulting in and will continue to result in fewer congregants attending and participating in worship services. And it will reshape—and, indeed, is already reshaping—the composition of Plaintiffs' worship services and meetings by diminishing the attendance and participation of members of immigrant communities.

141. Plaintiffs' congregants suffer too. Congregants from varying backgrounds—especially immigrants—have been deterred from attending worship altogether for fear of surveillance, interrogation, or raids by armed officers, and will continue to be deterred. Congregants are otherwise deterred from encouraging and welcoming all-comers, regardless of immigration status. And those congregants who are not themselves deterred from gathering for communal worship will have fewer people with whom to worship.

142. In all, DHS's new policy burdens and chills the expressive-association rights of Plaintiffs and their congregants.

143. To justify DHS's new policy, the government must satisfy exacting scrutiny. It must prove that it has a sufficiently important governmental interest, and that the policy is narrowly tailored to that interest. It cannot.

144. The government has already admitted that there are less restrictive means of fulfilling its interest. It has deployed those less restrictive means for more than three decades and cannot articulate a reason why they are now insufficient.

145. DHS's new policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

### COUNT III

### Violation of the Administrative Procedure Act—706(2)(A)
### Arbitrary and capricious adoption of new protected-areas policy

146. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

147. Under the APA, a court shall "hold unlawful and set aside agency action" that is arbitrary and capricious. 5 U.S.C. § 706(2).

148. The Secretary of Homeland Security is authorized to "establish such regulations" and "issue such instructions" to enforce "laws relating to . . . immigration." 8 U.S.C. § 1103(g)(2). DHS's new protected-areas (or sensitive-locations) policy is a final agency action because it is "the consummation of the agency's decisionmaking process" and it determines "rights [and] obligations" and creates "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 156, 177-78 (1997) (internal citation omitted). This "pragmatic" assessment includes the creation or revocation of safe harbors. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc*., 578 U.S. 590, 599-600 (2016) (internal citation omitted). Final agency action is subject to judicial review. 5 U.S.C. §§ 551(4), (13); 5 U.S.C. § 706.

149. For over 30 years, DHS has issued a consistent "statement of general . . . applicability and future effect designed to implement, interpret, or prescribe," 5 U.S.C. § 551(4) (defining "rule"), DHS agents' authority to conduct enforcement operations in protected areas.

150. Under the APA, agencies cannot depart from prior policies without acknowledging that they are making such a change and explaining their reasoning for doing so. *Fed. Commc'ns. Comm'n v. Fox Television*, 556 U.S. 502, 515 (2009). Agencies must "examine the relevant data and articulate a satisfactory explanation" when altering or rescinding their rules. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). And they must specifically consider the reliance interests of those who may be impacted by a change in their policies. *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30-31 (2020).

151. In undoing decades of prior agency policy without reasoning, DHS engaged in arbitrary and capricious agency action. By failing to provide reasoning and considering alternative actions, DHS left unaddressed the decades of reliance interests held by Plaintiffs and others, further emphasizing the arbitrary and capricious nature of this action by DHS.

152. Because DHS rescinded its previously operative protected-areas policy—and because DHS failed to "examine the relevant data and articulate a satisfactory explanation," including Plaintiffs' reliance interests—DHS's new policy is unlawful. DHS should be enjoined from implementing it.

153. DHS's new policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

33

JA47

## COUNT IV

### Violation of the Administrative Procedure Act---706(2)(B)
### Contrary to constitutional right

154. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

155. Under the APA, a court shall "hold unlawful and set aside agency action" that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

156. The Secretary of Homeland Security is authorized to "establish such regulations" and "issue such instructions" to enforce "laws relating to . . . immigration." 8 U.S.C. § 1103. DHS's new protected-areas (or sensitive-locations) policy is a final agency action because it is "the consummation of the agency's decisionmaking process" and it determines "rights and obligations" and creates "legal consequences." *Bennett*, 520 U.S. at 177-78 (internal citation omitted). This "pragmatic" assessment includes the creation or revocation of safe harbors. *Hawkes*, 578 U.S. at 600 (internal citation omitted). Final agency action is subject to judicial review. 5 U.S.C. §§ 551(4), (13); 5 U.S.C. § 706(2)(A).

157. Without the protected-area policy, DHS regulation 8 C.F.R.§ 287.8(f)(1)—and its new "common sense" standard—allows DHS agents to conduct immigration-enforcement operations at or near houses of worship or religious ceremonies.[2]

---

[2] 8 C.F.R.§ 287.8(f)(1) addresses the standards for enforcement activities during "site inspections." The regulation states, "[s]ite inspections are Border and Transportation Security Directorate enforcement activities undertaken to locate and identify aliens illegally in the United States, or aliens engaged in unauthorized employment, at locations where there is a reasonable suspicion, based on articulable facts, that such aliens are present."

158. For Plaintiffs, their members, and their attenders, in-person worship in which any and every person are welcomed to join is a core tenet of their religious exercise. The opportunity to engage in such communal worship is a long-held and vital part of their expression of faith.

159. Without the protected-area policy, DHS regulation 8 C.F.R. § 287.8(f)(1) discourages people from attending religious services. Specifically, the 2025 Policy will reduce the number and diversity of worshippers at Plaintiffs' meetings. The policy thus chills Plaintiffs' rights to the Freedom of Expressive Association.

160. The 2025 Policy cannot satisfy exacting scrutiny, so it is "contrary to constitutional right," 5 U.S.C. § 706(2)(B).

161. It is thus unlawful, and DHS should be enjoined from implementing it.

162. DHS's new policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

### COUNT V

### Violation of the Administrative Procedure Act---706(2)(C)
### In excess of statutory jurisdiction, authority, or limitations

163. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

164. Under the APA, a court shall "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

165. The Secretary of Homeland Security is authorized to "establish such regulations" and "issue such instructions" to enforce "laws relating to . . . immigration." 8 U.S.C. § 1103. DHS's new protected-areas (or sensitive-locations) policy is a final agency action because it is "the consummation of the agency's decisionmaking process" and it determines "rights and obligations"

and creates "legal consequences." *Bennett*, 520 U.S. at 177-78 (internal citation omitted). This "pragmatic" assessment includes the creation or revocation of safe harbors. *Hawkes*, 578 U.S. at 600 (internal citation omitted). Final agency action is subject to judicial review. 5 U.S.C. §§ 551(4), (13); 5 U.S.C. § 706.

166. Without the protected-area policy, DHS regulation 8 C.F.R.§ 287.8(f)(1)—with the agency's new "common sense" standard—allows defendant agencies to conduct immigration-enforcement operations at or near houses of worship or religious ceremonies.

167. For Plaintiffs, and their members, holding in-person worship in which any and every person are welcomed to join is a core tenet of their religious exercise. The opportunity to engage in such communal worship is a long-held and vital part of their expression of faith.

168. Without the protected-area policy, DHS regulation 8 C.F.R.§ 287.8(f)(1) discourages people from attending religious services. Plaintiffs will suffer myriad resulting harms, including losing messages from God. Plaintiffs also will not be able to encourage immigrants to join worship for fear that they will put the immigrants in harm's way. And due to Plaintiffs' substantial interactions with immigrant communities, they have a reasonable fear of immigration enforcement at their meetings. That very threat significantly burdens their religious exercise. The policy is thus a substantial burden on Plaintiffs' religious exercise under RFRA.

169. The DHS policy cannot satisfy strict scrutiny, so it is "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C).

170. It is thus unlawful, and DHS should be enjoined from implementing it.

171. DHS's new policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

36

JA50

## COUNT VI

**Violation of the Administrative Procedure Act— 5 U.S.C. § 706(2)(D)**
**Without observance of procedure required by law**

172. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

173. DHS requires that its rules and regulations go through the notice-and-comment process generally required by the Administrative Procedure Act. *See R.J. Reynolds Vapor Co. v. Food & Drug Admin.*, 65 F.4th 182, 194 (5th Cir. 2023); *see also* 5 U.S.C. § 553.

174. Under the APA, a court shall "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

175. The Secretary of Homeland Security is authorized to "establish such regulations" and "issue such instructions" to enforce "laws relating to . . . immigration." 8 U.S.C. § 1103. DHS's new protected-areas (or sensitive-locations) policy is a final agency action because it is "the consummation of the agency's decisionmaking process" and it determines "rights and obligations" and creates "legal consequences." *Bennett*, 520 U.S. at 177-78 (internal citation omitted). This "pragmatic" assessment includes the creation or revocation of safe harbors. *Hawkes*, 578 U.S. at 600 (internal citation omitted). Final agency action is subject to judicial review. 5 U.S.C. §§ 551(4), (13); 5 U.S.C. § 706. The "APA authorizes courts to set aside agency actions that are 'without observance of procedure required by law.'" *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 494 (D. Md. 2020) (internal citation omitted); 5 U.S.C. § 706(2)(D).

176. DHS has repealed its longstanding guarantee that, absent extraordinary circumstances, the government would not conduct immigration enforcement at protected areas, including houses of worship of other religious ceremonies. The 2021 Mayorkas Memo acts as the policy for DHS

because it set a "statement of general . . . applicability and future effect designed to implement, interpret, or prescribe" the enforcement power of DHS agents. 5 U.S.C. § 551(4) (defining "rule").

177. To alter or rescind its protected-areas rule, DHS must first engage in notice-and-comment rulemaking, as required by the APA. *Nat. Res. Def. Council*, 894 F.3d 95, 113 (2d Cir. 2018); *see also* 5 U.S.C. § 553.

178. DHS did not engage in notice-and-comment rulemaking.

179. Because DHS rescinded the longstanding protected-area rule without going through the notice-and-comment process required of agency rules, it is not in observance of procedure required by law.

180. It is thus unlawful, and DHS should be enjoined from implementing it.

181. DHS's new policy has already injured Plaintiffs and will continue to do so until enjoined or vacated.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a.    Declare the 2025 Policy unconstitutional;

b.    Vacate the 2025 Policy;

c.    Enjoin DHS and its constituent agencies from implementing, enforcing, or acting according to the 2025 Policy;

d.    Award Plaintiffs costs of suit, attorneys' fees, and expenses to the greatest extent authorized by all applicable laws; and

e.    Issue such other relief as the Court deems proper.

38

**JURY DEMAND**

Plaintiffs demand a jury trial of all issues so triable under Rule 38 of the Federal Rules of Civil Procedure.

February 4, 2025                    Respectfully submitted,

                                   _/s/ Alethea Anne Swift_
                                   Alethea Anne Swift (Bar No. 30829)
                                   Bradley Girard[+]
                                   Sarah Goetz*
                                   Andrew Bookbinder*
                                   J. Sterling Moore*
                                   Audrey Wiggins*
                                   Skye Perryman*

                                   DEMOCRACY FORWARD FOUNDATION
                                   P.O. Box 34553
                                   Washington, DC 20043
                                   Phone: (202) 448-9090
                                   Fax: (202) 796-4426
                                   aswift@democracyforward.org
                                   bgirard@democracyforward.org
                                   sgoetz@democracyforward.org
                                   abookbinder@democracyforward.org
                                   smoore@democracyforward.org
                                   awiggins@democracyforward.org
                                   sperryman@democracyforward.org

                                   *Counsel for Plaintiffs*

                                   [+] *Application for full admission pending*
                                   *Admitted* pro hac vice

39

JA53

**CERTIFICATE OF SERVICE**

I, Alethea Anne Swift, hereby certify the foregoing document was served on Defendants via CM/ECF in compliance with Federal Rule of Civil Procedure 5(a). Because at least one attorney for Defendants has not yet entered an appearance in this matter, Defendants were additionally served via emails to andrew.warden@usdoj.gov and kristina.wolfe@usdoj.gov.

_____
Alethea Anne Swift
*Counsel for Plaintiffs*

# Exhibit 1

PYM-000001

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*,

           Plaintiffs,

**v.**

**U.S. Department of Homeland Security,** *et al.*,

           Defendants.

Civil Case No. _____

## DECLARATION OF MICHAEL LEVI

I, Michael Levi, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

### My knowledge of the Quaker faith

1. I am a member of Adelphi Friends Meeting of the Religious Society of Friends, located in Adelphi, Maryland.

2. I have been attending Adelphi Friends Meeting since the mid 1990s.

3. I became a member of the meeting around 2004.

4. I am currently a member of two committees: the Ministry and Worship Committee and the Change Group.

1

PYM-000002

5.  I have served in various roles in Adelphi Friends Meeting in the past, including Clerk, Assistant Clerk, Treasurer, Assistant Treasurer, and as a member and often clerk of various other committees.

6.  In addition to my thirty-plus years of worship, I have studied the Quaker faith extensively.

7.  Over the years, I have taught a class on the core tenets of Quaker faith and practice between fifteen and twenty times. I have taught the class at Adelphi Friends Meeting, at a Friends School, and at the Friends General Conference—a yearly gathering of different Quaker groups and meetings.

8.  There are four main branches of Quakerism: the liberal branch, the conservative branch, the Friends United Meeting, and the Evangelical Friends.

9.  Adelphi Friends Meeting falls under the liberal branch. The name is not reflective of any political ideology.

10. The liberal branch of the Quaker faith has two distinguishing features. First, worship is unprogrammed, meaning that services are not conducted by any preacher or religious leader. Second, we have a diverse theological understanding. Although Quakerism came out of the Christian tradition, the liberal branch recognizes that many Friends do not consider themselves Christians.

11. Because the Quaker faith is not controlled or determined by any earthly authority, my understanding of the faith may differ from the understanding

2

PYM-000003

of others. That being said, what follows is a description of the faith that I believe generally holds true in the liberal branch of Quakerism.

### Core tenets of the faith

12. There are four core insights into what it means to be a Quaker: encounter, worship, discernment, and testimony.

**Encounter**

13. Quakers believe that humans can and do experience God directly—known as "encounter."

14. We have no human who directs our spiritual development. There is no creed, no catechism, and no canonical statement of belief.

15. We believe that, at any given time, any given person may experience the divine. And that person may receive a message that is intended to be shared broadly.

16. Put another way, everyone who enters the door to a meeting house may be a source of divine revelation.

17. We believe that different life experiences lead people to hear and understand the Spirit of God in somewhat different ways. So having a diversity and richness of human experience gives us a richer, fuller understanding of how God is speaking to us individually and as a community.

18. It is essential for our spiritual development to be able to hear God's word, no matter who it comes from.

PYM-000004

**Worship**

19. Quakers have developed practices that encourage that encounter—known as "worship."

20. In our scheduled, regular worship, we gather—generally in the Meeting House—and sit in expectant waiting.

21. To some, it might look like we are sitting silently, not doing anything. In fact, there is a great deal happening that is not visible or audible. Every person is quieting their mind and emotions, making space for God to enter.

22. For some, God enters and delivers a message that is personal.

23. For some, God enters and delivers a message that is intended to be shared with the rest of the worshippers. When someone receives that kind of message, they stand and speak, sharing that message with the rest of the Meeting. That is called vocal ministry.

24. Vocal ministry can come from anyone, no matter their background or how long they have been a worshipping Quaker.

25. The communal aspect of worship is central to the exercise of the Quaker faith. There are meetings that people refer to as "gathered meetings." In a gathered meeting, there is a feeling among everyone in the room that we are truly together in that moment. It just happens—there is a deep spiritual bond and a love for everyone in the meeting that spring from our communal togetherness. At the end of a gathered meeting, it is obvious to everyone in the room that something special has happened.

4

PYM-000005

**Discernment**

26. Third, we have developed practices to help understand that encounter—known as "discernment."

27. Discernment is the process of interpreting God's will and making decisions. Such decisions may be personal or may be for the sake of the community.

28. In any kind of meeting, we make space for God to enter. For example, whatever the topic being discussed, we regularly pause for silent worship.

29. Our religious exercise is not limited to our regularly scheduled worship meetings. Because of discernment, our meetings for decision making are acts of worship too. That is because during our decision making, God is present. We call these "Meetings for Worship for the Conduct of Business." Our decision-making process is an attempt to determine how the presence of the divine is guiding the community.

**Testimony**

30. Quakers are led to a particular way of living—known as "testimony."

31. Quakers believe in continuing revelation. That means that God has not finished speaking to humans. We do not believe that God is changing, instead we believe that because humans are developing, the way that God speaks to us changes to meet us where we are.

32. As a result, some of our testimonies have changed over time. For example, Quakers used to refuse to use honorifics or titles and would also refuse to remove their hats.

5

PYM-000006

33. Some testimonies remain consistent. For example, Quakers are well-known for our peace testimony; most Friends oppose all war, for any reason. Most would describe themselves as pacifists.

34. Some Quakers use the acronym SPICES to help explain some core beliefs of Quaker testimony. SPICES stands for simplicity, peace, integrity, community, equality (both social and spiritual), and stewardship. SPICES is a way to help understand the development of the Quaker faith. It is not a creed or a set of rules for the faith going forward.

35. Community is very important to Quakers. Community stretches globally and is not limited to members of the Quaker faith.

36. We believe that living our values requires us, among other things, to be truthful at all times.

## My worship at Adelphi Friends Meeting

37. I regularly attend weekly worship at the Adelphi Friends Meeting House.

38. I appreciate that the Meeting offers a Zoom option, especially for members who are house-bound or unable to physically attend. Sometimes I attend remotely. But attending worship in the Meeting House is a much more powerful religious experience.

39. Our weekly worship meeting starts with approximately 10 minutes of singing hymns together. The hymns have long been one of my favorite parts of the weekly worship meeting.

PTM-000007

40. After we finish singing the hymns, we settle into worship. In worship, we sit facing the center of the room. We sit silently, allowing space for God to enter. When someone is moved to share vocal ministry, they share it aloud and then we return to sitting silently.

41. It can be difficult to enter the state of mind that I need to receive messages from God. It requires bringing my mind to a place of stillness.

42. When I am able to still my mind, I enter a state that is hard to describe, but there is a sense of being untethered or weightless.

43. When I quiet my mind in worship, it gives me energy and replenishes me.

44. Sometimes, the state of worship goes far beyond mere replenishment. In those moments, I am not alone. There is at least one additional presence with me, the presence of God. Sometimes, in addition to the presence of God, I feel the spiritual presence of the others who are physically in the room with me.

45. In silent worship, I often receive insights that I have not had before. I see things in a new way. Sometimes I have hope for, or understanding of, a problem that seemed intractable. Often I have a profound feeling of love, hope, warmth, and kindness.

46. I frequently feel the presence of God during worship, but I do not frequently engage in vocal ministry. I engage in vocal ministry when I feel that I have received a message that isn't just for me, but is intended to be shared with others.

47. Sometimes I have sat down after delivering vocal ministry and not remembered what I said. In those moments, I feel like I was a simple conduit or channel for a message from God.

48. Vocal ministry from others affects my worship. When I listen to others deliver messages, the messages will often send me down a new path of thought, evoke a new feeling, or offer me insight.

49. Those who are sitting quietly and do not engage in vocal ministry are actively participating in our communal worship. Speaking is just one expression of worship. Sitting quietly in Quaker worship is not a passive silence. Sitting quietly is part of the centering and the communion that we are sharing, which is, to me, more important than the messages.

50. The worship portion of our weekly services usually lasts about an hour, although depending on the circumstances, it can go longer.

51. I am frequently surprised that the time for worship is over because it has passed so quickly.

52. After worship, we share "joys and concerns." This is a time for personal sharing, including requests to the community to hold someone in the Light—the Quaker version of praying for somebody.

53. After sharing joys and concerns, the person who is serving as the clerk for that specific meeting for worship ends the worship and people begin to shake hands and greet one another.  This is followed by announcements. As part of the announcements, the clerk of the Outreach and Fellowship

8

committee tells everyone that the Meeting always makes available at least one person to speak with anyone, especially newcomers, to explain Quaker worship. The clerk of the Hospitality committee also announces the weekly potluck that immediately follows worship. And recently children have begun to share what they learned that day in First Day School—the Quaker equivalent of Sunday School.

### Adelphi Meeting's community interactions

54. In addition to being open to all, Adelphi Friends Meeting and its members engage directly with our local community in a host of ways.

55. The Meeting House has an annual Strawberry Festival. The festival includes a used-clothing sale, household goods, games, food, and more. Many members of our local community who are not Quakers and who do not attend our Meeting attend the festival.

56. Unofficial community engagement by members of Adelphi Friends Meeting is supported by the Meeting and our members. These various community engagements often result in non-Members learning about our Meeting.

57. For example, members of Adelphi Friends Meeting have volunteered at the local public school over the years.

58. Likewise, a Member of the Meeting is from Kenya. Through learning about that Member's background and work, a group of Members worked to raise money for a Kenyan village.

9

PTM-000010

**The importance of worship with all comers, including immigrants**

59. Because Quaker worship is rooted in a communal experience, restrictions on who attends is a significant harm to our religious experience.

60. Our worship is open to all comers—no matter their status. We firmly believe that one's life experience affects how one hears the spirit and what conclusions one might draw. So a diversity of worshippers allows us to experience God in a broader, more encompassing way.

61. Members who are Christ-centered deeply believe in Jesus's admonitions to welcome the stranger and to love thy neighbor.

62. I am aware that being welcoming of others and having an open door is core to religious traditions spanning centuries and continents.

63. Welcoming anybody and everybody is a core religious belief of mine.

64. The importance of welcoming immigrants to our worship is not simply a theoretical value. Over the years, we have had a large number of immigrants come to worship. For example, significant numbers of people from Kenya and Burundi have worshipped at Adelphi Friends Meeting.

65. Our Meeting has been enriched by the presence of these immigrants. We have had experiences that we would certainly not have had if immigrants did not join us for worship.

66. Having immigrants worship with us has made an enormous difference to who we are as individuals and as community.

PYM-000011

67. Dissuading immigrant members of our community from attending worship seriously harms Adelphi Friends Meeting, its members, and anyone who attends worship. It lessens our ability to hear God and what God is trying to tell us.

68. I believe that the threat of immigration enforcement at houses of worship, including the Adelphi Friends Meeting House, dissuades people from attending. That greatly harms our worship.

69. Government enforcement actions that stops people from entering our meeting house—or scares them from doing so—affects us personally, viscerally, emotionally, and theologically.

70. Knowing that immigration enforcement could happen at our Meeting House, I will not be as encouraging of immigrants joining us for worship. As much as their presence would be a benefit to my religious experience (and to Adelphi Friends Meeting broadly), I do not feel comfortable knowing that their attendance could bring them severe personal harm—regardless of their legal status, into which I would never inquire.

71. The threat of immigration enforcement presents additional harms to our worship.

72. We believe deeply in peace and many Quakers are pacifists. As an example, many Quakers do not take the decision to call the police lightly because it means calling an armed person to intervene.

PTM-000012

73. Having armed law-enforcement officers inside or outside of our house of worship would hamper our ability to connect to God. It would be distracting and threatening. And for many, including me, the mere threat of that presence would be enough to harm our religious practice.

Silver Spring, Maryland
January 25, 2025



Michael Levi

12

# Exhibit 2

PYM-000013

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| **Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*,<br><br>        Plaintiffs,<br><br>**v.**<br><br>**U.S. Department of Homeland Security,** *et al.*,<br><br>        Defendants. | **Civil Case No. 8:25-cv-243 TDC** |

## DECLARATION OF NOAH MERRILL

I, Noah Merrill, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

### The history and structure of New England Yearly Meeting of the Religious Society of Friends

1. New England Yearly Meeting is the formal and legal association of local Quaker congregations in the six New England states: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.

2. New England Yearly Meeting is located at:

   901 Pleasant St.

   Worcester, MA 01602

3. A Yearly Meeting in the Quaker religion is an association, a yearly gathering, and the way of describing Quakers within a certain region.

1

PYM-000014

4. New England Yearly Meeting is the oldest Yearly Meeting in the world. It has met continuously since 1661.

5. New England Yearly Meeting comprises 63 local congregations—called monthly meetings—across New England. The monthly meetings range from rural to urban, and everything in between.

6. Monthly meetings are the basic organizational unit in the Quaker religion. Generally, monthly meetings have been incorporated, have bylaws, own a meeting house, and have their own budget. Most community-based activities happen at monthly meetings.

7. Many of our monthly meetings own their meeting houses, but not all do. Some monthly meetings rent the space they use for worship. Some monthly meetings share the physical space of another house of worship, like a church or a temple. I believe that it would be difficult for law enforcement to determine whether these houses of worship are being used at any given time for Quaker worship or for other worship.

8. To be a monthly meeting in the Religious Society of Friends, a meeting must be recognized by a quarterly or yearly meeting.

9. Quarterly meetings are gatherings of monthly meetings in a specific geographic area.

10. Quarterly meetings gather 3-4 times a year for worship and to make decisions about issues that concern the monthly meetings in the region.

11. Quarterly meetings are sometimes individual legal entities, most often they are not.

12. Quarterly meetings are formally and legally a constituent and subsidiary part of the Yearly Meeting.

JA70

PYM-000015

13. The Yearly Meeting is the highest organizational body (judicatory) in the Religious Society of Friends. There is no wider organization to which a Yearly Meeting answers, though yearly meetings globally are in contact with one another.

14. The Yearly Meeting gathers yearly for worship and to make decisions about issues that affect the constituent quarterly and monthly meetings.

15. The Yearly Meeting is legally incorporated, both as a church and a 501(c)(3).

16. Monthly meetings are the heart of the Quaker community, but legally and practically the Yearly Meeting exercises a degree of control over monthly meetings.

17. With rare exceptions, every one of New England Yearly Meeting's constituent monthly meetings sends an annual report to New England Yearly Meeting and, depending on the contents of the report, New England Yearly Meeting will work with the monthly meeting to determine its best path forward.

18. If there is a potential legal issue at a monthly meeting, the meeting would contact New England Yearly Meeting to intervene or assist.

19. New England Yearly Meeting acts on behalf of monthly meetings for legal purposes. If, for example, someone made a bequest to a monthly meeting that an estate was not honoring, New England Yearly Meeting would take appropriate action on behalf of the monthly meeting.

20. New England Yearly Meeting does not manage the budgets of its monthly meetings. But if a monthly meeting closes down, generally the monthly meeting's assets transfer to New England Yearly Meeting.

21. Monthly meetings fund New England Yearly Meeting. Approximately 2/3 of the budget of New England Yearly Meeting comes from monthly meetings.

3

PYM-000016

22. Because so much of New England Yearly Meeting's budget comes from monthly meetings, a loss of members would harm the monthly meetings and New England Yearly Meeting.

23. New England Yearly Meeting is not its own church in the same way that a monthly meeting is. But New England Yearly Meeting gathers annually for worship, fellowship, advocacy, and decision-making about the development of the Quaker faith in New England.

24. When we meet annually, we understand the Yearly Meeting to be its own worshipping body. As part of that worshipping body, the Yearly Meeting has its own clerk and those who guide New England Yearly Meeting's religious development and service in the world.

25. New England Yearly Meeting emphasizes that all Quakers in New England are a part of our community. The annual gathering is attended by members of monthly meetings throughout New England and others interested in exploring or developing ties with the Quaker faith.

26. Our annual gathering is open to anyone who wants to attend. It is generally understood that nonmembers will likely not play a substantial role in decision making at the annual gathering. But they are welcome to attend and to worship.

27. New England Yearly Meeting would never turn anyone away from our annual gathering based on their immigration status, and we do not ask about immigration status.

28. Because Quakers believe that any and every person can experience God directly in a way that should be shared with others, we encourage and welcome people from all walks of life.

4

PYM-000017

29. New England Yearly Meeting, like Quakers generally, understand ourselves as a global community.

30. The Quaker faith has a strong tie to Central and South America. We have attendees at New England Yearly Meeting's annual gathering for whom Spanish is their first language, both residents of the United States and visitors from several Latin American countries. So we provide interpretive services at large meetings, including our annual gathering.

31. The Quaker faith also has a strong tie to Africa. New England Yearly Meeting has a monthly meeting that consists of members of the African Diaspora.

**My role in the New England Yearly Meeting and my faith**

32. I am the Yearly Meeting Secretary of New England Yearly Meeting. The position is roughly equivalent to that of Executive Director for the organization.

33. As Yearly Meeting Secretary, I serve as the legal agent and representative of New England Yearly Meeting.

34. The position of Yearly Meeting Secretary answers to the Permanent Board of New England Yearly Meeting.

35. The Yearly Meeting Secretary directly supervises 9 staff members.

36. I have been in my position for 12 years.

37. I have been employed in various positions in the Quaker faith since 2003.

38. I grew up a Quaker and am an active member in the Religious Society of Friends.

39. I have been recognized as a Recorded Minister. In the Quaker faith, a Recorded Minister is one in whom the community has recognized certain sustained gifts and expects to be able to interpret the Quaker faith to the wider world.

JA73

40. I believe that any immigration-enforcement action, or the threat of immigration enforcement, at a Quaker house of worship would cause serious harm to the religious exercise of New England Yearly Meeting and its member monthly meetings.

41. I do not recall ever seeing a gun in a Quaker meeting, and Quakers have held a religious commitment against violence in all forms for more than 350 years.

42. I understand the immigration-enforcement officers generally are armed.

43. I believe that the presence of armed officers at a meeting would cause significant harm to our religious exercise.

44. If I knew that immigration enforcement could happen at a monthly meeting, at any of our worship events throughout the year, or at our annual gathering, I would not be as encouraging of any immigrant joining us for worship. As much as their presence would benefit our religious experience, I would not feel comfortable knowing that their attendance could subject them to armed federal officers.

Newfane, Vermont
February 3, 2025

Noah Merrill

# Exhibit 3

PYM-000020

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*,

       Plaintiffs,

v.

**U.S. Department of Homeland Security,** *et al.*,

       Defendants.

Civil Case No. _____

## DECLARATION OF RUBY STEIGERWALD

I, Ruby Jane Steigerwald, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1.  I am a member of the Adelphi Friends Meeting, located in Adelphi, Maryland.

2.  I have been attending the Adelphi Meeting since approximately 2015.

3.  I previously attended and was a member of the Twin Cities Friends Meeting in Minneapolis-St. Paul, Minnesota, where I was an attender and member for 16 years.

4.  I also attended the Monteverde Friends Meeting in Monteverde, Puntarenas Province, Costa Rica, for one-and-a-half years, from 1997 to 1999.

1

**JA76**

PYM-000021

5.  I am currently Co-Clerk of the Children's Religious Education Committee and a member of the Climate Action Working Group within the Peace and Social Concerns Committee at the Adelphi Meeting.

6.  While a member of the Twin Cities Friends Meeting, I was a member of the First Day School Committee, which covers children's religious education. I was also the Clerk of Meeting. I also served on the El Salvador Committee of the Northern Yearly Meeting, whose purpose is to foster a relationship between El Salvador Yearly Meeting and Northern Yearly Meeting, including youth exchange programs and supporting a Quaker school in El Salvador.

7.  I am a retired teacher. Throughout most of my professional career, I worked with the children of immigrants. I also taught English as a Second Language courses to adults.

**My worship at the Adelphi Friends Meeting**

8.  I regularly attend weekly worship at the Adelphi Friends Meeting House.

9.  Our weekly worship meeting begins with about 15 minutes of singing hymns.

10. We then begin worship, which lasts about an hour. Children join for the first 20 minutes of that time.

11. Worship consists of sitting in silence and waiting to hear the voice of God. We sometimes refer to this process as seeking the inner light, inner voice, or the Christ within.

2

PYM-000022

12. After worship, we share "Joys and Concerns," during which people have the opportunity to talk about things happening in their life or to share thoughts or feelings that may not rise to the level of something to be shared during worship.

13. During Joys and Concerns, we hold each other in the light.

14. Thereafter, we exchange greetings by shaking hands or hugging those around us, and newcomers introduce themselves.

15. The meeting concludes by breaking bread together.

16. Joys and Concerns, greeting one another, and breaking bread together are important aspects of our religious exercise because it is important to our religious experience to know the other people who are a part of the Adelphi Meeting.

17. The Adelphi Friends Meeting offers remote participation in weekly worship via Zoom.

18. While it is important because it allows people who are ill, who have mobility issues, or who live far away from the meeting house to access worship, I prefer to worship in person.

19. We worship in community, and it is harder for me to feel that communal connection when worshipping via Zoom.

### The Testimony of Equality

20. The Friends have a set of values, known as Testimonies, that inform how we live and how we worship.

3

PYM-000023

21. One of the Testimonies is Equality. The Testimony of Equality means that we see that of God in all people.

22. That Testimony of Equality means that we value and worship without regard to a person's background, immigration status, or how they arrived in this country.

### Engagement with the community

23. The Adelphi Meeting engages with our community in a number of ways.

24. Because the Adelphi Meeting is located in an area with a large population of Hispanic people and Spanish-speakers, we include Spanish-language materials about Quakerism in the foyer of the meeting house.

25. We also translate important social-justice related committee minutes into Spanish and publish them on our website.

26. In the past, we have hung a large banner in front of our meeting house welcoming immigrants in our community. The banner, citing Leviticus 19:33-34, said, "Do not mistreat strangers. Treat them as citizens. Love them as yourself."

27. We have regularly supported immigrant families settling in our community, including families from Afghanistan, Burundi, Kenya, and Nicaragua, many of whom were refugees and escaping civil unrest. Some of these families joined our meeting for worship.

28. We also open our meeting house and grounds to the community.

4

PYM-000024

29. For example, the Adelphi Meeting is a member of the Adelphi Neighborhood Association, and the Association holds its meetings in our meeting house.

30. We built a playground on our grounds and ensure that it is open to families and children in our community, regardless of whether they attend or are members of the Adelphi Meeting.

31. We also hold an annual event, the Strawberry Festival, which is open to all members of the local community, regardless of whether they are members of the Adelphi Meeting.

**The importance of communal worship with all-comers, including immigrants**

32. Communal worship is a core aspect of my faith and religious exercise, and restrictions on communal worship would negatively affect my religious exercise and ability to practice my faith.

33. We believe that everyone has their own connection to spirit, or access to the divine.

34. Having as many people attend our meetings as possible is an important aspect of worship, because every individual who attends presents an opportunity for God to speak to us through them.

35. When we have a deep spiritual experience, it is because we have all sensed something and been in the same spiritual presence together, which can only happen through communal participation in worship.

5

36. Radical inclusivity, including inclusivity of people from different backgrounds and cultures, is also an important aspect of our religious worship, because it allows access to the divine through the most sources possible.

37. The specter or actual presence of armed law enforcement officers coming near or inside our meeting house during worship is very disturbing and would be incredibly disruptive and traumatic.

38. I believe that it may lead some members of our community to refrain from attending weekly worship in person, particularly Latino members and people with children.

39. If some people cease attending weekly worship, it would negatively affect the ability of our attenders and members to gather together for communal worship.

40. If some people cease attending weekly worship, my own ability to worship will be diminished.

41. If I were permitted to worship only with those with lawful immigration status, it would not only negatively affect my ability to worship with all-comers, but it would infringe my religious beliefs otherwise, including the Testimony of Equality.

42. The Friends are anti-violence and a peace church. We do not take up arms. And we stand in the power that removes the occasion of violence and war.

6

PYM-000026

43. The presence of armed law enforcement officers near or inside our meeting house would undermine our ability to remove the occasion of violence, because it would create the opportunity for conflict and violence that go against our pacifist values.

44. The presence of armed law enforcement officers in our meeting house would also disrupt our worship in other ways, including by disrupting our ability to engage in the quiet reflection that is necessary to access the divine.

Washington, D.C.
January 25, 2025

Ruby Jane Steigerwald

7

JA82

# Exhibit 4

PYM-000027

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*,

        Plaintiffs,

**v.**

**U.S. Department of Homeland Security,** *et al.*,

        Defendants.

**Civil Case No. _____**

## DECLARATION OF RONI J. KINGSLEY

I, Roni J. Kingsley, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am Clerk of the Richmond Friends Meeting, located in Richmond, Virginia.

2. The Richmond Monthly Meeting is a congregation of the Religious Society of Friends.

3. It is part of the Baltimore Yearly Meeting, a regional Meeting of the Religious Society of Friends. The Baltimore Yearly Meeting has existed for more than 300 years.

4. I began attending the Richmond Friends Meeting in 1989 and became a member around 2000.

1

JA84

PYM-000028

5.  I have served as Clerk of the Richmond Friends Meeting since 2024. I served as Assistant Clerk from 2022-23.

6.  I have been part of a number of committees in my time as an attendee and member of the Richmond Meeting, including the Peace and Social Concerns, Building and Grounds, Care and Counsel, Technical Support, Nominating, and Ministry and Worship Committees. Some committees require membership, some do not.

### Richmond Friends Meeting and worship

7.  I regularly attend weekly worship at the Richmond Friends Meeting House.

8.  The weekly worship meetings take place every Sunday, one at 9:30 a.m. and one at 11:00 a.m. Our meetings are open and anyone may attend.

9.  The Richmond Friends Meeting congregation has roughly 225 regular attendees and members.

10. Richmond Friends Meeting is made up of attendees and members. Attendees are any people who attend our meetings. Members are people who have gone through the formal process of becoming a member of Richmond Friends Meeting and thereby the broader Religious Society of Friends.

11. An attendee can become a member by making a written request to the Clerk of Meeting who will then pass the request to the Care and Counsel Committee. This committee forms an ad hoc committee called a clearness committee. Members of the clearness committee meet, sit, and discuss

2

FFM-000029

membership with the interested individual. If everyone feels clear following this process, the decision goes to the full Care and Counsel Committee which will make a recommendation for membership to the entire Richmond Friends Meeting at a monthly business meeting. Typically, approval is "held over" until the following month's business meeting to give people from meeting the opportunity to speak with the individual should they wish to.

12. The Richmond Friends Meeting is nonhierarchical. That means there is no clergy that leads worship, decides religious doctrine, or determines the content of any meeting for worship. Instead, we gather in silence for worship.

13. At meetings for worship, we gather in silence for a period of Spirit-led waiting worship that lasts one hour. A member of the Care and Counsel Committee is at the open door to greet people, especially newcomers. People find places to sit, and all benches face the middle. A member of the Ministry and Worship Committee sits on "facing bench" (a bench near the front of the room). This person will initiate and end worship as well as guide announcements after worship. There is no program of content planned in advance. If someone is moved to share a message, they rise and do so. This is called vocal ministry. Vocal ministry can take the form of giving a message, saying a prayer, singing a song, or asking the meeting to join them in song. When they are finished, they sit back down.

PYM-000030

14. Individuals typically only share once during a meeting. People are asked not to respond to each other during meeting, but sometimes a thread or theme develops throughout a meeting. Some times there are no messages during a meeting. An hour of silence is not uncommon.

15. At the end of the hour, there is a shaking of hands initiated by the person on facing bench, which signals the end of worship.

16. On the third Sunday of every month, worship includes the business of Richmond Friends Meeting. It is referred to as Meeting for Worship with Attention to Business

17. On weeks where worship with attention to business takes place, the meeting hears recommendations from its committees about actions that the meeting may take and attends to perfunctory matters, like budgeting.

**Richmond Friends Meeting's decision making process**

18. Richmond Friends Meeting seeks unity in our decision-making. We seek unity as a body, we do not vote. Decision-making is undertaken by the whole body, and it does not matter how long someone has been attending meeting. Nor does it matter whether they are an attendee or a member.

19. It is the Clerk's job to help the meeting consider the business before it. The Clerk does not control the conversation. Instead, the Clerk helps to guide consideration of the matters at hand.

20. The Clerk must get a sense of the unity and then test whether the meeting has come to unity during discernment.

**Richmond Friends Meeting's immigrant community interactions**

4

PYM-000031

21. In addition to being open to all, the Richmond Friends Meeting and its members engage directly with our local community in a host of ways.

22. Richmond Friends Meeting House hosts English classes for refugees and immigrants.

23. Richmond Friends Meeting House specifically makes the meeting house available to the community and for people that need space.

24. Being open to all is part of our ministry and core to our religious beliefs.

25. As part of our ministry, Richmond Friends Meeting House has supported immigrant women through programming and financial assistance, including sewing courses and helping to purchase sewing machines.

26. Unofficial community engagement is encouraged at the Richmond Friends Meeting as well, and members try to live through their values in the community, not just during meetings.

27. As an expression of living our faith through values in the community, attendees and members of the Richmond Friends Meeting have volunteered to drive people to immigration appointments, meet immigrants as they arrive at bus stations, and sponsor new immigrant families when they arrive in Richmond in partnership with Catholic Charities.

### The importance of meeting with all-comers

28. Richmond Friends Meeting is open to all-comers. It does not matter if it is someone's very first meeting or if they have been coming for decades. The doors are open, physically and metaphorically, to all at Richmond Friends Meeting. That is part of how we practice our faith.

5

PYM-000032

29. At Richmond Friends Meeting, we give testimony to our spiritual lives by the way we live. Quakerism is not about what you believe, it's how you live. Our testimonies (Simplicity, Peace, Integrity, Community, Equality, and Stewardship of the Environment) are how we live our faith: personal, family life, in the community, and in the world.

30. Richmond Friends Meeting is rooted in communal experience. When someone speaks during meeting, it is similar to when a pastor speaks to a congregation, and it's to be taken the same way. It is ministry given to the congregation.

31. At Richmond Friends Meeting, the form of worship is "waiting worship." Everyone is collectively waiting together on Spirit. Our worship is not solitary, there is an understanding that we are gathered as a body. The meeting is not 50 distinct people sitting on their individual cushions. There is a spiritual connectedness to it. Even at a meeting where there might not be a message, there is a sense of togetherness with every single person in the room.

**Effects of ICE Enforcement at Richmond Friends Meeting and the presence of armed immigration officers**

32. Any immigration enforcement action during our meetings would seriously harm Richmond Friends Meeting and its members.

33. Already, the threat of armed immigration officers has begun to have an impact on our meeting. At the suggestion that ICE could begin enforcement in or near a meeting, an attendee asked whether we would need to start

PTM-000033

locking our doors during meetings. Closing off the meeting to the public is something we have never done before because it interferes with our religious commitment to communal worship.

34. The knowledge that ICE agents can interrupt our worship is also already making our members less likely to attend. A member of color expressed concern that he could be mistaken for being undocumented and feared the idea of enforcement actions in or around the meeting. We have other attendees of color who are less comfortable at meeting now that armed immigration officers can operate in or around the meeting.

35. The method of worship at Richmond Friends Meeting, open worship, works only because everyone is in a circle together. The doors are open, there's a greeter at the doorway to welcome people in. All of that is part of the spiritual hospitality that we want to have. The idea of the presence of law enforcement—or the threat of that presence—goes against that.

36. Pacifism is deeply ingrained in the Quaker faith and is the ideal that brought so many people to the doors of Richmond Friends Meeting. Our pacifism is much more than a surface level opposition to war. Pacifism is deeper and broader than that. For us, it includes inward peace and peace at home.

37. Knowingly putting a person in harm's way or risking their involvement in a violent encounter violates my religious beliefs. Having weapons or armed people in or around the meeting is inconceivable and contrary to our faith.

7

PYM-000084

38. In our manner of waiting worship, we sit quietly, release distractions, and settle into an inner stillness that leads to Spirit-led listening. For this reason, too, having weapons or armed people in or around the meetings is inconceivable and contrary to our faith. Even the idea of there being weapons at meeting is distressing enough to make it very difficult to engage in waiting worship and will discourage attendance.

Henrico County, Virginia
January 26, 2025

Roni J. Kingsley

8

# Exhibit 5

PYM-000035

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*,

        Plaintiffs,

**v.**

**U.S. Department of Homeland Security,** *et al.*,

        Defendants.

Civil Case No. _____

## DECLARATION OF FRANCIE MARBURY

I, Francie Marbury, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am Member of the Putney Friends Meeting, located in Putney, Vermont.

2. The Putney Friends Meeting is a Worship Group of the Religious Society of Friends.

3. It is part of the New England Yearly Meeting, a regional Meeting of the Religious Society of Friends.

4. I began attending the Putney Friends Meeting over 20 years ago.

5. I served as Clerk of the Putney Friends Meeting from 2006 to 2011, and again from 2022 to 2024.

1

PYM-000036

6. I have been part of a number of committees in my time as an attendee and member of the Putney Meeting, including the Social Justice Committee and the Childcare and First Day School Committee. Some committees require membership, some do not.

### Putney Friends Meeting and worship

7. I regularly attend weekly worship at the Putney Friends Meeting House.

8. The weekly worship meetings take place every Sunday, one at 8:30 a.m. and one at 10:30 a.m. At 10:00 a.m. we have intergenerational singing in between the two worship sessions. Our meetings are open and anyone may attend.

9. The Putney Friends Meeting congregation has approximately 100 regular attendees and members.

10. Putney Friends Meeting is made up of attendees and members. Attendees are any people who attend our meetings. Members are people who have gone through the formal process of becoming a member of Putney Friends Meeting and the broader Religious Society of Friends.

11. Attendees can become members by submitting a requestor for membership and consulting with a clearness committee. Following meetings with a clearness committee, the committee will make a recommendation to the full meeting on an individual's membership, where a decision is made.

12. The Putney Friends Meeting is nonhierarchical. That means there is no pastor that leads worship, decides religious doctrine, or determines the

2

PTM-000037

content of any meeting for worship. Instead, we gather in silence for worship.

13. At meetings for worship, the doors are opened to allow people in. People sit down in the worship room where the seating is arranged in a circular manner. We gather in silence for a period of worship that lasts one hour. There is no content planned in advance. If someone is moved to share a message, they rise and do so. When they are finished, they sit back down.

14. On the third Sunday of every month, the Putney Friends Meeting includes attention to business as part of the weekly worship, at 12:00 p.m.

15. On weeks where worship with attention to business takes place, the meeting hears recommendations from its committees about actions that the meeting may take and attends to perfunctory matters, like budgeting.

### Putney Friends Meeting decision making process

16. Putney Friends Meeting seeks unity in our decision-making. We seek unity as a body, we do not vote. Decision-making is undertaken by the whole body, and it does not matter how long someone has been attending meeting. Nor does it matter whether they are an attendee or a member.

17. It is the Clerk's job to help the meeting consider the business before it. The Clerk does not control the conversation. Instead, the Clerk helps to guide consideration of the matters at hand.

18. The Clerk must get a sense of the unity and then test whether the meeting has come to unity during a decision-making.

3

PYM-000058

### Putney Friends Meeting's immigrant community interactions

19. In addition to being open to all, the Putney Friends Meeting and its members engage directly with our local community in a host of ways.

20. Putney Friends Meeting has a focus on welcoming the community.

21. Putney Friends Meeting has hosted fundraising events for community organizations. Such events include holding a silent auction and dinner to raise funds for the non-profit organization the Community Asylum Seekers Project.

22. Attendees of Putney Friends Meeting have also raised money for the non-profit organization Ethiopian Community Development Counsel.

23. Putney Friends Meeting has also supported applications for grants from the Bodine-Rustin Fund for Support and Action three times. Funds from the grant go towards supporting LGBTQ members of the community, including asylum seekers.

24. For the last few months, the Social Justice Committee of Putney Friends Meeting has maintained a peace vigil in the Putney Common for two Saturdays a month.

25. As part of our ministry, Putney Friends Meeting has supported the local immigrant and asylum community. This includes individuals from Putney Friends Meeting volunteering with the Community Asylum Seekers Project and the Ethiopian Community Development Counsel. Individuals that

4

PYM-000059

volunteer with these nonprofit organizations report back to Putney Friends Meeting on their progress.

26. This ministry has a long history of caring for the immigrant community. In the 1980s, Putney Friends Meeting was involved in supporting a local migrant family, and efforts to support the Putney immigrant community go even further back, including welcoming Southeast Asian immigrant families moving to the area.

27. Interactions with the community outside Putney Friends Meeting is a way that people learn about, and sometimes explore, the Quaker faith.

### The importance of meeting with all-comers

28. Putney Friends Meeting is open to all-comers. It does not matter if it is someone's very first meeting or if they have been coming for decades. The doors are open, physically and metaphorically, to all at Putney Friends Meeting.

29. At Putney Friends Meeting, we give testimony to our spiritual lives by the way we live. Quakerism is not about what you believe, it's how you live. The testimonies are how we live our faith: personal, family life, in the community, and in the world.

30. Putney Friends Meeting is rooted in our shared experience and unity. Instead of having a pastor, our worship involves attendees speaking during meeting. We believe that everyone has spirit within them, regardless of race, status, or background.

5

PFM-000040

31. When we worship, we worship together and are all joined in the room. That is why we refer to it as finding unity within the group.

**Effects of ICE enforcement at Putney Friends Meeting and the presence of armed immigration officers**

32. Putney Friends Meeting has never had to deal with immigration-enforcement operations before. Immigration enforcement would deeply impact worship. People would be scared of armed immigration officers sitting in the parking lot waiting for people to come out. The presence of armed officers would not only cause some people not to come to meeting, but it would force others to make decisions regarding how to deal with it. Some people would leave the meeting over it, some people would rather not be involved. Regardless, people should not have to make these choices regarding their faith.

33. Pacifism is deeply ingrained in the Quaker faith generally and Putney Friends Meeting specifically. Our pacifism is much more than a surface level opposition to war. Pacifism is deeper and broader than that. For us, it includes inward peace and peace at home. The very idea of there being weapons or armed people in or around the meeting is inconceivable, we've never even discussed having a no-weapons policy. Even the idea of there being weapons at meeting is totally distressing.

Putney, Vermont
January 25, 2025

Francie Marbury

6

# Exhibit 6

PYM-000041

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*, <br><br> Plaintiffs, <br><br> **v.** <br><br> **U.S. Department of Homeland Security,** *et al.*, <br><br> Defendants. | **Civil Case No. 8:25-cv-243 TDC** |

## DECLARATION OF CHRISTIE DUNCAN-TESSMER

I, Christie Duncan-Tessmer, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

### The history and structure of Philadelphia Yearly Meeting of the Religious Society of Friends

1. Philadelphia Yearly Meeting is a formal and legal association of local Quaker congregations in Pennsylvania, Delaware, Southern New Jersey, and the Eastern Shore of Maryland.

2. Philadelphia Yearly Meeting is located at:

    1515 Cherry Street

    Philadelphia, PA 19102

3. The Yearly Meeting is legally incorporated as a church and a 501(c)(3).

4. A Yearly Meeting in the Quaker religion is an association, a yearly gathering, and the way of describing Quakers within a certain region.

1

PYM-000042

5. Philadelphia Yearly Meeting has met continuously since 1682.

6. Philadelphia Yearly Meeting played a central role in the history of the freedom of religious exercise in this country. Philadelphia Yearly Meeting started the year after William Penn established Pennsylvania. As a Quaker, Penn was all too familiar with the religious discrimination that Quakers faced in England and other colonies, including Massachusetts.

7. In 1701, Penn established the Charter of Privileges, which guaranteed freedom of worship in Pennsylvania. The Charter of Privileges became one of the foundations of the protections for religious freedom in the First Amendment to the United States Constitution.

8. In 1804, the Friends built the Arch Street Meeting House on land granted by William Penn to the Friends. Philadelphia Yearly Meeting owns Arch Street Meeting House, the largest in the world, which is the location of a local congregation (monthly meeting) and Philadelphia Yearly Meeting's gathering of members.

9. Philadelphia Yearly Meeting gathers at Arch Street Meeting House two times yearly for worship and to make decisions about issues that affect the constituent quarterly and monthly meetings.

10. Because of size constraints at Arch Street Meeting House, Philadelphia Yearly meeting has its primary annual gathering on a college campus.

11. Monthly meetings are the heart of the Quaker community. Legally and practically, they are the constituent parts that make up the Yearly Meeting.

12. Many of our monthly meetings own their meeting houses, but not all do. Some monthly meetings rent the space they use for worship. At least one monthly meeting meets in a

2

Protestant building. I believe that it would be difficult for law enforcement to determine whether these buildings are being used at any given time for Quaker worship or for other worship.

13. All Philadelphia Yearly Meeting's constituent monthly meetings are asked to send an annual report, called the State of the Meeting, to Philadelphia Yearly Meeting. A committee of Philadelphia Yearly Meeting reads the reports, complies them into a single report, and reports on them at our annual gathering in the summer.

14. In the past, when an issue of concern arises in a State of the Meeting report, the committee contacts the monthly meeting to offer it support and guidance.

15. Monthly meetings fund Philadelphia Yearly Meeting. Approximately 1/4 of the budget of Philadelphia Yearly Meeting comes from monthly meetings.

16. A loss of members would harm the monthly meetings and Philadelphia Yearly Meeting.

17. Philadelphia Yearly Meeting does not have its own congregation in the same way that a monthly meeting does. Rather, Philadelphia Yearly Meeting is the interconnection of Friends from across all the meetings into larger community to support and care for one another and the community as a whole.  It gathers three times annually for worship, fellowship, advocacy, and decision-making about the development of the Quaker faith (called "sessions"). It also gathers Friends and meetings together throughout the year in a variety of programs, communications channels and gathering for mutual spiritual and practical support and growth.

18. When we meet, the Yearly Meeting has its own clerk and the community as a whole guides Philadelphia Yearly Meeting's religious development and service in the world.

PYM-000044

19. Philadelphia Yearly Meeting's gatherings are attended by members and attenders of monthly meetings throughout Philadelphia and others interested in exploring or developing ties with the Quaker faith.

20. Our gatherings are open to anyone who wants to attend. Some events at the gatherings are geared toward the public in addition to our members. I know of times at past gatherings in which non-Quakers attended those events then decided to stay for our worship sessions. We did not know the immigration status of those attendees, and we would never ask.

21. Philadelphia Yearly Meeting would never turn anyone away from our gatherings based on their immigration status, and we do not ask about immigration status.

22. Because Quakers believe that any and every person can experience God directly in a way that should be shared with others, we encourage and welcome people from all walks of life.

23. In 2014, Philadelphia Yearly Meeting adopted a series of strategic directions that reflect this belief and highlight our connections to immigrant populations.

24. The first strategic direction is connecting:

> We will share among us the wisdom, creativity, and resources of our meetings and Friends, so they may resonate throughout the whole community and allow us to thrive in relationship with the Divine. Individuals and meetings will give time, gifts, and experience in service, and in turn receive new insight, grounding, and friendships, directly and indirectly enriching their meetings and their own spiritual lives.

> We will connect Friends across the geography of PYM and with Friends from the wider world, in order to carry our concerns together. We will do this in a manner that allows everyone to participate in the life of the community.

25. Another strategic direction is belonging:

4

PYM-000045

Because we are all interconnected, we seek to increase a sense of belonging to an extended family of Friends. To be effective and whole, we need each other. Our personal experience of being a Friend is deepened by worshipping, discerning business, and sharing community beyond our home meetings. Friends of all ages, locations, and interests will have ways of entering the community and will feel glad they've participated.

We will look courageously into the roots of inequity in our culture, be willing to see and feel the pain it can cause and choose to do whatever is necessary to take risks and to change. We will dismantle imposed barriers in our yearly and monthly meeting structures and activities, which impede our experience of God within our communities and within ourselves. We seek to make the congregations inside of our meetinghouses reflect the beauty and diversity of the world outside of them.

26. Although Quakers generally do not proselytize, it is essential to encourage others for whom this path is meaningful to join us.

27. Philadelphia Yearly Meeting engages with the non-Quaker community in various ways. For example, there are groups within Philadelphia Yearly Meeting—called collaboratives—that work with people outside the Quaker community to address issues including the Middle East as well as racial and environmental justice. That work brings Philadelphia Yearly Meeting members into relationships with people from all walks of life who then learn about our faith.

28. Philadelphia Yearly Meeting, like Quakers generally, understand ourselves as a global community.

29. The global connection is not hypothetical or theoretical. Friends World Committee for Consultation conducts a worldwide Quaker census every decade (of which Philadelphia Yearly Meeting was a part). There are Quakers in 87 different countries.

30. Our beliefs, combined with the global nature of the Quaker faith, brings us into close relationship with immigrant populations.

5

PYM-000046

31. For example, one of our monthly meetings developed a close relationship with a family of East Africans who are Quaker and lived in a refugee camp in Syria before relocating to the United States. The family began its own Quaker congregation, which is not a part of Philadelphia Yearly Meeting, but meets in the meeting house of the monthly meeting that is part of Philadelphia Yearly Meeting.

32. Another Philadelphia Yearly Meeting monthly meeting is located in an area with a high immigrant population. That monthly meeting is very involved in the local community, including through working with organizations made up of immigrants. The monthly meeting does not inquire as to anyone's immigration status.

33. Our extensive work in our communities—especially with those most in need—is a way that people learn about, and become interested in, the Quaker faith.

**My role in the Philadelphia Yearly Meeting and my faith**

34. I am the General Secretary of Philadelphia Yearly Meeting. The position is roughly equivalent to that of Executive Director for the organization.

35. As General Secretary, I serve as the legal agent and representative of Philadelphia Yearly Meeting.

36. The position of General Secretary answers to councils, which together function like a Board of Directors.

37. Philadelphia Yearly Meeting has 25 full- or part-time staff.

38. I have been in my position for 10 years.

39. I have been employed in various positions in the Quaker faith since 1997.

40. I am an active member in the Religious Society of Friends through my membership at Chestnut Hill Friends monthly meeting.

6

PYM-000047

41. I started attending Chestnut Hill Friends in 1995 and became a member in 1999.

42. A core part of my Quaker beliefs is that we must be open and welcoming to anyone who wants to join us in worship. I believe that a broader representation of lived experience— including those of immigrants, regardless of their legal status—is critical to exercise of my faith.

43. I believe that any immigration-enforcement action, or the threat of immigration enforcement, at a Quaker house of worship would cause serious harm to the religious exercise of Philadelphia Yearly Meeting and its member monthly meetings.

44. Quakers have held a religious commitment against violence in all forms as a founding principle of the faith.

45. I have never seen a weapon in a Quaker meeting. The presence of a weapon in a Quaker meeting would be absolutely unacceptable.

46. I understand the immigration-enforcement officers generally are armed.

47. I believe that the presence of armed officers at a meeting would cause significant harm to our religious exercise.

48. If I knew that immigration enforcement could happen at a monthly meeting, at any of our worship events throughout the year, or at our annual gathering, I would not be as encouraging of any immigrant joining us for worship. As much as their presence would benefit our religious experience, I would not feel comfortable knowing that their attendance could subject them to armed federal officers.

Philadelphia, Pennsylvania
February 3, 2025

Christie Duncan-Tessmer

7

# Exhibit 7

PYM-000080

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

**Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*,

     Plaintiffs,

**v.**

**U.S. Department of Homeland Security,** *et al.*,

     Defendants.

Civil Case No. 8:25-cv-243 TDC

## DECLARATION OF SARAH GILLOOLY

I, Sarah Gillooly, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

**The history and structure of Baltimore Yearly Meeting of the Religious Society of Friends**

1. Baltimore Yearly Meeting of the Religious Society of Friends, Inc., is the association of the members of 43 local Quaker congregations—Monthly Meetings—in Maryland, Pennsylvania, Virginia, West Virginia, and Washington, D.C.

2. Baltimore Yearly Meeting is located at:

   17100 Quaker Lane

   Sandy Spring, MD 20912

3. Baltimore Yearly Meeting is a church and legally incorporated 501(c)(3) nonprofit organization.

1

PYM-000081

4.   Baltimore Yearly Meeting has met continuously (except for a single year during the influenza pandemic) since 1672. It is the third oldest Yearly Meeting in the world.

5.   A Yearly Meeting in the Quaker religion is an association, a yearly gathering, and a way of describing Quakers within a certain region.

6.   The Yearly Meeting is the highest organizational body in the Religious Society of Friends.

7.   Monthly meetings are the heart and basic organizational unit in the Quaker religion. Generally, monthly meetings have their own governing instruments and budgets and own or rent a meeting house. Most community-based activities happen at monthly meetings.

8.   Many of our monthly meetings own their meeting houses, but not all do. Some monthly meetings rent the space they use for worship. At least two monthly meetings meet inside Protestant churches. I believe that it would be difficult for law enforcement to determine whether the church was being used at any given time for Quaker worship or for Protestant worship.

9.   To be a monthly meeting in the Religious Society of Friends, a meeting must be recognized by the yearly meeting.

10.  Quarterly meetings are gatherings of monthly meetings. They gather 3-4 times a year for worship and to make decisions about issues that concern the monthly meetings in the region. Many, but not all, monthly meetings in Baltimore Yearly Meeting are members of a quarterly meeting.

11.  Baltimore Yearly Meeting is composed of an estimated 5,558 members from its 43 constituent Monthly Meetings, as well as several informal worshipping communities.

2

PYM-000052

12. Monthly meetings within Baltimore Yearly Meeting are guided by a common faith and practice.

13. Baltimore Yearly Meeting instructs its monthly meetings on minimum requirements to be recognized as a monthly meeting and retains the authority to discontinue a monthly meeting.

14. Each constituent monthly meeting sends an annual report to Baltimore Yearly Meeting on the spiritual state of the meeting. These reports are published for the information of all monthly meetings and are also summarized in the annual gathering. Baltimore Yearly Meeting will offer spiritual and practical support to monthly meetings based on the content of those reports.

15. Baltimore Yearly Meeting does not manage the budget of its monthly meetings. If a monthly meeting closes down, generally the monthly meeting's assets transfer to Baltimore Yearly Meeting.

16. Monthly meetings fund Baltimore Yearly Meeting in part. Approximately 1/6 of the budget of Baltimore Yearly Meeting comes from monthly meetings in the form of apportionment. These payments are made according to guidelines set by the yearly meeting, but each monthly meeting discerns the final amount.

17. A loss of members would harm the monthly meetings and Baltimore Yearly Meeting. Losing members would mean financial loss in addition to loss of spiritual and denominational unity.

18. Baltimore Yearly Meeting gathers four times per year for worship, fellowship, and decision-making about the development of the Quaker faith in our region.

19. We understand those gatherings to be gathered meetings for worship.

3

20. When we meet, we understand the Yearly Meeting to be its own worshipping body. As part of the worshipping body, Baltimore Yearly Meeting has its own clerk and those who guide its religious development and service in the world.

21. Baltimore Yearly Meeting emphasizes that all Quakers in its region are part of our community. Its gatherings are attended by the members of its constituent monthly meetings and others who are not official members but are active participants in our worshipping body.

22. All are welcome to attend Baltimore Yearly Meeting's gatherings. Baltimore Yearly Meeting would never turn anyone away, and we do not ask about immigration status.

23. It is generally understood that individuals not active in a monthly meeting will likely not play a substantial role in decision-making at Baltimore Yearly Meeting's gatherings, but all are welcome to attend and to worship.

24. Because we believe that anyone can experience God directly, and that such experiences is to be shared with others, our faith requires us to welcome anyone who wants to join.

25. We understand ourselves to be part of a worldwide body of Quakers.

26. Some of Baltimore Yearly Meeting's constituent monthly meetings are located in areas with large populations of immigrants.

27. Some monthly meetings of Baltimore Yearly Meeting have a substantial number of active members or attenders who are immigrants, particularly African immigrants.

28. The Quakers have a long tradition of hosting people who come from places where there is ongoing violence or civil unrest. Our hospitality is an exercise of our faith. Our hospitality does not turn on someone's legal status.

4

PYM-000054

29. An important aspect of our faith in Baltimore Yearly Meeting is the practice of "intervisitation"—the spiritual practice of visiting Quakers from different parts of the world and different branches of Quakerism.

30. Practicing intervisitation is an important means of building and maintaining our relationship with our coreligionists across theological and geographical differences, as our Quaker faith requires.

31. As part of that effort, I and other members of Baltimore Yearly Meeting have attended events hosted by Evangelical Quakers, many of whom are Spanish-speaking.

32. In 2023, I was part of a delegation of Quakers to Kenya for a worldwide gathering with coreligionists.

**My role in the Baltimore Yearly Meeting and my faith**

33. I am General Secretary of Baltimore Yearly Meeting. The position is roughly equivalent to that of Executive Director for the organization.

34. As General Secretary, I serve as the legal agent and representative of Baltimore Yearly Meeting.

35. The position of General Secretary ultimately answers to the Trustees of Baltimore Yearly Meeting.

36. The General Secretary directly supervises approximately 12 staff members. Baltimore Yearly Meeting also employs approximately 150 seasonal workers in the four summer camps that it operates, which serve approximately 500 children.

37. I have been in my position for 3 1/2 years.

38. I am an active member of the Religious Society of Friends and a member of Adelphi Friends Meeting in Adelphi, Maryland.

5

PYM-000055

39. I will complete my seminary education in Spring 2025 and am in the process to be recognized as a Recorded Minister.

40. I also volunteer part-time as a Quaker chaplain at a local hospital in Washington, D.C.

41. I believe that any immigration-enforcement action at a Quaker meeting house or at any place where a meeting for worship is occurring would cause serious harm to the religious exercise of Baltimore Yearly Meeting and its members in its constituent monthly meetings. And I believe that the threat of immigration-enforcement actions at a Quaker meeting house or at any place where a meeting for worship is occurring causes serious harm to the religious exercise of Baltimore Yearly Meeting and its members in its constituent monthly meetings.

42. Knowing that immigration enforcement can happen at a monthly meeting, annual gathering, or other worship event, my ability be a servant-leader to these meetings is hampered, and I cannot be as encouraging of immigrants joining us for worship. As much as their presence would benefit our religious experience, I do not feel comfortable knowing that their attendance could subject them to armed federal officers.

43. Knowingly putting a person in harm's way or subjecting them to the possibility of a violent encounter would violate my religious beliefs.

44. I believe that threatened or actual immigration-enforcement action near or inside a Quaker meeting house or at any place where a meeting for worship is occurring may lead some to refrain from attending worship services.

45. Quakers have held a religious commitment against taking up arms for more than 350 years. I do not recall ever seeing a gun, or a weapon of any kind, in a Quaker meeting.

6

46. The presence of armed law enforcement officers in or near a meeting house would cause significant harm. It would cause immediate and lasting disruption to our ability to worship.

47. I believe that the Department of Homeland Security's new immigration-enforcement policy burdens our ability to continue the spiritual practice of intervisitation.

Washington, D.C.
February 3, 2025

Sarah Gillooly

7

# Exhibit 8

PTM-000058

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Philadelphia Yearly Meeting of the
Religious Society of Friends, *et al.*,

      Plaintiffs,

v.

U.S. Department of Homeland
Security, *et al.*,

      Defendants.

Civil Case No. _____

## DECLARATION OF ROBIN MOHR

I, Robin Mohr, declare under penalty of perjury, under 28 U.S.C. § 1746, that

the following is true and correct:

1. I am Clerk of the Green Street Meeting, located in Philadelphia,

   Pennsylvania.

2. Green Street Meeting is a Monthly Meeting. It is one of the seven Monthly

   Meetings that constitute the Philadelphia Quarterly Meeting, and it is part

   of the Philadelphia Yearly Meeting.

3. I have attended Green Street Meeting since 2011 and became a member in

   2012.

4. I have served as Clerk of the Nominating Committee and Clerk of the

   Children's Religious Education Committee and been a member of the

1

Property Committee and Hospitality Committee at the Green Street Meeting.

5. And I am an attender and participant at annual sessions of Philadelphia Yearly Meeting.

6. I previously attended and was a member of the San Francisco Monthly Meeting, which I attended from 1995 to 2011.

7. While a member of the San Francisco Monthly Meeting, I was a member of the Ministry and Oversight Committee, Children's Religious Education Committee, News Committee, and Hospitality Committee.

8. From 2011 until 2024, I was formerly the Executive Secretary of the Friends World Committee for Consultation, Section of the Americas, which fosters fellowship among all the branches of the Religious Society of Friends.

9. I am also a speaker, writer, and movement leader within the Religious Society of Friends. I speak and write about the sustainability of the denomination, how our modern practice builds on our traditional practices, and building bridges among different branches of Friends and across differences of theology, language, geography, and cultural and racial divisions.

## Relationship between Green Street Meeting and Philadelphia Yearly Meeting

10. Green Street Meeting is one of the member monthly meetings that makes up Philadelphia Yearly Meeting.

2

PTM-000080

11. Members of Green Street Meeting have been staff members or volunteers with different committees of the Philadelphia Yearly Meeting.

12. The Philadelphia Yearly Meeting provides programming support to the Green Street Meeting, including spiritual formation programs and sessions for dealing with the business of the Philadelphia Yearly Meeting.

13. The Philadelphia Yearly Meeting also provides financial support to the Green Street Meeting, including for the education of children, for members experiencing economic hardships, and for those suffering for conscience's sake, including money to support the family of a Friend who has been imprisoned for conscience-related reasons.

14. Green Street Meeting makes a financial contribution every year to the Philadelphia Yearly Meeting.

### My worship at the Green Street Meeting

15. I regularly attend weekly worship at the Green Street Meeting.

16. Worship is held in expectant waiting on the movement of the Holy Spirit.

17. It begins with people gathering in silence to listen for God speaking to us. When we stop talking, we can hear more clearly.

18. If someone feels moved by the Holy Spirit to minister out loud, they may be moved to rise and speak.

19. Our worship is called "unprogrammed worship," because there is no plan for who will speak, or when. There may be messages for anyone in the room.

3

PTM-000061

20. After worship concludes, we share food, which is an important part of our spiritual practice of community.

21. The Green Street Meeting offers remote participation in weekly worship via Zoom.

22. While it is important because it allows people who are not able to attend in person to participate in weekly worship, I have a much deeper and more profound experience when members are gathered together physically.

## The importance of communal worship with all-comers, including immigrants

23. Communal worship is a core aspect of my faith and religious exercise, and restrictions on communal worship would negatively affect my religious exercise and ability to practice my faith.

24. Quakers have traditionally gathered together in person.

25. We believe that God is speaking all the time. We prepare ourselves to listen better when we gather together.

26. There is something in the spiritual nature of human beings coming together that enables us to listen better to the Holy Spirit speaking to us.

27. We believe in the ability of all people to minister.

28. Openness to all people who come through our doors is part of the Christian witness and our Quaker witness. We believe that all people are able to channel the Holy Spirit and to minister to our community.

29. Because everyone receives messages of the Holy Spirit in a different way, having as many people attend our meetings as possible allows for more

4

people listening, and more opportunities to grasp messages of the Holy Spirit from others.

30. Hearing from people who have different experiences and understandings of the Holy Spirit enriches our practice.

31. The Quakers have a long tradition of welcoming immigrants and refugees in our communities. Supporting the stranger in our midst is part of our religious practice.

32. Green Street Meeting has focused on ensuring that it is an open and welcoming community, including for members of the immigrant community. Among other things, we welcome people at the door before worship, invite visitors and new attenders to introduce themselves, share food together after worship, and ensure that our religious education and other materials reflect a diversity of faces, voices, and languages.

33. The threat or presence of armed law enforcement officers coming near or inside our meeting house during worship would disrupt the peaceful practice of our religion.

34. I believe that the threat or presence of armed law enforcement officers coming near or inside our meeting house may deter people from attending worship.

35. The Green Street Meeting has members who are immigrants. Some of them have shared their fear of immigration enforcement, even though they are U.S. citizens.

5

JA120

PYM-000063

36. If some people cease attending weekly worship, it would negatively affect the ability of our attenders and members to gather together for communal worship.

37. If some people cease attending weekly worship, my own ability to worship will be diminished.

38. We are traditionally and currently opposed to the use of armed violence for any purpose.

39. Many Quakers have chosen our denomination because of our commitment to peace and nonviolence, and because they understand that Quaker meetings are a place of peace and nonviolence.

40. The threat or presence of armed law enforcement officers in or near our meeting house would be a violation of our space.

41. The threat or presence of armed law enforcement officers coming near or inside our meeting house during worship would also make it more difficult to center and listen to the word of God inside our hearts.

Philadelphia, Pennsylvania
January 26, 2025

Robin Mohr

JA121

# Exhibit 9

# Memorandum



LRT 40/4-P

| Subject | Date |
|---|---|
| Sector Policy Regarding Entry Into Places of Worship, Schools and Private Residences | January 21, 1993 |

| To | From |
|---|---|
| All Sector Employees Laredo Sector | Jose E. Garza Chief Patrol Agent Laredo, Texas |

This memorandum is to ensure that all Sector employees are fully aware of Sector policy regarding entry into places of worship, schools and private residences.

Places of worship will not be entered for the purpose of apprehending illegal aliens even if in hot pursuit unless an Assistant Chief or above has authorized it.

Schools will not be entered to arrest illegal aliens even if in hot pursuit. The only exception is to pick up the children of an alien in custody for the purposes of maintaining family unity after an Assistant Chief or above has authorized it.

Private residences will not be entered to arrest illegal aliens even if in hot pursuit unless permission has been given by the owners and a Supervisory Agent or above has authorized it.

JA123

Form G-2

# Exhibit 11

# Memorandum

HQ 807-P

| Subject | Date |
|---|---|
| Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies. | MAY 17 1993 |

| To | From |
|---|---|
| District Directors<br>Chief Patrol Agents | Office of Operations |

## POLICY:

It is a policy of the Service to attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies.

## PROCEDURES:

Enforcement operations which are likely to involve apprehensions on the premises of schools, places of worship, or at funerals or other religious ceremonies require advance written approval by the District Director or Chief Patrol Agent. Such actions are reportable under Operations Instructions (OI) 103.1(g) pertaining to reporting of incidents and unusual matters. Approval of an operation by a field office manager does not substitute for required headquarters authorizations for actions requiring such approval, e.g., 511 cases.

The Assistant District Directors, OIC, or Deputy Chief Patrol Agent, may approve inspections of records; preliminary investigative activities related to a specific individual or individuals which will not entail contact with the person under investigation; and similar activities at such locations when apprehensions will not be made.

For purposes of this policy, the term "schools" includes pre-schools; primary, secondary, and post-secondary schools (including colleges and universities); and other institutions of learning such as vocational or trade schools. "Places of worship" includes such institutions as churches, temples, and synagogues. "Other religious ceremonies" include grave site ceremonies and rosaries. The requirement for advance approval of operations in such locations should not be construed as tolerance for violations of the law by or on the premises of such institutions.

In determining the appropriateness of a proposed action, District Directors and Chief Patrol Agents shall consider the following:

Page 2
District Directors
Chief Patrol Agents

• The availability of alternative measures which would achieve the enforcement objective (e.g., making the arrest off the premises);

The importance of the enforcement objective in the context of Service priorities;

Measures which can be taken to minimize the impact on operation of the school or place of worship;

Whether the action has been requested or approved by managers of the institution involved.

Exceptions to this policy, e.g., local agreements to cover a specific situation or institution, must be approved in writing by the Associate Commissioner for Enforcement. Headquarters may also direct exceptions in such unusual situations as a declared national emergency by Presidential Executive Order or National Security Council directive, e.g., a mass alien influx or alien registration action.

When situations arise that do not permit written authorization prior to entry onto the premises of schools or places of worship, officers are expected to exercise good judgement concerning the appropriate action to take. Some situations will require the officer to proceed; in other instances entry onto the premises will not be appropriate. If exigent circumstances require a deviation from this policy, the matter must be reported immediately by the District Director or Chief Patrol Agent to the appropriate Assistant Commissioner. All field office managers must ensure that enforcement officers are well versed in and able to apply the criteria for exigent circumstances stated in the Service manual on *The Law of Arrest, Search, and Seizure for Immigration Officers* (M-69). Reports should explain the exigency requiring the officer's action, any steps which were taken to secure supervisory authorization in the absence of written approval (e.g., oral approval from supervisor), the seriousness of the suspected violation, whether the facility was in operation (e.g., were classes in session), and other pertinent facts.

Where operations covered by this policy are planned in advance, the general practice for Border Patrol officers requires that the operation will be conducted in plain clothes. However, under exigent circumstances, one of the factors that officers should consider is the likelihood that they will be identified as law enforcement officers; in such instances, the absence of a uniform may mitigate against continuing a pursuit.

Page 3
District Directors
Chief Patrol Agents

This directive does not affect the scope of authority of Service officers under the Immigration and Nationality Act, but is directed to the operational implementation of such authority. The requirement for approval in advance of such operations and actions on such premises should not be construed as an indication of tolerance for any violations of the law by anyone at or in charge of a school or a place of worship. This directive is an internal statement of procedure which does not confer any benefits upon nor impose any requirements upon anyone other than Service officers as a part of a uniform exercise of delegated authority.

James A. Puleo /for
Acting Associate Commissioner

Enclosure



**Department of Homeland Security**
Bureau of Customs and Border Protection
*U.S. Border Patrol*

EPT 50/19.1.5

*Office of the Chief*
*U.S. Border Patrol Sector Headquarters*
*8901 Montana Avenue*
*El Paso, Texas 79925-1212*

APR 20 2004

MEMORANDUM FOR:        PATROL AGENTS IN CHARGE
                       AND UNIT SUPERVISORS
                       EL PASO SECTOR

FROM:                  Luis E. Barker
                       Chief Patrol Agent
                       El Paso Sector

SUBJECT:               Enforcement Activities at Schools, Places of Worship, and at
                       Funeral or Other Religious Ceremonies

Attached for your information are two policy memorandums sent to the field on
June 20, 2001. Reiterate this policy relating to enforcement activities at schools, places
of worship, funerals, or other religious ceremonies. Additionally, accompanying these
memorandums is a directive issued by my office, in which I instruct all PAICs and Unit
Supervisors to strictly adhere to the guidelines given in these two policy memorandums.

Please ensure that every agent understands this policy and complies with it. Agents
should be aware of the locations that fall within the purview of these instructions to
avoid any inadvertent or perceived violation of the policy.

Please distribute copies of these memorandums to every agent. You are directed to
forward to Assistant Chief Patrol Agent (ACPA) Manuel Flores, Sr., a roster of your
agents showing that they have received this material.

Should there be any questions, please contact ACPA Flores at (915) 834-8304.

Attachments



| | | Date | | Initial | Date |
|---|---|---|---|---|---|
| D1 | | | D11 | | |
| D2 | | | D12 | | |
| D3 | | | D13 | | |
| D4 | | | D14 | | |
| D5 | | | D15 | | |
| D6 | | | D16 | | |
| D7 | | | D17 | | |
| D8 | | | D18 | | |
| D9 | | | D19 | | |
| D10 | | | D20 | | |

PTM-000073





**U.S. Department of Justice**
Immigration and Naturalization Service

EPT 50/19.1.5

*U.S. Border Patrol Sector Headquarters*
*8901 Montana Avenue*
*El Paso, Texas 79925-1212*

**JUN 20 2001**

MEMORANDUM FOR ALL PATROL AGENTS IN CHARGE AND UNIT SUPERVISORS
EL PASO SECTOR

FROM:        Luis E. Barker
             Chief Patrol Agent
             El Paso Sector

SUBJECT:     Enforcement Activities at Schools, Places of Worship, or at Funeral or Other
             Religious Ceremonies.

    Attached for your information are two policy memorandums relating to enforcement
activities at schools, places of worship, funerals or other religious ceremonies. It is the policy of
the Service, and this Sector, to attempt to avoid apprehension of persons and to tightly control
investigative operations on the premises of schools, places of worship, funerals and other
religious ceremonies. All agents should be cognizant of the issues contained in these two memos
and be sensitive to the areas identified.

    As stated in the memo, this policy does not affect the scope of authority of Service
officers, but is directed to the operational implementation of such authority. The requirement for
approval in advance of such operations and actions on such premises should not be construed as
an indication of tolerance for any violation of the law by anyone at, or in charge of a school or
place of worship. All Patrol Agents in Charge, and Unit Supervisors should make sure their
agents understand that they should not conduct operations in these areas and should enter these
premises only in the most exigent of circumstances.

JA129

Memorandum for All Patro... gents in Charge and Unit Supervisors          Page 2
Subject:  Enforcement Activities at Schools, Places, of Worship, or at Funerals or Other
          Religious Ceremonies.

Please provide a roster of your agents to ACPA David Ham showing that they have received a copy of these memos and that they have read and understand the contents. It is extremely important in this era of increased interest in our activities on the border by a variety of special interest groups that we understand and comply with this policy. If you have any questions concerning this policy, please contact ACPA David Ham at (915) 834-8304.

Attachments

PTM-000073



**U.S. Department of Justice**
Immigration and Naturalization Service

COR 50/19.1.5

*Central Region*
*7701 N. Stemmons Freeway*
*Dallas, Texas 75247*

June 14, 2001

MEMORANDUM FOR DISTRICT DIRECTORS
                CHIEF PATROL AGENTS
                CENTRAL REGION

FROM:      Robert A. Wallis
           Acting Regional Director
           Central Region

SUBJECT:   Enforcement Activities at Schools, Places of Worship, or at Funerals or Other
           Religious Ceremonies.

It is the policy of the Service to attempt to avoid apprehension of persons and to tightly
control investigative operations on the premises of schools, places of worship, funerals and other
religious ceremonies.

On May 17, 1993, Acting Associate Commissioner for Operations, James A. Puleo, issued a
memorandum outlining the Service's policy on excludable areas for enforcement activities. The
memo first states that enforcement operations that are likely to involve apprehensions at schools,
places of worship, or at funerals or other religious ceremonies must be approved in advance by
the District Director or Chief Patrol Agent. The Assistant District Directors or Deputy Chief
Patrol Agents may approve inspections of records; preliminary investigative activities relating to
a specific individual or individuals which will not entail contact with the person under
investigation; and similar activities at such locations when apprehensions will not be made.

For the purposes of this policy, the term "schools" includes preschools; primary, secondary,
and post-secondary schools (including colleges and universities); and other institutions of
learning such as vocational or trade schools. "Places of worship" includes such institutions as
churches, temples, and synagogues. "Other religious ceremonies" include gravesite ceremonies
and rosaries. The requirement for advance approval of operations in such locations should not be
construed as tolerance for violations of the law by or on the premises of such institutions.

Page 1 of 2

PTM-000076

8/15/01   FRI 10:13 FAX 214 7877434          CRODDP              →→→ EPT BP                    @003

)

Memorandum for District Directors and Chief Patrol Agents                          Page 2 of 2
Subject:  Enforcement activities at schools, places of worship, or at funerals or other religious
          ceremonies.

In determining the appropriateness of a proposed action, District Directors and Chief Patrol
Agents are to consider:  (1) the availability of alternative measures that would achieve the
enforcement objective; (2) the importance of the enforcement objective in the context of INS
priorities; (3) measures that can be taken to minimize the impact on the operation of the school
or place of worship; and (4) whether the action has been requested or approved by the
management of the institution involved.

Michael A. Pearson, Executive Associate Commissioner for Field Operations, must approve
exceptions to the policy.  Also, INS headquarters might make exceptions in unusual situations,
such as during a declared national emergency.

The memo added that situations that do not permit written authorization before entering
schools or places of worship, "officers are expected to exercise good judgement concerning the
appropriate action to take."  The officer must report all exigent circumstances that mandated
deviation from the set policy.

Finally, the memo noted that where operations covered by the policy are planned in advance,
the general practice for Border Patrol Agents requires that the operation be conducted in plain
clothes.  However, in exigent circumstances the agents should consider the likelihood that they
will be identified as law enforcement officers, because in such circumstances the absence of a
uniform might mitigate against a pursuit.

This directive does not affect the scope of authority of Service officers under the Immigration
and Nationality Act, but is directed to the operational implementation of such authority.  The
requirement for approval in advance of such operations and actions on such premises should not
be construed as an indication of tolerance for any violation of the law by anyone at, or in charge
of a school or place of worship.  This directive is an internal statement of procedure, which does
not confer any benefits upon nor impose any requirement upon anyone other than Service
officers as a part of a uniform exercise of delegated authority

Should you have any questions regarding this procedure, please call Robert E. Jolicoeur,
Deputy Assistant Regional Director, Detention and Removal, at (214) 905-8337.

# Exhibit 14



*Office of Investigations*

U.S. Department of Homeland Security
425 I Street, NW
Washington, DC 20536

**U.S. Immigration
and Customs
Enforcement**

**DEC 2 6 2007**

| | |
|---|---|
| **MEMORANDUM FOR:** | All Assistant Directors
All Special Agents in Charge
All Deputy Assistant Directors |
| **FROM:** | Marcy M. Forman
Director, Office of Investigations |
| **SUBJECT:** | Enforcement Actions at Schools |

The presence of our law enforcement agents conducting investigative activity at schools, or in venues where children's activities occur, has always been a point of particular sensitivity, especially given the public's interest in ICE's mission. Accordingly, it is important to emphasize that great care and forethought be applied before undertaking any investigative or enforcement type action at or near schools, other institutions of education, and *venues* generally where children and their families may be present.

Accordingly, the following policy is immediately effective.

When an enforcement action or investigative activity includes possibility of detention or questioning of subjects at the above listed sites, the first line supervisor shall generate a request memorandum seeking approval from the Special Agent in Charge. The memorandum must be reviewed and approved by the Special Agent in Charge prior to the anticipated activity and notification must be made to the appropriate Headquarters Operations Manager.

This policy does not apply to cases or investigations involving situations where no enforcement activity is contemplated, such as requesting information from school officials, retrieving records, or otherwise routine non-enforcement activity. This policy also does not apply to terrorism-related investigations, cases of public safety or other cases that can be articulated. However, when time and circumstances permit, offices are required to provide appropriate notice to Headquarters of any enforcement action at any of the above listed sensitive locations.

All employees should be cognizant of the sensitivity of engaging in arrests or other enforcement activities at areas where children are present, such as educational institutions. Exercising common sense and good judgment will prevent situations that would negatively impact our ability to protect the safety and security of the Homeland.

A formal Directive is currently being drafted. This memorandum will serve as the interim policy regarding enforcement activities at schools. Your cooperation in implementing this policy is appreciated.

www.ice.gov

REL0000024903

# Exhibit 15

SUPERSEDED BY POLICY #10029.2 "Enforcement Actions at or Focused on Sensitive Locations" (OCTOBER 24, 2011)
Case 8:25-cv-00243-TDC   Document 16-6   Filed 02/05/25   Page 2 of 3
PYM-000080

*Office of the Assistant Secretary*

U.S. Department of Homeland Security
425 I Street, NW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

July 3, 2008

MEMORANDUM FOR:   All Field Office Directors
All Special Agents in Charge

FROM:   Julie L. Myers
Assistant Secretary

SUBJECT:   Field Guidance on Enforcement Actions or Investigative Activities
At or Near Sensitive Community Locations

ICE personnel should refrain from conducting enforcement actions or investigative activities at or near sensitive community locations such as schools, places of worship, and funerals or other religious ceremonies, except in limited circumstances as set forth within this memorandum. Such restraint strikes a balance between our law enforcement responsibilities and the public's confidence in the way ICE executes its mission.

Precedent for this approach is clear. Under Immigration and Naturalization Service (INS) Policy HQ 807-P, Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies (May 17, 1993), law enforcement personnel were directed to:

*"[A]ttempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies."*

ICE policies are in place to ensure that our personnel conduct enforcement operations in a manner that is safe and respectful of all persons. This policy was recently reinforced in a December 26, 2007 Memorandum from Marcy M. Forman, Director, Office of Investigations, entitled Enforcement Actions at Schools. This field guidance clearly states that ICE views these actions with particular sensitivity:

*"[I]t is important to emphasize that great care and forethought be applied before undertaking any investigative or enforcement type action at or near schools, other institutions of education, and venues generally where children and their families may be present."*

Policies governing ICE Office of Detention and Removal (DRO) Fugitive Operations Teams have similarly discouraged enforcement actions in these sensitive locations. Furthermore, all of our enforcement actions have been, and should continue to be, thoroughly planned, reviewed, and approved by senior field office personnel so that both the public's safety and our national security are guaranteed.

SUPERSEDED BY POLICY #10029.2 "Enforcement Actions at or Focused on Sensitive Locations" (OCTOBER 24, 2011)
www.ice.gov
JA136

REL0000024902

SUBJECT: Field Guidance on Enforcement Actions or Investigative Activities At or Near
Sensitive Community Locations
Page 2

While ICE policies and procedures do not specifically preclude enforcement actions or
investigative activities at the aforementioned locations, the direction of INS HQ807-P remains in
effect.

Consistent with these policies, including INS HQ807-P, there may be specific situations
requiring ICE personnel to act at or near sensitive locations. Such situations would include those
involving terrorism-related investigations, matters of public safety, or actions where no
enforcement activity is involved, such as requesting information from school officials, retrieving
records, or otherwise routine, non-enforcement activity. Any such case must be raised to the
appropriate Headquarters program office prior to any action or, in exigent circumstances, as soon
as practicable. Moreover, personnel are reminded to be cognizant of the impact of their activity,
exercise good judgment and act with an appropriate level of compassion in light of the location
while exercising their authority in such circumstances.

This policy should not be construed as an indication of tolerance for any violations of the law by
anyone at or in charge of any of these sensitive locations. A formal ICE Policy Directive
providing policy and procedures for these enforcement actions and/or investigative activities will
be issued in the near future.

SUPERSEDED BY POLICY #10029.2 "Enforcement Actions at or Focused on Sensitive Locations" (OCTOBER 24, 2011)

JA137

REL0000024902

# Exhibit 16

Policy Number: 10029.2
FEA Number: 306-112-002b

U.S. Department of Homeland Security
500 12th Street, SW
Washington, D.C. 20536

OCT 2 4 2011



U.S. Immigration
and Customs
Enforcement

MEMORANDUM FOR:    Field Office Directors
                   Special Agents in Charge
                   Chief Counsel

FROM:              John Morton
                   Director

SUBJECT:           Enforcement Actions at or Focused on Sensitive Locations

Purpose

This memorandum sets forth Immigration and Customs Enforcement (ICE) policy regarding
certain enforcement actions by ICE officers and agents at or focused on sensitive locations. This
policy is designed to ensure that these enforcement actions do not occur at nor are focused on
sensitive locations such as schools and churches unless (a) exigent circumstances exist, (b) other
law enforcement actions have led officers to a sensitive location as described in the *"Exceptions
to the General Rule"* section of this policy memorandum, or (c) prior approval is obtained. This
policy supersedes all prior agency policy on this subject.[1]

Definitions

The enforcement actions covered by this policy are (1) arrests; (2) interviews; (3) searches; and
(4) for purposes of immigration enforcement only, surveillance. Actions not covered by this
policy include actions such as obtaining records, documents and similar materials from officials
or employees, providing notice to officials or employees, serving subpoenas, engaging in Student
and Exchange Visitor Program (SEVP) compliance and certification visits, or participating in
official functions or community meetings.

The sensitive locations covered by this policy include, but are not limited to, the following:

---

[1] Memorandum from Julie L. Myers, Assistant Secretary, U.S. Immigration and Customs Enforcement, "Field
Guidance on Enforcement Actions or Investigative Activities At or Near Sensitive Community Locations" 10029.1
(July 3, 2008); Memorandum from Marcy M. Forman, Director, Office of Investigations, "Enforcement Actions at
Schools" (December 26, 2007); Memorandum from James A. Puleo, Immigration and Naturalization Service (INS)
Acting Associate Commissioner, "Enforcement Activities at Schools, Places of Worship, or at funerals or other
religious ceremonies" HQ 807-P (May 17, 1993). This policy does not supersede the requirements regarding arrests
at sensitive locations put forth in the Violence Against Women Act, see Memorandum from John P. Torres, Director
Office of Detention and Removal Operations and Marcy M. Forman, Director, Office of Investigations, "Interim
Guidance Relating to Officer Procedure Following Enactment of VAWA 2005 (January 22, 2007).

Enforcement Actions at or Focused on Sensitive Locations
Page 2

- schools (including pre-schools, primary schools, secondary schools, post-secondary schools up to and including colleges and universities, and other institutions of learning such as vocational or trade schools);
- hospitals;
- churches, synagogues, mosques or other institutions of worship, such as buildings rented for the purpose of religious services;
- the site of a funeral, wedding, or other public religious ceremony; and
- a site during the occurrence of a public demonstration, such as a march, rally or parade.

This is not an exclusive list, and ICE officers and agents shall consult with their supervisors if the location of a planned enforcement operation could reasonably be viewed as being at or near a sensitive location. Supervisors should take extra care when assessing whether a planned enforcement action could reasonably be viewed as causing significant disruption to the normal operations of the sensitive location. ICE employees should also exercise caution. For example, particular care should be exercised with any organization assisting children, pregnant women, victims of crime or abuse, or individuals with significant mental or physical disabilities.

<u>Agency Policy</u>

*General Rule*

Any planned enforcement action at or focused on a sensitive location covered by this policy must have prior approval of one of the following officials: the Assistant Director of Operations, Homeland Security Investigations (HSI); the Executive Associate Director (EAD) of HSI; the Assistant Director for Field Operations, Enforcement and Removal Operations (ERO); or the EAD of ERO. This includes planned enforcement actions at or focused on a sensitive location which is part of a joint case led by another law enforcement agency. ICE will give special consideration to requests for enforcement actions at or near sensitive locations if the only known address of a target is at or near a sensitive location (e.g., a target's only known address is next to a church or across the street from a school).

*Exceptions to the General Rule*

This policy is meant to ensure that ICE officers and agents exercise sound judgment when enforcing federal law at or focused on sensitive locations and make substantial efforts to avoid unnecessarily alarming local communities. <u>The policy is not intended to categorically prohibit lawful enforcement operations when there is an immediate need for enforcement action as outlined below.</u> ICE officers and agents may carry out an enforcement action covered by this policy without prior approval from headquarters when one of the following exigent circumstances exists:

- the enforcement action involves a national security or terrorism matter;
- there is an imminent risk of death, violence, or physical harm to any person or property;

Enforcement Actions at or Focused on Sensitive Locations
Page 3

- the enforcement action involves the immediate arrest or pursuit of a dangerous felon, terrorist suspect, or any other individual(s) that present an imminent danger to public safety; or
- there is an imminent risk of destruction of evidence material to an ongoing criminal case.

When proceeding with an enforcement action under these extraordinary circumstances, officers and agents must conduct themselves as discretely as possible, consistent with officer and public safety, and make every effort to limit the time at or focused on the sensitive location.

If, in the course of a planned or unplanned enforcement action that is not initiated at or focused on a sensitive location, ICE officers or agents are subsequently led to or near a sensitive location, barring an exigent need for an enforcement action, as provided above, such officers or agents must conduct themselves in a discrete manner, maintain surveillance if no threat to officer safety exists and immediately consult their supervisor prior to taking other enforcement action(s).

<u>Dissemination</u>

Each Field Office Director, Special Agent in Charge, and Chief Counsel shall ensure that the employees under his or her supervision receive a copy of this policy and adhere to its provisions.

<u>Training</u>

Each Field Office Director, Special Agent in Charge, and Chief Counsel shall ensure that the employees under his or her supervision are trained (both online and in-person/classroom) annually on enforcement actions at or focused on sensitive locations.

<u>No Private Right of Action</u>

Nothing in this memorandum is intended to and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

This memorandum provides management guidance to ICE officers exercising discretionary law enforcement functions, and does not affect the statutory authority of ICE officers and agents, nor is it intended to condone violations of federal law at sensitive locations.

# Exhibit 17

Pennsylvania Avenue, NW
Washington, DC 20229



U.S. Customs and
Border Protection

JAN 1 8 2013

Deputy Commissioner

MEMORANDUM FOR:    See Distribution

FROM:    David V. Aguilar
Deputy Commissioner

SUBJECT:    U.S. Customs and Border Protection Enforcement Actions at or
Near Certain Community Locations

The presence of U.S. Customs and Border Protection (CBP) Officers and Agents conducting
enforcement activities at or near schools, places of worship, and certain other community
locations has been a sensitive issue. Accordingly, careful consideration and planning must be
undertaken, as outlined herein, in relation to enforcement actions conducted at or near these
establishments.

The following establishments should be considered to be within the context of this policy:

- schools, including pre-schools, primary schools, secondary schools, post-secondary
  schools, vocational or trade schools, and colleges and universities;
- places of worship, including places where funerals, weddings, or other public religious
  ceremonies are taking place;
- community centers; and
- hospitals.

CBP personnel should consult their supervisors for guidance when an enforcement action is
being contemplated or planned at or near a location not specifically listed above but that may be
similar in nature, description, or function. In assessing the appropriateness of a proposed action,
supervisors should consider alternative measures that could achieve the enforcement objective
without causing significant disruption to the normal activities or operations at the identified
location, including the importance of the enforcement objective in furthering CBP's mission.

When CBP enforcement actions or investigative activities are likely to lead to an apprehension at
or near such locations, written approval by the Chief Patrol Agent, Director of Field Operations,
Director of Air and Marine Operations or the Internal Affairs Special Agent in Charge is
required. The Deputy to these offices may approve the inspection of records, preliminary
investigative activities, and similar activities at these locations where apprehensions are not
likely to be made.

This policy does not summarily preclude enforcement actions at the listed locations. When
situations arise that call for enforcement actions at or near the above-mentioned establishments
without prior written approval, Agents and Officers are expected to exercise sound judgment and

JA143

U.S. Customs and Border Protection Enforcement Action at or
Near Certain Community Locations
Page 2

common sense while taking appropriate action. Exigent circumstances, including matters related to national security, terrorism, or public safety, requiring an Agent or Officer to enter these establishments, must be reported immediately through the respective chain of command, as applicable.

This policy does not limit or otherwise apply to CBP operations that are conducted at or near the international border (including the functional equivalent of the border), or CBP operations that bear nexus to the border including, for example, but not limited to smuggling interdiction efforts that result in transportation to a hospital, custodial monitoring of injured aliens in CBP custody that require hospitalization, or a controlled delivery from the border that concludes in close proximity of one of the aforementioned locations.

This CBP policy guidance memorandum, which may be modified, superseded, or rescinded by CBP at any time without notice, is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, for any party.

Distribution:    Assistant Commissioner, Office of Air and Marine
                 Assistant Commissioner, Office of Field Operations
                 Assistant Commissioner, Office of Internal Affairs
                 Chief, Office of Border Patrol
                 Chief Counsel



United States Government Accountability Office

Report to Congressional Requesters

**July 2021**

# IMMIGRATION ENFORCEMENT

## Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations



A Century of Non-Partisan Fact-Based Work

**July 2021**

# GAO@100 Highlights

Highlights of GAO-21-487, a report to congressional requesters

# IMMIGRATION ENFORCEMENT

## Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations

## Why GAO Did This Study

In recent years, some U.S. citizens have claimed that they were mistakenly detained or removed by ICE and held by CBP on administrative immigration charges. Such charges are based on civil violations of U.S. immigration law, but these charges are not applicable to U.S. citizens.

GAO was asked to review issues related to U.S. citizens detained by ICE or held by CBP on administrative immigration charges. This report examines (1) the extent to which ICE and CBP have developed and implemented policies and procedures for investigating the potential U.S. citizenship of individuals its officers and agents encounter; (2) ICE and CBP data on U.S. citizens detained by ICE or held by CBP on administrative immigration charges; and (3) the extent to which ICE has developed and implemented policies and procedures for investigating the potential U.S. citizenship of individuals its officers identify for detainers. GAO analyzed DHS documents and record-level enforcement data, and interviewed DHS officials at headquarters and in the field.

## What GAO Recommends

GAO recommends that ICE (1) update its training materials to reflect ICE policies regarding potential U.S. citizens, and (2) systematically collect and maintain electronic data of its encounters with individuals for whom there is evidence of potential U.S. citizenship. DHS concurred with the recommendations.

View GAO-21-487. For more information, contact Rebecca Gambler at (202) 512-8777 or gamblerr@gao.gov.

## What GAO Found

Department of Homeland Security's (DHS) U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) have policies and procedures for investigating citizenship, but some ICE guidance is inconsistent. Specifically, ICE policy requires officers to interview individuals claiming U.S. citizenship in the presence of, or in consultation with, a supervisor, but its training materials direct officers to end questioning if the officer believes the individual and the evidence suggests the individual is a U.S. citizen—without consulting a supervisor. By making its training materials consistent with ICE policy, ICE would have more assurance that all encounters with potential U.S. citizens receive appropriate supervisory review.

Further, while ICE policy requires officers to document citizenship investigations in ICE data systems, it does not require officers to update the citizenship field after identifying evidence that an individual may be a U.S. citizen. As a result, ICE does not know the extent to which its officers are taking enforcement actions against individuals who could be U.S. citizens. By systematically collecting and maintaining electronic data, ICE would have better insight into its officers' enforcement of administrative immigration law.

Available data indicate ICE and CBP took enforcement actions against some U.S. citizens. For example, available ICE data indicate that ICE arrested 674, detained 121, and removed 70 potential U.S. citizens from fiscal year 2015 through the second quarter of fiscal year 2020 (March 2020).



U.S. Immigration and Customs Enforcement (ICE) Enforcement Actions Against Potential U.S. Citizens from Fiscal Years 2015 through 2020 Quarter 2 (March 2020)

Source: GAO analysis of ICE data. | GAO-21-487

ICE has policies and procedures for investigating citizenship of individuals for detainers. Detainers are notices from ICE to other law enforcement agencies that articulate probable cause for removability. They also request for such agencies to inform DHS of a removable individual's pending release date and to maintain custody for up to 48 hours to allow DHS to assume custody. ICE officers are, to the extent feasible, to interview individuals in the custody of another law enforcement agency to aid in assessing the individuals' potential citizenship prior to issuing detainers. Available ICE data indicate ICE issued detainers for at least 895 potential U.S. citizens from fiscal year 2015 through the second quarter of 2020 and cancelled about 74 percent of those detainers.

**United States Government Accountability Office**

# Exhibit 20



**U.S. Department of Homeland Security**
Washington, DC 20528

*Secretary*

October 27, 2021

MEMORANDUM TO:     Tae D. Johnson
                   Acting Director
                   U.S. Immigration and Customs Enforcement

                   Troy A. Miller
                   Acting Commissioner
                   U.S. Customs and Border Protection

                   Ur M. Jaddou
                   Director
                   U.S. Citizenship and Immigration Services

                   Robert Silvers
                   Under Secretary
                   Office of Strategy, Policy, and Plans

                   Katherine Culliton-González
                   Officer for Civil Rights and Civil Liberties
                   Office of Civil Rights and Civil Liberties

                   Lynn Parker Dupree
                   Chief Privacy Officer
                   Privacy Office

FROM:              Alejandro N. Mayorkas
                   Secretary

SUBJECT:           **Guidelines for Enforcement Actions in or Near Protected Areas**

This memorandum provides guidance for ICE and CBP enforcement actions in or near areas that require special protection.  It is effective immediately.

This memorandum supersedes and rescinds John Morton's memorandum entitled, "Enforcement Actions at or Focused on Sensitive Locations" (number 10029.2, dated October 24, 2011), and David Aguilar's memorandum entitled, "U.S. Customs and Border Protection Enforcement Actions at or Near Certain Community Locations" (dated January 18, 2013).

1

PYM-000189

## I.       Foundational Principle

In our pursuit of justice, including in the execution of our enforcement responsibilities, we impact people's lives and advance our country's well-being in the most fundamental ways.  It is because of the profound impact of our work that we must consider so many different factors before we decide to act.  This can make our work very difficult.  It is also one of the reasons why our work is noble.

When we conduct an enforcement action – whether it is an arrest, search, service of a subpoena, or other action – we need to consider many factors, including the location in which we are conducting the action and its impact on other people and broader societal interests.  For example, if we take an action at an emergency shelter, it is possible that noncitizens, including children, will be hesitant to visit the shelter and receive needed food and water, urgent medical attention, or other humanitarian care.

To the fullest extent possible, we should not take an enforcement action in or near a location that would restrain people's access to essential services or engagement in essential activities.  Such a location is referred to as a "protected area."

This principle is fundamental.  We can accomplish our enforcement mission without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more.  Adherence to this principle is one bedrock of our stature as public servants.

## II.      Protected Areas

Whether an area is a "protected area" requires us to understand the activities that take place there, the importance of those activities to the well-being of people and the communities of which they are a part, and the impact an enforcement action would have on people's willingness to be in the protected area and receive or engage in the essential services or activities that occur there.  It is a determination that requires the exercise of judgment.

The following are some examples of a protected area.  The list is not complete.  It includes only examples:

- A school, such as a pre-school, primary or secondary school, vocational or trade school, or college or university.

- A medical or mental healthcare facility, such as a hospital, doctor's office, health clinic, vaccination or testing site, urgent care center, site that serves pregnant individuals, or community health center.

- A place of worship or religious study, whether in a structure dedicated to activities of faith (such as a church or religious school) or a temporary facility or location where such activities are taking place.

2

- A place where children gather, such as a playground, recreation center, childcare center, before- or after-school care center, foster care facility, group home for children, or school bus stop.

- A social services establishment, such as a crisis center, domestic violence shelter, victims services center, child advocacy center, supervised visitation center, family justice center, community-based organization, facility that serves disabled persons, homeless shelter, drug or alcohol counseling and treatment facility, or food bank or pantry or other establishment distributing food or other essentials of life to people in need.

- A place where disaster or emergency response and relief is being provided, such as along evacuation routes, where shelter or emergency supplies, food, or water are being distributed, or registration for disaster-related assistance or family reunification is underway.

- A place where a funeral, graveside ceremony, rosary, wedding, or other religious or civil ceremonies or observances occur.

- A place where there is an ongoing parade, demonstration, or rally.

We need to consider the fact that an enforcement action taken near – and not necessarily in – the protected area can have the same restraining impact on an individual's access to the protected area itself. If indeed that would be the case, then, to the fullest extent possible, we should not take the enforcement action near the protected area. There is no bright-line definition of what constitutes "near." A variety of factors can be informative, such as proximity to the protected area, visibility from the protected area, and people's behavioral patterns in and around the protected area. The determination requires an analysis of the facts and the exercise of judgment.

The fundamental question is whether our enforcement action would restrain people from accessing the protected area to receive essential services or engage in essential activities. Our obligation to refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area thus applies at all times and is not limited by hours or days of operation.

Whether an enforcement action can be taken in or near a courthouse is addressed separately in the April 27, 2021 Memorandum from Tae Johnson, ICE Acting Director, and Troy Miller, CBP Acting Commissioner, entitled "Civil Immigration Enforcement Actions in or Near Courthouses," which remains in effect.

## III.     Exceptions and Limitation on Scope

The foundational principle of this guidance is that, to the fullest extent possible, we should not take an enforcement action in or near a protected area. The phrase "to the fullest extent possible" recognizes that there might be limited circumstances under which an enforcement action needs to be taken in or near a protected area. The following are some examples of such limited circumstances:

3

PYM-000191

- The enforcement action involves a national security threat.

- There is an imminent risk of death, violence, or physical harm to a person.

- The enforcement action involves the hot pursuit of an individual who poses a public safety threat.

- The enforcement action involves the hot pursuit of a personally observed border-crosser.

- There is an imminent risk that evidence material to a criminal case will be destroyed.

- A safe alternative location does not exist.

This list is not complete. It includes only examples. Here again, the exercise of judgment is required.

Absent exigent circumstances, an Agent or Officer must seek prior approval from their Agency's headquarters, or as you otherwise delegate, before taking an enforcement action in or near a protected area. If the enforcement action is taken due to exigent circumstances and prior approval was therefore not obtained, Agency headquarters (or your delegate) should be consulted post-action. To the fullest extent possible, any enforcement action in or near a protected area should be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the protected area.

Enforcement actions that are within the scope of this guidance include, but are not limited to, such actions as arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance. This guidance does not apply to matters in which enforcement activity is not contemplated. As just one example, it does not apply to an Agent's or Officer's participation in an official function or community meeting.

This guidance does not limit an agency's or employee's statutory authority, and we do not tolerate violations of law in or near a protected area.

## IV.    Training and Reporting

Please ensure that all employees for whom this guidance is relevant receive the needed training. Each of your respective agencies and offices should participate in the preparation of the training materials.

Any enforcement action taken in or near a protected area must be fully documented in your Agency's Privacy Act-compliant electronic system of record in a manner that can be searched and validated. The documentation should include, for example, identification of the protected area; the reason(s) why the enforcement action was taken there; whether or not prior approval was obtained and, if not, why not; the notification to headquarters (or headquarters' delegate) that occurred after an action was taken without prior approval; a situational report of what

4

PYM-000192

occurred during and immediately after the enforcement action; and, any additional information that would assist in evaluating the effectiveness of this guidance in achieving our law enforcement and humanitarian objectives.

## V.    Statement of No Private Right Conferred

This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

5



# Immigration Enforcement at Sensitive Locations

*April 18, 2022*
Fiscal Year 2020 Report to Congress



*U.S. Immigration and Customs Enforcement*

# Message from the Acting Director

April 18, 2022

I am pleased to present the following report, "Immigration Enforcement at Sensitive Locations," which has been prepared by U.S. Immigration and Customs Enforcement (ICE).

This report was compiled pursuant to direction in House Report 116-180 and Senate Report 116-125, which accompany the Fiscal Year 2020 Department of Homeland Security Appropriations Act (P.L. 116-93).

Pursuant to congressional guidelines, this report is being provided to the following Members of Congress:

> The Honorable Lucille Roybal-Allard
> Chairwoman, House Appropriations Subcommittee on Homeland Security

> The Honorable Chuck Fleischmann
> Ranking Member, House Appropriations Subcommittee on Homeland Security

> The Honorable Chris Murphy
> Chair, Senate Appropriations Subcommittee on Homeland Security

> The Honorable Shelley Moore Capito
> Ranking Member, Senate Appropriations Subcommittee on Homeland Security

Inquiries related to this report may be directed to the ICE Office of Congressional Relations at (202) 732-4200.

Sincerely,

Tae D. Johnson
Acting Director
U.S. Immigration and Customs Enforcement

i

JA154

# I.    Legislative Language

This report was compiled in response to direction in House Report 116-180 and Senate Report 116-125, which accompany the Fiscal Year 2020 Department of Homeland Security (DHS) Appropriations Act (P.L. 116-93).

House Report 116-180 states:

> *Immigration Enforcement at Sensitive Locations.*—Further, within 180 days of the date of enactment of this Act, ICE is directed, in collaboration with other DHS entities as needed, to provide a public report on enforcement actions at sensitive locations since October 1, 2017. The report shall include the total number of enforcement actions at sensitive locations, broken down by field office; type of sensitive location; whether prior approval was given; what type of exigent circumstances existed, if any; and the number of non-targeted individuals who were also apprehended. It should also contain information on the number of enforcement actions occurring at courthouses and bus stops[1] for each field office, including the number of individuals apprehended at each location, broken down by targeted and non-targeted individuals.

Senate Report 116-125 states:

> *Training.*—The Committee directs ICE to provide its officers with guidance and training for engaging with victims of crime and witnesses of crime and to clarify policy guidance on enforcement actions in or near sensitive locations, including courthouses, in order to minimize any effect that immigration enforcement may have on the willingness and ability of victims and witnesses to pursue justice. The Committee directs ICE not later than 180 days after the date of enactment of this act to report on steps taken to minimize the effect immigration enforcement activity has on victims of crime and witnesses of crime and to provide monthly notifications to the Committee on enforcement actions that take place in or near sensitive locations, including courthouses.

---

[1] U.S. Immigration and Customs Enforcement's (ICE) Sensitive Locations policy does not include bus stops or courthouses, and as such, ICE is unable to report on this information.  Please see Policy Memorandum 10029.2, *Enforcement Actions at or Focused on Sensitive Locations* (Appendix B), for additional information.

# Appendix I:  Arrests at Sensitive Locations

1. **List of U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Arrests at Sensitive Locations from October 1, 2018, through October 31, 2020[3]**

| Type | Date | Sensitive Location | City | State | Field Office | Circumstances if Exigent |
|---|---|---|---|---|---|---|
| Exigent | 10/1/2018 | At School | Raleigh | NC | Atlanta | ICE officers or agents subsequently were led to a sensitive location. |
| Exigent | 4/24/2019 | At School | Pleasanton | TX | San Antonio | ICE officers or agents subsequently were led to a sensitive location. |
| Planned[4] | 7/8/2019 | Near Place of Worship | Los Angeles | CA | Los Angeles | N/A |
| Planned | 7/8/2019 | Near Place of Worship | Denver | CA | Denver | N/A |
| Planned | 7/9/2019 | Near School | Bell Gardens | CA | Los Angeles | N/A |
| Planned | 7/9/2019 | Near School | South Gate | CA | Los Angeles | N/A |
| Planned | 7/9/2019 | Near School | El Monte | CA | Los Angeles | N/A |
| Planned | 7/25/2019 | Near School | Moreno Valley | CA | Los Angeles | N/A |
| Planned | 8/29/2019 | Near School | Panorama City | CA | Los Angeles | N/A |
| Planned | 9/21/2019 | Near Place of Worship | Pasadena | CA | Los Angeles | N/A |
| Planned | 9/23/2019 | Near School | Los Angeles | CA | Los Angeles | N/A |
| Planned | 9/25/2019 | Near School | Pico Rivera | CA | Los Angeles | N/A |
| Planned | 10/27/2019 | Near School | Los Angeles | CA | Los Angeles | N/A |
| Planned | 11/26/2019 | Near School | Garden grove | CA | Los Angeles | N/A |

---

[3] In October 2018, ERO created a mechanism to record enforcement actions manually that were likely to take place at or near a sensitive location.  This record is used for internal tracking purposes only and is not considered a system of record.  Data for 2017 and earlier are not available.
[4] Planned operations are anticipated operations that may or may not have been executed.

| Type | Date | Sensitive Location | City | State | Field Office | Circumstances if Exigent |
|------|------|-------------------|------|-------|--------------|--------------------------|
| Planned | 12/30/2019 | Near Place of Worship | Los Angeles | CA | Los Angeles | N/A |
| Planned | 1/16/2020 | Near School | Carson | CA | Los Angeles | N/A |
| Planned | 1/26/2020 | Near Place of Worship | Los Angeles | CA | Los Angeles | N/A |
| Planned | 1/27/2020 | Near School | Hawthorne | CA | Los Angeles | N/A |
| Planned | 2/3/2020 | Near School | Los Angeles | CA | Los Angeles | N/A |
| Planned | 2/5/2020 | Near School | Albuquerque | NM | El Paso | N/A |
| Planned | 2/25/2020 | Near Place of Worship | Los Angeles | CA | Los Angeles | N/A |
| Planned | 2/25/2020 | Near Place of Worship | Bell Gardens | CA | Los Angeles | N/A |
| Planned | 2/28/2020 | Near School | Los Angeles | CA | Los Angeles | N/A |
| Planned | 3/5/2020 | Near School | Paramount | CA | Los Angeles | N/A |
| Planned | 3/16/2020 | Near School | Bell Gardens | CA | Los Angeles | N/A |
| Planned | 5/8/2020 | Near Place of Worship | Los Angeles | CA | Los Angeles | N/A |
| Exigent | 7/8/2020 | Near School | Washington | DC | Baltimore | ICE officers or agents subsequently were led to a sensitive location. |
| Planned | 7/21/2020 | Near School | Gillette | WY | Denver | N/A |
| Planned | 7/27/2020 | Near Place of Worship | Midland | TX | El Paso | N/A |

## 2. List of ICE Homeland Security Investigations Arrests at Sensitive Locations October 1, 2017, through October 31, 2020

| Type | Date | Sensitive Location | City | State | Description of Noncitizen | Description of Action |
|------|------|-------------------|------|-------|--------------------------|----------------------|
| Planned | 10/13/2017 | Church | Scranton | PA | U.S. citizen | Search Warrant |
| Planned | 10/24/2017 | University | High Point | NC | International Student | Administrative Arrest |

PTM-000245

| Type | Date | Sensitive Location | City | State | Description of Noncitizen | Description of Action |
|------|------|-----|------|-------|------|------|
| Planned | 10/31/2017 | Church (Alleged Residence) | Cleveland | OH | N/A | Federal Search Warrant for Child Exploitation |
| Planned | 12/5/2017 | University | San Marcos | TX | Child Pornography | Student |
| Planned | 12/18/2017 | Church | Walterboro | SC | U.S. citizen | State search and arrest warrants – Child Exploitation/Sexual Assault |
| Planned | 2/9/2018 | University | Saratoga Springs | NY | U.S. citizen | Conduct Interviews |
| Planned- | 2/13/2018 | School | Tarpon Springs | FL | Student (Citizenship Unknown) | Interview – Child Exploitation |
| Planned | 2/13/2018 | School | Wesley Chapel | FL | Employee (Citizenship Unknown) | Consent search of computer – Child Exploitation |
| Planned | 2/16/2018 | School | Stevenson | MD | Juvenile | Interview for Document and Benefit Fraud Task Force Investigation |
| Planned | 3/7/2018 | School | Starkville | MS | NA | Federal Search Warrant – Immigration Fraud |
| Planned | 3/29/2018 | Hospital | Washington | DC | Adult | Arrest for Possession of Child Pornography |
| Planned | 4/10/2018 | University | West Liberty | WV | Student | Administrative Arrest |
| Planned | 4/25/2018 | Technical Community College (School) | Pittsburgh | PA | Naturalized U.S. citizen | Conduct interviews |
| Planned | 6/7/2018 | Hospital | Salt Lake City | UT | N/A | Federal Search Warrant for Identification Theft and Illegal Hiring of Noncitizens |
| Planned | 8/1/2018 | Licensed family childcare home | Honolulu | HI | Owner (Citizenship unknown) | Search Warrant – Child Exploitation |
| Planned | 8/22/2018 | Church | Boise | ID | Noncitizen | Criminal Search Warrant – Federal Smuggling/ Counterfeit Offenses |
| Exigent | 10/23/2018 | Church | Olathe | KS | Citizen and national of Nigeria | Administrative Arrest |
| Planned | 11/7/2018 | Church | Starkville | MS | Lawful Permanent Resident (LPR) from Mexico | Federal Search Warrant – Financial Fraud |
| Planned | 11/29/2018 | School | Cooperstown | NY | U.S. citizen | Search Warrant |

| Type | Date | Sensitive Location | City | State | Description of Noncitizen | Description of Action |
|---|---|---|---|---|---|---|
| Planned | 1/16/2019 | University | Edwardsville | IL | N/A | Search Warrant – U.S. export laws |
| Planned | 2/25/2019 | Islamic Center | Pittsburg | PA | Iraqi citizen | Conduct interviews |
| Planned | 3/12/2019 | High School | Woodbury | MN | N/A | Federal Search Warrant – Threats, Murder for Hire |
| Exigent | 5/30/2019 | High School | Pittsburgh | PA | U.S. citizen | Conduct interviews |
| Planned | 10/23/2019 | Learning Center | San Diego | CA | N/A | Wire/Mail Fraud |
| Planned | 10/28/2019 | High School | | KS | N/A | Seizure of electronic devices – child exploitation |
| Planned | 12/5/2019 | University | Pittsburgh | PA | Student | Conduct Interviews |
| Planned | 1/14/2020 | School | Grand Island | NE | Student | Criminal Search Warrant – Child Exploitation |
| Planned | 1/29/2020 | Church | Van Nuys | CA | Pastor | Criminal Search Warrant – Visa/Marriage Fraud |
| Planned | 1/29/2020 | Church | Van Nuys | CA | Pastor | Visa/Marriage Fraud |
| Planned | 2/5/2020 | Courthouse | Central Islip | NY | Bloods Gang Member – U.S. citizen | Criminal Arrest Warrant – Federal Narcotics and Firearms Offenses |
| Planned | 3/3/2020 | Day Care | Gilroy | CA | N/A | Search Warrant related to Child Pornography |
| Planned | 3/6/2020 | University | Buffalo | NY | Student | Conduct interviews |
| Planned | 3/6/2020 | University | High Point | NC | F-1 Student - Chinese National - Visa canceled for drug conviction | Admin Arrest after F-1 Visa canceled |
| Planned | 3/10/2020 | School | Anza | CA | Faculty and Staff of School | Criminal Search Warrant – Visa Fraud/Labor Trafficking |
| Planned | 3/10/2020 | School | Anza | CA | Visa Fraud, Labor Trafficking | Criminal Search Warrant – Visa Fraud/Labor Trafficking |
| Planned | 4/24/2020 | School | Pasadena | CA | Visa Fraud | Planned |
| Planned | 6/4/2020 | Iowa National Guard (recruitment office) | Mount Pleasant | IA | N/A | Planned – Iowa National Guard (recruitment office) |
| Planned | 8/6/2020 | Church | Denison | TX | N/A | Search Warrant |
| Planned | 8/21/2020 | Church | Denison | TX | N/A | Search Warrant |

 An official website of the United States government

Here's how you know

PYM-000247

**Official websites use .gov**

A **.gov** website belongs to an official government organization in the United States.



**Secure .gov websites use HTTPS**

A **lock** ( 🔒 ) or **https://** means you've safely connected to the .gov website. Share sensitive information only on official, secure websites.



**U.S. Immigration and Customs Enforcement**

Call **1-866-DHS-2-ICE**

Report Crime

ICE     WHO WE ARE     ENFORCEMENT AND REMOVAL OPERATIONS

# Protected Areas and Courthouse Arrests

**Webpage under construction**

This page contains information that is outdated. It is being revised in accordance with new policy guidance as of Jan. 21, 2025.

JA160

PYM-000248

# Protected Areas Enforcement Actions

The Department of Homeland Security (DHS) issued a memorandum — _Guidelines for Enforcement Actions In or Near Protected Areas_ — instructing officers to refrain from taking enforcement actions at or near locations or protected areas in October 2021. This policy is part of DHS's effort to avoid restricting people's access to essential services or engagement in essential activities.

# Protected Areas

Protected areas are locations that provide essential services or activities. When determining if a location is a protected area, DHS considers the activities that take place there, the importance of those activities to the well-being of people and the communities of which they are a part and the impact an enforcement action would have on people's willingness to be in the protected area and receive or engage in the essential services or activities that occur there. It is a determination that requires the exercise of judgment.

Examples of protected areas include, but are not limited to:

- Schools
- Medical or mental healthcare facilities
- Places of worship or religious studies
- Places where children gather
- Social services establishments
- Places where disaster or emergency response/relief is provided
- Places where funerals, graveside ceremonies, rosaries, weddings, or other religious or civil ceremonies or observances occur

# Enforcement Actions Within the Scope of the Protected Areas Memorandum

Enforcement actions that are within the scope of this guidance include, but are not limited to, such actions as arrests, civil apprehensions, searches, inspections, seizures, the service of charging documents or subpoenas, interviews and immigration enforcement surveillance.

# Exceptions and Limitations on Scope

There might be limited circumstances under which an enforcement action needs to be taken in or near a protected area. The following are some examples of such limited circumstances:

- The enforcement action involves a national security threat
- There is an imminent risk of death, violence, or physical harm to a person
- The enforcement action involves the hot pursuit of an individual who poses a public safety threat
- The enforcement action involves the hot pursuit of a personally observed border crosser
- There is an imminent risk that evidence material to a criminal case will be destroyed
- A safe alternative location — a location deemed safe for DHS personnel, the subject of the enforcement action, and the public — does not exist

The memorandum does not limit ICE's or employee's statutory authority, and DHS does not tolerate violations of law in or near a protected area.

Absent exigent circumstances, DHS officers and agents must seek prior approval from their agency's headquarters or an authorized delegate before taking an enforcement action in or near a protected area. To the fullest extent possible, any

enforcement actions in or near a protected area should be taken in a non-public area, outside of public view, and to a point that minimize the chance that the enforcement action will prevent people from accessing the protected area.

If DHS officers and agents take enforcement actions that are believed to be in violation of the protected areas policy, a complaint may be filed through one of the following channels:

### ICE

(888) 351-4024
ERO Contact Form
Website

### CBP

(877) 227-5511
Website

### Office of the Inspector General

(800) 323-8603
Website

### DHS Office for Civil Rights and Civil Liberties

(866) 644-8360
CRCLCompliance@hq.dhs.gov

JA163

PFM-000250

Case 8:25-cv-00243-TDC    Document 28-24    Filed 02/05/25    Page 2 of 38
PTM-000256



*The independent source for health policy research, polling, and news.*

# Understanding the U.S. Immigrant Experience: The 2023 KFF/LA Times Survey of Immigrants

**Shannon Schumacher** (https://www.kff.org/person/shannon-schumacher/),

**Liz Hamel** (https://www.kff.org/person/liz-hamel/),

**Samantha Artiga** (https://www.kff.org/person/samantha-artiga/),

**Drishti Pillai** (https://www.kff.org/person/drishti-pillai/),

**Ashley Kirzinger** (https://www.kff.org/person/ashley-kirzinger/),

**Audrey Kearney** (https://www.kff.org/person/audrey-kearney/),

**Marley Presiado** (https://www.kff.org/person/marley-presiado/), Ana Gonzalez-Barrera, and

**Mollyann Brodie** (https://www.kff.org/person/mollyann-brodie/)

Published: Sep 17, 2023

## Overview

The Survey of Immigrants, a partnership between KFF and *The Los Angeles Times*, takes an in-depth look at the experiences of immigrants, a diverse group that makes up 16% of the U.S. adult population. Immigrants play an important role in the nation's workforce and culture, and they also face unique experiences and struggles in their communities, workplaces, and health care settings. Nonetheless, they overwhelmingly express optimism about their futures in the U.S. and have high hopes for their children.

The survey is the largest nationally representative survey focused on immigrants, interviewing 3,358 immigrant adults in 10 languages. The results provide a deep understanding of immigrants' experiences, reflecting their varied countries of origin and histories, immigration statuses, racial

Case 8:25-cv-00243-TDC    Document 28-24    Filed 02/05/25    Page 7 of 38
PTM-000281

- **Even with high levels of employment, one third of immigrants report problems affording basic needs like food, housing, and health care.** This share rises to four in ten among parents and about half of immigrants living in lower income households (those with annual incomes under $40,000). In addition, one in four lower income immigrants say they have difficulty paying their bills each month, while an additional 47% say they are "just able to pay their bills each month."

- **Among likely undocumented immigrants, seven in ten say they worry they or a family member may be detained or deported, and four in ten say they have avoided things such as talking to the police, applying for a job, or traveling because they didn't want to draw attention to their or a family member's immigration status.** However, these concerns are not limited to those who are likely undocumented. Among all immigrants regardless of their own immigration status, nearly half (45%) say they don't have enough information to understand how U.S. immigration laws affect them and their families, and one in four (26%) say they worry they or a family member could be detained or deported. Confusion and lack of information extend to public charge rules. About three quarters of all immigrants, rising to nine in ten among likely undocumented immigrants, say they are not sure whether use of public assistance for food, housing, or health care can affect an immigrant's ability to get a green card or incorrectly believe that use of this assistance will negatively affect the ability to get a green card.

- **About half of all immigrants have limited English proficiency, and about half among this group say they have faced language barriers in a variety of settings and interactions.** About half (53%) of immigrants with limited English proficiency say that difficulty speaking or understanding English has ever made it hard for them to do at least one of the following: get health care services (31%); receive services in stores or restaurants (30%); get or keep a job (29%); apply for government financial help with food, housing, or health coverage (25%); report a crime or get help from the police (22%). In addition, one-quarter of parents with limited English proficiency say they have had difficulty communicating with their children's school (24%). Working immigrants with limited English proficiency also are more likely to report workplace discrimination compared to those who speak English very well (55% vs. 41%).

JA165

# Exhibit 26

PTM-0003TT

*Democracy Dies in Darkness*

**Immigration**

# Trump officials issue quotas to ICE officers to ramp up arrests

The administration wants to increase the number of arrests from a few hundred per day to at least 1,200 to 1,500, increasing the chances that non-criminals will be detained.

Updated January 26, 2025

🎧 5 min    ↗    🔖    💬 4819

By <u>Nick Miroff</u> and <u>Maria Sacchetti</u>

U.S. Immigration and Customs Enforcement officials have been directed by Trump officials to aggressively ramp up the number of people they arrest, from a few hundred per day to at least 1,200 to 1,500, because the president has been <u>disappointed with the results</u> of his mass deportation campaign so far, according to four people with knowledge of the briefings.

The quotas were outlined Saturday in a call with senior ICE officials, who were told that each of the agency's field offices should make 75 arrests per day and managers would be held accountable for missing those targets. The four people spoke on the condition of anonymity to disclose internal briefings.

The orders significantly increase the chance that officers will engage in more indiscriminate enforcement tactics or face accusations of civil rights violations as they strain to meet quotas, according to current and former ICE officials.



**Podcast episode**

## Trump's deportation campaign has

The Trump administration's plan to rapidly ramp up deportations.

**Play now**    26 min                    Follow on

JA167

White House "border czar" Tom Homan has said documents 28-27 White House officials and its officers would prioritize immigrants with criminal records and who are gang members. But the quotas issued this weekend would place ICE officers under more pressure to seize a wider range of potential deportees to avoid reprimand, including immigrants who have not committed crimes.

Neither ICE nor Homan responded to requests for comment. After an earlier version of this article was published, White House press secretary Karoline Leavitt said in an email that, "your story is false," but did not reply when asked for specifics.

Homan told ABC News in an interview broadcast Sunday that the administration is "in the beginning stages" of its mass deportation plan, and while public safety threats and national security threats are a priority, "as that aperture opens, there'll be more arrests nationwide."

ICE announced in a statement Sunday that agents "began conducting enhanced targeted operations today in Chicago," with help from other federal agencies, including the FBI. Acting Homeland Security secretary Benjamine C. Huffman last week revoked a directive that had essentially barred ICE from arresting immigrants in or around sensitive areas such as schools, hospitals and churches.

Later Sunday, Homan appeared on a streaming service with Phil McGraw, the television doctor known as Dr. Phil, to emphasize that ICE is searching for specific immigrants who have committed crimes.

"Sweeps don't occur anywhere," Homan told McGraw, whose MeritTV said they were inside the ICE Command Center in Chicago.

> **How Donald Trump's deportation crackdown could unfold**
>
> The Washington Post examined which groups of immigrants could be at higher risk of deportation under the second Trump administration, and what logistical and financial obstacles stand in the way.

An ICE official who was not authorized to discuss the quota said the agency's list of criminal suspects was sufficiently long, so officers would be able to continue prioritizing public safety and national security threats to meet quotas.

Last year, ICE told lawmakers there were about 670,000 immigrants on its caseload who had criminal convictions or faced criminal charges. Some are serving sentences in jails and prisons.

But Paul Hunker, a former ICE chief counsel in Dallas, said arresting serious offenders takes time, staff and planning — more time than quotas might allow.

"Quotas will incentivize officers to race to arrest the people that are the people that are dangerous noncitizens," said Hunker, who, as the agency's chief counsel in Dallas, oversaw offices in North Texas and Oklahoma from 2003 through January 2024.

"I've just never heard of that," he said, referring to the quotas.

The agency manages a docket of about 7.8 million people who potentially face deportation, but many of them have pending claims in the U.S. immigration system or a form of provisional residency status. ICE's caseload more than doubled during Joe Biden's presidency amid record numbers of illegal border crossings.

ICE officers deployed aggressively during President Donald Trump's first week in office, boosting the number of immigrants taken into custody from fewer than 400 on Tuesday to nearly 600 on Friday. The number declined to 286 on Saturday, according to ICE.

Trump's supporters and others have pointed out that those totals will not yield the "millions" of deportations the president has promised.

Trump made a similar promise during his first term and came up far short, reaching a peak of about 267,000 during the 2019 fiscal year. The Biden administration deported 271,000 in fiscal year 2024, the highest annual total in a decade. Trump has long had little patience for explanations of why his goals are not realistic.

ICE officers have been told for years that indiscriminate roundups are unsafe and counterproductive, because they spread panic throughout immigrant communities and produce significant public backlash. ICE and the White House did not immediately respond to requests for comment.

Trump officials have told ICE the president expects arrest operations to proceed around-the-clock and that officers should cancel personal leave, according to the four people briefed on the directives.

ICE has about 5,500 officers nationwide working on immigration enforcement, a staffing level that has remained roughly flat for the past decade. The Trump administration took steps to supplement those numbers by deputizing officers and agents at the Justice Department to investigate immigration violations and make arrests, enlisting personnel from the FBI, U.S. Marshals, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco, Firearms and Explosives and the Federal Bureau of Prisons.

**Trump presidency**

Follow live updates on the Trump administration. We're tracking Trump's progress on campaign promises and his picks for key administration roles.

Trump also ordered more Homeland Security Investigations agents to immigration enforcement. The agency is DHS's investigative division for counterterrorism, drug smuggling, human trafficking cases, child exploitation and other crimes.

"Mobilizing these law enforcement officials will help fulfill President Trump's promise to the American people to carry out mass deportations," Huffman said in a statement. "For decades, efforts to find and apprehend illegal aliens have not been given proper resources. This is a major step in fixing that problem."

Former ICE officials, speaking on the condition of anonymity to describe the work of Homeland Security Investigations, said reassigning special agents to carry out civil immigration enforcement will mean they devote less time to probing serious crimes.

 An official website of the United States government



**Official websites use .gov**
A **.gov** website belongs to an official government organization in the United States.

🔒 **Secure .gov websites use HTTPS**
A **lock** ( 🔒 ) or **https://** means you've safely connected to the .gov website. Share sensitive information only on official, secure websites.

🌐 **En Español**   🗖 **Contact Us**   🔗 **Quick Links**

 **U.S. Immigration and Customs Enforcement**

Search

Call **1-866-DHS-2-ICE**      Report Crime

ICE      WHO WE ARE      ENFORCEMENT AND REMOVAL OPERATIONS

## Protected Areas and Courthouse Arrests

# DHS Directive *Enforcement Actions in or Near Protected Areas* (Jan. 20, 2025)

The Department of Homeland Security (DHS) issued a directive — *Enforcement Actions in or Near Protected Areas* — on Jan. 20, 2025, for U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP), superseding and rescinding DHS's Oct. 27, 2021, memorandum of the same title, which determined that certain locations require special protection from enforcement of U.S. immigration laws.

The Jan. 20, 2025, DHS *Enforcement Actions in or Near Protected Areas* directive recognizes that "officers frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location. Going forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense."

# Exhibit 30



U.S. Department of Homeland Security

# Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole

**Release Date:** January 21, 2025

WASHINGTON – Yesterday, Acting Department of Homeland Security Secretary Benjamine Huffman issued two directives essential to ending the invasion of the US southern border and empower law enforcement to protect Americans.

The first directive rescinds the Biden Administration's guidelines for Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP) enforcement actions that thwart law enforcement in or near so-called "sensitive" areas. The second directive ends the broad abuse of humanitarian parole and returns the program to a case-by-case basis. ICE and CBP will phase out any parole programs that are not in accordance with the law. The following statement is attributable to a DHS Spokesperson:

*"This action empowers the brave men and women in CBP and ICE to enforce our immigration laws and catch criminal aliens—including murders and rapists—who have illegally come into our country. Criminals will no longer be able to hide in America's schools and churches to avoid arrest. The Trump Administration will not tie the hands of our brave law enforcement, and instead trusts them to use common sense.*

*"The Biden-Harris Administration abused the humanitarian parole program to indiscriminately allow 1.5 million migrants to enter our country. This was all stopped on day one of the Trump Administration. This action will return the humanitarian parole program to its original purpose of looking at migrants on a case-by-case basis."*

## Topics

BORDER SECURITY (/TOPICS/BORDER-SECURITY)      IMMIGRATION AND CUSTOMS ENFORCEMENT (/TOPICS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT)

## Keywords

BORDER SECURITY (/KEYWORDS/BORDER-SECURITY)      CUSTOMS AND BORDER PROTECTION (CBP) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)
IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)

Last Updated: 01/21/2025

JA173

# Exhibit 33

**The New York Times**

https://www.nytimes.com/2025/01/30/us/immigrant-communities-hiding-ice.html

# Immigrant Communities in Hiding: 'People Think ICE Is Everywhere'

Schools, churches and shops are feeling the chilling effect of the fear of deportation. One minister said fewer congregants were showing up for services.

 ▶ **Listen to this article · 9:14 min** Learn more

  

**By Miriam Jordan, Hamed Aleaziz and Heather Knight**

Miriam Jordan reported from Los Angeles, Hamed Aleaziz from Washington and Heather Knight from San Francisco.

Jan. 30, 2025

At a barbershop in Los Angeles, only one of the 10 chairs was occupied on what would ordinarily be a busy evening. In San Francisco, a middle school student's erroneous information about seeing an immigration officer on a city bus prompted the school district to send parents a warning.

In Chicago, a mistaken report that immigration agents showed up at a school set off panic that rippled across the country. At a church in Charlotte, N.C., more than a third of the usual congregants were absent from a recent evening service.

Hotlines set up by advocates for immigrants to report enforcement activity have experienced a spike in calls.

"The hysteria is out of control," said Patrick Garcia, executive director of Embrace All Latino Voices, a group in Charlotte, N.C.

Case 8:25-cv-00243-TDC    Document 28-34    Filed 02/05/25    Page 3 of 10
PTM-000339

After taking office last week, the Trump administration began highlighting what it has characterized as a new and more aggressive effort to target illegal immigration and deliver on a key campaign pledge to carry out mass deportations. So far, the enforcement efforts have been primarily individual arrests, rather than sweeps of factories, farms or other large-scale sites. Immigration and Customs Enforcement has reported on social media more than 5,000 arrests in around a week's time.

An estimated 14 million undocumented immigrants live in the United States, according to demographers and other experts. The number includes people with no legal status as well as people who have some form of temporary status that is being contested in court or has been threatened with termination by the Trump administration.

Arresting and deporting even a small share of the population with no status or contested status is all but impossible. But stirring anxiety and uncertainty among those millions of people appears to be far easier, stoked by sharp rhetoric from Mr. Trump and his top aides and fed by news footage of federal agents massing in communities from Seattle to New York.

JA176



"It hasn't been as bad as this since Covid-19," said James Kang, left, the owner of First Bargain, a grocery store in Los Angeles. "My customers are staying home." Mark Abramson for The New York Times

Even schools, churches and hospitals, places long considered insulated from immigration enforcement, have become fair game after the Department of Homeland Security's recent announcement that such locations were not off limits to agents.

Denver Public Schools recorded a decline in attendance of 10 percent or more over the last week at some schools that have a large number of students from migrant families. An undocumented woman named Martha, 60, said she had stopped volunteering as a crossing guard and cafeteria worker at the school in her neighborhood in nearby Aurora, Colo., as raid rumors swirled. "My kids are grown up now, but they still need their mother by their side, and my biggest fear is that I will be picked up and taken away from them," she said.

JA177

Thomas D. Homan, Mr. Trump's border czar, said that allowing immigration agents to have access to sensitive sites gave them the ability to pursue targets wherever they want, in line with other law enforcement agencies.

"It's not like we're walking in and arresting everybody in the building, so the institution shouldn't be afraid. The criminal alien should be afraid," Mr. Homan said in an interview.

In San Francisco, Karen Rodriguez rushed to pick up her 7-year-old son from school after parents were notified by a worker there that ICE agents had been spotted in the area. "Fear is definitely a feeling we all have," said Ms. Rodriguez, a 30-year-old Colombian. She said that she, her husband and their son had crossed the border and were planning to apply for asylum.

Most undocumented immigrants have been in the country at least a decade. They work in large numbers in construction, agriculture and other sectors, and they often have children who were born in the United States. Many have felt that if they stayed out of trouble with the police, they would be relatively safe here.

No more.

Even in Los Angeles and San Francisco, cities that have passed laws to protect their immigrant communities, people are altering their routines.

At the Park Plaza Barber Shop in Los Angeles, there was only one customer at 5:15 p.m. on Tuesday. Ordinarily, most or all 10 chairs would be occupied, with more patrons waiting, said the owner, José Anguino. But in a neighborhood flush with immigrants, many were lying low, he said.

Case 8:25-cv-00243-TDC    Document 28-34    Filed 02/05/25    Page 6 of 10
PX114.42



"Everyone is terrified, and they don't want to spend money because they don't know what could be coming," said José Anguino, who owns Park Plaza Barber Shop in Los Angeles.  Mark Abramson for The New York Times

JA179

"Everyone is terrified, and they don't want to spend money because they don't know what could be coming," said Mr. Anguino, who has owned the business for three decades.

Next door, at First Bargain, which sells an array of Mexican foods, just a handful of customers roamed the aisles. Sales have dropped about 30 percent since last week, said James Kang, the owner of the supermarket.

"It hasn't been as bad as this since Covid-19," he said. "My customers are staying home."

Across the country, in Charlotte, N.C., Apolo Santos, the pastor of an Assembly of God Church, which ministers to the area's fast-growing Brazilian community, said that his congregants were scared when President Trump was last in office, "but not with this intensity."

"People think ICE is everywhere," he said, which is hurting church attendance.

"Stay alert if you're heading toward Gastonia," said a message in Portuguese in a WhatsApp group on Wednesday, relaying a supposed sighting on a road to that North Carolina town.

And Mr. Garcia, of Embrace All Latino Voices, the advocacy group, said that some people were starting to talk about returning to their home countries.

Self-deportation, or the idea that undocumented people will just leave, has been promoted by proponents of highly restrictive immigration policies to achieve attrition through enforcement.

Indeed, Mr. Homan, the border czar, said he hoped people would decide to abandon the country.

"It'd be wiser for people that are in the country illegally to simply go home and come back the right way. Absolutely," he said.

John Sandweg, a senior Homeland Security official in the Obama administration, said the strategy was clear. "The administration is creating a climate of fear as part of a self-deportation plan," he said.

Details about the arrests have been extremely limited, making it difficult to assess the extent to which the recent operations have been more expansive than the day-to-day enforcement efforts by ICE.

To calm nerves and debunk misinformation on TikTok, other social media platforms and in tabloids, the consulate of Mexico in Los Angeles, home to the largest Mexican population in the United States, released a video this week.

"We see no evidence of massive raids, of people arrested randomly in the streets or of operations in churches or schools," Carlos González Gutiérrez, the consul general, said in the two-minute video posted on Facebook, Instagram and X.



Agents detaining two immigrants at a Home Depot parking lot in Tucson, Ariz., earlier this week.  Rebecca Noble/Reuters

He explained that 17 Mexican men who had "prior history with law enforcement" had been detained last weekend, a number that is not atypical.

"For now, there is no reason for you to refrain from your usual activities," Mr. Gutiérrez said.

Yet the specter of federal agents and the spigot of rumors on social media have created anxiety that can be hard to allay. The erroneous report by a middle school student in San Francisco of seeing an ICE agent on a public bus took on a life of its own.

A screen shot of a text message sent by a social worker at the school to colleagues said ICE agents "were in a black car, had dogs and entered the 29 bus. They introduced themselves as ICE. Then, they questioned passengers and detained several adults and school-age children."

An Instagram post by a popular local photographer included a similar account that was shared more than 9,000 times. The school district sent an email to families warning them that agents might be in the vicinity of the bus route.

But there was no ICE action on any bus that day, according to the city's police chief, William Scott, who said he had confirmed that with Homeland Security. He said the student most likely saw police officers board the same bus to look for a lost child and mistook them for ICE agents.

The next day, a rumor spread that ICE agents had entered five downtown office buildings searching for janitors to deport. That, too, was shared widely on social media. Hundreds of janitors failed to report for their shifts that night, according to Olga Miranda, president of the local janitors' union.

It turned out that the agents were in two of those buildings with an arrest warrant and were not targeting janitors, she said.

JA182

Lorena Melgarejo, who takes calls on a hotline for Faith in Action Bay Area, a social justice group in Northern California, said that there have been "ghost sightings" of ICE agents everywhere.

"There are so many that it's almost impossible to follow them," she said.

She has been telling people to call immediately if they witness a raid firsthand, but otherwise to double-check first. Her advice is that people remain vigilant while keeping up their routines — attending doctor's appointments, sending children to school and showing up for work.

"We cannot be frozen by fear already," she said. "It's only been days!"

Tim Arango contributed reporting from Denver.

**Miriam Jordan** reports from a grass roots perspective on immigrants and their impact on the demographics, society and economy of the United States. More about Miriam Jordan

**Hamed Aleaziz** covers the Department of Homeland Security and immigration policy. More about Hamed Aleaziz

**Heather Knight** is a reporter in San Francisco, leading The Times's coverage of the Bay Area and Northern California. More about Heather Knight

# Exhibit 37





---

BUSINESS

# Column: Inside the Bakersfield raids that showed how Trump's immigration policies will sow chaos



Immigrants get information about their constitutional rights after a presentation by a consortium of attorneys, organizations, and community experts at the Robert F. Kennedy High School Auditorium in Delano, Calif.  (Tomas Ovalle / For The Times)



**By Michael Hiltzik**
Business Columnist  |  𝕏 Follow

Jan. 22, 2025 3 AM PT

On Jan. 7, the phones of immigration advocates in Bakersfield began lighting up with calls from immigrant farmworkers. The messages said the U.S. Border Patrol was

conducting an indiscriminate dragnet in the area, pulling over vehicles presumed to be carrying immigrants to work and taking dozens into custody.

To the advocates, this didn't seem right. The Border Patrol — a unit of U.S. Customs and Border Protection — had not been seen operating in anyone's memory in Bakersfield, some 300 miles from the patrol's California offices in El Centro, a few miles from the Mexican border.

Although there are two detention centers in Bakersfield run by ICE — Immigration and Customs Enforcement — none of the detainees could be found in either one. The Border Patrol, a sister agency of ICE, staged its raids not at ICE installations, but out of a parking lot at a facility of the Interior Department, which has nothing to do with immigration or border security.

> *There's a lot of fear, a lot of anxiety for everyone with an undocumented loved one, which is a significant portion of the Latino community in Kern County.*
>
> **— Antonio De Loera-Brust, UFW**

The Border Patrol eventually asserted that it had conducted a four-day "targeted enforcement" operation aimed at undocumented immigrants with criminal records, ultimately detaining 78 individuals mostly for crimes such as drug trafficking, burglary and child abuse.

It's fair to say that almost no one familiar with the immigration ecosystem in Kern County, where Bakersfield is located — not immigration lawyers, United Farm Workers officials or employers — believes a word of this. The UFW and other sources estimate that some 200 people were detained in just the first two days, and 1,000 in all may have been detained and released.

Rather than "targeted" enforcement, the Border Patrol conducted "random stops of vehicles exclusively founded on racial profiling of individuals," Ambar Tovar, director of legal services for the UFW Foundation, told me.

The officers raid locations where they knew they would find farmworkers gathering — such as at a Home Depot, where immigrant laborers come to seek day work, and along California Route 99, the highway traveled by immigrant farmworkers heading to their jobs. At some spots, where they were asked to show warrants naming targeted individuals, the officers simply drove away without answering.

ADVERTISEMENT

"They definitely seemed to be targeting agricultural workers and day laborers," said Casey Creamer, president of California Citrus Mutual, the trade association for citrus growers.

---



**BUSINESS**

**Column: Julie Su would be a perfect Labor secretary. That's why Big Business hates her**

April 24, 2023

---

Creamer said there have been no indications that immigrants in Kern County were responsible for a wave of violent crime, the ostensible justification for the raids.

JA187

1/30/25, 5:24 PM
Hiltzik: Trumpian immigration enforcement has arrived - Los Angeles Times
Case 8:25-cv-00243-TDC    Document 28-38    Filed 02/05/25    Page 5 of 10
PTM-000396

"The people who got targeted get up to go to work at 5 or 6 a.m.," he said. "They work hard and then go home to their families. That's incompatible with violent crime. Drug dealers aren't going out to harvest citrus."

One aspect of these raids elicits broad agreement: Their effect was to sow fear. "It's had a very chilling effect on the whole community," said Antonio De Loera-Brust, a spokesman for the UFW. "There's a lot of fear, a lot of anxiety for everyone with an undocumented loved one, which is a significant portion of the Latino community in Kern County."

Creamer estimates that about 25% of immigrant workers in the area stayed home from work in the first day of the raids, and 75% afterward. That continued until Jan. 10, when word spread that the Border Patrol had left the county and gone back to El Centro.

Until then, he said, "the raids sent shock waves through the entire Central Valley," the breadbasket of California and of the entire country. At the Mercado Latino Tianguis outside Bakersfield, a popular shopping spot for the Latino community, customers all but disappeared during the raids and about one-third of the businesses closed.

The Border Patrol didn't respond to my request for further information about the raids.

It's hard to overestimate the impact that raids like these could have on California agriculture, which, like other states, is highly dependent on immigrant labor. The raids occurred as the harvesting of California oranges, mandarins and lemons was entering a peak period for fresh fruit. California accounts for about 90% of the domestic supply of oranges, mandarins, lemons and grapefruit.

About 20% of the estimated 24,000 citrus farm employees in California work in Kern County, Creamer says. In this case, he adds, the immediate impact was muted because the raids occurred over only four days and the schedule of citrus harvesting can be somewhat flexible.



**BUSINESS**

## Column: The ugly historical roots of the GOP's sadistic migrant transports

Sept. 19, 2022

---

Yet "in the small farming towns outside Bakersfield, at gas stations and in the miles and miles of fields, everyone seemed to know about the arrests," my colleagues Rachel Uranga and Andrea Castillo reported, "sowing fear among migrant families, many of whom had children or spouses that were born here" and consequently are American citizens.

Pupils from immigrant families stayed home from school. About 1 million children in California — 10% of the school-age population — have least one undocumented immigrant parent and about 115,000 are themselves undocumented.

The Homeland Security Department hasn't disclosed who authorized the raids and why they took place. Although they were launched before Donald Trump's presidential inauguration, they impressed many as a harbinger of attacks on immigrants to come during his administration. They hint at Trump's preoccupation with illegal immigration.

The raids caught the community's elected representatives flat-footed.

"I have received numerous calls from constituents expressing fear for their families' safety, and I do not support inciting concern," Rep. David Valadao (R-Hanford), said in a statement issued the Monday after the raids ended. "We can all agree known criminals should be expelled from the United States, but it is crucial that future operations are communicated clearly to avoid causing any further alarm among our farmworkers."

Gregory Bovino, chief of the Border Patrol's El Centro sector, boasted on social media about what he called "Operation Return to Sender," stating that 60 agents had been deployed in marked and unmarked vehicles. Bovino further asserted that his sector's

Case 8:25-cv-00243-TDC     Document 28-38     Filed 02/05/25     Page 7 of 10
PTM-000398

"responsibility" stretches from the Mexican border north to the California-Oregon state line.

That's true, up to a point. The Border Patrol claims the right to stage warrantless searches within 100 air miles of any external boundary of the U.S., including national boundaries and shorelines. That's a zone in which two-thirds of the U.S. population lives, encompassing all of Florida, Hawaii, Maine, New Hampshire and Michigan; most of New York and more than half of California, including all its major cities.



The Border Patrol claims jurisdiction over more U.S. territory than most people know.   (ACLU)

What struck immigrant advocates about the raids was the sheer thuggishness of the operation, which dovetailed neatly with the uncompromising rhetoric about immigration sounded by Trump during his campaign and in his inaugural speech Monday.

Agents transported detainees from Bakersfield to El Centro, a drive that can take as long as six hours, instead of processing them locally, where they would be available for local legal advice and representation. Detainees said they were released in El Centro without transportation home.



**BUSINESS**

**Column: The Nazi roots of the Trump-Vance smear of Haitian immigrants**

Sept. 17, 2024

Two UFW members were pressured into signing a form attesting to their voluntary departure from the U.S., then shipped over the border from El Centro to Mexicali, De Loera-Brust says.

"That effectively waived their rights to a hearing or due process or legal representation, and allowed the Border Patrol to dump them in Mexicali," he said. "At that point, there's not much we can do. By the time we got our members a lawyer, they were already in Mexico and there was no case for our lawyers to argue."

The union says neither individual had a criminal history or an outstanding criminal warrant. "They were undocumented, but they were otherwise completely law-abiding, hardworking folks, the primary breadwinners for their families, leaving behind undocumented spouses and U.S. citizen children who were born in this country," De Loera-Brust said.

Agents in an unmarked car pulled over Ernesto Campos, the owner of a Bakersfield gardening service who was naturalized as a U.S. citizen more than 10 years ago. According to [a video Campos shot on the scene](#) and that was aired on Bakersfield TV station KGET, the agents demanded that Campos' passenger, an undocumented employee step out of the truck. Campos informed them that the passenger already had an asylum hearing scheduled. Campos shut off his engine and gave the agents his driver's license.

Nevertheless, according to an exchange captured on the video, an agent slashed Campos' truck tires, which can be seen deflated on the video. When Campos asked why the agent had immobilized his vehicle, the agent replied, "I'm not going to argue with you, bro. You did what you did, I did what I did." He verified that Campos was a U.S. citizen, but he was arrested on suspicion of "alien smuggling." Campos was released about four hours later. The border Patrol didn't respond to my request to identify the agent and explain his conduct.

## Latest from Michael Hiltzik  ›

Column: OpenAI accuses China of stealing its content, the same accusation that authors have made against OpenAI

Column: The population exodus from antiabortion states is underway and may be picking up steam

Column: A CIA 'assessment' revives the fact-free claim that COVID started in a Chinese lab

## More to Read

### Immigration arrests in churches? Some clergy say not so fast

Jan. 29, 2025



### Community groups set up strike teams to respond to Trump's mass deportation plans

Jan. 25, 2025



### 'Scare tactic': Bonta slams Trump move targeting local officials over immigration

Jan. 22, 2025



**Michael Hiltzik**

Pulitzer Prize-winning journalist Michael Hiltzik has written for the Los Angeles Times for more than 40 years. His business column appears in print every Sunday and Wednesday, and occasionally on other days. Hiltzik and colleague Chuck Philips shared the 1999 Pulitzer Prize for articles exposing corruption in the entertainment industry. His seventh book, "Iron Empires: Robber Barons, Railroads, and the Making of Modern America," was published in 2020. His forthcoming book, "The Golden State," is a history of California. Follow him on X at twitter.com/hiltzikm and on Facebook at facebook.com/hiltzik.

Copyright © 2025, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

# Exhibit 43



U.S. Department of Homeland Security
Washington, DC 20528

January 20, 2025

MEMORANDUM FOR:      Caleb Vitello
                     Acting Director
                     U.S. Immigration and Customs Enforcement

                     Pete R. Flores
                     Senior Official Performing the Duties of the Commissioner
                     U.S. Customs and Border Protection

FROM:                Benjamine C. Huffman
                     Acting Secretary

SUBJECT:             Enforcement Actions in or Near Protected Areas

This memorandum addresses Immigration and Customs Enforcement (ICE) and Customs and
Border Protection (CBP) enforcement actions in or near areas that the Department of Homeland
Security (DHS) previously determined require special protection. It is effective immediately.
This memorandum supersedes and rescinds Alejandro Mayorkas's October 27, 2021
memorandum entitled, Guidelines for Enforcement Actions in or Near Protected Areas.

Our brave men and women in uniform put their lives on the line every day to advance the rule of
law and keep our people safe. As part of that work, officers frequently apply enforcement
discretion to balance a variety of interests, including the degree to which any law enforcement
action occurs in a sensitive location.

Going forward, law enforcement officers should continue to use that discretion along with a
healthy dose of common sense. It is not necessary, however, for the head of the agency to create
bright line rules regarding where our immigration laws are permitted to be enforced. The
Director of ICE and the Commissioner of CBP may wish to issue further guidance to assist
officers in exercising appropriate enforcement discretion.

This memorandum is not intended to, does not, and may not be relied upon to create any right or
benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or
criminal matter.

PTM-000575

BRIEFINGS & STATEMENTS

# PRESS BRIEFING BY PRESS SECRETARY KAROLINE LEAVITT

January 29, 2025

1:06 P.M. EST

MS. LEAVITT:  Good afternoon, everybody.

Q   Good afternoon.

MS. LEAVITT:  How are we?  Good to see all of you.  It's an honor to be here with all of you.  A lot of familiar faces in the room, a lot of new faces.

And President Trump is back, and the golden age of America has most definitely begun.

The Senate has already confirmed five of President Trump's exceptional Cabinet nominees: Secretary of State Marco Rubio, Defense Secretary Pete Hegseth, CIA Director John Ratcliffe, Homeland Security Secretary Kristi Noem, and Treasury Secretary Scott Bessent.  It is imperative that the Senate continues to confirm the remainder of the president's well-qualified nominees as quickly as possible.

As you have seen during the past week, President Trump is hard at work fulfilling the promises that he made to the American people on the campaign trail.  Since taking the oath of office, President Trump has taken more than 300 executive actions; secured nearly $1 trillion in U.S. investments; deported illegal alien rapists, gang members, and suspected terrorists from our homeland; and restored common sense to the federal government.

I want to take a moment to go through some of these extraordinary actions.

On day one, President Trump declared a national emergency at our southern border to end the four-year-long invasion of illegal aliens under the previous administration.  Additionally, President Trump signed an executive order to end catch and release and finish construction of his effective border wall.  By using every

JA196

JFXM-000583

they were hired to do, which is to detain, arrest, and deport illegal criminals who have invaded our nation's borders over the past four years.  That's what the president is committed to seeing.

Q   One more.

MS. LEAVITT:  Peter.

    Q   Just following up on that, Karoline —

Q   Karoline, if I could ask you very quickly, just following up on the question on immigration.  First, President Trump, during the course of the campaign in 2024, said the following about illegal im- — immigration.  He said, "They're going back home where they belong, and we start with the criminals.  There are many, many criminals."  NBC News has learned that ICE arrested 1,179 undocumented immigrants on Sunday, but nearly half of them — 566 of the migrants — appear to have no prior criminal record besides entering the country illegally.

MS. LEAVITT:  (Laughs.)

Q   Is the president still focused exclusiv- — which is a civil crime, not a — not a — it's not criminal —

MS. LEAVITT:  It's a federal crime.

Q   It's a fed- — so, I'm asking though, he said he was going to focus on those violent offenders first.  So, is violent offenders no longer the predicate for these people to be deported?

MS. LEAVITT:  The president has said countless times on the campaign trail — I've been with him at the rallies; I know you've been there covering them too, Peter — that he is focused on launching the largest mass deportation operation in American history of illegal criminals.

And if you are an individual, a foreign national, who illegally enters the United States of America, you are, by definition, a criminal.  And so, therefore —

Q   So, to be clear, it's not exclusively —

MS. LEAVITT:  — you are subject deportation.

Q   I apologize for interrupting.  So, to be clear, it's not — violent criminals do not receive precedence in terms of the deportations taking place?

MS. LEAVITT:  The president has also said — two things can be true at the same time.  We want to deport illegal criminals, illegal immigrants from this country.  But the president has said that, of course, the illegal dr- — criminal drug dealers, the rapists, the murderers, the individuals who have committed heinous acts on the interior of our country and who have terrorized law-abiding American citizens, absolutely, those should be the priority of ICE.  But that doesn't mean that the other illegal criminals who entered our nation's borders are off the table.

Q   Understood.  Then let me ask you a separate question about the confusion that still exists across the country right now as it relates to the — the freeze — or the pause, as it's described.  President Trump, of course, ran — one of the key policy items was that he was going to lower prices, lower the cost of everything from groceries, as he often said.  But in many of the cases, it would seem that some of these moves could raise prices for real Americans on everything from low-income heating — that program; childcare programs.  Will nothing that the

# Exhibit 47

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*,<br><br>          Plaintiffs,<br><br>**v.**<br><br>**U.S. Department of Homeland Security,** *et al.*,<br><br>          Defendants. | **Civil Case No. 8:25-cv-243-TDC** |

### DECLARATION OF AMAR SHERGILL

I, Amar Singh Shergill, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1.  I am a member of the Sikh Temple Sacramento Executive Management Committee.

2.  I have been a member of Sikh Temple Sacramento Sangat (congregation) for over two decades.

3.  I am active in Sikh community life both generally and at Sikh Temple Sacramento.

4.  Sikh Temple Sacramento was inaugurated in 1983. Our grounds include a more than 20,000 square-foot prayer hall and 26,000 square-foot community kitchen.

5.  Sikh Temple Sacramento is a place of worship for the Sikh population in the Greater Sacramento area, approximately 30,000 people.

### Gurdwaras

6.  Sikh Temple Sacramento is a *gurdwara*: a Sikh place of worship, learning, and community gathering. *Gurdwara* literally means "gateway to the guru."

PYM-000600

7. Gurdwaras are sacred and sovereign institutions. They are places that Sikhs gather for fellowship, worship, and *langar* (sharing in a communal meal).

8. Gurdwaras are central to all major life events for Sikhs. Birth, marriage, and death are all marked with worship and langar.

9. Central to the concept of a Gurdwara is that all people must be welcomed in the space without fear. Like all Gurdwaras, Sikh Temple Sacramento is open to people of all religions and backgrounds.

10. The *Nishaan Sahib* (Sikh flag) flies outside every gurdwara, including ours, and is viewed as a beacon of refuge and hope for anyone in need. The *Nishaan Sahib* signals that anyone from any religion, community, or background is welcome.

**Sikh Faith**

11. The Sikh worldview centers around the idea of *Ik Onkar* (oneness). Sikhs believe that people of all faiths worship one divine being who created this world and lives within it. *Ik Onkar* means that the divine is equally present in all people and that every human being is equal in the eyes of God—whatever their religion, social identity, or immigration status.

12. Sikh scripture is at the center of Sikh life and is placed literally and figuratively in a central role at the Gurdwara. The *Guru Granth Sahib* (Sikh scripture) is revered and respected as a living Guru (teacher) and is written as prose and poetry, allowing part of every worship service to be conducted with communal singing.

13. During worship at the Gurdwara, community members, including children, often lead the congregation in singing and prayer. Community members may also explain basic ideas and lessons from the selections.

PYM-000601

14. While most of our larger gatherings occur on Sundays, langar (communal meal) is always available at our Gurdwara. People of all backgrounds and identity groups are welcome to join.

15. The Sikh faith does not have an ordained clergy. Any person from the congregation may lead religious services and assist in preparing langar. Both acts are fundamentally a communal effort.

16. In general, fully and meaningfully practicing the Sikh faith requires joining with the community in service and prayer. We refer to the community with whom we gather for worship and communal meals as our *Sangat*.

17. Sikhs seek the presence of our Sangat to meaningfully express our faith.

18. For example, a subset of the Sangat is the *Khalsa.* The Khalsa is a congregation of those who have been initiated fully into the Sikh faith. To be initiated, they received *Amrit*, a core component of our religious practice. Receiving Amrit is a Sikh religious ceremony that is often analogized to baptism. Amrit must be received from others in the Khalsa.

19. Sikhs who have joined the Khalsa carry all the major outwards symbols attributed to the Sikh faith today, including but not limited to the wearing of the *dastaar* (Sikh turban), uncut hair, and carrying the *Kirpan*.

**DHS's New Policy**

20. DHS's new policy allowing immigration enforcement at houses of worship allows ICE agents to conduct surveillance, investigate, raid, and make arrests at Gurdwaras, including ours.

PYM-000602

21. Knowing that our Gurdwara may be subject to government surveillance and raids by armed agents is burdening our religious exercise, as our faith invites us to gather in community with one another.

22. The new policy had an immediate chilling effect on worship and fellowship at our Gurdwara.

23. We have already heard from members of our Sangat who are concerned that participation in Sikh religious life at the Gurdwara may put them at risk because of the new policy.

24. Some of the people who are concerned are undocumented, but even people with legal immigration status are unsure whether it is safe to attend.

25. It is my understanding that almost ninety percent of our congregation are first- or second-generation immigrants. About half are first-generation immigrants.

26. Decreased attendance at our Gurdwara hinders our ability to carry out essential religious practices with the entire Sangat.

27. Because communal worship and fellowship is so important to Sikh practice, keeping community members from attending the Gurdwara harms not just those who are too fearful to attend but also everyone else at the Gurdwara.

28. DHS's new policy is also reducing Gurdwara attendance and interfering with our religious exercise by renewing our collective concern, grounded in Sikh history, of government interference in our ability to freely practice our faith.

29. Throughout our history, Sikhs have known the pain of having the sanctity of our Gurdwaras violated, especially by the government. In the lead up to the Sikh Genocide of 1984, the Indian military conducted Operation Blue Star, a coordinated assault on the

JA202

PTM-000603

Golden Temple and other Gurdwaras throughout Punjab that claimed the lives of thousands of Sikhs.

30. As long as DHS's new policy is in effect, it will impair Sikhs' ability to practice our faith freely, openly, and without concern.

31. Despite the threat that the DHS's policy poses to the Sangat, I remain in *Chardi Kala* (eternal joyous optimism, especially in times of great challenge) with my fellow Sikhs, and we will work together for *Sarbat Da Bhalla* (the betterment of all humanity).

Elk Grove, California
February 4, 2025

Amar Singh Shergill

# Exhibit 48

PYM-000604

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

Philadelphia Yearly Meeting of the
Religious Society of Friends, *et al.*,

      Plaintiffs,

v.

U.S. Department of Homeland Security, *et al.*,

      Defendants.

Civil Case No. 8:25-cv-243-TDC

### DECLARATION OF REV. DR. JEFF HAYES

I, Jeff Hayes, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am the Senior Minister of Oakland Baptist Church in Rock Hill, South Carolina, which I usually refer to as "Oakland." I have held that role since 2017.

2. As Senior Minister, I am the spiritual leader of the church and lead the church in accomplishing its work with God's help and guidance.

3. I grew up Baptist, am a native of South Carolina, and have also served churches in Greenville, Spartanburg, and Barnwell counties. I consider myself an active member of Baptist communities.

4. I hold a Bachelor of Arts in Religion from Furman University and a Master of Divinity and Doctor of Ministry degree from Gardner-Webb University.

### Church Structure

5. Oakland is located at 1067 Oakland Avenue in Rock Hill, South Carolina.

1

PYM-000605

6. Oakland owns the land on which it is located and is a legally incorporated 501(c)(3) not-for-profit corporation.

7. Oakland Baptist Church was founded in 1950. It is affiliated with the Cooperative Baptist Fellowship, a Baptist denomination comprised of theologically moderate churches. Our church has been a member of CBF for at least 20 years and is also a member of CBF South Carolina.

8. Including members and regular attendees, our congregation is approximately 500 people. We do not consider immigration status when reviewing candidates for membership.

9. Oakland Baptist Church has five interrelated core purposes that reflect our Baptist beliefs and commitments. Those are:

   a. To propagate the Gospel of our Lord Jesus Christ through service to our local community as well as to the uttermost parts of the world, depending always on the leadership of the Holy Spirit;

   b. To provide regular opportunity for Bible study and other forms of Christian education, public worship, services, and fellowship;

   c. To sustain the ordinances, doctrines, and ethics set forth in the teachings of our Lord Jesus Christ;

   d. To channel our talents and material gifts to the advancement of the Kingdom of God; and

   e. To serve our Lord Jesus Christ in all areas of life.

10. In 2022, Oakland adopted seven goals associated with our Vision plan for the church. One of those goals is to be an "open, inviting, and inclusive community of faith where

2

JA206

everyone can find a place of belonging." A subsequent strategy to accomplish that goal reads: "intentionally working to increase diversity in our laity and partnerships that reflects the diversity and inclusiveness we value." DHS's new policy prevents us from attaining this goal.

### Loving Our Neighbors

11. Oakland is committed to being an open, inviting, and inclusive community of faith. Our faith is about relationships, and it drives us to find intentional ways to connect new people into the life of our church, regardless of where they are on their faith journey.

12. Our scriptures tell us repeatedly (for example, in Leviticus 19:9-18, Matthew 22:33-40, Mark 12:28-31, Luke 10:25-28, Galatians 5:14, and James 2:8) that we should love our neighbor as ourselves. Jesus tells us that our neighbors are everyone, including those who are completely different from us (Luke 10:25-37).

13. Oakland has therefore covenanted with God to be a servant church that recognizes the infinite worth of every person. A core component of that covenant with God is that our differences—whatever they may be and including with respect to immigration status—do not separate us but rather increase our understanding and strengthen the bonds of Christian love.

14. In fact, our faith requires us to know and serve our neighbors, including immigrants and refugees.

15. For example, Leviticus 19:33–34 reads: "When an alien resides with you in your land, you shall not oppress the alien. The alien who resides with you shall be to you as the citizen among you; you shall love the alien as yourself, for you were aliens in the land of Egypt: I am the LORD your God." And in Matthew 25:35, Jesus says, "I was hungry

3

JA207

PYM-000607

and you gave me food, I was thirsty and you gave me something to drink, I was a stranger and you welcomed me."

16. Our faith thus compels us to share the love of Christ with immigrant and refugee communities. We live that aspect of our faith in several ways.

17. First, we house the Carolina Immigrant Alliance, a legal clinic led by one of our deacons, choir members, and Sunday School teachers. The Immigrant Alliance is in the church building, and supporting its work is an essential component of living our faith. The Immigrant Alliance counsels all kinds of immigrants, both documented and undocumented, and has served over 200 clients from at least 34 countries. Since DHS changed its policy to allow ICE enforcement at churches, people in our community are afraid to come to the Immigrant Alliance for help.

18. Second, we offer weekly ESL classes in our fellowship hall that are completely run by volunteers from our church. Since DHS changed its policy and started allowing ICE enforcement at houses of worship, attendance at those classes has declined because people are afraid of immigration enforcement at the church.

19. Third, we welcome all who wish to join, regardless of their immigration status.

20. While we do not inquire about our parishioners' legal status, I know of at least two long-time members who may lose their temporary protected status soon and who are therefore fearful of attending services. One of those members has led our children's time moments during worship, and the other used to work for the church in a maintenance position. Because ICE is now able to enter houses of worship, these individuals—who have been members of our church for over ten years—are now fearful of attending services.

4

PYM-000608

21. We have additional congregants who are immigrants, both documented and undocumented. They too are now afraid to come to our sacred space to worship, since DHS's new policy means they might be targeted or even just swept up in a raid while here.

### Worshipping God

22. Oakland's congregation has covenanted to be faithful to the public worship of God, which is one of our core religious practices.

23. To fulfill that covenant with God, Oakland holds regular meetings for the purpose of public worship, Christian education, and fellowship.

24. All these meetings are open to the public, as our faith requires. Nehemiah 8-9, Psalm 86:9-10, John 4:23-24.

25. Limiting those meetings to those with legal immigration status would contradict our faith. One of our core values is being a church that shows God's love via mutual respect and acceptance of others in all walks of life.

26. But it would also contradict our faith as well as our God-given vision for the church to encourage our immigrant neighbors to join us when we know they might now be targeted by ICE even during worship. Our faith leads us to commit to missions, where we serve our neighbors both locally and globally. Knowingly putting our neighbors in danger violates our faith.

27. Even our non-immigrant parishioners are disturbed by DHS's new policy. Some are considering not attending worship out of fear of armed intrusion by ICE.

5

PYM-000609

28. I myself am the parent of two young children, and I don't know how I could explain law enforcement officers with guns coming in to interrogate and arrest our neighbors and fellow worshippers.

York County, South Carolina
February 3, 2025

Rev. Dr. Jeff Hayes

6

JA210

# Exhibit 49

PYM-000610

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*,<br><br>       Plaintiffs,<br><br>**v.**<br><br>**U.S. Department of Homeland Security,** *et al.*,<br><br>       Defendants. | **Civil Case No. 8:25-cv-243 TDC** |

## DECLARATION OF REVEREND DOCTOR PAUL BAXLEY

I, Paul Baxley, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

### The structure of the Cooperative Baptist Fellowship

1.  I am the Executive Coordinator of the Cooperative Baptist Fellowship, which is incorporated in the state of Georgia.

2.  CBF is a network of churches, individuals, and partners inviting each other into deeper community, equipping each other for ministry and seeking the transformation of God's world.

3.  CBF is made up of more than 1,400 individual congregations, more than 40 field personnel (what some other religions refer to as missionaries) bearing witness to Jesus Christ around the world, nearly 1,200 endorsed chaplains and pastoral counselors, 15

1

PYM-000611

state and regional organizations, dozens of theological schools and partner organizations and so much more.

4. The relationship between CBF and its member congregations involves mutual participation and contribution. Congregations contribute to CBF financially, serve on our governance bodies, and participate in missions and advocacy. CBF supports congregations in myriad ways, including through financial assistance and field personnel. CBF also seeks to help pastors and other congregational leaders thrive through offering leadership development, educational materials, spiritual formation support and opportunities for networking and renewal.

5. CBF's 1,400 congregations operate in 37 states, Puerto Rico and the District of Columbia in the United States.

6. Many of CBF's congregations own the property that houses their church. Some do not and instead rent or use another space. Some—including one in Richmond, Virginia, for example—use houses of worship that are owned by other denominations.

7. Our diverse community includes partners all over the world, and our Fellowship supports a wide range of missions and ministries that give people meaningful opportunities to put their faith to action. With a deep respect for freedom, diversity, and equality, we encourage autonomy while inviting dynamic collaboration.

8. CBF is managed under the direction and authority of the Governing Board, which provides fiscal and legal oversight to the Fellowship. As Executive Coordinator, I answer to the Governing Board.

9. CBF employs 86 people.

10. Currently, 44 of CBF's employees are field personnel.

11. Field personnel generally work in a specific geographic region. Among other things, they work in close partnership with many individual congregations both within and outside their region. Congregations who choose to directly partner with CBF field personnel provide financial assistance, send volunteer teams to meet the needs of the particular ministry, bring in the field personnel to help educate a church in how to carry out its own ministry, and pray for the field personnel and those to whom they are ministering.

12. Several field personnel work directly with immigrants including asylum seekers, refugees, visa holders and those without documentation. CBF congregations have built relationships with those field personnel to support their ministries and learn firsthand how immigration issues in border states impact the rest of the country. These congregations supply blankets, clothing, toiletry and personal care items, and food for migrants. Meeting physical needs and learning the migrants' stories of faith and resilience strengthens the faith of CBF congregations who see a picture of God at work in awe-inspiring ways.

13. I am a member of a CBF church. And I travel extensively to other CBF congregations as part of my duties. In a typical month I preach in a different CBF church three Sundays a month. I also attend some annual meetings of our state and regional organizations, seek other opportunities to engage congregational leaders, and visit field personnel throughout the year.

**Core tenets of our faith and their relation to immigration**

14. As Cooperative Baptists, God invites us and equips us to share and spread the hope of Christ. Whether we're feeding the hungry, advocating for the unheard, nurturing a

3

PYM-000613

young person's calling to ministry, endorsing a chaplain to serve or helping families get back on their feet after a disaster, we and those with whom we minister experience transformation.

15. Our understanding of Baptist faith and practice is based on our commitment to the historic Baptist principles of religious liberty, church-state separation, autonomy of the local congregation, and the freedom to interpret Scripture under the guidance of the Holy Spirit. Our fellowship further affirms the centrality of local congregations to the mission of Jesus Christ and the equal participation of women and men in all aspects of church leadership and Christian ministry.

16. As followers of Jesus it is most essential that we are doing what Jesus tells us to do. Most directly, Jesus said in Matthew 25: "I was a stranger and you welcomed me." Many people forget that as a child, Jesus himself lived life as a refugee. His parents took him in his earliest years and fled the country of his birth because of the cruelty of Herod's regime.

17. In the faces of immigrants and refugees who are fleeing political or religious persecution, or who are seeking sanctuary from tyrants, we see nothing less than the face of Jesus. To welcome a stranger is to welcome Jesus.

18. In his first mission sermon, Jesus announced that his calling was to "bring good news to the poor, release to the captives, recovery of sight to the blind and to let the oppressed go free." When we show hospitality to immigrants and refugees, when we help them find home, health, life and opportunity among us, we are fulfilling that mission of Jesus.

19. Jesus' command to welcome strangers and therefore welcome him, continues a prominent theme of Old Testament scriptures. In Exodus and Deuteronomy, the Hebrew

4

JA215

PYM-000614

people are charged to welcome strangers because they were once strangers in Egypt. The prophet Micah commands that faithful people "do justice, love kindness and walk humbly with God."

20. Other New Testament scriptures affirm Jesus' mandate as well. In Romans 12:9, Paul commands that we show hospitality to strangers. In Ephesians 2:19, Paul promises "you are no longer strangers and sojourners but fellow citizens with the saints." In Hebrews 13, the writer affirms that when we show hospitality to strangers, we entertain angels without knowing it.

21. We have other reasons to welcome immigrants and refugees. When we meet immigrants and refugees from around the world, we see children of God, made in the image of God, loved unconditionally by God as are all people of the world. We know the Gospel of Jesus Christ is intended as "good news of great joy for all people" because that's what the Christmas angels told us.

22. With the most quoted words of Scripture of all, we know that "God so loved the world." For this reason among many others, we reject any suggestion that God loves people of one nation more than God loves people of other nations.

23. The most essential identifying mark for Christians is not legal documents we hold but rather the professions of faith we make in Jesus and a life we live together in the power of Christ. The waters of baptism are more powerful than national citizenship, native language, or any other barrier.

24. Because God's love is global and because the church is global, we also know that God has always worked in the world by sending people across borders and boundaries. That was true early in the biblical story when God called Abram to leave his country and go

5

PYM-000615

"to the land I will show you." It was true when Paul travelled across the known world working with people from many cultures to start churches.

25. There has always been an unmistakable connection between the mission of God and migration. God sends people from us and to us to do God's work among us. That's why when we receive strangers we entertain angels. God sends people from other places with other gifts to strengthen our faith and advance the ways we serve God's mission.

**Cooperative Baptist Fellowship's worship with and ministry to immigrants**

26. CBF is committed to ministry among immigrants and refugees. Our ministries with immigrants and refugees are a matter of deep faith in that they flow from the commands of Jesus and the teachings of Scripture.

27. From CBF's inception, we have been commissioning field personnel to serve among migrant populations of the world and for more than two decades we have had a team of field personnel serving in the United States doing ministry with people from other countries.

28. A significant number of CBF partner congregations are engaged in direct ministry with immigrants and refugees, either through partnerships with our field personnel, relationships with local faith-based nonprofits, or ministries they have developed themselves. Some of those ministries are explicitly focused on immigrants and refugees, while others serve immigrants in the context of ministries with a wider focus such as feeding ministries, housing ministries, and educational programs.

29. CBF partner congregations who engage these ministries range from our most theologically conservative to our most theologically progressive and represent everyone in between.

30. Many of our field personnel minister to immigrant communities. They do so without regard to legal immigration status, into which field personnel do not inquire.

31. CBF partner congregations offer a broad array of services and classes to minister to their local communities—including immigrants. Those ministries include, but are not limited to, food pantries, children's ministry, clothing closets, job-training programs, housing assistance, child-care assistance, medical and dental clinics, addition recovery programs, hypothermia-prevention shelters, and mental-health counseling. Most of these ministries take place in the same church building used for worship services.

32. Some of CBF's partner congregations' ministries are specifically geared to immigrant communities. The most prominent are English as a Second Language classes. The majority of ESL classes are held in the same church buildings used for worship services. Some other ministries for immigrant communities include resettling refugees; offering legal, counseling, or translation services; and supplying money or volunteers to nonprofits who provide direct services to immigrants.

33. Between CBF congregations and field personnel, we are currently ministering to immigrants from more than 50 countries.

34. Our ministry to immigrants does not merely provide them with basic necessities, like food and clothing. Our ministry also provides immigrants with community, a sense of belonging, connection to other people, and other things necessary for anyone to grow and flourish in a new country. Creating the conditions for people to thrive—not just survive—is an expression of our religious beliefs.

PYM-000617

35. Our relationship with immigrants and refugees is not merely a reflection of our deep beliefs to care for others. It is a reflection of our beliefs that these brothers and sisters in Christ make us and our religious community better

36. CBF has benefitted from the leadership of immigrants at every level—from CBF staff to volunteers at local congregations.

37. Having people from different backgrounds—including immigrants—as an integral part of our faith community transforms our faith body to look more like the body of Christ. We learn from them different ways of understanding and experiencing the Holy Spirit.

38. CBF employs immigrants. CBF churches have staff who are immigrants and members who are immigrants. Immigrants are lay leaders in our congregations including serving as deacons and small group leaders and contributing to worship as ushers, choir members, offering prayers in their native languages, and reading scripture.

39. Some of CBF's congregations share their church buildings with an ethnic congregation or a congregation that worships in a language other than English.

40. Many of these congregations that worship in languages other than English are also CBF congregations. I believe that these congregations have large numbers of immigrants as members. We do not ask about the legal immigration status of anyone who attends these congregations or any other congregations.

41. CBF partner congregations have worked to incorporate other languages into worship that is primarily in English. For example, we have had members of congregations give blessings, deliver prayers, read scripture, or sing hymns in their native language because it helps all congregants encounter God in new and different ways.

JA219

42. Although our immigrant congregants come from all over the world, CBF congregations have a large number of Spanish speakers. Spanish is the primary language for some CBF congregations.

43. At CBF's National General Assembly, we provide contemporaneous Spanish translation during our plenary sessions and worship. CBF is continually increasing the number of print and digital resources we provide in Spanish.

**How DHS's new policy harms Cooperative Baptist Fellowship and its members**

44. The Department of Homeland Security's new policy that allows immigration enforcement at or near houses of worship has already caused CBF and its members immense harm and will continue to do so.

45. CBF has been asked by congregations across the country how to protect their immigrant members who have expressed that they are afraid for their safety.

46. In response to DHS's new policy, some congregations have reported that fewer people, especially immigrants, are attending worship. Having fewer people in worship is a significant harm to our religious exercise—we believe that everyone should be able to worship freely. And whether it means more people singing and praying together, or a heightened feeling of communal worship, having more people (especially those of different backgrounds) is important for exercise of our religion.

47. Having fewer congregants for worship hurts CBF in myriad ways. For one, much of CBF's budget comes from contributions from our congregations. Fewer worshippers means less money for the congregations, and it means fewer contributions to CBF.

48. The harm of reduced number of worshippers goes well beyond financial harm. CBF and its congregations rely heavily on volunteer engagement—in ministry, advocacy, and

9

JA220

PYM-000619

governance. Fewer people attending services means fewer people to get involved in that volunteer work that runs our community.

49. A reduced number of worshippers also harms the work done by our field personnel. Our field personnel work directly with congregations in many ways. Among other things, field personnel receive financial and volunteer support from congregations. If congregations have fewer worshippers, they will have fewer resources—financially and otherwise—to support the work of our field personnel. In addition, many worshippers who stay home out of fear of immigration-enforcement operations are people most in need of our ministries. If those worshippers continue to avoid interacting with their congregations, the religious work of our field personnel will be diminished.

50. Losing immigrant worshippers also lessens our ability to experience God by diminishing the ways in which we can learn from those who have lived courageously and had different experiences of the Holy Spirit.

51. Over time, CBF and its congregations have included people of different races, ethnicities, and nationalities at every level, including leadership. In short, our leadership has transformed our body to more closely resemble the body of Christ. If our congregations continue to experience reduced attendance by immigrants out of fear, we will lose staff, volunteers, and lay leaders of diverse backgrounds. Because diversity has brought us closer to resembling the body of Christ, losing it would be a grave harm to our ability to live out our religious beliefs.

52. In response to DHS's new policy, some congregations have reported that there has been a noticeable decline in people engaging with ministry for immigrant communities, especially ESL classes. One congregation has reported that its ESL program usually

10

JA221

brings in about 30 people. Now about 10 attend. That is a 66% decline in the ESL program.

53. One CBF congregation has reported that since DHS announced its new policy, not only are fewer people attending ESL classes, those who are not attending are acting differently—they are not responding to emails and are otherwise difficult to reach, which was not the case before.

54. One CBF congregation has had fewer participants in its low-income ministry; fewer people are engaging with the congregation's food pantry and clothing shelter, among other things. For CBF, serving these communities is not just community service, it is an exercise of our religious beliefs. Fewer participants in these services means fewer people with whom we can commune for worship and fellowship.

55. As another example, one of our pastors has a habit when driving away to roll down her window and say hello to church families that she sees. She was driving away from the church at a time when people were leaving an outreach ministry that provides food and clothing. The ministry serves a large number of immigrants. After DHS adopted its new policy, she was driving away from church when she saw an immigrant family that was a part of the congregation. She rolled down her window to shout hello. The family was visibly scared by someone shouting at them from a car outside of the church. The pastor now questions whether she should greet people in the way she has a habit of doing because immigrant congregants are in a constant state of fear that she does not want to exacerbate.

11

56. I understand that most immigration-enforcement officers are armed. Some members of CBF congregations would be uncomfortable with the presence of guns in their houses of worship.

57. CBF and its congregations would suffer immensely from immigration-enforcement operations at our houses of worship. The operations would interrupt our worship, including by traumatizing children and other congregants who would witness one of their fellow worshippers being arrested by armed federal officers.

58. The very threat of this enforcement means that many worshippers cannot attend services or ministry with a clear mind, ready to worship. Instead, they are worried about the potential of an immigration-enforcement operation.

59. Although some immigrant members of our community are staying home out of fear, for some the response has been more dramatic. For example, one attender of a CBF congregation was here on a visa. She had previously worshipped with the congregation, led in worship, volunteered, and attended Sunday School. Despite being here legally, her family sent her back to Central America so that she could be prepared to receive others who might be deported.

60. CBF has received multiple requests for advice from our congregations who are responding directly to communities gripped with fear of immigration enforcement at churches. CBF has been forced to give pastors advice that requires redirecting resources or, in some instances, goes against our core beliefs. For example, we have advised pastors to give pastoral care at the homes of immigrants who are too afraid to leave for fear of ICE enforcement at churches. That means that time the pastor would otherwise spend at church is spent off-site, including in transit. Alternatively, we have advised

JA223

some congregations who are afraid that they can lock the church doors so that immigration officers cannot simply walk in. Not only does locking the door mean that a church needs to have someone work the door to let in congregants, it also goes against a core belief of ours that our doors should be open—literally and figuratively—to anyone that wants to join us for worship. At least one CBF congregation, fearing immigration-enforcement operations, posted signs to designate areas in its building as public or private to make clear to potential federal agents where they are not allowed to enter.

61. From experience, CBF knows that immigration enforcement can be done without entering churches. For example, in 2018, a congregant of a CBF church in North Carolina was deported after attending a regular check-in with ICE, accompanied by his associate pastor. Gille Bikindou had previously been denied asylum and although a judge ordered his deportation, he was released on an order of supervision. For almost eight years he regularly checked in with ICE. In early 2018, at a seemingly routine check-in, he was arrested and deported. DHS did not, and did not need to, enter the church to detain Mr. Bikindou. Among others, CNN reported on Mr. Bikindou's story: https://www.cnn.com/2018/02/22/us/church-fights-deportation-gilles-bikindou/index.html.

Decatur, Georgia
February 2, 2025

Rev. Dr. Paul Baxley

13

# Exhibit 50

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.,*<br><br>                    Plaintiffs,<br><br>**v.**<br><br>**U.S. Department of Homeland Security,** *et al.*,<br><br>                    Defendants. | **Civil Case No. 8:25-cv-243 TDC** |

**DECLARATION OF REVEREND DOCTOR RANDALL CARTER**

I, Randall Carter, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

**The structure of Temple Baptist Church**

1.  Temple Baptist is a congregation of Baptist Christians and Christians from other traditions.

2.  Temple Baptist is located at:

    2121 Umstead Rd.

    Durham, NC 27712.

3.  Temple Baptist is a church and legally incorporated 501(c)(3) nonprofit organization.

4.  Temple Baptist owns the property on which the church is located.

5.  Temple Baptist's congregation includes approximately 150 people.

1

6. The Baptist church formed out of the Reformation and into a "free" church movement. Congregations work together across networks and partnerships for greater ministry and mission.

7. In the United States, there are several Baptist groups, associations, and denominations.

8. Temple Baptist is and has been a member of the Cooperative Baptist Fellowship since 2004.

9. Temple Baptist also is and has been a member of the Cooperative Baptist Fellowship of North Carolina since 2004.

10. CBFNC partners with CBF along with other state and regional CBF organizations.

11. Temple Baptist would never turn away a member based on immigration status, and we do not ask current or prospective members about immigration status.

12. Temple Baptist would never refuse to serve anyone through any of our ministries based on immigration status, and we do not ask those we serve about immigration status.

### My roles at Temple Baptist and CBFNC and my faith

13. I am the Senior Pastor of the Temple Baptist Church, which is incorporated in the state of North Carolina.

14. I am also the interim director of CBFNC's Welcome House network. This network includes around 60 churches, who work to provide temporary housing to refugees and other vulnerable populations.

15. As Temple Baptist's Senior Pastor, I serve as the legal agent and representative of Temple Baptist.

16. I have been in my position for two-and-a-half years.

17. I grew up Baptist and am an active member in Baptist communities.

PYM-000625

**Core tenets of our faith and their relation to immigration**

18. As Baptists, our primary and essential commitment is to Jesus Christ as the crucified and risen Son of God.

19. Baptists are not creedal and so do not insist on creedal affirmation for church membership.

20. Baptists affirm the Holy Scriptures of the Old Testament and New Testament as the final authority for faith and practice in the life of the believer and the believers' church. We affirm the inspiration and the purpose of the Scriptures as described in 2 Timothy 3:15–17: "[A]nd how from infancy you have known the Holy Scriptures, which are able to make you wise for salvation through faith in Christ Jesus. All Scripture is God-breathed and is useful for teaching, rebuking, correcting and training in righteousness, so that the servant of God may be thoroughly equipped for every good work."

21. We affirm the classic and orthodox statements of the Christian Faith found in early church statements like the Apostles' Creed and the Nicene Creed. The content of these creeds reflects well our connection to historic Christian convictions, with the references in these creeds to the "catholic" church understood to mean the universal church and not the particular Roman Catholic Church.

22. We affirm historic Baptist convictions including believer's baptism, priesthood of believers, religious freedom (as well as a free church), and congregational polity. We recognize these convictions are different from other Christian traditions. We long for unity in the church, and at the same time we hold these convictions deeply as our witness to the larger church.

JA228

PTM-000026

23. We believe the Biblical way to live out the Christian faith is in active participation in the community of believers. While many other expressions of the Christian faith exist, nothing takes the place of the local body of believers. We believe the local church is responsible before God for decision making and ministry, including decisions about leadership in the church.

24. We affirm the giftedness and calling of women and men in the church, including to ordained leadership. We believe the Bible celebrates the gifts and leadership of women and men in the local church, including leadership as deacons and pastors.

25. We affirm the call to evangelism and missions. Jesus told his disciples, "As the Father has sent me, so I send you." John 20:21. God the Father sent Jesus to the world and for the whole world. Jesus then sent his disciples into the world with the Good News of salvation. We believe our call is to embody the Good News of God's Kingdom in Jesus locally in North Durham and to wherever in this world God leads us to go and to partner.

26. Temple Baptist is committed to welcoming immigrants and refugees. At the heart of this commitment is a profound theological and scriptural foundation.

27. At Temple Baptist, our faith calls us to practice the ministry of "radical" hospitality. Leviticus 19:33–34 captures this call to welcome the vulnerable: "When an alien resides with you in your land, you shall not oppress the alien. The alien who resides with you shall be to you as the citizen among you; you shall love the alien as yourself, for you were aliens in the land of Egypt: I am the LORD your God."

28. Our commitment to the Lordship of Jesus Christ guides our values as a church. And Jesus emphasizes the divine importance of hospitality by equating welcoming the

4

stranger with welcoming himself. In Matthew 25:35, Jesus says, "I was hungry and you gave me food, I was thirsty and you gave me something to drink, I was a stranger and you welcomed me."

29. And so, our faith teaches that God calls us to welcome the "alien" and "stranger." And our faith obligates us to answer that call by welcoming immigrants into our communities and equipping them to resettle among us.

30. We believe that each immigrant in our community is an individual made in the image of God with inherent worth and dignity, and that radical hospitality is an opportunity to recognize and honor this humanity. Welcoming the stranger is not just an act of kindness but a divine calling on all our lives to reflect the heart of the gospel and the love of Christ to those most in need.

31. Our Christian faith compels us to address systemic issues that hinder refugee families from flourishing—including by advocating for just and compassionate immigration policy.

32. It is our duty as Christians to use our tangible resources, including space in our building and on our campus and land, to be the hands and feet of Christ by welcoming these members into our communities.

33. As heated debates about immigration continue on the national stage, we believe it is more important than ever for Christians to practice compassion to the vulnerable and the stranger, and to shape the conversation around immigration toward greater hospitality instead of being shaped by inflammatory political rhetoric.

**Temple Baptist's worship and ministry with immigrants**

34. On most Sundays, approximately 10% of active-worship attendance includes persons born outside the United States.

35. Our spiritual commitments are reflected in our ministry with refugees and immigrants.

36. For example, Temple Baptist participates in the Welcome House Triangle West network.

37. Welcome House is a ministry of radical hospitality that provides temporary reception housing ministry for refugees and immigrants who do not have a place to live upon arrival to the United States.

38. Welcome House partners with CBFNC, refugee agencies, and partner churches, as well as individuals that provide a hospitality ministry to vulnerable neighbors in the Raleigh/Durham/Chapel Hill area.

39. All Welcome House guests are sponsored by an agency or church.

40. Through Temple Baptist's Welcome House ministry, we turned a vacant home on our church's property into a space to provide temporary housing for refugee families.

41. This initiative allows Temple Baptist to serve out its religious mission of radical hospitality to the "alien" and "stranger."

42. It has also provided an opportunity for members of Temple Baptist's congregation and I to meet refugees from around the world who have escaped danger and persecution to seek a new life in Durham. Simply having more exposure to refugee families has helped our congregation gain a broader, more connected vision of community. This, in turn, has fostered a more welcoming and inclusive church environment and shaped a greater

PTM-000629

understanding of challenges refugees face, such as the rapid depletion of resettlement stipends due to expensive temporary accommodations.

43. Working with immigrant families, whether from the Democratic Republic of Congo, Afghanistan, or Myanmar, to name a few, has made policy become personal. Immigrants are not mere political issues; they are individuals with families, stories, and intrinsic value. Through my ministry at Temple Baptist, I have helped a Congolese family adjust to living in a small rental house, connected with Afghan families through driving practice, and helped a Burmese family purchase a new car. These personal connections underscore the resilience and generosity of refugee families and the profound impact of genuine welcome and support.

**How DHS's new policy harms Temple Baptist**

44. The Department of Homeland Security's new policy that allows immigration enforcement at or near houses of worship has already caused Temple Baptist immense harm and will continue to do so.

45. We have immigrant worshippers that attend Temple Baptist. We do not ask their immigration status.

46. We have seen a reduced number of immigrants willing to attend worship or engage in our ministries. I believe that this is out of fear of immigration enforcement.

47. I am aware that immigrant members of our worship community are afraid of immigration enforcement. They do not feel that church and our ministries are the sacred and safe space that they used to be.

48. DHS's new policy of immigration-enforcement in houses of worship creates confusion and fear. Even those who participate in worship and activities with Temple Baptist who

believe their immigration status to be legal now question their place and safety among us.

49. For example, a Venezuelan family in the United States on a "temporary protected status" designation now fear that they will not be able to stay long term. They simply want to get settled into work and school for their children but fear that their Hispanic appearance will make them a target.

50. Similarly, Afghans that moved through our Welcome House are also experiencing uncertainty about their status. They have asked questions about long-term security for them and their families and are afraid that they will be sent back to the terror of the Taliban.

51. These are examples of the kinds of fears in our church community that cause these families to become more isolated rather than believe they can freely show up at the church.

52. Having fewer people in worship is a significant harm to our religious exercise—we believe that everyone should be able to worship freely. And whether it means more people singing and praying together, or a heightened feeling of communal worship, having more people (especially those of different backgrounds) is important for exercise of our religion.

53. Having fewer congregants for worship hurts Temple Baptist in myriad ways. For one, much of Temple Baptist's budget comes from contributions from its members. Fewer worshippers means less money for Temple Baptist, and subsequently a diminished ability to serve out its religious mission through worship and ministry.

54. The harm of reduced number of worshippers goes well beyond financial harm. Temple Baptist relies heavily on volunteer engagement—in ministry, advocacy, and governance. Fewer people attending services means fewer people to get involved in that volunteer work that runs our community and fulfills our spiritual obligations to attend to the hungry and thirsty, to welcome the stranger, to take care of the sick, to clothe the naked, and to visit the prisoner, among other duties.

55. Moreover, we answer God's call to welcome the "alien" and "stranger" through our ministry with refugees and immigrants. Having fewer people willing to be served and welcomed by these ministries is a significant harm to our religious exercise.

56. For example, if fewer people are willing to use the home on Temple Baptist's property for temporary housing, we will be less able to serve out our mission through our participation in the Welcome House ministry.

57. Losing immigrant participants in our ministry services also lessens our ability to continue gaining a broader, more connected vision of community, which fosters a more welcoming and inclusive church environment.

58. Over time, Temple Baptist's members have included people of different races, ethnicities, and nationalities at every level, including leadership. In short, our leadership has transformed our body to more closely resemble the body of Christ. If our congregation continues to experience reduced attendance by immigrants out of fear, we will lose staff, volunteers, and lay leaders of diverse backgrounds. Because diversity has brought us closer to resembling the body of Christ, losing it would be a grave harm to our ability to live out our religious beliefs.

59. I believe that any immigration-enforcement action, or the threat of immigration enforcement, at Temple Baptist would cause serious harm to our religious exercise, services, and ministries.

60. I understand that most immigration-enforcement officers are armed. Some members of Temple Baptist would be uncomfortable with the presence of guns on church property.

61. Temple Baptist and its members would suffer immensely from immigration-enforcement operations at our houses of worship. The operations would interrupt our worship and ministry services, including by traumatizing children and other congregants who would witness one of their fellow worshippers being arrested by armed federal officers.

62. The very threat of this enforcement means that many Temple Baptist members cannot attend services or ministry with a clear mind, ready to worship. Instead, they are worried about the potential of an immigration-enforcement operation.

63. Knowing that immigration enforcement could happen on church property, at any of our worship services, or at any of our many ministries serving refugees and immigrants, I cannot be as encouraging of any immigrant joining us for worship or being served by our ministries. As much as their presence in both contexts would benefit our religious experience, I do not feel comfortable knowing that their attendance could subject them to armed federal officers.

Durham, North Carolina
February 4, 2025

*Rev. Dr. Randall Carter*

Rev. Dr. Randall Carter

10

JA235

# Exhibit 51

PYM-000633

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*,<br><br>        Plaintiffs,<br><br>**v.**<br><br>**U.S. Department of Homeland Security,** *et al.*,<br><br>        Defendants. | **Civil Case No. 8:25-cv-243 TDC** |

### DECLARATION OF REVEREND JUAN L. GARCIA

I, Juan L. Garcia, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am the Moderator of the Cooperative Baptist Fellowship.

2. The Moderator is the highest-ranking officer in CBF.

3. I am a pastor of a Hispanic congregation in Newport News, Virginia, which includes people from Mexico, Central America, South America, and the Caribbean.

4. I am an immigrant and a native Spanish speaker.

5. My views on immigration are not just personal—they are theological.

6. I believe that we have a religious duty to be a community that invites, welcomes and embraces everyone God puts in our way—the full spectrum of humanity—to be a part of this spiritual and redeeming journey we have been called to.

1

PYM-000634

7. I recently gave an address to CBF's Winter Governance Meeting in Decatur, Georgia. In my address, I spoke about DHS's new policy allowing immigration-enforcement at houses of worship and what harms it causes to CBF, its congregations, and our faith community.

8. I delivered the address mere days after ICE had conducted an immigration-enforcement arrest at a church fewer than 10 miles away, in Tucker, Georgia. So the immigration enforcement in Tucker was not just a news story to me and many members of CBF. It was, instead, something close, personal, and viscerally terrifying.

9. For CBF, for many of our congregations, and for people to whom I minister, the threat of immigration enforcement at houses of worship is not a hypothetical possibility. It is something that has caused immediate and drastic harms to our faith community.

10. The Hispanic community in this country, regardless of their immigration status (documented or undocumented), is afraid, is suffering, is being targeted and persecuted, is wondering when they will be the next victims of an ICE raid, or when someone will call immigration on them, or what will happen to their children if they get arrested and deported.

11. I am a U.S. citizen. But I am concerned and afraid. I am afraid for what might happen to me and my family, because we are brown, we have accents, we speak primarily Spanish or Spanglish, we do ministry with and for the Hispanic community, and because we know that immigration enforcement so often relies on those outward indicators of nationality—regardless of legal status.

12. Recently, a couple of families of my church (one from Venezuela and one from Ecuador) came down for prayer at the end of our service. I have the habit of asking people about what they want me to pray for. The first family told me, "Pastor, for peace in the midst of all that

2

JA238

is happening," and the second, "Pastor, we have an appointment with Immigration to put our fingerprints, and we are afraid." As I was praying for that family, I began to feel not only their fears and concerns, but my own, and the ones of many more like us. So, I broke down. As I embraced them, I began to sob and cry out in anguish and desperation—like when you are in a situation where you don't see a way out in sight. Halfway through my prayer, it was no longer a prayer and intercession for them, it was a prayer and intercession for all of us, Hispanic Immigrants, facing the uncertainty and fear of this imminent and unrestraint threat. "God, embraced us. God, have mercy. God, we are afraid. God, we need you."

13. Fear and insecurity caused by the threat of immigration enforcement are real and we are beginning to see their effects in our houses of worship. I have heard that some Hispanic parishioners are thinking of no longer attending church for fear of being intercepted by ICE. Others have already stopped attending. Some of our congregants have decided to leave their homes only to work and buy food.

14. Our Hispanic churches are no longer sanctuaries of peace, refuge, and safety. Our worship services can be interrupted at any moment. Our people are so concerned about the possibility of receiving those unwanted visitors that one of our ushers, a gentleman from Ecuador, asked me, "Pastor, what are we going to do? We always keep the doors open, but there are people who come that we don't know. Should we keep them open, or should we keep them close and locked all the time?" Those are the things that now a pastor like me is worrying about. Now, for our own safety, we have to begin to scrutinize those who come into our doors to see if they are legit visitors or ICE agents.

15. DHS's new policy is harming people at every level of CBF and its congregations—from those who attend church all the way to the Governing Board.

16. The threat of immigration enforcement at our houses of worship hurts all of us, but it is especially harmful to our Latino/a brothers and sisters, pastors, leaders and co-workers. We are suffering for this persecution. We are sad for what our people are going through. We are mad about the constant lies expressed about our people and the vicious attacks we are receiving.

17. Our Lord Jesus was an immigrant and a refugee fleeing persecution. In our own history as people of God, we were immigrants in the land of Egypt. So our God and our faith compel us to stand for the immigrant and refugee community in times of persecution as these.

Newport News, Virginia
February 3, 2025

_Rev. Juan Garcia_

Rev. Juan Garcia

4

# Exhibit 52

PYM-000637

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Philadelphia Yearly Meeting of the Religious Society of Friends,** *et al.*,<br><br>       Plaintiffs,<br><br>**v.**<br><br>**U.S. Department of Homeland Security,** *et al.*,<br><br>       Defendants. | **Civil Case No. 8:25-cv-243-TDC** |

## DECLARATION OF NANCY BLACK

I, Nancy B. Black, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am a member of the Brooklyn Friends Meeting, located in Brooklyn, New York.

2. I have been attending the Brooklyn Friends Meeting since approximately 1972.

3. I am currently co-clerk of the pastoral care subcommittee of the ministry and counsel committee and a member of the finance and collections committee at the Brooklyn Friends Meeting.

4. I previously served as Clerk of the Brooklyn Friends Meeting in the 1990s. I have also previously served on the nominating committee, the ministry and counsel committee, and the Brooklyn Friends School committee.

5. I also served as clerk of New York Quarterly Meeting from 2007-2011.

6. I was a professor of English at Brooklyn College, where I taught a diverse range of students for approximately 40 years.

PYM-000038

## Worship at the Brooklyn Friends Meeting

7.   I regularly attend weekly worship at the Brooklyn Friends Meeting House.

8.   Brooklyn Friends Meeting offers three meetings for worship on Sundays, and one meeting for worship on Tuesdays. It also holds a variety of other spiritual activities.

9.   Brooklyn Friends Meeting has approximately 300 members.

10.  Worship consists of sitting in silence and waiting to hear the voice of God. We sometimes refer to this process as seeking the inner Light, inner voice, or the Christ within.

11.  Brooklyn Friends Meeting is made up of a large and diverse collection of people, and everybody's voice matters. One of our key testimonies concerns equality.

12.  Listening to everyone's voice, and inviting everyone in, is central to our worship.

13.  We welcome children of all ages into the meeting house. During worship, they attend First Day School, which includes religious instruction. The children join the meeting toward the end of worship.

14.  When worship concludes, we invite members and attenders to share joys and sorrows and requests to be held in the Light, i.e., sharing the names of people whom they want the meeting to pray for. That is an important aspect of our worshipful activity.

15.  Thereafter, we exchange greetings by shaking hands or hugging those around us.

16.  The meeting concludes by breaking bread together, during which time members socialize and committees engage in some of their spiritual work.

17.  On the first Sunday of each month, worship is preceded by gathering to sing hymns for approximately 45 minutes before worship formally begins.

PYM-000039

18. Brooklyn Friends Meeting offers some of its worship services via Zoom. Zoom worship is important because it enables Friends who have not been able to attend worship in person, because of illness, mobility issues, distance, or other factors, access to worship.

19. For many, though, there is something essential about in-person worship.

20. Additionally, Zoom worship is not accessible to all Brooklyn Friends Meeting members, some of whom do not have access to the equipment required for remote participation.

**Engagement with the community**

21. Brooklyn Friends Meeting has existed since 1835, and it has been meeting in the same meeting house, at 110 Schermerhorn Street, since 1857.

22. Brooklyn Friends Meeting engages with our racially, ethnically, and socioeconomically diverse community, including members of the immigrant community, in a number of ways.

23. An important part of our history and our faith is seeing the Divine in everyone and welcoming everyone to be a part of our community.

24. We have a Welcoming Committee, which greets people when they come to the door and shows them inside.

25. There is a banner on the fence at our meeting house welcoming refugees and immigrants. The banner has hung there since at least 2020.

26. We also open our meeting house to the community, in both formal and informal ways.

27. On the last Sunday of every month, Brooklyn Friends Meeting holds a community dinner at its meeting house, which is open not just to members and attenders, but all

PYM-000640

people in the community. It is frequently attended by people who are experiencing food insecurity, including, at times, a number of migrants.

28. Twice a week, we host the University Settlement House, which provides educational and social services to immigrants and low-income families, at our meeting house. The University Settlement House provides pastoral care, community wellness, workshops, connections to social services, and other resources to members of the community during the office hours that it holds at our meeting house.

29. Once a week, students from neighboring Brooklyn Frontiers High School, located next door to our meeting house, come to the meeting house kitchen to attend a cooking class.

**The importance of communal worship with all-comers, including immigrants**

30. We have a large and diverse number of members, attenders, and others from the community who join for weekly worship.

31. Communal worship is a core aspect of my faith and religious exercise, and restrictions on communal worship negatively affect my religious exercise and ability to practice my faith.

32. As Quakers, we have no ministers; each person who worships in a meeting is a minister, in a way. Every person is crucial to the meeting, because everyone has their own connection to Spirit, or access to the Divine. Continuing revelation through people is critical.

33. That is true regardless of whether a person speaks in a meeting or not. It is the presence of Friends communing for worship that allows us to center down, which deepens the worship.

PYM-000041

34. The loss of members or attenders negatively affects our religious exercise because it deprives us of an essential part of our ministry not to have those voices in the room. Fewer people means less God in the room. It would be like omitting books of the Bible, because people are our texts.

35. The loss of members or attenders strikes at the heart of who we are and how we worship.

36. The specter or actual presence of armed law enforcement officers coming near or inside our meeting house during worship is very disturbing and incredibly disruptive.

37. The new policy creates an environment of fear.

38. I believe that it may lead some members of our community to refrain from attending weekly worship in person.

39. People ceasing attending weekly worship negatively affects the ability of our attenders and members to gather together for communal worship.

40. People ceasing attending weekly worship diminishes my own ability to worship.

41. Brooklyn Friends Meeting is a peaceful, nonviolent, and safe space. Ours is an open and inviting door.

42. The presence of armed law enforcement officers near or inside our meeting house would go against our pacifist values.

43. The presence of armed law enforcement officers in our meeting house would also disrupt our worship in other ways, including by disrupting our ability to engage in the quiet reflection that is necessary to access the Divine.

PYM-000642

Brooklyn, New York
February 3, 2025

Nancy B. Black

# Exhibit 53

PYM-000643

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

**Philadelphia Yearly Meeting of the
Religious Society of Friends,** *et al.*,

          Plaintiffs,

**v.**

**U.S. Department of Homeland Security,** *et
al.*,

          Defendants.

**Civil Case No. 8:25-cv-243-TDC**

## DECLARATION OF STEVEN MOHLKE

I, Steven Mohlke, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following

is true and correct:

**The history and structure of New York Yearly Meeting of the Religious Society of Friends**

1. New York Yearly Meeting of the Religious Society of Friends, Inc., is a New York not-

   for-profit religious corporation organized under Section 15 of the New York Religious

   Corporations Law. It is the governing and advisory umbrella organization for 65

   Quaker congregations—Monthly Meetings—across New York, Northern New Jersey,

   and Southwest Connecticut.

2. New York Yearly Meeting is located at:

   15 Rutherford Place

   New York, NY 10003

3. New York Yearly Meeting has existed since 1695, and it has met continuously since

   1696.

PYM-000644

4. A Yearly Meeting in the Quaker religion is an association, a yearly gathering, and the way of describing Quakers within a certain region.

5. New York Yearly Meeting is part of two wider organizations of Quaker Yearly Meetings: Friends General Conference and Friends United Meeting. But there is no wider denominational authority beyond the Yearly Meeting.

6. Monthly meetings are the basic organizational unit in the Quaker religion. Monthly meetings are authorized to have their own by-laws and budgets. They own or rent their own meeting houses and places of worship.

7. At least five of New York Yearly Meeting's monthly meetings meet for worship inside other denominations' houses of worship, including Presbyterian churches, a Methodist church, an interdenominational church, and another multi-denominational space. I believe that it would be difficult for law enforcement to determine whether the church was being used at any given time for Quaker worship or other worship.

8. To be a monthly meeting, a meeting must be recognized by a quarterly, regional, or half-yearly meeting that is a subregion of New York Yearly Meeting.

9. New York Yearly Meeting has 65 Monthly Meetings with approximately 2,900 members. It also includes approximately 10 additional informal worship groups.

10. New York Yearly Meeting instructs its monthly meetings on minimum requirements to be recognized as a monthly meeting.

11. New York Yearly Meeting publishes a book of discipline known as Faith and Practice, which provides trusted guidance for its monthly meetings and their members.

12. New York Yearly Meeting may offer spiritual and practical support to its monthly meetings.

PYM-000643

13. Most monthly meetings write an annual state-of-the-meeting report, which is sent to New York Yearly Meeting, which in turn writes a report for the whole of New York Yearly Meeting.

14. New York Yearly Meeting does not manage the budget of its monthly meetings. But if a monthly meeting closes down, generally the monthly meeting's assets transfer to New York Yearly Meeting.

15. Monthly meetings fund New York Yearly Meeting in part, through an annual covenant donation. Approximately 60% of the budget of New York Yearly Meeting comes from monthly meetings.

16. New York Yearly Meeting gathers three times per year for worship, fellowship, and decision-making about the development of the Quaker faith in our region.

17. When we meet, we understand the Yearly Meeting to be its own worshipping body. As part of the worshipping body, the New York Yearly Meeting has its own clerk.

18. New York Yearly Meeting emphasizes that all Quakers in its region are part of our community. Its gatherings are attended by the members of its constituent monthly meetings and others who are not official members but are active participants in our worshipping body.

19. All are welcome to attend New York Yearly Meeting's gatherings. New York Yearly Meeting would never turn anyone away, and we do not ask about immigration status.

20. All are also invited to participate in New York Yearly Meeting's decision-making.

21. We believe that there is that of God in everyone, and therefore we are all joined in community. This prompts us to open our doors and welcome the stranger.

PYM-000646

22. When some voices, including immigrant voices, are not present and are missing from our decision-making, we can make decisions that are not true to what God would have us do.

23. Many of New York Yearly Meeting's monthly meetings are located in areas with large populations of immigrants, including its monthly meetings in both urban and more rural areas.

24. Many of these monthly meetings have active members who are immigrants.

25. For example, one of New York Yearly Meeting's member monthly meetings is made up of documented refugees. Even though all members are documented or U.S. citizens, I know that if law enforcement is present at or near the church, worshippers would choose not to attend.

26. Another of our monthly meetings is in an area with a large and growing Spanish-speaking population and is considering adding weekly worship in Spanish.

27. Another of our monthly meetings, which is located in a rural, farm-oriented community, works actively with the large migrant populations in the area.

**My role in New York Yearly Meeting and my faith**

28. I am General Secretary of New York Yearly Meeting. The position is roughly equivalent to that of Executive Director for the organization.

29. As General Secretary, I serve as the legal agent of and am authorized to execute documents on behalf of New York Yearly Meeting.

30. The General Secretary directly supervises 6 staff members.

31. I have been in my position for seven-and-a-half years.

PYM-000047

32. I am an active member in the Religious Society of Friends and a member of Ithaca Monthly Meeting of the Religious Society of Friends.

33. I also facilitate regular workshops on Quaker decision-making for Friends inside and outside New York Yearly Meeting.

34. I believe that any immigration-enforcement action at a Quaker meeting house or at any place where a meeting for worship is occurring would cause serious harm to the religious exercise of New York Yearly Meeting and its monthly meetings. And I believe that the threat of immigration-enforcement actions at a Quaker meeting house or at any place where a meeting for worship is occurring causes serious harm to the religious exercise of New York Yearly Meeting and its monthly meetings.

35. Knowing that immigration enforcement can happen at a monthly meeting, annual gathering, or other worship event, I cannot be as encouraging of immigrants joining us for worship. Encouraging immigrants to come to worship knowing that they may be placed in harm's way, or that their lives may be made harder as a result of an encounter with immigration-enforcement officers, conflicts with my religious beliefs.

36. I believe that threatened or actual immigration-enforcement action near or inside a Quaker meeting house or at any place where a meeting for worship is occurring may lead some members of New York Yearly Meeting to refrain from attending worship.

37. When you introduce the possibility of armed law-enforcement officers showing up at or near Quaker meeting houses, it is discouraging of worship.

38. Quakers believe in nonviolence. We do not believe in taking up arms.

39. Having any armed presence in a Quaker meeting house would be distracting and make it difficult if not impossible to worship. If I was aware of an armed presence outside a

PYM-000648

Quaker meeting house, it would be similarly distracting and it would burden my ability

to worship. It would put me in a different state other than worship.


Ithaca, New York                              *Steve Mohlke*
February 3, 2025                                    Steven Mohlke



NIH Public Access
Author Manuscript
*Soc Sci Med.* Author manuscript; available in PMC 2012 August 1.

Published in final edited form as:
*Soc Sci Med*. 2011 August ; 73(4): 586–594. doi:10.1016/j.socscimed.2011.06.007.

# The Impact of Immigration and Customs Enforcement on Immigrant Health: Perceptions of Immigrants in Everett, Massachusetts, USA

**Karen Hacker, M.D., M.P.H.**,
Institute for Community Health, Cambridge Health Alliance, Harvard Medical School

**Jocelyn Chu, Sc.D., M.P.H.**,
Institute for Community Health, Cambridge Health Alliance, Harvard Medical School

**Carolyn Leung, Ed.D.**,
Tufts Clinical Translational Science Institute, Tufts Medical School, Boston, MA

**Robert Marra, M.B.A.**,
Community Affairs, Cambridge Health Alliance, Cambridge, MA

**Alex Pirie, B.A.**,
Immigrant Service Providers Group/Health, Somerville, MA

**Mohamed Brahimi, M.A.**,
Muslim American Civic and Cultural Association, Malden MA

**Margaret English, M.A**,
Institute on Urban Health Research, Bouvé College of Health Sciences; Northeastern University

**Joshua Beckmann, M.P.H., M.S.W**,
Institute on Urban Health Research, Bouvé College of Health Sciences; Northeastern University

**Dolores Acevedo-Garcia, PhD, MPA-URP**, and
Institute on Urban Health Research, Bouvé College of Health Sciences; Northeastern University

**Robert P. Marlin, M.D., Ph.D.**
Department of Medicine, Cambridge Health Alliance, Harvard Medical School

## Abstract

U.S. immigrants have faced a changing landscape with regard to immigration enforcement over the last two decades. Following the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, and the creation of the Immigration and Customs Enforcement (ICE) agency after the attacks of September 11, 2001, detention and deportation activity increased substantially. As a result, immigrants today are experiencing heightened fear of profiling and deportation. Little research exists on how these activities affect the health and well-being of U.S. immigrant communities. This study sought to address this gap by using community-based participatory research to investigate the impact of enhanced immigration enforcement on

© 2011 Elsevier Ltd. All rights reserved.

Corresponding Author: Karen Hacker, M.D., M.P.H.; Institute for Community Health, Cambridge Health Alliance, Associate Professor of Medicine, Harvard Medical School. Khacker@challiance.org.

**Publisher's Disclaimer:** This is a PDF file of an unedited manuscript that has been accepted for publication. As a service to our customers we are providing this early version of the manuscript. The manuscript will undergo copyediting, typesetting, and review of the resulting proof before it is published in its final citable form. Please note that during the production process errors may be discovered which could affect the content, and all legal disclaimers that apply to the journal pertain.

NIH-PA Author Manuscript    NIH-PA Author Manuscript    NIH-PA Author Manuscript

Hacker et al.                                                                                                                          Page 2

NIH-PA Author Manuscript

immigrant health in Everett, Massachusetts, USA, a city with a large and diverse immigrant population. Community partners and researchers conducted 6 focus groups with 52 immigrant participants (documented and undocumented) in five languages in May 2009. The major themes across the groups included: 1) Fear of deportation, 2) Fear of collaboration between local law enforcement and ICE and perception of arbitrariness on the part of the former and 3) Concerns about not being able to furnish documentation required to apply for insurance and for health care. Documented and undocumented immigrants reported high levels of stress due to deportation fear, which affected their emotional well-being and their access to health services. Recommendations from the focus groups included improving relationships between immigrants and local police, educating immigrants on their rights and responsibilities as residents, and holding sessions to improve civic engagement. Immigration enforcement activities and the resulting deportation fear are contextual factors that undermine trust in community institutions and social capital, with implications for health and effective integration processes. These factors should be considered by any community seeking to improve the integration process.

### Keywords

Immigrants; Immigration and Customs Enforcement; USA; deportation fear; 9/11; stress, access to care; community-based participatory research

## Background

U.S. immigrants have faced a changing landscape with regard to immigration enforcement over the last two decades After the passage of the Illegal Immigration Reform and Immigrant Responsibility Act (IRRIRA) of 1996, detention of illegal immigrants increased and the categories for persons subject to detention expanded along with the types of crimes for which noncitizens could be deported (Miller, 2005). With the creation of Immigration and Customs Enforcement (ICE), a new division within the Department of Homeland Security, following the attacks of September 2011, the growth of detention and deportation activities accelerated (U.S. Immigration and Customs Enforcement, 2009). Now, with the advent of section 287(g) agreements which allow local police officers to carry out enforcement of federal immigration law ( Rodriguez, Chishti, Capps, & St. John, 2010) even longtime documented immigrants are being targeted for deportation for minor offenses ( Miller, 2005).

Simultaneously, there has been a progressive shift in responsibility for immigration policy and enforcement from the federal government to states and locales (Fix & Tumlin, 1997; Suarez-Orozco & Suarez-Orozco, 2009). Communities where immigrant populations are most concentrated are struggling to address the strains associated with the influx of diverse and, at times, undocumented populations. Local institutions, including police departments, schools, and health systems, are developing their own de-facto policies to accommodate these new populations (Steinberg, 2008). At times, these local policies directly conflict with federal ICE mandates. For example, the 2007 ICE raids in New Haven, CT occurred within days of the city adopting a "resident identification card" that allowed documented and undocumented immigrants to open bank accounts and use other municipal services (www.Eyewitness News 3, 2007).

The contextual factors present in receiving communities greatly influence the assimilation patterns of new immigrants. According to segmented assimilation theory, immigrants follow divergent assimilation paths based in part on the characteristics of the host community (Portes, Fernandez-Kelly, & W., 2005; Portes & Rumbaut, 2006; Zhou, 1997). Community context includes socio-economic conditions and governmental policies which may support

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

2)      Perception of collaboration between local law enforcement and ICE leading to unlimited discretion to arrest immigrants: Participants–regardless of documentation status-believed that the local police were an arm of a larger federal authority and were working closely with ICE. There was also a belief that local and state police had the authority to deport individuals.

Both of these themes had implications for additional themes related to access to health care and perceived health which included:

3)      Concerns about documentation required for insurance and health care: Both documented and undocumented immigrants discussed fears that giving out personal information to acquire health insurance or health care would be reported to ICE.

4)      Fear of deportation and its relationship to emotional well-being and health care compliance: Documented and undocumented participants in all groups reported feelings of anxiety and hopelessness resulting from the ever present fear of deportation. In some cases this led to avoidance of care (missed appointments, refusal to complete state documents to obtain health coverage and subsequent lack of insurance).

**Fear of Deportation**

Fear of deportation was identified by members in all focus groups. Individuals expressed anxiety about being asked for documentation and "picked up" indiscriminately by authorities.

There is a fear of being deported if they (immigrants) don't have papers, or if they do something "bad". Even minor infractions of the law, such as a traffic violation, can get someone deported. *(Haitian Creole-speaking participant)*

I am too scared to ask for help. For everything they request documents. For everything they ask for the social security number. I am always scared, there is always fear. *(Spanish-speaking participant)*

The unpredictable nature of ICE activity and deportation described in numerous stories of disappearing friends and relatives made people feel helpless in the face of powerful authorities and added to their sense of vulnerability.

They (ICE) go with paper and if [they are] looking for someone above, if they accidentally go to the first floor and you don't have documentation they will take you anytime, you never know. I have a friend who used to live in Chelsea and was taken by immigration. *(English-speaking participant)*

Some even worried that other immigrants would report them to authorities.

ICE came to my house at 7 in the morning back in 2004. Our neighbor sold us out. I was very scared. They wanted to check the house, claiming that I was hiding illegal people. …I really thought I was going to be deported at that moment… *(Arabic-speaking participant)*

While one might assume that only undocumented immigrants would experience this fear, documented immigrants were also fearful for their family members or because their own "status" might be questioned.

Back in 2004 they came in to my house too and told me that I was hosting a lot of undocumented immigrants and that they were sleeping on the floor. I was lucky I had a work permit back then and none of that information they had was true and they asked me if I worshiped in a mosque on regular basis and if I knew of any plot

*Soc Sci Med*. Author manuscript; available in PMC 2012 August 1.

JA257

or attack that was going to take place against the U.S. I was very scared. *(Arabic-speaking participant)*

Many participants were particularly worried about the impact of ICE activity and deportation on their children or on children of other immigrants. They reported numerous stories of children being left behind when parents were picked up and taken by ICE.

My sister-in-law had 2 girls. She got deported and someone else had to take care of the children *(English-speaking participant)*

Overall, deportation fear seemed to affect all the immigrants in the focus groups, regardless of their documentation or their country of origin. The ever-present concern that at any time, ICE might take you from your family, created an environment of insecurity.

(I) want to feel safe but I cannot. Sometimes I want to go somewhere but I am afraid, if they take me while I am away, I couldn't forgive myself because I would leave my son and husband. It changes the way I live. *(English-speaking participant).*

Any time I leave my house, I don't know if I will be arrested and deported. I tell my kids if I get deported you have to take care of each other... *(Arabic-speaking participant)*

**Relationships between Police and ICE**

Given the fear expressed about deportation, it was not surprising that both local and state law enforcement officials were perceived to be closely related to ICE. The distrust for law enforcement was expressed in all the focus groups. In some cases the perception of police connection to ICE was reflective of the situation in their own countries.

The separation between the police and ICE is something hard to understand as in Brazil they are all interconnected. *(Portuguese-speaking participant)*

(I) don't feel free to go to police department and report a crime. (I'm) afraid to say because they might take me to investigation. I can't share information with the police. I am afraid because I am undocumented. *(English-speaking participant)*

This perceived connection between ICE and police only serves to increase fear as many immigrants discussed being targeted and stopped by police for no particular reason and assumed that the next step would be deportation.

Once I was shopping for groceries…and when I stepped out of the supermarket to put my bags in the car, I noticed a police officer checking me out. When I entered my car and turned it on, she came up behind me with her lights on, asking for my driver's license.....*(Portuguese-speaking participant)*

Despite not having valid driver's licenses, many undocumented immigrants continued to drive out of necessity, needing to transport their families and get to their jobs. In the Everett area, while there is limited public transportation (buses) driving is often essential especially since equipment (cleaning devises, painting tools, etc) is needed for jobs and distances to employment are not walkable. However, many felt that they were targeted by authorities for minor violations and only then identified as undocumented. This in turn could lead to arrest or other consequences. These "traffic stops" made immigrants hyper-vigilant about the police presence in Everett.

He (a friend) does not understand how come the police officers have no definite set of rules to follow, when they pull over a driver with no driver's license. Some of them send the person to jail, some tow the car and some just let the person go. *(Portuguese-speaking participant)*

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

# EXHIBIT 55

PYM-000669



*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, DC 20536

**U.S. Immigration and Customs Enforcement**

January 31, 2025

MEMORANDUM FOR:        Russell Hott
                       Acting Executive Associate Director
                       Enforcement and Removal Operations

                       Robert Hammer
                       Acting Executive Associate Director
                       Homeland Security Investigations

FROM:                  Caleb Vitello
                       Acting Director

SUBJECT:               Common Sense Enforcement Actions in or Near Protected Areas

On January 20, 2025, Acting Secretary Benjamine C. Huffman issued a memorandum titled, *Enforcement Actions in or Near Protected Areas*, superseding and rescinding effective immediately the October 27, 2021, *Guidelines for Enforcement Actions in or Near Protected Areas* memorandum from former Secretary Alejandro N. Mayorkas. The Acting Secretary's memorandum acknowledges the ability of the Department's law enforcement personnel to apply enforcement discretion to balance a variety of interests, including the degree to which law enforcement actions occur in protected areas. [1]

For this reason, the Department will not be issuing bright line rules regarding where immigration laws are permitted to be exercised. Instead, the Acting Secretary authorized the Director of U.S. Immigration and Customs Enforcement (ICE) and the Commissioner of U.S. Customs and Border Protection to issue further guidance to assist law enforcement personnel in exercising appropriate enforcement discretion.

---

[1] For purposes of ICE immigration enforcement action, protected areas include schools (pre-schools through post-secondary, including colleges, universities, and vocational and trade schools); hospitals; churches, synagogues, mosques, or other institutions of worship; and a site during the occurrence of a public demonstration, such as a march, rally, or parade.

Page 2 of 2

I have great faith in the judgment of our law enforcement personnel and, accordingly, charge Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area. AFODs and ASACs may provide authorization for such actions either verbally or in writing. Before authorizing an immigration enforcement action at a site where a public demonstration is underway, AFODs and ASACs must consult with local Office of the Principal Legal Advisor leadership for guidance on constitutional considerations.

Any further guidance your Directorates develop should be coordinated together and developed in consultation with the ICE Office of Regulatory Affairs and Policy and OPLA to ensure consistency and legal sufficiency.

<u>Disclaimer</u>

This guidance does not, is not intended to, and may not be construed to create or modify any right or benefit, substantive or procedural, enforceable at law by any party against the United States, its agencies, its officers, or any person.

Distribution:

Deputy Director
Executive Associate Director, Enforcement and Removal Operations
Executive Associate Director, Management and Administration
Associate Director, Office of Professional Responsibility
Principal Legal Advisor
Assistant Director, Office of Civil Rights Compliance
Assistant Director, Office of External Affairs
Assistant Director, Office of Firearms and Tactical Programs
Assistant Director, Office of Regulatory Affairs and Policy
Chief of Staff, Office of the Director
Deputy Chief of Staff, Office of the Director

# EXHIBIT 59

← **Post**

 **Secretary Kristi Noem** ✔ 🛂
@Sec_Noem



7 AM in NYC. Getting the dirt bags off the streets.



# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| PHILADELPHIA YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS, NEW ENGLAND YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS, BALTIMORE YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS, INC., ADELPHI FRIENDS MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS, RICHMOND FRIENDS MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS, NEW YORK YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS, INC., COOPERATIVE BAPTIST FELLOWSHIP and SIKH TEMPLE SACRAMENTO, | Civil Action No. 25-0243-TDC |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY and KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*, | |
| Defendants. | |

## MEMORANDUM OPINION

For over 30 years, the United States government has imposed various limitations and safeguards on the execution of immigration enforcement actions in or near places of worship. In light of the First Amendment's protections relating to religious exercise, such limitations served to mitigate the potential collision between the interests of government and religion that would inevitably arise from intrusions by armed law enforcement officers into churches, synagogues,

mosques, temples, and other places of worship. On January 20, 2025, the United States Department of Homeland Security ("DHS") abruptly removed all such limitations and safeguards and instead left decisions on whether to conduct such enforcement actions to the unilateral discretion of individual officers. Three different faith communities have now challenged this action.

Specifically, Plaintiffs Philadelphia Yearly Meeting of the Religious Society of Friends; New England Yearly Meeting of the Religious Society of Friends; Baltimore Yearly Meeting of the Religious Society of Friends, Inc.; Adelphi Friends Meeting of the Religious Society of Friends; Richmond Friends Meeting of the Religious Society of Friends; and New York Yearly Meeting of the Religious Society of Friends, Inc. (collectively, the "Quaker Plaintiffs"), along with Plaintiffs Cooperative Baptist Fellowship ("CBF") and Sikh Temple Sacramento ("the Sikh Temple"), have filed a civil action against Defendants DHS and Secretary of Homeland Security Kristi Noem, in her official capacity (collectively, "DHS"), in which they allege that the new policy relating to immigration enforcement actions in or near places of worship violates their right to freedom of expressive association under the First Amendment to the United States Constitution, U.S. Const. amend. I; the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb to 2000bb-4; and the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706. Plaintiffs have filed a Motion for a Temporary Restraining Order and Preliminary Injunction, which is fully briefed. The Court held a hearing on the Motion on February 13, 2025. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

# BACKGROUND

## I.     Protected Areas Guidance (1993–2021)

From at least 1993 to 2021, various agencies within the federal government charged with enforcing the nation's immigration laws have issued and applied policy guidance governing immigration enforcement actions in or near certain locations that have been referred to as either "sensitive locations" or "protected areas," including such locations as places of worship, schools, health care facilities, and sites of parades and demonstrations. *E.g.*, Joint Record ("J.R.") 82–83, 189–90, ECF Nos. 49-2, 49-3. For example, on May 17, 1993, James Puleo, the Acting Associate Commissioner of Operations for the Immigration and Naturalization Service, issued a memorandum stating in part that it was "a policy of the Service to attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies." J.R. 67. On July 3, 2008, Julie Myers, the Assistant Secretary of Homeland Security for United States Immigration and Customs Enforcement ("ICE") issued a memorandum that referenced Puleo's memorandum and directed that ICE personnel "should refrain from conducting enforcement action or investigative activities at or near sensitive community locations such as schools, places of worship, and funerals or other religious ceremonies," except in certain identified "limited circumstances." J.R. 80. From October 24, 2011 to October 27, 2021, a memorandum issued by ICE Director John Morton ("the Morton Memorandum"), placed restrictions on ICE enforcement actions at or focused on a broader of list of "sensitive locations," including places of worship and the sites of religious ceremonies, J.R. 82–84, and from January 18, 2013 to October 27, 2021, a memorandum issued by David Aguilar, the Deputy Commissioner of United States Customs and Border Protection ("CBP") ("the Aguilar Memorandum"), similarly restricted the ability of CBP officers and agents to conduct enforcement

3

activities at or near a similar list of sensitive locations that included places of worship and sites of religious ceremonies.

On October 27, 2021, Secretary of Homeland Security Alejandro Mayorkas issued a memorandum to the leaders of ICE and CBP, which are component agencies of DHS, entitled "Guidelines for Enforcement Actions in or Near Protected Areas" ("the Mayorkas Memorandum" or "the 2021 Policy"). J.R. 188. The Mayorkas Memorandum replaced the Morton and Aguilar Memoranda and provided guidance relating to law enforcement actions in or near a non-exhaustive list of "protected areas," which included a "school," a "medical or mental healthcare facility," a "place of worship or religious study," a "place where children gather," a "social services establishment," a "place where disaster or emergency response and relief is being provided," a "place where a funeral, graveside ceremony, rosary, wedding, or other religious or civil ceremonies or observances occur," and a "place where there is an ongoing parade, demonstration, or rally." J.R. 189–90.

The Mayorkas Memorandum directed that, as a "foundational principle," "[t]o the fullest extent possible, [DHS] should not take an enforcement action in or near a protected area." J.R. 190. Enforcement actions included "arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance." J.R. 191. As a qualification to this principle, the guidance recognized that "there might be limited circumstances under which an enforcement action needs to be taken in or near a protected area," including but not limited to when: (1) "[t]he enforcement action involves a national security threat"; (2) "[t]here is an imminent risk of death, violence, or physical harm to a person"; (3) "[t]he enforcement action involves the hot pursuit of an individual who poses a public safety threat"; (4) "the enforcement action involves the hot pursuit of a personally observed border-

4

JA267

crosser"; (5) "[t]here is an imminent risk that evidence material to a criminal case will be destroyed"; and (6) "[a] safe alternative location does not exist." J.R. 190–91.

When such limited circumstances justified an enforcement action in or near a protected area, law enforcement officers or agents were generally required to seek "prior approval from their Agency's headquarters," or an official delegated by the agency head to provide such approval, before taking the action. J.R. 191. The guidance noted, however, that "[i]f the enforcement action is taken due to exigent circumstances and prior approval was therefore not obtained, Agency headquarters" or the delegated official "should be consulted post-action." *Id.* The guidance further provided that "[t]o the fullest extent possible, any enforcement action in or near a protected area should be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the protected area." *Id.*

## II. The 2025 Policy

On January 20, 2025, Acting Secretary of Homeland Security Benjamine C. Huffman sent a memorandum ("the Huffman Memorandum") to the Acting Director of ICE and the Senior Official Performing the Duties of the Commissioner of CBP addressing ICE and CBP "enforcement actions in or near areas that [DHS] previously determined require special protection." J.R. 574. As its primary action, the Huffman Memorandum states that "effectively immediately," it "supersedes and rescinds" the Mayorkas Memorandum. *Id.*

As guidance in place of the rescinded Mayorkas Memorandum, the Huffman Memorandum states:

> Our brave men and women in uniform put their lives on the line every day to advance the rule of law and keep our people safe. As part of that work, officers frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location.

Going forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense. It is not necessary, however, for the head of the agency to create bright line rules regarding where our immigration laws are permitted to be enforced.

*Id*. It further provides that the "Director of ICE and the Commissioner of CBP may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion." *Id*.

On January 21, 2025, DHS issued a press release relating to the issuance of the Huffman Memorandum in which a DHS spokesperson stated:

This action empowers the brave men and women in CBP and ICE to enforce our immigration laws and catch criminal aliens—including murders and rapists—who have illegally come into our country. Criminals will no longer be able to hide in America's schools and churches to avoid arrest. The Trump Administration will not tie the hands of our brave law enforcement, and instead trusts them to use common sense.

J.R. 329.

On January 31, 2025, pursuant to the Huffman Memorandum, Acting ICE Director Caleb Vitello issued a memorandum entitled "Common Sense Enforcement Actions in or Near Protected Areas" ("the Vitello Memorandum"). J.R. 669. The Vitello Memorandum defines protected areas to include "schools"; "hospitals"; "churches, synagogues, mosques, or other institutions of worship"; and "a site during the occurrence of a public demonstration, such as a march, rally, or parade." J.R. 669 n.1. As guidance, it "charge[s] Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area" and states that "AFODs and ASACs may provide authorization for such actions either verbally or in writing." J.R. 670. Although the Vitello Memorandum requires AFODs and ASACs to "consult with local Office of the Principal Legal Advisor leadership for guidance on constitutional considerations" before "authorizing an immigration enforcement action

6

at a site where a public demonstration is underway," it does not contain a similar requirement for enforcement actions at any other protected areas, including places of worship. *Id.* Although the Vitello Memorandum applies only to ICE personnel and does not apply to CBP personnel, the Court will refer to the Huffman and Vitello Memoranda collectively as "the 2025 Policy."

## III.    Plaintiffs' Religious Beliefs and Practices

Plaintiffs come from three distinct religious groups: Quakers, Cooperative Baptists, and Sikhs. Plaintiffs have submitted declarations of individuals associated with each of these groups setting forth the religious beliefs and practices relevant to the resolution of the Motion and the impact of the 2025 Policy on these beliefs and practices.

### A.    The Quaker Plaintiffs

The Quaker Plaintiffs are comprised of six different communities, or meetings, of the Religious Society of Friends, which has practiced the Quaker faith in America dating back to the 1600s. "Yearly meetings" constitute the highest organizational bodies in the Religious Society of Friends and meet annually for worship and to make decisions about issues that affect constituent units, which include monthly meetings, the basic organizational unit in the Quaker religion. Generally, monthly meetings have been incorporated, have by-laws, have a budget, and own a meeting house, which is a space where worship and community-based activities take place.

As to Quakers' belief system, among the core tenets is the belief that humans can and do experience God directly. In light of this belief, Quakers do not have an assigned individual who directs their spiritual development and believe that at any given time a person may experience the divine and receive a message that is intended to be shared broadly. Indeed, it is "essential" for spiritual development that Quakers "be able to hear God's word, no matter who it comes from." J.R. 3. Thus, in regular, scheduled worship, Quakers gather in their meeting house and sit facing

7

the center of the room in "expectant waiting." J.R. 4. When God enters and shares with an individual a message intended to be shared with the other worshippers, that member stands and communicates that message with the rest of the meeting in a practice called "vocal ministry." *Id.* Quakers believe that different life experiences lead people to hear and understand God in somewhat different ways, such that having a diversity and richness of human experience within the meeting provides a richer, fuller understanding of how God is speaking to individuals and the community.

The communal aspect of worship is central to the exercise of the Quaker faith. Even those sitting quietly and not engaging in vocal ministry are actively participating. From the "communal togetherness" during worship, members share a deep spiritual bond and understanding that "something special has happened." *Id.* Further, after worship, members share "joys and concerns" through which they may request the community to hold someone in the Light, the Quaker version of praying for somebody. J.R. 8. The session ends with attendees shaking hands and greeting one another. As a result of these practices, even when there are opportunities to participate in worship remotely, "attending worship in the Meeting House is a much more powerful religious experience." J.R. 6.

Quakers also have shared beliefs and ways of living, known as "testimonies." J.R. 33. For example, Quakers are well known for their "peace testimony" in that most oppose all war, for any reason, and would describe themselves as pacifists. J.R. 5. Quakers also share the testimony of equality, under which Quakers see God in all people, such that they value and worship without regard to a person's background, including immigration status. The Quaker faith, in particular the New England Yearly Meeting, has strong ties to Central America, South America, and Africa and has attendees from those regions. The Adelphi Friends Meeting is located in an area with a large

8

Hispanic population and regularly supports immigrant families, including from Nicaragua, Afghanistan, Burundi, and Kenya, some of whom join the meeting for worship. The Philadelphia Yearly Meeting has monthly meetings located in areas with a high immigrant population. The Quaker Plaintiffs generally do not inquire into the immigration status of their members. They also act on the testimony of equality by providing services that directly support immigrants, including by providing interpretive services at large meetings, offering English classes for refugees, driving worshippers to immigration appointments, and sponsoring new immigrant families upon arrival.

Since DHS announced the 2025 Policy, members of the Quaker Plaintiffs have reacted with serious concern over its impact on their religious practice. For example, at the Richmond Friends Meeting, at least one attendee has inquired about whether the threat of immigration enforcement would require meetings to lock their doors during worship, which interferes with Quakers' religious commitment to communal worship. Some attendees who are people of color have expressed fear of enforcement actions in or around the meeting, concern that they could be mistaken for being undocumented, and discomfort in attending meetings because armed immigration officers can operate in or around the meeting. At the Green Street Meeting, within the Philadelphia Yearly Meeting, even immigrant members who are United States citizens have expressed fear of immigration enforcement at meetings.

According to Michael Levi, a member of the Adelphi Friends Meeting, because Quaker worship is communal, decreases in attendance as a result of the 2025 Policy would cause a "significant harm" to the worship experience, in part because "one's life experience affects how one hears the spirit and what conclusions one might draw," as "a diversity of worshippers allows [Quakers] to experience God in a broader, more encompassing way." J.R. 10. In particular, at Adelphi Friends Meeting, where "worship is open to all comers—no matter their status" and a

significant number of immigrants attend worship, meetings have been "enriched by the presence of these immigrants" because members "have had experiences that [they] would certainly not have had if immigrants did not join [them] for worship." *Id.* Thus, as Levi asserts, "enforcement actions that stop[] people from entering our meeting house—or scare[] them from doing so—affects us personally, viscerally, emotionally, and theologically." J.R. 11.

Beyond reducing or threatening to reduce attendance at worship services, immigration enforcement actions at Quaker meetings would inhibit religious exercise in other ways. In light of Quakers' pacifist views, the presence of armed law enforcement officers in or near meeting houses is "inconceivable and contrary to" the Quaker faith and harms Quaker religious practice by hindering attendees' ability to connect with God. J.R. 12, 34. As attested to by Roni Kingsley, Clerk of the Richmond Friends Meeting, "[e]ven the idea of there being weapons at meeting is distressing enough to make it very difficult to engage in waiting worship and will discourage attendance." J.R. 34. According to a member of the Putney Friends Meeting, which is part of the New England Yearly Meeting, the presence of armed officers outside the meeting house would cause some people not to attend the meeting or even to leave the meeting entirely. Moreover, some Quakers, regardless of their own legal status, will not be as encouraging of immigrants joining them for worship out of fear for the immigrants' safety, even though the lack of immigrants attending worship undermines the religious experience because it lessens the ability of attendees "to hear God and what God is trying to tell us." J.R. 11. Finally, because yearly meetings such as New England Yearly Meeting and Baltimore Yearly Meeting receive a portion of their budget from their constituent monthly meetings, and because monthly meetings receive contributions from members, a reduction in the number of members attending monthly meetings would have a financial impact on both monthly meetings and yearly meetings.

## B. The Cooperative Baptist Fellowship

CBF is "a network of churches, individuals, and partners" that "equip[] each other for ministry and seek the transformation of God's world." J.R. 610. Specifically, CBF includes over 1,400 congregations; over 40 "field personnel," consisting of CBF's equivalent of missionaries; approximately 1,200 "endorsed chaplains and pastoral counselors"; and 15 state- or region-specific organizations. J.R. 610–11. The CBF-member congregations operate in 37 states, the District of Columbia, and Puerto Rico.

Cooperative Baptists believe that because Jesus Christ was a refugee, "the faces of immigrants and refugees" are "the face of Jesus." J.R. 613. Cooperative Baptists' faith thus "compels [them] to share the love of Christ with immigrant and refugee communities" and to provide those communities with "'radical' hospitality." J.R. 607, 626. Doing so allows Cooperative Baptists to "fulfill[] the mission of Jesus." J.R. 613. Many CBF congregations "have large numbers of immigrants as members." J.R. 617. For example, at the Temple Baptist Church in Durham, North Carolina, on most Sundays, approximately 10 percent of worship attendees are immigrants.

Cooperative Baptists' religious commitment to serving immigrants manifests itself in various ways. Some CBF congregations and CBF field personnel are engaged in direct ministry explicitly focused on immigrants and refugees, while others serve immigrant communities as part of broader ministry efforts. Among other activities, they host food pantries, distribute clothes, conduct job-training programs, provide housing and child-care assistance, and host health clinics, often in the same church building they use for their worship services. CBF congregations also assist with resettling refugees and provide legal, counseling, and translation services for immigrants. For example, the Oakland Baptist Church in Rock Hill, South Carolina hosts at its

church building a legal clinic for immigrants known as the Carolina Immigrant Alliance and offers English as a second language ("ESL") courses in its fellowship hall, both led by volunteers from the church. Another CBF church provides temporary housing to immigrant families. Ultimately, "[c]reating the conditions for people to thrive—not just survive—is an expression" of Cooperative Baptists' religious beliefs. J.R. 616.

Since DHS announced the 2025 Policy, CBF congregations have observed a change in behavior among their members. Congregations have reported that "fewer people, especially immigrants, are attending worship." J.R. 618. Those no longer attending worship include immigrants with legal status and those without legal status. J.R. 607–08, 629–30. For example, the Oakland Baptist Church reports that two long-time members who have temporary protected status, including one who served the congregations by leading "children's time moments during worship," are now fearful of attending services. J.R. 607. Temple Baptist Church has an immigrant family on lawful temporary protective status which fears that its members' Hispanic appearance will make them a target. Reverend Dr. Randall Carter, Senior Pastor for the Temple Baptist Church, attributes CBF's diminished attendance to the fact that immigrant members "do not feel that church and [CBF] ministries are the sacred and safe space that they used to be." J.R. 629. Further, he states that some CBF members "would be uncomfortable with the presence of guns" in their church, which would occur if armed ICE agents entered the premises to conduct enforcement activities. J.R. 632. Indeed, ICE "conducted an immigration-enforcement arrest at a church fewer than 10 miles away" from the site of CBF's Winter Governance Meeting in Decatur, Georgia at which DHS's 2025 Policy was being discussed. J.R. 634.

According to CBF's Executive Coordinator, Reverend Dr. Paul Baxley, the reduced attendance, particularly of people from different backgrounds, reduces the "feeling of communal

worship" and lessens the ability of CBF members "to experience God by diminishing the ways" they can "learn from those who have lived courageously and had different experiences of the Holy Spirit," thereby causing harm to CBF religious exercise. J.R. 618–19. The reduced attendance also harms CBF financially because "much of CBF's budget comes from contributions from [its] congregations," and it also reduces the number of volunteers to operate its community service activities. J.R. 618. Moreover, since DHS adopted the 2025 Policy, the number of individuals seeking assistance from CBF, whether at food pantries, clothing shelters, or legal clinic sessions has also declined. In particular, attendance at ESL classes has declined as a result of fear of immigration enforcement, with one congregation reporting a 66 percent decline in ESL attendance. Because such community service is an exercise of CBF religious beliefs, such reduced attendance directly hinders CBF congregations' ability to exercise those beliefs.

Reverend Baxley has also stated that the 2025 Policy has caused CBF to give advice to its members that "goes against our core beliefs." J.R. 621. For example, CBF has told some congregations "that they can lock the church doors so that immigration officers cannot simply walk in" even though doing so "goes against a core belief" of CBF's that its congregations' "doors should be open—literally and figuratively—to anyone that wants to join [them] for worship." J.R. 621–22. At the same time, the 2025 Policy has also compelled CBF to contradict its faith in that it is part of CBF's faith to "encourage our immigrant neighbors to join us," but to do so violates their religious belief that they should not knowingly put "our neighbors in danger," which would occur if such immigrants attended services because they could be "targeted by ICE even during worship." J.R. 608.

## C. The Sikh Temple

The Sikh Temple is a Gurdwara, or place of worship, for the Sikh population in the Sacramento, California area, comprising approximately 30,000 people. Approximately 50 percent of the Sikh Temple's congregation consist of immigrants.

The Sikh worldview centers around the idea of Ik Onkar, or oneness, which means that the divine is equally present in all people and that every human being is equal in the eyes of God— whatever their religion, social identity, or immigration status. Gurdwaras are places that Sikhs gather for fellowship, worship, and "langar," the sharing in a communal meal with their community, referred to as their Sangat. J.R. 600. In general, fully and meaningfully practicing the Sikh faith requires joining with the community in service and prayer. Because the Sikh faith does not have an ordained clergy, any person from the congregation may lead religious services and assist in preparing langar. During worship at the Gurdwara, community members often lead the congregation in singing and prayer.

Central to the concept of a Gurdwara is that all people must be welcomed in the space without fear. In light of this precept, and the communal nature of worship, Amar Singh Shergill, a member of the Executive Management Committee of the Sikh Temple, has asserted that the knowledge that the Sikh Temple may be subject to government surveillance and raids by armed agents burdens its members' exercise of religion, in part because DHS's new policy has had "an immediate chilling effect on worship and fellowship" at its Gurdwara, and decreased attendance hinders the Sikh Temple's ability to carry out essential religious practices with the entire Sangat. J.R. 602. Specifically, the Sikh Temple has already heard from members who are concerned that participation in Sikh religious life at the Gurdwara may put them at risk because of the 2025 Policy. Some of those concerned are undocumented, but even Sikhs with legal immigration status are

unsure whether it is safe to attend. The 2025 Policy is also reducing attendance and interfering with the Sikh Temple's religious exercise because it is renewing concern among members about governmental intrusions on the sanctity of their places of worship, which derives from a history of violent military assaults on Gurdwaras.

## DISCUSSION

In the Motion, Plaintiffs seek a preliminary injunction barring DHS from "implementing, enforcing, or acting pursuant to DHS's 2025 Policy regarding enforcement actions in or near houses of worship . . . or from carrying out immigration-enforcement operations at houses of worship absent a judicial warrant or exigent circumstances." Mot. at 1, ECF No. 26.

To obtain a preliminary injunction, moving parties must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement as articulated. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

In addition to arguing that Plaintiffs have failed to establish each of the requirements for a preliminary injunction, DHS also argues that the Motion should be denied because (1) Plaintiffs lack standing; and (2) Plaintiffs' proposed injunction is statutorily barred. The Court will first address these two threshold issues.

## I.     Standing

DHS argues that Plaintiffs lack standing to assert their claims.  Because Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies," plaintiffs in federal civil actions must demonstrate standing to assert their claims.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  The "irreducible constitutional minimum" requirements of standing consist of three elements:  (1) the plaintiff must have suffered an "injury in fact"; (2) the injury must be fairly traceable to the actions of the defendant; and (3) it must be "likely" that the injury will be "redressed by a favorable decision."  *Id*. at 560–61 (citations omitted).  Standing must be established for each claim and form of relief sought.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  When there are multiple plaintiffs, the Court need only determine that there is at least one plaintiff with standing for a particular claim in order to consider the claim.  *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).  As relevant here, "standing requirements are somewhat relaxed in First Amendment cases."  *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013).  Here, DHS contends that Plaintiffs have not established any element of standing.

### A.     Injury in Fact

To satisfy the requirement of an "injury in fact," Plaintiffs must identify "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).  Notably, the "leniency of First Amendment standing manifests itself most commonly in the doctrine's first element: injury-in-fact."  *Cooksey*, 721 F.3d at 235.  Although Plaintiffs have asserted a variety of injuries or potential injuries, they focus most specifically on the injury of a reduction in attendance at worship services and ministry programs.  In the Amended Complaint, Plaintiffs allege that the 2025 Policy "is already resulting in and will continue to result

in fewer congregants attending and participating in worship services" and "will reshape—and, indeed, is already reshaping—the composition of Plaintiffs' worship services and meetings by diminishing the attendance and participation of members of immigrant communities." Am. Compl. ¶ 140, ECF No. 28. More specifically, Reverend Baxley of CBF has stated in his declaration that "[i]n response to DHS's new policy, some congregations have reported that fewer people, especially immigrants are attending worship," as well as that "there has been a noticeable decline in people engaging with ministry for immigrant communities, especially ESL classes." J.R. 618, 619. As reported by Reverend Dr. Jeff Hayes, a minister at CBF's Oakland Baptist Church, those who now fear coming to CBF churches include "documented and undocumented immigrants" who are concerned that "since DHS's new policy . . . they might be targeted or even just swept up in a raid while" at church. J.R. 608. Notably, one CBF congregation has reported a 66 percent decrease in attendance at its ESL program, while another has reported fewer participants in its low-income ministry activities, including its food pantry and clothing shelter. According to Reverend Hayes, attendance at his church's ESL classes "has declined because people are afraid of immigration enforcement at the church." J.R. 607.

Such reductions in attendance cause injury to Plaintiffs. At a first level, as stated by Reverend Baxley, because much of CBF's budget comes from contributions by its congregations, "[f]ewer worshippers means less money for the congregations." J.R. 618. Because CBF relies heavily on volunteers for its ministry and other activities, reduced attendance also causes the harm of having "fewer people to get involved in [the] volunteer work that runs our community." J.R. 619. Moreover, in light of CBF's emphasis on communal worship, Reverend Baxley has asserted that reduced attendance causes "significant harm to our religious exercise" because having more attendees "singing and praying together" provides a "heightened feeling of communal worship,"

and that a reduction in the number of immigrant worshippers "lessens our ability to experience God by diminishing the ways in which we can learn from those who have lived courageously and had different experiences of the Holy Spirit." J.R. 618, 619. Further, because CBF considers its ministry programs to be not just community service, but an exercise of religious beliefs, reductions in participation in ESL classes and other ministry programs harm its members' ability to practice their faith.

The other Plaintiffs also report actual or imminent reductions in attendance. The Sikh Temple reports that "DHS's new policy is . . . reducing Gurdwara attendance and interfering with our religious exercise," that it "had an immediate chilling effect on worship and fellowship at our Gurdwara," and that those concerned about whether it is safe to attend include not only undocumented individuals but also members with legal immigration status. J.R. 602. Particularly where the Sikh faith does not have ordained clergy, and members of the congregation therefore may lead the services, including in singing and prayer, the Sikh Temple asserts that the "[d]ecreased attendance hinders our ability to carry out essential religious practices with the entire Sangat." *Id.*

After the announcement of the 2025 Policy, members of the Quaker Plaintiffs have expressed concern about decreased attendance because attendees may be mistaken for being undocumented, J.R. 33, and because, in light of Quakers' pacificist beliefs, "[e]ven the idea of there being weapons at meeting," which would occur if armed immigration officers conduct enforcement actions at religious institutions, "is distressing enough to make it very difficult to engage in waiting worship and will discourage attendance," J.R. 34. Reductions in attendance would have a particularly adverse impact on Quaker meetings because they are communal sessions at which any attendee can receive and share the word of God, and "one's life experience affects

how one hears the spirit and what conclusions one might draw," so "a diversity of worshippers allows [Quakers] to experience God in a broader, more encompassing way." J.R. 10. Reduced attendance would also have an adverse financial impact because Quaker meetings rely in part on contributions from meeting attendees.

A reduction in attendance at religious services and activities constitutes a concrete injury in fact. In *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989), in which several churches filed a lawsuit arising from immigration officers' surreptitious recording of church services, the court held that the plaintiffs had sufficiently alleged a concrete injury for standing purposes by asserting that:

> [A]s a result of the surveillance of worship services, members have withdrawn from active participation in the churches, a bible study group has been canceled for lack of participation, clergy time has been diverted from regular pastoral duties, support for the churches has declined, and congregants have become reluctant to seek pastoral counseling and are less open in prayers and confessions.

*Id*. at 521–22. The court specifically rejected the argument that these harms impacted individual worshippers but not the churches themselves. *Id.* at 522. Rather, it held that "[w]hen congregants are chilled from participating in worship activities, when they refuse to attend church services because they fear the government is spying on them . . . we think a church suffers organizational injury because its ability to carry out its ministries has been impaired." *Id.* As in *Presbyterian Church*, Plaintiffs allege that the 2025 Policy, which effectively expands DHS's ability to engage in immigration enforcement actions on the premises of their places of worship, has caused or imminently will cause a decrease in attendance at worship services and ministry programs that results in a comparable harm to Plaintiffs. Most notably, CBF has already identified a specific decrease in attendance at both worship services and ministry services such as ESL classes that has

caused both financial harm and an impairment to its ability to carry out its ministry activities. Plaintiffs have therefore sufficiently alleged an injury in fact for standing purposes. *See id.*

DHS's citation to *Laird v. Tatum*, 408 U.S. 1 (1972), and *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), does not alter this conclusion. As to the injury-in-fact prong, DHS argues that these cases establish that, in the absence of actual application of a government investigative program against Plaintiffs, a subjective, speculative chilling effect arising from that program cannot establish a concrete injury-in-fact that is "certainly impending." Opp'n at 7, ECF No. 34 (quoting *Clapper*, 568 U.S. at 409). In *Laird*, the plaintiffs, in asserting a First Amendment challenge to a United States Department of the Army data-gathering system established to assist with an Army response to domestic civil disturbances, which they deemed to intrude on "lawful and peaceful civilian political activity," alleged only that their injury was "a 'chilling' effect on the exercise of their First Amendment rights" caused by "the existence and operation of" the Army program, without any explanation of when and how they might be targeted by such data-gathering activity or any assertion of any other harm arising from the program. *Laird*, 408 U.S. at 2–3. While the Court held that this asserted chilling effect on plaintiffs was "not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm," *id.* at 13–14, here, Plaintiffs are not relying on an abstract chilling effect arising from the 2025 Policy to establish a concrete injury; rather, they have alleged an objective harm in the form of a reduction in attendance at worship services and ministry programs.

In *Clapper*, the plaintiffs, consisting of "attorneys and human rights, labor, legal, and media organizations" whose work would cause them to engage in confidential electronic communications with foreign individuals located abroad, asserted a First Amendment challenge to section 702 of the Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. § 1881a, which authorized electronic

20

surveillance of foreign individuals reasonably believed to be located outside the United States. *Clapper*, 568 U.S. at 401, 406. In alleging injuries, however, the plaintiffs asserted only that the plaintiffs' communications would likely be acquired through this program at some point in the future, and that they had engaged in their own proactive undertaking of "costly and burdensome measures to protect the confidentiality of their international communications." *Id.* at 401–02. The Court ultimately deemed the first alleged injury "too speculative" to be "certainly impending" because it relied on a "highly attenuated chain of possibilities" that would need to occur before the plaintiffs' communications would be actually intercepted pursuant to the challenged program, and the second alleged injury improper because it would allow plaintiffs to "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* at 410, 416. Here, Plaintiffs do not rely on either type of alleged injury and instead have asserted an actual injury in the form of reduced attendance, with both financial and other impacts, that is not merely "certainly impending" but has already occurred.

Finally, DHS's reliance on *United States v. Texas*, 143 S. Ct. 1964 (2023), is misplaced. DHS asserts that this case demonstrates that there can be no cognizable injury based on the statement that "parties challenging immigration enforcement priorities lack an Article III injury because such lawsuits 'run up against the Executive's Article II authority to enforce federal law.'" Opp'n at 11 (quoting *Texas*, 143 S. Ct. at 1971). In *Texas*, however, the Court found that the plaintiffs, consisting of several states, lacked standing to assert a claim that DHS's new guidelines for immigration enforcement violated the law because they needed to require more arrests of noncitizens. *See Texas*, 143 S. Ct. at 1968. The lack of standing, or any concrete injury, was based not on a general principle that Article II bars lawsuits relating to Executive Branch policies governing arrests and prosecutions, but on the specific principle that "when the Executive Branch

elects *not* to arrest or prosecute, it does not exercise coercive power over an individual's liberty or property, and thus does not infringe upon interests that courts often are called upon to protect." *Id.* at 1971. An injury can occur, however, when as in the present case, an Executive Branch policy could result in arrests of specific individuals. *See id.* at 1971 n.2. As for the general language about Article II authority, where Plaintiffs' claim does not challenge the Executive Branch's prioritization of immigration law enforcement or decisions on how many arrests to make pursuant to those laws, but instead challenges only whether the policy on the location of such law enforcement activity may infringe on constitutional or statutory rights arising from intrusions on Plaintiffs' places of worship, such language does not prevent Plaintiffs from asserting a cognizable injury arising from such an enforcement policy.

For the foregoing reasons, the Court concludes that Plaintiffs have sufficiently alleged an injury in fact arising from the reduced attendance at religious services and ministry programs.

### B.    Traceability

Next, Plaintiffs must demonstrate that their asserted injury is fairly traceable to DHS's actions. *See Lujan*, 504 U.S. at 560. Under this requirement, plaintiffs need not establish that the challenged action is the "proximate cause" of the injury and instead need only show that it is "in part responsible for" the asserted injury. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013) (stating that "the concept of concurrent causation" is "useful in evaluating" this element); *see also Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 283 (4th Cir. 2018). When a plaintiff is challenging a government policy or action and "the plaintiff is an unregulated party" in that the policy or practice is directed at third parties, traceability "ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and

perhaps on the response of others as well.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 1557 (2024) ("*FDA*") (quoting *Lujan*, 504 U.S. at 562).

Here, Plaintiffs have both alleged and produced evidence that supports the conclusion that attendance at worship services and ministry programs is decreasing at least in part as the result of the 2025 Policy. Reverend Baxley has specifically attributed the decline in CBF's attendance to "DHS's new policy," J.R. 618, 619, and in fact the decline in attendance at ESL classes has been reported "since DHS announced its new policy," J.R. 620. The Sikh Temple also directly attributes the decline in attendance to "DHS's new policy," J.R. 602, and the Quaker Plaintiffs link the concerns about imminent reductions in attendance to the 2025 Policy. Where the religious institutions themselves, after hearing from their members, have concluded that the reduced attendance is caused by the 2025 Policy, and where it appears to have occurred only since the issuance of the 2025 Policy, DHS's attempts to contest the validity of this causal connection are not persuasive.

Although DHS argued at the hearing on the Motion that reduced attendance could be a reaction to the general announcements of an increase in immigrant enforcement activity in the same time frame, it fails to credit the fact that some of the expressed concerns relate specifically to the presence of immigration officers at places of worship, not in the general community. For example, the Quaker Plaintiffs have stated that their members are expressing discomfort in attending meetings specifically because of the potential that armed immigration officers may be operating in or around the meeting, which would run afoul of Quaker beliefs relating to pacifism. The Sikh Temple has also identified a specific concern about armed law enforcement officers inside their places of worship arising from a history of military intrusions into Gurdwaras. The

Court therefore finds that Plaintiffs have sufficiently alleged that the "the asserted injury is fairly traceable" to the 2025 Policy. *See Lujan*, 504 U.S. at 560.

Again relying on *Clapper*, DHS also argues that Plaintiffs cannot show traceability because the causal chain between the 2025 Policy and the decline in attendance "rests on a speculative chain of attenuated possibilities." Opp'n at 12–13. In *Clapper*, however, the chain of causation between the challenged policy and the potential injury to the plaintiffs that was deemed insufficient included not just the step of the Government deciding to target the communications of the plaintiffs' foreign contacts, but also the additional intervening steps of the Government invoking the challenged authority under 50 U.S.C. § 1881a as opposed to another legal basis for conducting the surveillance and, more importantly, of independent third parties, specifically judges of the Foreign Intelligence Surveillance Court, approving the action, as required by § 1881a. *Clapper*, 568 U.S. at 410. Here, the 2025 Policy would be relevant to all intrusions at places of worship, and because Plaintiffs primarily object to warrantless entries, the chain of causation does include the intervening step of approval of the intrusions by independent third parties. Thus, Plaintiffs' chain of causation in this case is far less attenuated than in *Clapper* and rests on the straightforward proposition that based on the announcement of the 2025 Policy, members and attendees of Plaintiffs' religious institutions, particularly undocumented immigrants but also lawful immigrants, would reduce their attendance out of a fear of being the subject of, or being caught up in, immigration enforcement actions at those places of worship.

Finally, DHS asserts that this causal connection does not establish traceability because it "would be the consequence of 'unfettered choices' made by some of the 'independent actors' that are not before the Court," specifically, the decisions and choices of Plaintiffs' members and attendees. Opp'n at 12 (quoting *Lujan*, 504 U.S. at 562). Although DHS is correct that standing

is "substantially more difficult to establish" when the "causal relation between injury and challenged action depends upon the decision of an independent third party," standing is "not precluded" under such circumstances. *California v. Texas*, 141 S. Ct. 2104, 2117 (2021). Since *Clapper*, in which the Court referenced its "usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors" and declined to rely on such a causal link to find standing, *Clapper*, 568 U.S. at 414, the United States Supreme Court has clarified the principles governing consideration of such theories of traceability. In *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), after referencing *Clapper*, the Court found that a theory of traceability for standing purposes could succeed if it rested not on "mere speculation about the decisions of third parties" but instead on "the predictable effect of Government action on the decisions of third parties." *Id.* at 2566. In pursuing such a theory, the plaintiff must show that the third parties at issue "will likely react in predictable ways" that will lead to an injury to the plaintiff. *Id.*; *see FDA*, 144 S. Ct. at 1557; *California*, 141 S. Ct. at 2109 (quoting *Dep't of Commerce*, 139 S. Ct. at 2566).

In *Department of Commerce*, a group of state governments and other public and private entities challenged the Secretary of Commerce's decision to include a question about citizenship on the 2020 census form and asserted standing based on the contention that some percentage of noncitizens would decline to respond to the census because of that question, and that, as a result, certain state plaintiffs would have undercounted populations and thus incur injuries such as reduced federal funding calculated based on census data. *Id.* at 2565. Although the Government asserted that "any harm to [the plaintiffs] is not fairly traceable to the Secretary's decision, because such harm depends on the independent action of third parties choosing to violate their legal duty to respond to the census," the Court rejected the Government's argument based on its conclusion

that the plaintiffs had shown that those third parties "will likely react in predictable ways to the citizenship question, even if they do so unlawfully and despite the requirement that the Government keep individual answers confidential." *Id.* at 2566. Since *Department of Commerce*, multiple courts have found traceability for purposes of standing based on the assertion that immigrants, including undocumented immigrants, will act in predictable ways that result injuries to the plaintiffs. *See, e.g.*, *Texas v. United States*, 126 F.4th 392, 412 (5th Cir. 2025) (concluding that Texas had demonstrated traceability for standing purposes sufficient to challenge DHS's Final Rule establishing the Deferred Action for Childhood Arrivals program ("DACA") where it put forward "sufficient, unrebutted evidence to support the 'common-sense assertion' that, absent DACA, some recipients would leave the United States"); *United States v. Iowa*, 126 F.4th 1334, 1343 (8th Cir. 2025) (concluding that the United States had demonstrated traceability for standing purposes sufficient to challenge a state law criminalizing the presence of undocumented immigrants within Iowa where the fact that "aliens would leave Iowa in response to the law is a 'predictable effect'" that would force federal officials to expend resources to locate them and would antagonize foreign nations, as referenced in a press release by the Government of Mexico); *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 487–89 (D. Md. 2019) (finding causation for standing purposes sufficient to challenge the State Department's policy modifying the criteria for determining whether a visa applicant is likely to be a public charge if admitted to the United States, where the plaintiff, a city government, alleged that "immigrants and their families will react in 'predictable ways' to the changes" in that fewer will seek public benefits, thereby injuring the plaintiff by impeding its ability to provide benefits and social services and causing higher usage of city services in lieu of federal services).

26

Here, as in *Department of Commerce*, the Court can and will find traceability based on the actions of third-party members and attendees of Plaintiffs' congregations, particularly immigrants, in declining to attend worship services and ministry programs in response to the 2025 Policy. Such a response is not a matter of speculation but instead a "predictable" reaction. *Dep't of Commerce*, 139 S. Ct. at 2566. Indeed, the predictability of this reaction is stronger than in *Department of Commerce* because there is evidence, in the form of declarations from Plaintiffs, that some such individuals have already stopped attending worship services and ministry programs as a direct result of the 2025 Policy. Moreover, other facts in the record support the conclusion that the decisions to stop attending are predictable, including the facts that (1) the press release in which DHS announced the 2025 Policy stated that "[c]riminals will no longer be able to hide in America's schools and churches to avoid arrest," J.R. 329; and (2) there was recently an immigration enforcement action at a church only 15 minutes away from a CBF church in Georgia. J.R. 347; *see* Reply at 5, ECF No. 10. The traceability requirement is therefore satisfied.

## C. Redressability

Lastly, Plaintiffs must show that their asserted injury is redressable. To do so, Plaintiffs must demonstrate that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Sierra Club*, 899 F.3d at 284 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). The "second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" *FDA*, 144 S. Ct. at 1555 (quoting *Sprint Commc'ns Co. v. APCC Services, Inc.*, 554 U.S. 269, 288 (2008)). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id*. Further, the "burden imposed by this requirement is not onerous." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018). Plaintiffs

27

"need not show that a favorable decision will relieve [their] every injury." *Id.* (alteration in original) (quoting *Sierra Club*, 899 F.3d at 284). "Rather, plaintiffs 'need only show that they personally would benefit in a tangible way from the court's intervention.'" *Id.* (quoting *Sierra Club*, 899 F.3d at 284). "The removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability." *Sierra Club*, 899 F.3d at 285.

Here, at a minimum, Plaintiffs seek a return to the 2021 Policy that existed prior to the 2025 Policy. Under the 2021 Policy, immigration enforcement in or near places of worship was subject to specific restrictions not present in the 2025 Policy. First, the 2021 Policy required that immigration enforcement actions not be taken at places of worship and other protected areas "[t]o the fullest extent possible." J.R. 189. Second, the 2021 Policy identified a list of only six "limited circumstances" under which such actions could be taken. J.R. 190–91. Even allowing for the fact that the list was non-exhaustive, it is reasonable to infer that the range of scenarios under which an immigration enforcement action could occur at a place of worship is meaningfully narrower under the 2021 Policy than under the 2025 Policy, the latter of which includes neither of the restrictions referenced above. In turn, it is reasonable to infer that a return to the 2021 Policy would reduce both the number of enforcement actions that would occur at a place of worship and the level of fear and concern over such actions that has caused the reduction in attendance at Plaintiffs' places of worship. Indeed, Plaintiffs operated their places of worship under the 2021 Policy without experiencing the kind of concern and reduced attendance that they are currently experiencing. Even assuming that some members of Plaintiffs would remain concerned about venturing to public places like houses of worship in light of the general increase in immigration enforcement separate from the 2025 Policy, redressability is satisfied if a favorable ruling would result in "[t]he removal of even one obstacle to the exercise of one's rights, even if other barriers

28

remain." *Sierra Club*, 899 F.3d at 285. The Court therefore concludes that Plaintiffs have shown

a "non-speculative likelihood that the injury would be redressed by a favorable judicial decision."

*Cooksey*, 721 F.3d at 238.

For the foregoing reasons, the Court concludes that Plaintiffs have met their burden to

establish standing at this stage of the case.

## II.     8 U.S.C. § 1252(f)(1)

DHS also argues that this Court cannot grant Plaintiffs' requested injunction because a

provision of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1252(f)(1), prohibits it from

doing so. 8 U.S.C. § 1252, entitled "Judicial review of orders of removal," includes the following

subsection:

> Regardless of the nature of the action or claim or of the identity of the party or
> parties bringing the action, no court (other than the Supreme Court) shall have
> jurisdiction or authority to enjoin or restrain the operation of the provisions of part
> IV of this subchapter, as amended by the Illegal Immigration Reform and
> Immigrant Responsibility Act of 1996, other than with respect to the application of
> such provisions to an individual alien against whom proceedings under such part
> have been initiated.

8 U.S.C. § 1252(f)(1). The Supreme Court has held that § 1252(f)(1) "generally prohibits lower

courts from entertaining injunctions that order federal officials to take or to refrain from taking

actions to enforce, implement, or otherwise carry out" Part IV of the Immigration Subchapter of

the INA, which consists of 8 U.S.C. §§ 1221–1232. *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057,

2064–65 (2022). However, § 1252(f)(1) bars only the grant of injunctive relief applicable beyond

the circumstances of an individual alien and "does not deprive the lower courts of all subject matter

jurisdiction over claims brought under sections 1221 through 1232." *Biden v. Texas*, 142 S. Ct.

2528, 2539 (2022). Moreover, § 1252(f)(1) does not bar injunctions affecting DHS's authority

pursuant to provisions of the INA outside of §§ 1221–1232 "simply because of collateral effects

on a covered provision." *Al Otro Lado v. Exec. Office of Immigr. Rev.*, 120 F.4th 606, 627 (9th Cir. 2024); *Texas v. U.S. Dep't of Homeland Security*, 123 F.4th 186, 209–10 (5th Cir. 2024) (citing *Garland*, 142 U.S. at 2067 n.4).

Here, the conduct at issue in the Motion generally is not governed by the covered provisions. Although the Huffman Memorandum does not define what conduct constitutes an "enforcement action," J.R. 574, the Mayorkas Memorandum defined enforcement actions within the scope of the 2021 Policy as including, but not limited to, "arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance," J.R. 191. At the hearing, DHS acknowledged that this conduct largely falls outside the covered provisions referenced in § 1252(f)(1). Indeed, the core of these activities is governed by 8 U.S.C. § 1357, which outlines the powers of "immigration officers and employees" to act without a warrant, which include the authority to arrest, interrogate, and search aliens under certain circumstances. 8 U.S.C. §§ 1357(a), (c). The parties agree that § 1357 falls outside of the scope of § 1252(f)(1). In their Amended Complaint and reply brief, Plaintiffs have clarified that the injunction they seek is specific to DHS's implementation of 8 C.F.R. § 287.8(f), a regulation that governs "site inspections," which are defined as "enforcement activities undertaken to locate and identify aliens illegally in the United States, or aliens engaged in unauthorized employment, at locations where there is a reasonable suspicion, based on articulable facts, that such aliens are present." *Id.* That regulation was promulgated pursuant to 8 U.S.C. § 1357(a). *See Olivia-Ramos v. Attorney General*, 694 F.3d 259, 283 (3d Cir. 2012); *United States v. Quintana*, 623 F.3d 1237, 1239-40 (8th Cir. 2010). Thus, § 1252(f)(1) does not bar the Court from issuing an injunction relating to this case. *See Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 813–14 (9th Cir. 2020) (holding that "§ 1252(f)(1)'s limitations do not apply" to an

injunction relating to the authority under 8 U.S.C. § 1357(d)); *Texas*, 123 F.4th at 209–10 (finding that § 1252(f)(1) does not bar an injunction relating to DHS's authority under 8 U.S.C. § 1357(a)(3)).

A review of 8 U.S.C. §§ 1221–1232, however, reveals one provision that appears to provide the authority for certain types of enforcement actions that could be at issue under the 2025 Policy. 8 U.S.C. § 1226, which is entitled "Apprehension and detention of aliens," includes § 1226(a), which provides that "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Thus, the Court concludes that any injunction may not restrict or enjoin DHS's ability to engage in arrests pursuant to an administrative warrant and will specify that limitation in any injunction.

### III. Likelihood of Success on the Merits

Having addressed DHS's threshold arguments, the Court turns to the requirements for a preliminary injunction. In their Motion, Plaintiffs argue that they are likely to succeed on the merits of their First Amendment claim and their RFRA claim. Where Plaintiffs did not reference their APA claims in the Motion, the Court will not consider those claims in relation to the Motion.

Plaintiffs assert that they are likely to succeed on the merits of their First Amendment and RFRA claims because the 2025 Policy both significantly affects their First Amendment right to expressive association and substantially burdens the free exercise of their religions under RFRA, and DHS has not made the required showings to justify such burdens. Before the Court addresses whether the 2025 Policy likely violates these provisions, the Court first defines the specific contours of the 2025 Policy and its effects on immigration enforcement actions.

Where the primary action effected by the Huffman Memorandum was the rescission of the Mayorkas Memorandum, the 2025 Policy significantly expands the range of situations, and thus the likelihood, that DHS will conduct an immigration enforcement action in or near a place of worship. Under the Mayorkas Memorandum, ICE and CBP were directed that they should not take an enforcement action in or near a place of worship to "the fullest extent possible," and that such actions were to occur only in certain "limited circumstances." J.R. 190–91. It specifically identified these "limited circumstances" by providing a non-exclusive list of such circumstances consisting of: a national security threat; an imminent risk of death, violence, or physical harm to a person; the hot pursuit of an individual who poses a public safety threat or of a personally observed border-crosser; an imminent risk that evidence material to a criminal case will be destroyed; and the absence of a safe alternative location for the enforcement action. J.R. 190–191. Even when a contemplated law enforcement action fell within one of those categories or a comparable circumstance, DHS officers and agents needed to obtain prior approval from ICE or CBP headquarters, unless there were exigent circumstances, in which case they were required to consult with their headquarters post-action.

The 2025 Policy does away with all of these limitations and safeguards, including the "fullest extent possible" requirement, the requirement that an action fall within the category of "limited circumstances," and the requirement of headquarters approval or ratification, and now permits individual officers and agents to engage in enforcement actions in or near places of worship at their unilateral discretion. Though the Vitello Memorandum adds a requirement of authorization from a local supervisor, without specifying when such approval must be secured, it does not reinstate any of the three main safeguards contained in the Mayorkas Memorandum and in any event applies only to ICE personnel, not to CBP personnel. Accordingly, the effect of the

2025 Policy, which allegedly burdens Plaintiffs' religious expression and exercise, is that it has eliminated all of the previous limitations and safeguards on DHS immigration enforcement actions in or near places of worship and permits them to occur subject only to the "common sense" and "discretion" of the officer or agent. J.R. 574.

### A. First Amendment

Plaintiffs first assert that they are likely to succeed on the merits of their claim that the 2025 Policy violates their First Amendment right to expressive association. The First Amendment to the United States Constitution provides that: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Indeed, as the Court stated in *Roberts*:

> An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed. According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.

*Id.* at 622 (internal citation omitted).

To determine whether the right to expressive association has been infringed, courts consider, first, "whether the group engages in 'expressive association,'" *Boy Scouts of America v. Dale*, 530 U.S. 640, 649 (2000); second, whether the challenged state action would "significantly affect" or "burden" the group's desired expression, *id.* at 650, 653; and third whether the

governmental interest justifies the burden on the expressive association, *id.* at 658–59; *see also Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 442 (3d Cir. 2000) (adopting this framework for expressive association claims).

At the hearing on the Motion, DHS confirmed that there is no dispute that Plaintiffs, by engaging in communal worship and related activities, are engaged in expressive association. *See Roberts*, 468 U.S. at 622 (stating that the right to expressive association reaches the "right to associate with others in pursuit of a wide variety of . . . religious . . . ends"). The Court therefore focuses on the second and third prongs.

### 1. Significant Burden

Plaintiffs assert that the 2025 Policy, by rescinding the limitations and safeguards on immigration enforcement actions in or near places of worship contained in the Mayorkas Memorandum and providing no guidelines for such actions other than the "discretion" and "common sense" of immigration enforcement officers, significantly affects or burdens their right of expressive association. J.R. 574. The right to expressive association can be significantly affected or burdened by state action in a variety of ways. For example, one form of burdening the right is an "'intrusion into the internal structure or affairs of an association' like a 'regulation that forces the group to accept members it does not desire.'" *Boy Scouts*, 530 U.S. at 648 (quoting *Roberts*, 468 U.S. at 623). The Supreme Court has also "held laws unconstitutional that require disclosure of membership lists for groups seeking anonymity, or impose penalties or withhold benefits based on membership in a disfavored group." *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 69 (2006) (internal citations omitted). Because these laws "made group membership less attractive," they implicated "the same First Amendment concerns about affecting the group's ability to express its message." *Id.* The right of expressive association can also be

34

significantly burdened by law enforcement activity that interferes with the ability of individuals to participate in the activities of a religious organization. *See Tabbaa v. Chertoff*, 509 F.3d 89, 101 (2d Cir. 2007) (finding that a law enforcement operation to conduct searches of individuals who had attended religious conferences imposed a significant burden on the right of expressive association).

Notably, a government action may significantly affect or burden the right of expressive association without intending to do so and without directly restricting the right of individuals to associate freely. *See Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 461 (1958) ("*NAACP*"); *Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, *UAW*, 485 U.S. 360, 367 n.5 (1988). The right is "protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Lyng*, 485 U.S. at 367 n.5 (quoting *Bates v. Little Rock*, 361 U.S. 516, 523 (1960)). The infringement may occur when it "inevitably follow[s] from . . . the governmental action." *NAACP*, 357 U.S. at 461.

A government policy may burden associational rights by deterring attendance at religious activities. In *Tabbaa*, CBP, acting on intelligence that gave it "reason to believe that persons with known terrorist ties" would be attending certain Islamic conferences including the Reviving the Islamic Spirit ("RIS") Conference in Toronto, Canada, instituted "a special inspection operation pursuant to which all individuals who attended" one of the conferences and then "sought entry into the United States were subject to the kind of screening procedure normally reserved for suspected terrorists," including searches of their persons and vehicles, questioning, fingerprinting, and photographing. *Tabbaa*, 509 F.3d at 92. Upon the filing of a First Amendment claim by the plaintiffs, who had attended the RIS Conference and were subjected to this procedure on their

return from Canada, CBP argued that the operation "only incidentally interfered with" the plaintiffs' expressive associational rights because they did not bar or prevent the plaintiffs from attending the RIS Conference, and the plaintiffs were not actually "chilled" by the inspections because some expressed a willingness to attend future conferences. *Id.* at 94–95, 101. The court rejected these arguments and held that the operation imposed a sufficiently "significant" burden on plaintiffs' right to expressive association both because the searches had effectively penalized them for exercising their First Amendment right to attend a religious conference, and because "the prospect of being singled out for such extensive processing could reasonably deter others from associating at similar conferences." *Id.* at 101–02 (ultimately upholding the operation because it was supported by a compelling governmental interest and was narrowly tailored).

Here, Plaintiffs argue that it is likely that the 2025 Policy imposes, and in fact has already imposed, a significant burden on expressive associational rights because intrusions on places of worship by immigration enforcement officers in order to engage with and possibly arrest individuals will "deter[] attendance at worship, ministry, and other events that occur at houses of worship," especially among immigrants, "by causing fear of surveillance, interrogation, or arrest." Mot. at 16, ECF No. 26-1. Significantly, Plaintiffs all serve immigrant communities, including undocumented immigrants: several of the Quaker Plaintiffs have a large number of immigrant worshippers, provide services to immigrants, or are located among large immigrant populations; CBF has congregations with large numbers of immigrants and specifically provides services to immigrants and refugees; and approximately half of the Sikh Temple's congregation consists of immigrants, including undocumented members. Despite the specter of immigration enforcement actions pursuant to the 2025 Policy, the Quaker Plaintiffs, CBF, and the Sikh Temple have all affirmed that their religious beliefs include welcoming and encouraging all to attend their services,

regardless of immigration status, the Quaker Plaintiffs and CBF have further specified that they do not inquire about immigration status, and none of Plaintiffs have disavowed a willingness to continue to serve undocumented immigrants. Plaintiffs' places of worship are therefore within the range of locations likely to be targeted for immigration enforcement actions pursuant to the more permissive 2025 Policy. Such enforcement actions, however, are likely to result in decreases in attendance by immigrant worshippers. Indeed, as discussed above in relation to standing, the present record demonstrates that even the threat of enforcement actions pursuant to the 2025 Policy has already caused reductions in attendance at Plaintiffs' places of worship. *See supra* part I.A. Most notably, CBF has reported actual reductions in attendance already occurring at both worship service and ministry programs such as food pantries, legal clinics, and ESL classes. The Sikh Temple has also reported decreased attendance. Those no longer attending include not only undocumented immigrants, but also immigrants with legal status who are fearful of immigration enforcement actions because they may be mistaken for undocumented immigrants. Further, the Quaker Plaintiffs have reported that members of color are expressing discomfort in attending meetings because of the potential that armed immigration officers may be operating in or around the meeting. Where a decline in the attendance of Plaintiffs' immigrant worshippers has already been motivated by the mere threat of enforcement, it follows that actual application of the 2025 Policy against Plaintiffs would lead to even greater declines in attendance.

Such reductions in attendance significantly affect Plaintiffs' expressive association because Plaintiffs' beliefs require communal worship and activities. For the Quaker Plaintiffs, the communal aspect of worship is "central to the exercise of the Quaker faith," J.R. 4, because they believe that any individual can experience an encounter with God, and individuals share their messages from God with all other congregants during worship. A reduction in the number of

worshippers, particularly immigrant worshippers, adversely affects the religious experience of all attendees of a meeting because "a diversity of worshippers allows [Quakers] to experience God in a broader, more encompassing way," J.R. 10, especially where Quakers believe that individuals with different life experiences hear and understand God differently.

For CBF, having fewer participants in worship services harms its religious exercise because "[h]aving more people (especially those of different backgrounds) is important for" their religious exercise because of the "heightened feeling of communal worship" that comes from having "more people singing and praying together." J.R. 618. Moreover, because Collective Baptists believe that their faith "compels" them to "to share the love of Christ with immigrant and refugee communities," J.R. 607, 626, and to provide "radical hospitality" to the vulnerable, J.R. 626, it is part of their religious exercise to provide services to immigrant communities, including through food pantries, legal services clinics, and ESL courses for immigrants. Fewer participants accessing these services thus also significantly burdens the exercise of their religious beliefs.

As for the Sikh Temple, "fully and meaningfully practicing the Sikh faith requires joining with the community in service and prayer." J.R. 601. Where the Sikh faith does not have an ordained clergy such that any person in a Sikh congregation can lead a religious service and prepare a langar, and community members may explain the "ideas and lessons from the selections" from Sikh scripture, decreased attendance at the Gurdwara "hinders [their] ability to carry out essential religious practices." J.R. 602.

In addition, the 2025 Policy will significantly affect Plaintiffs' expressive association by removing any meaningful limitations on intrusions into places of worship by armed law enforcement officers. The Quaker Plaintiffs have attested that pacifism is "deeply ingrained in the Quaker faith," such that "[h]aving weapons or armed people in or around the meeting is

38

inconceivable and contrary to our faith." J.R. 33. Robin Mohr, the Clerk of the Green Street Meeting within the Philadelphia Yearly Meeting, has stated that many people choose to join the meeting because of this commitment to nonviolence and "because they understand that Quaker meetings are a place of peace and nonviolence." J.R. 63. Indeed, because Quaker worship requires sitting quietly, releasing distractions, and reaching "an inner stillness that leads to Spirit-led listening," the "idea of there being weapons at meeting is distressing enough to make it very difficult to engage in waiting worship and will discourage attendance." J.R. 34. Even now, and as attested to by Roni Kingsley, the Clerk of the Richmond Friends Meeting, the "knowledge that ICE agents can interrupt our worship is already making our members less likely to attend." J.R. 33.

Similarly, the Sikh Temple attests that, in light of a history of military assaults on Sikh Gurdwaras, the potential for intrusions by armed government personnel pursuant to the 2025 Policy "will impair Sikhs' ability to practice our faith freely, openly, and without concern." J.R. 603. As with the Quaker Plaintiffs, the Sikh Temple notes that "DHS's new policy is" already "reducing Gurdwara attendance" as a result. J.R. 602. The 2025 Policy has therefore rendered membership in Plaintiffs' religious institutions "less attractive." *Rumsfeld*, 547 U.S. at 69.

As recognized by the Supreme Court, this Court must "give deference to an association's assertions regarding the nature of its expression," and "must also give deference to an association's view of what would impair its expression." *Boy Scouts*, 530 U.S. at 653. Indeed, in accordance with this principle, DHS, at the hearing on the Motion, stated that it is not contesting the sincerity of Plaintiffs' asserted beliefs. Where Plaintiffs' communal religious exercise will be significantly and adversely affected by reductions in attendance resulting from immigration enforcement actions pursuant to the 2025 Policy, armed law enforcement officers operating in or near places of worship

pursuant to the 2025 Policy will adversely affect the ability of Quakers and Sikhs to follow their religious beliefs or worship freely, and these burdens have already begun to occur based only on the issuance of that Policy, it is likely that Plaintiffs will be able to establish that the 2025 Policy is significantly affecting or burdening their expressive association rights.

DHS resists this conclusion by arguing that, to the extent that the 2025 Policy deters immigrants or others from attending services at Plaintiffs' places of worship, the chilling of that attendance is not "objectively reasonable" where the 2025 Policy merely directs immigration officers to exercise their "discretion" and "common sense." J.R. 574. As an initial matter, the Court notes that the "objectively reasonable" standard referenced by DHS relates to the issue of First Amendment standing, not necessarily to the issue of whether there is an actual infringement of a First Amendment right. *See Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011). In any event, the linkage between the 2025 Policy and the corresponding decreased attendance is objectively reasonable where, as discussed above, the 2025 Policy's main effect was the removal of all major limitations and safeguards on immigration enforcement actions in or near places of worship. *See supra* part III.

In addition, the reasonableness of congregants' reaction is bolstered by the facts that: (1) the press release announcing the 2025 Policy specifically referenced the need to conduct immigration enforcement operations in or near places of worship through the statement that "[c]riminals will no longer be able to hide in America's schools and churches to avoid arrest," J.R. 329; (2) a national media outlet reported that "ICE agents . . . said they believe that rescinding the Mayorkas order is going to free them up to go after more illegal immigrants, because illegal immigrants have until now been able to hide near schools and churches and avoid arrest," J.R. 315; and (3) an immigrant was apprehended by ICE at a church in Georgia which Plaintiffs assert is

only 15 minutes away from a CBF church. Further, the reaction among immigrants with legal status is reasonable in light of news reports of ICE agents allegedly detaining even United States citizens. *See, e.g.*, J.R. 331. And given that each of Plaintiffs has religious beliefs that cause them to welcome and serve immigrants, has significant immigrant membership or operates in communities with significant immigrant populations, and has not disavowed that they will continue to serve immigrants both with and without legal status, it is reasonable to expect that DHS will direct immigration enforcement toward Plaintiffs specifically. The Court therefore finds that the requirement of a significant burden on expressive association has been satisfied.

### 2.    Interest Balancing

The fact that a government policy or practice imposes a significant burden on expressive association does not itself establish a violation of the First Amendment. Under *Roberts*, such a policy or practice is nevertheless constitutional if it serves "compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623. Although DHS, at the hearing, agreed that this standard applies, Plaintiffs have argued that the applicable standard is that of "exacting scrutiny" articulated more recently in *Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373 (2021), under which the challenged policy must have "a substantial relation" with a "sufficiently important government interest" that "reflect[s] the seriousness of the actual burden on First Amendment rights," and must also be "narrowly tailored to the government's asserted interest." *Id.* at 2383 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)). Where *Americans for Prosperity Foundation* states that the exacting scrutiny standard is applicable to First Amendment challenges to "compelled disclosure," such as requirements to disclose lists of members or donors, *see id.*, and compelled disclosure is not at issue in this case, the Court finds that the *Roberts* standard applies.

Notably, the asserted governmental interest must relate not to the interest in having the overall policy, but to the interest in applying it to Plaintiffs despite its impact on their expressive association as informed by their particular religious beliefs. *Cf. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431–32 (2006) (stating that under RFRA, the compelling interest test derived from cases relating to the free exercise of religion "look[s] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[s] the asserted harm of granting specific exemptions to particular religious claimants"). Thus, DHS must articulate (1) how allowing immigration enforcement actions to occur in or near Plaintiffs' places of worship outside of the limitations and safeguards in the 2021 Policy furthers a compelling state interest; and (2) how that interest cannot be satisfied through "means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623.

DHS has offered no argument on how the 2025 Policy, specifically the rescission of the limitations and safeguards in the 2021 Policy and the adoption of a policy without any limits other than "discretion" and "common sense," J.R. 574, meets these requirements. Instead, DHS argues that it is premature to evaluate whether the 2025 Policy violates First Amendment rights because "there is no government action to analyze" and to do so would result in an "advisory opinion." Opp'n at 23. As discussed above, however, Plaintiffs have established standing and thereby may properly seek a ruling, and they have already demonstrated harm arising from the 2025 Policy. *See supra* part I. Courts routinely evaluate government policies under the First Amendment that have yet to be specifically applied to a plaintiff, based on a consideration of the impact of the policy on the plaintiffs' specific religious beliefs, precisely because to do so could avoid any infringement of that right. *See, e.g.*, *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2309, 2313, 2318 (2023) (concluding that, in the context of a pre-enforcement challenge, the potential

application of a Colorado anti-discrimination statute to the plaintiff in the conduct of a wedding website business would violate her First Amendment rights where the plaintiff asserted she might be compelled to produce content contrary to her religious beliefs, and there was a credible threat of sanctions); *Tingley v. Ferguson*, 47 F.4th 1055, 1064-65, 1084–89 (9th Cir. 2022) (conducting First Amendment analysis where the plaintiff brought a pre-enforcement challenge to a state statute subjecting licensed health care providers to discipline for performing conversion therapy on patients where the plaintiff asserted that the ban violated his religious beliefs). Where Plaintiffs have articulated their own religious beliefs and practices, which include inclusion of and service to immigrants both with and without legal status, and have thus shown how their places of worship are susceptible to being the target of immigration enforcement actions pursuant to the 2025 Policy that could infringe on their associational rights, the same kind of evaluation is appropriate here.

The failure to articulate a governmental interest is also difficult to understand where DHS has argued that Plaintiffs' claim has no "limiting principle," as the primary limit on any infringement on a First Amendment right is the balancing of interests at issue at this stage of the analysis. *See Tabbaa*, 509 F.3d at 92 (upholding a CBP operation even though it imposed a significant burden on the plaintiffs' First Amendment rights, where CBP established that it was justified by a compelling state interest and could not be achieved by significantly less restrictive means). Regardless, where DHS has not identified or articulated a governmental interest to justify the application of the 2025 Policy to Plaintiffs, the Court cannot uphold that application, whether under the *Roberts* standard or the exacting scrutiny standard of *Americans for Prosperity Foundation*.

Even assuming that the Government could establish the requisite compelling state interest, the Court finds that, on the present record, the 2025 Policy cannot be deemed to meet the second

43

requirement that the asserted state interest "cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623. The Mayorkas Memorandum, by requiring that law enforcement operations in or near places of worship be avoided "to the fullest extent possible" and by placing limitations on the circumstances under which they could occur, demonstrates that such a significantly less restrictive policy exists, and DHS has offered no argument on how that policy, or another policy with more limits and safeguards than are present in the 2025 Policy, cannot achieve the governmental interests motivating the 2025 Policy. In fact, the Vitello Memorandum itself contains one limitation specific to enforcement actions at sites "where a public demonstration is underway," which requires consultation with legal counsel "for guidance on constitutional considerations" before an enforcement action is approved, which was not applied to proposed enforcement actions at places of worship. J.R. 670. Similarly, 8 U.S.C. § 1357, which as discussed above governs the core enforcement activities that are the subject of Plaintiffs' proposed injunction, *see supra* part II, contains a limitation on enforcement actions at a farm or "other outdoor agricultural operation"—that consent of the owner or a warrant is required before an officer or agent may enter for the purpose of "interrogating a person believed to be an alien as to the person's right to be or to remain in the United States"—that could be, but has not been, applied to places of worship. 8 U.S.C. § 1357(e); *cf. Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 730–31 & n.40 (2014) (finding, for purposes of a RFRA claim, that pre-existing statutory and regulatory exemptions demonstrate that the governmental interest in a policy may be accomplished "equally well" through the less-restrictive approaches contained in the exemptions).

Accordingly, the Court concludes that, even if DHS had identified a compelling state interest as justification for the 2025 Policy, DHS has failed to show that any such interest "cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468

U.S. at 623. For substantially the same reasons, the Court also concludes that the 2025 Policy, which imposes virtually no limitations or safeguards on immigration enforcement at places of worship, is not "narrowly tailored," as required by the exacting scrutiny standard. *Americans for Prosperity Found.*, 141 S. Ct. at 2383.

## B. RFRA

Plaintiffs also assert that they are likely to succeed on the merits of their RFRA claim. RFRA provides "very broad protection for religious liberty." *Burwell*, 573 U.S. at 693. The statute provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section." 42 U.S.C. § 2000bb-1(a). Subsection (b) states that "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* § 2000bb-1(b). It also defines "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A).

The plaintiffs have the burden of establishing that "a substantial burden has been imposed on the exercise of sincerely-held religious beliefs," and upon such a showing, the Government has the burden to demonstrate that the policy furthers a "compelling governmental interest" and that it does so by "the least restrictive means." *Goodall by Goodall v. Stafford Cnty. Sch. Bd.*, 60 F.3d 168, 171 (4th Cir. 1995); *Gonzales*, 546 U.S. at 428–29.

### 1. Substantial Burden

Plaintiffs assert that the 2025 Policy, including its rescission of the 2021 Policy, substantially burdens various sincerely-held religious beliefs. Under RFRA, a "substantial

burden" requires "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 100 (4th Cir. 2013) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)). The "use of the phrase 'violate his beliefs'" in the substantial burden standard "does not exclude non-mandatory religious conduct or beliefs." *Davis v. Wigen*, 82 F.4th 204, 212 (3d Cir. 2023). In *Davis*, the court held that, under the same standard applied in *Liberty University*, a prison policy that prevented a couple from getting married imposed a substantial burden on their exercise of religion under RFRA even though the couple's religion did not affirmatively require them to get married, because "marriage 'had profound religious significance for them' and because they 'viewed their marriage as an expression of' their Christian faith." *Davis*, 82 F.4th at 207, 212; *compare id.* at 211–12 *with Liberty Univ., Inc.*, 733 F.3d at 100. The United States Court of Appeals for the Fourth Circuit has adopted this approach in the context of a land use claim under the analogous Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc. *Cf. Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 555–56 (4th Cir. 2013) (holding that under RLUIPA a plaintiff can demonstrate a substantial burden in support of a land use RLUIPA claim by establishing that "a government regulation puts substantial pressure on it to modify its behavior" but does not need to show that it "pressures the plaintiff to violate its beliefs"); *Gonzales*, 546 U.S. at 436 (stating that RLUIPA allows individuals "to seek religious accommodations pursuant to the same standard as set forth in RFRA").

Most notably, the plain language of RFRA references a prohibition on the Government "substantially burden[ing] a person's exercise of religion," 42 U.S.C. § 2000bb-1(a), and "exercise of religion" is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C §§ 2000bb-2(4), 2000cc-5(7)(A). The substantial burden

prong therefore can be satisfied if a government policy imposes substantial pressure to modify one's religious exercise, even if it does not compel a direct violation of a specific religious belief. At the hearing, DHS agreed that the substantial burden element can be satisfied if plaintiffs demonstrate only that a government policy substantially pressures them to modify their behavior in carrying out their beliefs.

Here, Plaintiffs generally rely on the same beliefs and alleged burdens on those beliefs underlying their claim of a significant burden on their First Amendment right to expressive association. As described above, Plaintiffs have provided facts showing that, in light of their religious beliefs and practices relating to immigrants, they can reasonably expect to face immigration enforcement actions at their places of worship pursuant to the 2025 Policy, that such actions will likely result in declines in attendance at their worship and ministry services, and that such declines are, in fact, already occurring. *See supra* part III.A.1. They have further demonstrated that, as a result of such enforcement actions and declining attendance, certain core religious beliefs and practices will be significantly burdened, including the beliefs that each of Plaintiffs' religions require regular, communal worship; that at least CBF requires, as part of its religious exercise, that its congregations engage in services to support immigrants and refugees; and that, for the Quaker Plaintiffs in particular, the presence of any firearms in worship services, such as those of armed law enforcement officers, violates their faith. *See supra* part III.A.1. As with a First Amendment expressive association claim, RFRA requires that courts give deference to Plaintiffs' religious beliefs and thus assess not whether the plaintiffs' religious beliefs are "reasonable," but only whether they reflect "an honest conviction." *Burwell*, 573 U.S. at 724–25. Indeed, as stated at the hearing, DHS does not contest the honesty or sincerity of Plaintiffs' beliefs.

Based on the same facts discussed in the First Amendment analysis, the Court concludes that Plaintiffs are likely to succeed in demonstrating that, under RFRA, enforcement actions authorized by the 2025 Policy will substantially burden, at a minimum, (1) the Quaker Plaintiffs' pacifist beliefs; and (2) Plaintiffs' communal worship and CBF's immigrant-focused services. First, as to the Quaker Plaintiffs, where pacifism is "deeply ingrained in the Quaker faith," J.R. 33, to the point where "having weapons or armed people in or around [a Quaker] meeting is inconceivable and contrary to [Quaker] faith," J.R. 33–34, any intrusions by armed law enforcement officers on one of the Quaker Plaintiffs' meeting houses, which could be expected to occur in light of the close ties between several of the Quaker Plaintiffs and immigrant communities and the lack of limitations and safeguards in the 2025 Policy, would directly violate the Quaker faith. In addition, they would "hamper [the Quaker Plaintiffs'] ability to connect to God," J.R. 12; "be incredibly disruptive and traumatic," J.R. 25; and "cause significant harm to [their] religious exercise," J.R. 18. Thus, while subject to the balancing of interests at the second stage of the analysis, the 2025 Policy, which permits immigration enforcement actions at places of worship without any specific limitations or safeguards other than "common sense," imposes a substantial burden on the Quaker Plaintiffs by requiring them to accept an intrusion that directly violates their religious beliefs. J.R. 574.

Second, the Court finds that the 2025 Policy also imposes a substantial burden on Plaintiffs' exercise of religion in relation to their communal worship and CBF's immigrant-focused services by undermining Plaintiffs' ability to engage in such religiously compelled activities. *See supra* part III.A.1. Immigration enforcement actions at Plaintiffs' places of worship pursuant to the 2025 Policy would impose substantial pressure on Plaintiffs to modify their behavior by preventing them from worshipping with a larger and more diverse group of congregants and thereby inhibiting their

48

exercise of central facets of their respective religions. Indeed, the decrease in attendance at communal worship services and ministry programs that CBF and the Sikh Temple are already experiencing as result of the 2025 Policy demonstrates that it has already created that substantial burden.

Hindrances to communal worship can establish a substantial burden for RFRA purposes. In *Sabir v. Williams*, 53 F.4th 51 (2d Cir. 2022), two Muslim federal prisoners whose beliefs required that they pray five times a day "with the largest possible number of other Muslims" because doing so "multiplies the blessings and utility of prayer" challenged under RFRA the prison's policy "restricting prayer in groups of more than two people to the prison's chapel," which was frequently unavailable. *Id.* at 55. The court found that the restriction on the number of people who could pray communally outside the chapel substantially burdened the plaintiffs' religious exercise under RFRA, even though the plaintiffs could still engage in some form of communal prayer. *Id.* at 60 (finding that the reduced form of communal prayer was "insufficient to eliminate that substantial burden").

Here, as in *Sabir*, the fact that Plaintiffs can still engage in some form of communal worship, or the fact that CBF congregations can still provide services to immigrants to some extent, does not eliminate the burden that stems from having to worship with or serve a reduced number of people. Because enforcement actions pursuant to the 2025 Policy can be expected to cause fewer congregants to attend communal worship, and because the 2025 Policy has in fact already caused such reductions in attendance, the 2025 Policy effectively compels Plaintiffs to engage in worship with a smaller congregation and with fewer immigrants, even though their beliefs call for worship with as large and diverse a community as possible. Similarly, the 2025 Policy imposes a substantial burden on CBF because although its congregations are religiously compelled to serve

49

immigrant communities to "fulfill the mission of Jesus," J.R. 613, the decreased attendance resulting from the 2025 Policy has undermined their ability to provide such services to as many people as they had previously served.

In response, DHS argues that Plaintiffs' RFRA claim amounts to an objection to "the Government's internal affairs" because the Huffman Memorandum is an internal guidance document that does not require any particular action, and that it cannot impose a substantial burden because it requires only the exercise of "common sense" and discretion." Opp'n at 17. As discussed above, the 2025 Policy's rescission of the Mayorkas Memorandum, in fact, effected a substantial change to DHS's immigration enforcement policy and its impact on individuals and groups outside of the Government by eliminating the specific limitations and safeguards set forth in the 2021 Policy and thus expanding the ease with which immigration enforcement actions could occur at places of worship. *See supra* part III. Indeed, the January 21, 2025 DHS press release, which touted the 2025 Policy as a means to facilitate conducting apprehensions in churches, acknowledged this fact.

DHS also argues that "it is speculative that Plaintiffs' members and other congregants will cho[o]se to refrain from in-person attendance at worship services and other communal gatherings." Opp'n at 17. This argument ignores the statements in the declarations of CBF and the Sikh Temple supporting the conclusion that those organizations will have reduced attendance as a result of immigration enforcement actions that can be expected to be conducted at places of worship pursuant to the 2025 Policy, and that they are in fact already experiencing such decreases due to the fear of such immigration enforcement actions. For example, in his declaration on behalf of CBF, Reverend Baxley states that "[i]n response to DHS's new policy, some [CBF] congregations have reported that fewer people, especially immigrants, are attending worship" and that "some

50

congregations have reported that there has been a noticeable decline in people engaging with ministry for immigrant communities." J.R. 618–19. Indeed, in one particularly stark example, a CBF congregation reported that its ESL program, which typically attracted 30 people, is now attended by only 10 people. J.R. 619–20. In his declaration on behalf of the Sikh Temple, Amar Shergill states that the 2025 Policy "had an immediate chilling effect on worship and fellowship at our Gurdwara" and that "DHS's new policy is also reducing Gurdwara attendance." J.R. 602. Thus, the substantial burden that the 2025 Policy has placed on Plaintiffs is far from speculative and is already occurring.

Moreover, as discussed in the Court's analysis of Plaintiffs' First Amendment claim, it is reasonable to expect that such enforcement actions will occur at Plaintiffs' places of worship where DHS specifically stated in its press release announcing the 2025 Policy that "criminals will no longer be able to hide in America's schools and churches to avoid arrest," J.R. 329, and where certain Quaker Plaintiffs, CBF, and the Sikh Temple operate places of worship with, or in areas with, significant immigrant populations. *See supra* part III.A.1. The Court therefore finds that the substantial burden requirement has been satisfied.

### 2. Compelling Interest and Least Restrictive Means

Upon this finding of a substantial burden, DHS is required to demonstrate that the 2025 Policy "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b); *Burwell*, 573 U.S. at 726. As to the first requirement, DHS must "demonstrate that the compelling interest . . . is satisfied through application of the challenged [policy] 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales*, 546 U.S. at 430–31 (quoting 42 U.S.C. § 2000bb-1(b)). Thus, a court must look "beyond broadly

formulated interests justifying the general applicability of government [policies] and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Id.* at 431. This inquiry, in turn, requires a court "to look to the marginal interest in enforcing" the challenged policy against the parties in the case before it. *Burwell*, 573 U.S. at 727. Thus, where in a RFRA claim, the plaintiff is effectively seeking an exemption from the government policy, such as if the Quaker Plaintiffs specifically requested an exception to the 2025 Policy to bar armed law enforcement officers from intruding into their meetings, DHS must identify a compelling governmental interest that justifies the denial to Plaintiffs of exceptions in the form of, at a minimum, the application of the limitations and safeguards required by the 2021 Policy that were eliminated by the 2025 Policy.

As with the First Amendment claim, DHS has not even attempted to satisfy this burden and argues that it is premature to evaluate whether the 2025 Policy violates RFRA because "there is no specific government action to analyze" and to do so would result in an "advisory opinion." Opp'n at 18. This argument is unpersuasive for the same reasons articulated in relation to the First Amendment claim. *See supra* part III.A.2. Further, although DHS asserts that it cannot articulate the governmental interest "[w]ithout particular concrete facts to analyze how the [Huffman] Memorandum might operate," Opp'n at 19, Plaintiffs have already provided facts relating to their particular circumstances, including their own religious beliefs and practices and how they are burdened by actions authorized by the 2025 Policy such as intrusions by armed law enforcement officers. Thus, as with the First Amendment claim, where DHS has not attempted to articulate a compelling governmental interest for the 2025 Policy, the Court cannot uphold the 2025 Policy on this basis.

Finally, even assuming that DHS could establish the requisite governmental interest, it still must demonstrate that the policy is "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b)(2); *Burwell*, 573 U.S. at 728. This standard "is exceptionally demanding," and can be met only if DHS shows "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties." *Burwell*, 573 U.S. at 728. Where this requirement is even more stringent than its counterpart in the expressive association context, the Court finds that the 2025 Policy cannot be deemed to meet this requirement based on substantially the same reasons discussed in relation to Plaintiffs' First Amendment claim. *See supra* part III.A.2. In particular, it cannot meet the "least restrictive means" requirement where the 2021 Policy itself provides an example of a less restrictive means that has not been shown to be inadequate to meet the governmental interest, and where the Vitello Memorandum includes a limitation—consisting of a requirement of legal consultation—that applies to immigration enforcement actions conducted at demonstrations but not at places of worship and thereby provides greater protection to secular First Amendment activity than religious First Amendment activity. The Court therefore finds that Plaintiffs' have established a likelihood of success on the merits of the RFRA claim as well.

## IV.  Irreparable Harm

The second requirement for a preliminary injunction is that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief. *See Winter*, 555 U.S. at 20. "[T]he denial of a constitutional right . . . constitutes irreparable harm for purposes of equitable jurisdiction." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). Where the Court has found a likelihood of success on Plaintiffs' First Amendment freedom of expressive association claim, *see supra* part III.A., the deprivation of such a constitutional right alone would constitute irreparable harm. *See*

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (finding that infringement on a First Amendment right, even for "minimal periods of time, unquestionably constitutes irreparable injury" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion))). Accordingly, the Court concludes that Plaintiffs will likely suffer irreparable harm in the absence of preliminary relief.

The Court also finds that a violation of Plaintiffs' rights under RFRA constitutes an irreparable harm for the purposes of issuing preliminary relief. Although the Fourth Circuit has not addressed whether a plaintiff satisfies the irreparable harm requirement by demonstrating a violation of RFRA, various other United States Courts of Appeals have concluded that "irreparable harm accompanies a substantial burden on an individual's rights to the free exercise of religion under RFRA." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996); *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 609 (8th Cir. 2022); *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001).

In asserting that Plaintiffs have not shown that they are likely to suffer irreparable harm, DHS merely repeats its arguments that Plaintiffs' asserted burdens on their religious exercise and expressive association are too speculative and subjective to establish standing and a likelihood of success on the merits. Where the Court has reached different conclusions and found that Plaintiffs are likely to succeed on the merits of their First Amendment and RFRA claim, *see supra* part III, DHS has not provided a persuasive basis for the Court to decline to apply the above-referenced case law. Accordingly, the Court finds that Plaintiffs have established a likelihood that they will suffer irreparable harm absent preliminary relief.

54

## V.    Balance of the Equities and the Public Interest

The remaining requirements for a preliminary injunction are that the balance of equities tips in the plaintiffs' favor, and that an injunction is in the public interest. *See Winter*, 555 U.S. at 20. When one party is the Government, these two factors merge and are properly considered together. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In general, the Government and the public interest are not harmed by a preliminary injunction that temporarily enjoins a policy that is likely to be unconstitutional under the present circumstances. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d. 507, 521 (4th Cir. 2002); *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013). Where the Court has concluded that the 2025 Policy is likely to violate Plaintiffs' First Amendment right to expressive association, these factors weigh in Plaintiffs' favor.

Beyond this principle, the facts in the record further demonstrate that these factors favor of an injunction. Plaintiffs have provided evidence that the willingness of their congregants to attend worship and participate in ministry services is presently being chilled, and that, particularly at CBF and the Sikh Temple, attendance at such activities has already declined. Plaintiffs have thus shown that religious exercise is being hindered by the 2025 Policy for entire congregations, including United States citizens and immigrants with legal status, whose ability to worship is undermined by such reduced participation. In contrast, DHS has provided no facts demonstrating how its interests, in increased immigration enforcement or otherwise, would be materially and adversely impacted by an injunction, particularly one that would serve to pause the rescission of the 2021 Policy, as it has identified no necessary enforcement operations that could not be accomplished within the framework of the 2021 Policy or that cannot be accomplished without intruding on Plaintiffs' places of worship. The Court therefore finds that the balance of the equities and the public interest weigh in Plaintiffs' favor.

## VI.     Remedy

Where all four required elements have been established, the Court will grant a preliminary injunction. The parties, however, disagree on the scope of the injunction in two respects. First, as to the specific terms of the injunction, Plaintiffs do not seek to return to the status quo as it existed under the 2021 Policy; instead, they seek an injunction enjoining DHS "from carrying out immigration-enforcement operations at houses of worship absent a judicial warrant or exigent circumstances." Mot. at 1, ECF No. 26. Second, as to the geographic reach of the injunction, Plaintiffs seek a nationwide injunction. DHS opposes both of these requests and argues that any injunction should be "limited to restoring the status quo ante of applying the 2021 [Policy]" and should do so as to Plaintiffs only. Opp'n at 26.

As to the terms of the injunction, "the traditional function of a preliminary injunction" is to "maintain the status quo until after a trial and final judgment." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024). An injunction that "alter[s] the status quo before the case even begins" is a "mandatory injunction" and is "warranted only in the most extraordinary circumstances." *Id.* (internal citations omitted). Here, Plaintiffs request such a mandatory injunction in that the 2021 Policy did not require DHS to obtain a judicial warrant prior to conducting an immigration enforcement action at a place of worship absent exigent circumstances. Plaintiffs, however, have provided no legal authority for such a judicial warrant requirement, at least as to public areas within the places of worship. Moreover, at this stage of the litigation, Plaintiffs have not made any showing that a return to the 2021 Policy would burden their rights under the First Amendment or RFRA. Further, such a requirement would effectively impose an injunction on DHS's authority under 8 U.S.C. § 1226(a) to make arrests pursuant to an administrative warrant, which would be barred by 8 U.S.C. § 1252(f)(1). *See supra* part II.

Accordingly, the Court will not impose Plaintiffs' proposed mandatory preliminary injunction and will instead enter an injunction that bars the application of the 2025 Policy to Plaintiffs' places of worship, including its rescission of the 2021 Policy, such that DHS will be required to abide by the terms of 2021 Policy when pursuing enforcement actions in or near Plaintiffs' places of worship. Thus, pursuant to the 2021 Policy, DHS will be required to avoid enforcement actions in or near places of worship "to the fullest extent possible" and may undertake such enforcement actions only under one of the "limited circumstances" identified in the Mayorkas Memorandum or a comparable circumstance, and only with the advanced approval of ICE or CBP headquarters or, in the event of exigent circumstances, with post-action approval. J.R. 190-91. In light of 8 U.S.C. § 1252(f)(1), the injunction will not restrict or enjoin DHS's ability to engage in arrests at places of worship pursuant to an administrative or judicial warrant. *See supra* part II.

As for the geographic scope of the injunction, "[d]istrict courts have broad discretion to craft remedies based on the circumstances of a case, but likewise must ensure that 'a preliminary injunction is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (quoting *Roe v. Dep't of Defense*, 947 F.3d 207, 231 (4th Cir. 2020)). Pursuant to this authority, district courts may issue nationwide injunctions in various circumstances, including "when the facts would not require different relief for others similarly situated to the plaintiffs," *id.*, and when such an injunction is "necessary to afford relief to the prevailing party," *Va. Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 393 (4th Cir. 2001).

Here, the Court concludes that a nationwide injunction is not warranted because its ruling on the likelihood of success on the merits is premised on how the 2025 Policy would interact with the specific religious beliefs, religious practices, and composition of Plaintiffs' congregations, as

described in the Motion and the attached declarations, including in particular their beliefs relating to communal worship, service to immigrants, and pacifism. Plaintiffs have not shown that the 2025 Policy would imposes the same kind of burdens, as required to establish constitutional or statutory violations, on all other religious institutions across the nation. Thus, this is not a case, as Plaintiffs claim, in which "application of the challenged policy does not turn on individual characteristics of the plaintiffs." Mot. at 28, ECF No. 26-1. Because the Court cannot find on the present record that "the facts would not require different relief for others similarly situated to the plaintiffs," *HIAS, Inc.*, 985 F.3d at 326, a nationwide injunction is not warranted. Further, Plaintiffs' invocation of the need for uniformity in the nation's immigration laws and policies, which sometimes serves as an appropriate rationale for a nationwide injunction, *see, e.g. Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547, 548 (2016); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 987 (9th Cir. 2020), is unpersuasive here because the nature and terms of the 2021 Policy are such that even if it were required to be applied nationwide, it would not necessarily result in completely uniform enforcement of immigration laws across all places of worship.

Finally, Plaintiffs have not shown that an injunction applicable only to them cannot provide them with full relief. Plaintiffs have provided no basis to conclude that they could not provide to DHS, for purposes of enforcement of the injunction, a list of the locations of their places of worship and of other sites at which they may hold their worship services. Although Plaintiffs argue that their religious beliefs requiring them to welcome all persons to their places of worship would remain undermined if individuals they encourage to attend their services remain reluctant to attend absent a nationwide injunction, they have not provided a sufficient factual basis to support that assertion. Regardless, at this stage of the litigation, that fact alone cannot support the

conclusion that a nationwide injunction applicable to all places of worship can be justified where the Court's finding of a likelihood of success on the merits is specific to the 2025 Policy's application to Plaintiffs' particularized religious beliefs and practices. The preliminary injunction will therefore bar the application of the 2025 Policy only at Plaintiffs' places of worship.

In issuing this injunction, the Court does not question that law enforcement, when necessary, must have the ability to conduct operations in or near places of worship. Nor does the Court make any findings on whether the 2025 Policy meets, exceeds, or falls short of what the First Amendment and RFRA require. The Court finds only that at this early stage of the case, on the sensitive and fraught issue of when and under what circumstances law enforcement may intrude into places of worship to conduct warrantless operations, the 2025 Policy's lack of any meaningful limitations or safeguards on such activity likely does not satisfy these constitutional and statutory requirements as to Plaintiffs, and that a return to the status quo is therefore warranted until the exact contours of what is necessary to avoid unlawful infringement on religious exercise are determined later in this case.

## CONCLUSION

For the foregoing reasons, the Motion for a Preliminary Injunction will be GRANTED IN PART and DENIED IN PART. The Motion will be granted in that a preliminary injunction will be granted to bar application of the 2025 Policy, and to return to the 2021 Policy, as to Plaintiffs only, as specified in the accompanying Preliminary Injunction. The Motion will be otherwise denied. A separate Order shall issue.

Date: February 24, 2025

THEODORE D. CHUANG
United States District Judge

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

PHILADELPHIA YEARLY MEETING OF
THE RELIGIOUS SOCIETY OF FRIENDS,
NEW ENGLAND YEARLY MEETING OF
THE RELIGIOUS SOCIETY OF FRIENDS,
BALTIMORE YEARLY MEETING OF THE
RELIGIOUS SOCIETY OF FRIENDS, INC.,
ADELPHI FRIENDS MEETING OF THE
RELIGIOUS SOCIETY OF FRIENDS,
RICHMOND FRIENDS MEETING OF THE
RELIGIOUS SOCIETY OF FRIENDS,
NEW YORK YEARLY MEETING OF THE
RELIGIOUS SOCIETY OF FRIENDS, INC.,
COOPERATIVE BAPTIST FELLOWSHIP
and
SIKH TEMPLE SACRAMENTO,

      Plaintiffs,

      v.

U.S. DEPARTMENT OF
HOMELAND SECURITY and
KRISTI NOEM, *in her official capacity as
Secretary of Homeland Security*,

      Defendants.

Civil Action No. 25-0243-TDC

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby ORDERED that Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction, ECF No. 26, is GRANTED IN PART and DENIED IN PART. The Motion is granted in that the Court grants and issues the accompanying Preliminary Injunction. The Motion is otherwise denied.

Date: February 24, 2025

THEODORE D. CHUANG
United States District Judge

JA323

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

PHILADELPHIA YEARLY MEETING OF
THE RELIGIOUS SOCIETY OF FRIENDS,
NEW ENGLAND YEARLY MEETING OF
THE RELIGIOUS SOCIETY OF FRIENDS,
BALTIMORE YEARLY MEETING OF THE
RELIGIOUS SOCIETY OF FRIENDS, INC.,
ADELPHI FRIENDS MEETING OF THE
RELIGIOUS SOCIETY OF FRIENDS,
RICHMOND FRIENDS MEETING OF THE
RELIGIOUS SOCIETY OF FRIENDS,
NEW YORK YEARLY MEETING OF THE
RELIGIOUS SOCIETY OF FRIENDS, INC.,
COOPERATIVE BAPTIST FELLOWSHIP
and
SIKH TEMPLE SACRAMENTO,

       Plaintiffs,

      v.

U.S. DEPARTMENT OF
HOMELAND SECURITY and
KRISTI NOEM, *in her official capacity as
Secretary of Homeland Security*,

       Defendants.

Civil Action No. 25-0243-TDC

## PRELIMINARY INJUNCTION

For the reasons set forth in the accompanying Memorandum Opinion and Order, which are

incorporated by reference, it is hereby ORDERED that:

1. Defendants the United States Department of Homeland Security ("DHS") and Kristi Noem,
   in her official capacity as Secretary of Homeland Security; DHS component agencies,
   including but not limited to U.S. Immigration and Customs Enforcement ("ICE") and U.S.
   Customs and Border Protection ("CBP"); all officers, agents, employees, and appointees
   of DHS and its component agencies; and all other persons who are in active concert and
   participation with them (collectively, "Defendants"), are ENJOINED as follows:

a. In relation to all potential or actual immigration enforcement actions in or near any place of worship owned, operated, occupied, or used by one or more of the above-captioned Plaintiffs or their agents, employees, or members, as specified on a list to be provided by Plaintiffs, Defendants shall not implement, enforce, apply, or act pursuant to the terms of the Memorandum of January 20, 2025 from the Acting Secretary of Homeland Security entitled "Enforcement Actions in or Near Protected Areas," or the terms of the Memorandum of January 31, 2025 from the Acting Director of ICE entitled "Common Sense Enforcement Actions in or Near Protected Areas."

b. In relation to all potential or actual immigration enforcement actions in or near any place of worship owned, operated, occupied, or used by one or more of the above-captioned Plaintiffs or their agents, employees, or members, as specified on a list to be provided by Plaintiffs, Defendants shall instead implement, enforce, apply, and act pursuant to the terms of the Memorandum of October 27, 2021 from the Secretary of Homeland Security entitled "Guidelines for Enforcement Actions in or Near Protected Areas," a copy of which is attached hereto as Exhibit A, including but not limited to the requirements that (1) immigration enforcement actions at places of worship shall not be undertaken "to the fullest extent possible"; (2) such enforcement actions shall occur only in circumstances identical to or comparable to the enumerated "limited circumstances"; (3) such enforcement actions shall occur only with prior approval of ICE or CBP headquarters or with post-action consultation in the event of exigent circumstances that prevented such prior approval; and (4) to the fullest extent possible, any enforcement action in or near a place of worship shall be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the place of worship. *See* Ex. A § III.

c. Consistent with 8 U.S.C. § 1252(f)(1), this injunction does not enjoin or restrict Defendants from conducting arrests in or near places of worship when authorized by an administrative or judicial warrant.

2. As necessary for enforcement of the Preliminary Injunction, Plaintiffs shall provide to Defendants immediately, and in any event no later than three days after the date of this Order, a list consisting of the names and addresses of all places of worship that are owned, operated, occupied, or used by any Plaintiff or its agents, employees, or members.

3. Pursuant to Federal Rule of Civil Procedure 65(c), Plaintiffs are required to post with this Court a bond of $100.

4. The Preliminary Injunction shall take effect upon completion of both (1) the posting of the bond; and (2) the transmission to Defendants of the list of Plaintiffs' places of worship.

Violations of this Preliminary Injunction shall subject Defendants and all other persons bound by this Order to all applicable penalties, including contempt of court.

Date:  February 24, 2025

THEODORE D. CHUANG
United States District Judge

# Exhibit A



Secretary

**U.S. Department of Homeland Security**
Washington, DC 20528

# Homeland Security

October 27, 2021

MEMORANDUM TO:    Tae D. Johnson
                 Acting Director
                 U.S. Immigration and Customs Enforcement

                 Troy A. Miller
                 Acting Commissioner
                 U.S. Customs and Border Protection

                 Ur M. Jaddou
                 Director
                 U.S. Citizenship and Immigration Services

                 Robert Silvers
                 Under Secretary
                 Office of Strategy, Policy, and Plans

                 Katherine Culliton-González
                 Officer for Civil Rights and Civil Liberties
                 Office of Civil Rights and Civil Liberties

                 Lynn Parker Dupree
                 Chief Privacy Officer
                 Privacy Office

FROM:            Alejandro N. Mayorkas
                 Secretary

SUBJECT:         **Guidelines for Enforcement Actions in or Near Protected Areas**

---

This memorandum provides guidance for ICE and CBP enforcement actions in or near areas that require special protection. It is effective immediately.

This memorandum supersedes and rescinds John Morton's memorandum entitled, "Enforcement Actions at or Focused on Sensitive Locations" (number 10029.2, dated October 24, 2011), and David Aguilar's memorandum entitled, "U.S. Customs and Border Protection Enforcement Actions at or Near Certain Community Locations" (dated January 18, 2013).

1

## I.    Foundational Principle

In our pursuit of justice, including in the execution of our enforcement responsibilities, we impact people's lives and advance our country's well-being in the most fundamental ways. It is because of the profound impact of our work that we must consider so many different factors before we decide to act. This can make our work very difficult. It is also one of the reasons why our work is noble.

When we conduct an enforcement action – whether it is an arrest, search, service of a subpoena, or other action – we need to consider many factors, including the location in which we are conducting the action and its impact on other people and broader societal interests. For example, if we take an action at an emergency shelter, it is possible that noncitizens, including children, will be hesitant to visit the shelter and receive needed food and water, urgent medical attention, or other humanitarian care.

To the fullest extent possible, we should not take an enforcement action in or near a location that would restrain people's access to essential services or engagement in essential activities. Such a location is referred to as a "protected area."

This principle is fundamental. We can accomplish our enforcement mission without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more. Adherence to this principle is one bedrock of our stature as public servants.

## II.    Protected Areas

Whether an area is a "protected area" requires us to understand the activities that take place there, the importance of those activities to the well-being of people and the communities of which they are a part, and the impact an enforcement action would have on people's willingness to be in the protected area and receive or engage in the essential services or activities that occur there. It is a determination that requires the exercise of judgment.

The following are some examples of a protected area. The list is not complete. It includes only examples:

- A school, such as a pre-school, primary or secondary school, vocational or trade school, or college or university.

- A medical or mental healthcare facility, such as a hospital, doctor's office, health clinic, vaccination or testing site, urgent care center, site that serves pregnant individuals, or community health center.

- A place of worship or religious study, whether in a structure dedicated to activities of faith (such as a church or religious school) or a temporary facility or location where such activities are taking place.

2

- A place where children gather, such as a playground, recreation center, childcare center, before- or after-school care center, foster care facility, group home for children, or school bus stop.

- A social services establishment, such as a crisis center, domestic violence shelter, victims services center, child advocacy center, supervised visitation center, family justice center, community-based organization, facility that serves disabled persons, homeless shelter, drug or alcohol counseling and treatment facility, or food bank or pantry or other establishment distributing food or other essentials of life to people in need.

- A place where disaster or emergency response and relief is being provided, such as along evacuation routes, where shelter or emergency supplies, food, or water are being distributed, or registration for disaster-related assistance or family reunification is underway.

- A place where a funeral, graveside ceremony, rosary, wedding, or other religious or civil ceremonies or observances occur.

- A place where there is an ongoing parade, demonstration, or rally.

We need to consider the fact that an enforcement action taken near – and not necessarily in – the protected area can have the same restraining impact on an individual's access to the protected area itself. If indeed that would be the case, then, to the fullest extent possible, we should not take the enforcement action near the protected area. There is no bright-line definition of what constitutes "near." A variety of factors can be informative, such as proximity to the protected area, visibility from the protected area, and people's behavioral patterns in and around the protected area. The determination requires an analysis of the facts and the exercise of judgment.

The fundamental question is whether our enforcement action would restrain people from accessing the protected area to receive essential services or engage in essential activities. Our obligation to refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area thus applies at all times and is not limited by hours or days of operation.

Whether an enforcement action can be taken in or near a courthouse is addressed separately in the April 27, 2021 Memorandum from Tae Johnson, ICE Acting Director, and Troy Miller, CBP Acting Commissioner, entitled "Civil Immigration Enforcement Actions in or Near Courthouses," which remains in effect.

## III.    Exceptions and Limitation on Scope

The foundational principle of this guidance is that, to the fullest extent possible, we should not take an enforcement action in or near a protected area. The phrase "to the fullest extent possible" recognizes that there might be limited circumstances under which an enforcement action needs to be taken in or near a protected area. The following are some examples of such limited circumstances:

3

- The enforcement action involves a national security threat.

- There is an imminent risk of death, violence, or physical harm to a person.

- The enforcement action involves the hot pursuit of an individual who poses a public safety threat.

- The enforcement action involves the hot pursuit of a personally observed border-crosser.

- There is an imminent risk that evidence material to a criminal case will be destroyed.

- A safe alternative location does not exist.

This list is not complete. It includes only examples. Here again, the exercise of judgment is required.

Absent exigent circumstances, an Agent or Officer must seek prior approval from their Agency's headquarters, or as you otherwise delegate, before taking an enforcement action in or near a protected area. If the enforcement action is taken due to exigent circumstances and prior approval was therefore not obtained, Agency headquarters (or your delegate) should be consulted post-action. To the fullest extent possible, any enforcement action in or near a protected area should be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the protected area.

Enforcement actions that are within the scope of this guidance include, but are not limited to, such actions as arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance. This guidance does not apply to matters in which enforcement activity is not contemplated. As just one example, it does not apply to an Agent's or Officer's participation in an official function or community meeting.

This guidance does not limit an agency's or employee's statutory authority, and we do not tolerate violations of law in or near a protected area.

## IV.    Training and Reporting

Please ensure that all employees for whom this guidance is relevant receive the needed training. Each of your respective agencies and offices should participate in the preparation of the training materials.

Any enforcement action taken in or near a protected area must be fully documented in your Agency's Privacy Act-compliant electronic system of record in a manner that can be searched and validated. The documentation should include, for example, identification of the protected area; the reason(s) why the enforcement action was taken there; whether or not prior approval was obtained and, if not, why not; the notification to headquarters (or headquarters' delegate) that occurred after an action was taken without prior approval; a situational report of what

4

JA331

occurred during and immediately after the enforcement action; and, any additional information that would assist in evaluating the effectiveness of this guidance in achieving our law enforcement and humanitarian objectives.

## V.    Statement of No Private Right Conferred

This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

5

JA332

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| PHILADELPHIA YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>    Defendants. | Civil Action No. 8:25-cv-00243-TDC |

## <u>NOTICE OF APPEAL</u>

Defendants, United States Department of Homeland Security and Kristi Noem, in her official capacity as Secretary of Homeland Security, hereby appeal to the United States Court of Appeals for the Fourth Circuit this Court's preliminary injunction entered on February 24, 2025. *See* ECF Nos. 60-62.

Dated:  April 24, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

ANDREW I. WARDEN
Assistant Branch Director

*/s/ Kristina A. Wolfe*
KRISTINA A. WOLFE (VA Bar No. 71570)
KARIMA ORTOLANO (MA Bar No. 707575)
United States Department of Justice

Civil Division
Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel: 202-353-4519
Fax: 202-616-8470
Email:  Kristina.Wolfe@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2025, I electronically filed the foregoing appendix with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

 *s/ Sarah N. Smith*
Sarah N. Smith