**No. 25-1512**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

Philadelphia Yearly Meeting of the Religious Society of Friends *et al*.,

*Plaintiffs-Appellees*,

v.

United States Department of Homeland Security *et al*.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Maryland
Case No. 25-cv-243, Hon. Theodore D. Chuang

## Brief for Appellees

Bradley Girard
Sarah Goetz
J. Sterling Moore
Andrew Bookbinder
Ayesha Khan
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Philadelphia Yearly Meeting of the Religious Society of Friends, who is Plaintiff-Appellee, makes the following disclosure:

1.   Is party a publicly held corporation or other publicly held entity?
YES ☐     NO ☑

2.   Does party/amicus have any parent corporations?
YES ☐     NO ☑

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? YES ☐     NO ☑

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?
YES ☐     NO ☑

5.   Is party a trade association? YES ☐     NO ☑

6.   Does this case arise out of a bankruptcy proceeding?
YES ☐     NO ☑

7.   Is this a criminal case in which there was an organization victim?
YES ☐     NO ☑


Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, New England Yearly Meeting of the Religious Society of Friends, who is Plaintiff-Appellee, makes the following disclosure:

1.   Is party a publicly held corporation or other publicly held entity?
YES ☐     NO ☑

2.   Does party/amicus have any parent corporations?
YES ☐     NO ☑

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? YES ☐     NO ☑

i

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?
YES ☐    NO ☑

5.    Is party a trade association? YES ☐    NO ☑

6.    Does this case arise out of a bankruptcy proceeding?
YES ☐    NO ☑

7.    Is this a criminal case in which there was an organization victim?
YES ☐    NO ☑


Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Baltimore Yearly Meeting of the Religious Society of Friends, Inc., who is Plaintiff-Appellee, makes the following disclosure:

1.    Is party a publicly held corporation or other publicly held entity?
YES ☐    NO ☑

2.    Does party/amicus have any parent corporations?
YES ☐    NO ☑

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? YES ☐    NO ☑

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?
YES ☐    NO ☑

5.    Is party a trade association? YES ☐    NO ☑

6.    Does this case arise out of a bankruptcy proceeding?
YES ☐    NO ☑

7.    Is this a criminal case in which there was an organization victim?
YES ☐    NO ☑

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Adelphi Friends Meeting of the Religious Society of Friends, who is Plaintiff-Appellee, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?
   YES ☐     NO ☑

2. Does party/amicus have any parent corporations?
   YES ☐     NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? YES ☐     NO ☑

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?
   YES ☐     NO ☑

5. Is party a trade association? YES ☐     NO ☑

6. Does this case arise out of a bankruptcy proceeding?
   YES ☐     NO ☑

7. Is this a criminal case in which there was an organization victim?
   YES ☐     NO ☑

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Richmond Friends Meeting of the Religious Society of Friends, who is Plaintiff-Appellee, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?
   YES ☐     NO ☑

2. Does party/amicus have any parent corporations?
   YES ☐     NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? YES ☐     NO ☑

iii

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?
YES ☐   NO ☑

5. Is party a trade association? YES ☐   NO ☑

6. Does this case arise out of a bankruptcy proceeding?
YES ☐   NO ☑

7. Is this a criminal case in which there was an organization victim?
YES ☐   NO ☑


Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, New York Yearly Meeting of the Religious Society of Friends, Inc., who is Plaintiff-Appellee, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?
YES ☐   NO ☑

2. Does party/amicus have any parent corporations?
YES ☐   NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? YES ☐   NO ☑

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?
YES ☐   NO ☑

5. Is party a trade association? YES ☐   NO ☑

6. Does this case arise out of a bankruptcy proceeding?
YES ☐   NO ☑

7. Is this a criminal case in which there was an organization victim?
YES ☐   NO ☑

iv

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Sikh Temple Sacramento, who is Plaintiff-Appellee, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?
   YES ☐     NO ☑

2. Does party/amicus have any parent corporations?
   YES ☐     NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? YES ☐     NO ☑

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?
   YES ☐     NO ☑

5. Is party a trade association? YES ☐     NO ☑

6. Does this case arise out of a bankruptcy proceeding?
   YES ☐     NO ☑

7. Is this a criminal case in which there was an organization victim?
   YES ☐     NO ☑


Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Cooperative Baptist Fellowship, who is Plaintiff-Appellee, makes the following disclosure:

1. Is party a publicly held corporation or other publicly held entity?
   YES ☐     NO ☑

2. Does party/amicus have any parent corporations?     YES ☐     NO ☑

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? YES ☐     NO ☑

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?
     YES ☐     NO ☑

5.   Is party a trade association? YES ☐     NO ☑

6.   Does this case arise out of a bankruptcy proceeding?
     YES ☐     NO ☑

7.   Is this a criminal case in which there was an organization victim?
     YES ☐     NO ☑

# TABLE OF CONTENTS

**Page(s)**

Corporate Disclosure Statement ................................................................. i

Table of Authorities ................................................................. ix

Introduction ................................................................. 1

Statement of the Case ................................................................. 2

    A.   Plaintiff Houses of Worship ................................................................. 2

        1.   The Cooperative Baptist Fellowship ................................. 2

        2.   The Quakers ................................................................. 4

        3.   The Sikh Temple Sacramento ................................................................. 6

    B.   DHS's longstanding policy limiting immigration enforcement at houses of worship ................................................................. 7

    C.   DHS's replacement of its longstanding policy with "common sense" ................................................................. 10

    D.   The district court's preliminary injunction ................................. 12

Summary of Argument ................................................................. 17

Standard of Review ................................................................. 21

Argument ................................................................. 21

I.   Plaintiffs are likely to succeed on the merits. ................................. 22

    A.   Plaintiffs have standing. ................................................................. 22

        1.   Plaintiffs are injured by DHS's policy. ................................. 22

        2.   Plaintiffs' injuries are caused by DHS's recission of the sensitive-locations policy. ................................. 28

        3.   Plaintiffs' injuries are redressable. ................................. 34

    B.   Plaintiffs are likely to succeed on their First Amendment claim. ................................................................. 36

        1.   DHS's policy significantly affects Plaintiffs' expressive activity. ................................................................. 36

        2.   DHS cannot satisfy exacting scrutiny. ................................. 43

    C.   Plaintiffs are likely to succeed on their RFRA claim. ................. 47

## TABLE OF CONTENTS—continued

1.   DHS's new policy substantially burdens Plaintiffs' religious exercise. ...................................................47

2.   DHS cannot satisfy strict scrutiny. ........................................55

II.   The remaining preliminary-injunction factors favor Plaintiffs. ..........56

A.   DHS's new policy irreparably harms Plaintiffs. .........................56

B.   The balance of the equities and public interest support Plaintiffs. ...................................................................57

Conclusion ...................................................................59

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Air Evac EMS, Inc. v. Cheatham,*
   910 F.3d 751 (4th Cir. 2018)............................................................... 24

*Ams. for Prosperity Found. v. Bonta,*
   594 U.S. 595 (2021) ................................................... 36, 37, 44, 46, 47

*Apache Stronghold v. United States,*
   101 F.4th 1036 (9th Cir. 2024) ..................................................... 52, 53

*Bates v. Little Rock,*
   361 U.S. 516 (1960) ............................................................................ 37

*Bell v. Brockett,*
   922 F.3d 502 (4th Cir. 2019)............................................................... 43

*Benham v. City of Charlotte, N.C.,*
   635 F.3d 129 (4th Cir. 2011)........................................................ 23, 27

*Bennett v. Spear,*
   520 U.S. 154 (1997) ............................................................................ 29

*Bethel World Outreach Ministries v. Montgomery Cnty. Council,*
   706 F.3d 548 (4th Cir. 2013)........................................................ 48, 52

*Billups v. City of Charleston, S.C.,*
   961 F.3d 673 (4th Cir. 2020)............................................................... 55

*Bostic v. Schaefer,*
   760 F.3d 352 (4th Cir. 2014)............................................................... 22

*Bowen v. Roy,*
   476 U.S. 693 (1986) ............................................................................ 51

*Boy Scouts of Am. v. Dale,*
   530 U.S. 640 (2000) ...................................................................... 36, 41

ix

## TABLE OF AUTHORITIES—continued

**Page(s)**

*California v. Texas*,
   593 U.S. 659 (2021) .............................................................. 29

*Centro Tepeyac v. Montgomery Cnty.*,
   722 F.3d 184 (4th Cir. 2013) ......................................... 21, 58

*Clapper v. Amnesty International USA*,
   568 U.S. 398 (2013) ............................................... 27, 28, 33

*Cooksey v. Futrell*,
   721 F.3d 226 (4th Cir. 2013) ............................................. 22

*Davison v. Randall*,
   912 F.3d 666 (4th Cir. 2019) ............................................. 22

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) ......................................... 30, 31, 32, 34

*Diamond Alt. Energy, LLC v. EPA*,
   606 U.S. 100 (2025) ......................................... 26, 29, 30, 34

*Doe v. Reed*,
   561 U.S. 186 (2010) ............................................................ 44

*Elrod v. Burns*,
   427 U.S. 347 (1976) ............................................................ 56

*Evans v. Eaton Corp. Long Term Disability Plan*,
   514 F.3d 315 (4th Cir. 2008) ............................................. 21

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ............................................... 29, 33, 34

*Fighting Finest, Inc. v. Bratton*,
   95 F.3d 224 (2d Cir. 1996) ................................................. 41

*Frank Krasner Enters. v. Montgomery Cnty.*,
   401 F.3d 230 (4th Cir. 2005) ............................................. 35

## TABLE OF AUTHORITIES—continued

Page(s)

*Gibson v. Fla. Legis. Investigation Comm.*,
372 U.S. 539 (1963) ............................................................. 37

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006) ............................................................ 48

*Hobby Lobby Stores, Inc. v. Sebelius*,
723 F.3d 1114 (10th Cir. 2013) .......................................... 57

*Holt v. Hobbs*,
574 U.S. 352 (2015) ............................................................ 56

*Hosanna-Tabor Evangelical Lutheran Church
and School v. EEOC*,
565 U.S. 171 (2012) ............................................................ 40

*Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*,
17 F.3d 691 (4th Cir. 1994) ................................................ 56

*Int'l Refugee Assistance Project v. Trump*,
883 F.3d 233 (4th Cir. 2018) .............................................. 56

*Jesus Christ Is the Answer Ministries, Inc. v.
Baltimore Cnty., Md.*,
915 F.3d 256 (4th Cir. 2019) .............................................. 44

*Jolly v. Coughlin*,
76 F.3d 468 (2d Cir. 1996) ................................................. 57

*Laird v. Tatum*,
408 U.S. 1 (1972) ................................................................ 28

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) .............................................. 26

*Libertarian Party of Va. v. Judd*,
718 F.3d 308 (4th Cir. 2013) ........................................ 29, 32

# TABLE OF AUTHORITIES—continued

**Page(s)**

*Liberty Univ., Inc. v. Lew,*
    733 F.3d 72 (4th Cir. 2013)................................................................ 55

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .............................................................. 22, 35

*Lyng v. Int'l Union,*
    485 U.S. 360 (1988) .............................................................. 41, 42

*Lyng v. Nw. Indian Cemetery Protective Ass'n,*
    485 U.S. 439 (1988) ......................................................... 42, 51, 52

*Mack v. Warden Loretto FCI,*
    839 F.3d 286 (3d Cir. 2016) ................................................... 53

*Mahmoud v. Taylor,*
    606 U.S. 522 (2025) ................................................................ 52

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ................................................................ 47

*Mennonite Church USA v. DHS,*
    778 F.Supp.3d 1 (D.D.C. 2025) ............................................ 31

*Miccosukee Tribe of Indians v. United States,*
    163 F.3d 1359 (11th Cir. 1998).............................................. 52

*Muth v. United States,*
    1 F.3d 246 (4th Cir. 1993)..................................................... 43

*NAACP v. Alabama ex rel. Patterson,*
    357 U.S. 449 (1958) ........................................ 23, 36, 37, 41

*New York v. DHS,*
    969 F.3d 42 (2d Cir. 2020) .................................................... 59

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................ 57

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Open Cmtys. All. v. Carson,*
    286 F.Supp.3d 148 (D.D.C. 2017) ...................................... 58

*Presbyterian Church (U.S.A.) v. United States,*
    870 F.2d 518 (9th Cir. 1989) ............................................. 23

*Real Alts., Inc. v. Sec'y of Health & Human Servs.,*
    867 F.3d 338 (3d Cir. 2017) ............................................. 55

*Religious Sisters of Mercy v. Becerra,*
    55 F.4th 583 (8th Cir. 2022) ............................................ 57

*Richardson v. Clarke,*
    52 F.4th 614 (4th Cir. 2022) ...................................... 43, 44

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984) ..................................................... 36, 38

*Rodriguez v. Robbins,*
    715 F.3d 1127 (9th Cir. 2013) .......................................... 58

*Roe v. Dep't of Def.,*
    947 F.3d 207 (4th Cir. 2020) ...................................... 21, 57

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
    592 U.S. 14 (2020) .......................................................... 1

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,*
    547 U.S. 47 (2006) ........................................................ 36

*Rutan v. Repub. Party of Ill.,*
    497 U.S. 62 (1990) ........................................................ 41

*Sabir v. Williams,*
    52 F.4th 51 (2d Cir. 2022) .............................................. 48

*Shelton v. Tucker,*
    364 U.S. 479 (1960) ....................................................... 46

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Sherbert v. Verner,*
374 U.S. 398 (1963) ............................................................ 47, 55

*Sierra Club v. U.S. Dep't of Interior,*
899 F.3d 260 (4th Cir. 2018) .......................................... 29, 34

*Tandon v. Newsom,*
593 U.S. 61 (2021) ................................................................ 23

*Thai Meditation Ass'n of Ala. v. City of Mobile,*
980 F.3d 821 (11th Cir. 2020) ............................................ 53

*Thomas v. Review Bd. of Ind. Emp. Sec. Div.,*
450 U.S. 707 (1981) .............................................................. 27

*United Presbyterian Church v. Reagan,*
738 F.2d 1375 (D.C. Cir. 1984) ........................................... 28

*United States v. Hardman,*
297 F.3d 1116 (10th Cir. 2002) ........................................... 52

*United States v. Texas,*
599 U.S. 670 (2023) .............................................................. 35

*Valley Pipeline, LLC v. 6.56 Acres of Land,*
915 F.3d 197 (4th Cir. 2019) ............................................... 21

*W. Va. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave,*
553 F.3d 292 (4th Cir. 2009) ............................................... 56

*Warner v. City of Boca Raton,*
420 F.3d 1308 (11th Cir. 2005) ........................................... 52

*Wood v. Milyard,*
566 U.S. 463 (2012) .............................................................. 43

**TABLE OF AUTHORITIES—continued**

**Page(s)**

**Statutes and Regulatory Materials**

42 U.S.C. § 2000bb-1.................................................................... 47

8 U.S.C. § 1252............................................................................ 14

Exec. Order No. 14165, 90 Fed. Reg. 8467 (Jan. 20, 2025)......................... 45

Proclamation 10886, 90 Fed. Reg. 8327 (Jan. 20, 2025)........................... 45

**Other Authorities**

Appellee's Br., *Mennonite Church USA v. DHS*, No. 25-5209
    (D.C. Cir. Dec. 12, 2025)..................................................... 31

Douglas Laycock & Oliver S. Thomas, *Interpreting the Religious
    Freedom Restoration Act*, 73 Tex. L. Rev. 209 (1994) ........................ 52

*The New Shorter Oxford English Dictionary* (1993) ................................... 54

## INTRODUCTION

For many people, "attending religious services" is "at the very heart" of the "guarantee of religious liberty." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19-20 (2020). It is hard to imagine a greater infringement on that guarantee than Government agents surveilling attendees, pulling parishioners aside for questioning, or entering a house of worship—while armed—to carry out immigration enforcement.

The Government has long recognized this: For over three decades, it has severely restricted immigration enforcement at houses of worship. Since 2021, the Department of Homeland Security required its agents to avoid enforcement at houses of worship to the "fullest extent possible," JA149, unless there were exigent circumstances and specific procedural safeguards were followed. Yet in January 2025, DHS repealed and replaced the 2021 Policy. The only limitation? That agents use "a healthy dose of common sense." JA195.

Plaintiffs—Baptist, Quaker, and Sikh houses of worship—showed that, among other things, the 2025 Policy impeded Plaintiffs' ability to gather for religious worship, thus violating their rights under the First Amendment and the Religious Freedom Restoration Act (and causing them irreparable harm). As a result, the 2025 Policy could survive only if it met heightened

1

scrutiny, a standard that DHS failed even to argue. So the district court preliminarily enjoined DHS from applying the 2025 Policy to Plaintiffs.

On appeal, DHS quibbles with the uncontested record evidence yet fails to argue that the district court committed clear error. And DHS's legal arguments boil down to the novel contention that because the 2025 Policy does not directly regulate Plaintiffs, the First Amendment and RFRA offer no relief for Plaintiffs' immense harms. In all, DHS cannot show that the district court abused its discretion. This Court should affirm.

## STATEMENT OF THE CASE

### A.  Plaintiff Houses of Worship

Plaintiffs are houses of worship from three religious groups: Cooperative Baptists, Quakers, and Sikhs. Although they have different beliefs, all three traditions share a deep religious commitment to welcoming and serving allcomers.[1]

### 1.  *The Cooperative Baptist Fellowship*

CBF is a network of Cooperative Baptist churches with over 1,400 congregations spread over 37 states, the District of Columbia, and Puerto Rico; over 30 field personnel (the CBF equivalent of missionaries); and

---

[1] Members within each group also have a diverse range of beliefs. For the sake of ease, this brief describes the beliefs of "Cooperative Baptists," "Quakers," and "Sikhs" to refer to the beliefs held by the Plaintiffs in this case.

approximately 1,200 chaplains and pastoral counselors. JA213. CBF and its member congregations believe that God invites and equips them to spread the hope of Jesus Christ. JA214. Their understanding of the Baptist faith is based on a commitment to religious liberty, autonomy of the local congregation, and the freedom to interpret Scripture under the guidance of the Holy Spirit. JA215.

Communal worship is core to Cooperative Baptists' religious exercise. Among other things, communal worship allows the Cooperative Baptists to experience God more expansively by learning from those who have had "different experiences of the Holy Spirit." JA221. So they believe that their congregations' "doors should be open—literally and figuratively—to anyone that wants to join [them] for worship." JA224.

Cooperative Baptists' faith compels them to share the love of Christ with immigrants and refugee communities and to provide those communities with radical hospitality. JA81. This stems from the Cooperative Baptist belief that because Jesus Christ was a refugee, "the faces of immigrants and refugees" are "the face of Jesus." JA215. As a result, serving their community is "more than just community service," it is an exercise of their religious beliefs and often takes place directly in the church buildings used for worship services. JA222. The Cooperative Baptists' religious commitment to serving immigrants and refugees takes various forms,

including advocating for just and compassionate immigration policies, using tangible resources such as Church space, land, or money to support immigration work, providing driving classes for new immigrants, hosting food pantries, running clothing drives, conducting job-training programs, providing housing and child-care assistance, and hosting health clinics. JA218, JA222, JA230, JA232. Additionally, congregations assist with resettling refugees and provide legal, counseling, language, and translation services for immigrants. JA218.

## 2.    *The Quakers*

The Religious Society of Friends—known as Quakers—have been in the United States longer than the country has existed. JA101. Having fled religious persecution in England, Quakers are no strangers to government burdens on religious practice. JA101. But it wasn't until 1682, when William Penn arrived in Pennsylvania (the same year Plaintiff Philadelphia Yearly Meeting was founded), that Quakers found refuge for their religious practice. JA101. The Quaker Plaintiffs comprise six different meetings—the Quaker term for congregations—spanning 13 states and Washington D.C. JA69, JA100, JA108, JA249.

Communal worship is central to Quaker religious exercise. JA59. Among the core tenets of the belief system is that humans can and do experience God directly. JA58. As a result, Quakers do not have assigned individuals

who direct their spiritual development or worship. JA58. Instead, Quakers believe that at any given time, a person may experience the divine and receive a message that is intended to be shared broadly. JA58. Thus, during regular worship, Quakers gather in their meeting house and sit facing the center of the room in silent "expectant waiting." JA59. When God enters and shares a message with an individual that is intended for the other worshippers, that person stands and engages in "vocal ministry." JA59. Quakers believe that the different life experiences lead to God manifesting for people in different ways. JA58. Subsequently, having a diverse and robustly attended meeting provides a fuller understanding of how God is speaking to them. JA58. It is essential for the spiritual development of Quakers to "be able to hear God's word, no matter who it comes from." JA58. And everyone present at a Quaker meeting is actively worshipping and engaged in "communal togetherness," whether they speak or not. JA59.

Quakers are guided in their daily lives by core religious beliefs—called "testimonies." One of the most well-known testimonies is the "peace testimony," which includes Quakers' opposition to all war and weapons, and their dedication to pacifism. JA61. Another testimony—the testimony of equality—is the belief that Quakers see God in all people and worship together without regard for a person's background, including immigration status. JA78. The Quaker faith attracts a diverse range of backgrounds, in

part, because of the testimony of equality. *See* JA79. Many Quaker Meetings are in regions with large immigrant populations and have congregants from a wide range of nations. JA73. And Quakers do not inquire into the immigration status of those who attend. JA103. Quakers further act on the testimony of equality by providing services directly to immigrants, including providing interpretive services at meetings, offering English classes for refugees, and driving worshippers to immigration appointments. JA88.

### 3.     *The Sikh Temple Sacramento*

The Sikh Temple Sacramento is a Gurdwara, or place of worship, for the approximately 30,000 Sikhs in the Sacramento, California area. About 50 percent of the Sikh Temple's congregation consists of immigrants. JA199.

The Sikh worldview centers around the idea of Ik Onkar, or oneness, which means that the divine is equally present in all people and that God sees all human beings as equal—whatever their religion, social identity, or immigration status. JA200. Sikhs gather at Gurdwaras for fellowship, worship, and "langar," the sharing in a communal meal with their community, referred to as their Sangat. JA201. Central to the concept of a Gurdwara is that all people must be welcomed in the space without fear. JA200. In general, fully and meaningfully practicing the Sikh faith requires joining with the community in service and prayer. JA200-201. Notably, the

Sikh faith does not have ordained clergy, so any individual from the congregation may lead religious services and assist in preparing langar. JA201. It is common for community members to lead the congregation in song and prayer during worship. JA201.

### B. DHS's longstanding policy limiting immigration enforcement at houses of worship

For more than thirty years, beginning in at least 1993 all the way through January 2025, federal agencies tasked with immigration enforcement have maintained policies severely limiting immigration enforcement at "protected areas" or "sensitive locations," including places of worship. JA122-142, JA194, JA259. These restrictions spanned continuously across five presidential administrations and multiple iterations of federal agencies including DHS, ICE, CBP and their predecessors. JA122-142, JA194, JA259.

In 1993, an INS policy directed agents to avoid apprehending people at places of worship. JA125. The policy required "advance written approval" by supervisors who were directed to consider, among other things, whether alternative measures were available. JA125. In 2008, ICE, one of the successor agencies to INS, issued a policy stating that personnel "should refrain from conducting enforcement action or investigative activities at or near sensitive community locations," including at places of worship, except

in limited circumstances. JA136. The ICE policy required enforcement actions at sensitive locations to be "thoroughly planned, reviewed, and approved by senior field office personnel." JA136. In 2011, ICE further restricted enforcement actions at or focused on a broad list of sensitive locations. JA139-141. The 2011 policy required agents to get prior approval from senior ICE officials for operations at sensitive locations, even when the action was led by another agency. JA139-141. It also detailed how ICE employees must be trained annually on the requirements for enforcement actions at sensitive locations. JA139-141. And in 2013, CBP issued a policy that restricted their agents from conducting enforcement at places of worship. That policy detailed how "supervisors should consider alternative measures that could achieve the enforcement objective" at sensitive locations. JA143-144. Additionally, the policy dictated that CBP actions likely to lead to an apprehension at or near a sensitive location required written approval by high-level leadership. JA143-144.

In 2021, DHS Secretary Alejandro Mayorkas issued a memo to both ICE and CBP superseding the prior protected-areas policies. JA148-152. The memo stated a "foundational principle": to the "fullest extent possible, we should not take an enforcement action in or near a protected area." JA150. According to the memo, DHS "can accomplish [its] enforcement mission without denying or limiting . . . people of faith access to their places of

8

worship." JA149. The memo explained that even "an enforcement action taken near—and not necessarily in—[a] protected area can have the same restraining impact on an individual's access to the protected area itself." JA149.

The policy detailed a broad, nonexhaustive list of the types of enforcement actions that should not take place near protected areas, including "arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance." JA151. If enforcement action in or near a protected area was necessary, to "the fullest extent possible, any enforcement action . . . should be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the protected area." JA151.

The 2021 Policy contemplated limited circumstances where enforcement actions in or near a protected area could be permitted. Those included national-security threats; "an imminent risk of death, violence, or physical harm to a person"; "hot pursuit of an individual who poses a public safety threat"; "an imminent risk that evidence material to a criminal case will be destroyed"; and if a "safe alternative location does not exist." JA151. The policy stated that absent exigent circumstances immigration agents "must

seek prior approval from their Agency's headquarters," and that if "enforcement action is taken due to exigent circumstances," DHS headquarters "should be consulted post-action." JA151. Any covered enforcement action was required to be documented to include "identification of the protected area; the reason(s) why the enforcement action was taken there; whether or not prior approval was obtained and, if not, why not; the notification to headquarters." JA151.

Under the 2021 Policy, DHS maintained a webpage explaining the sensitive-locations policy to the public and directing members of the public in how to file complaints if DHS officers violated the policy. JA163.

### C. DHS's replacement of its longstanding policy with "common sense"

On inauguration day, Acting DHS Secretary Benjamine Huffman rescinded and replaced the 2021 Policy. The new policy eliminates virtually all prior restrictions on enforcement actions at protected areas—including the foundational requirement that those actions be avoided to the "fullest extent possible," JA149—leaving enforcement decisions solely to officers' "discretion along with a healthy dose of common sense." JA194. DHS issued a press release stating that the new policy "empowers the brave men and women in CBP and ICE to enforce our immigration laws and catch criminal aliens—including murder[er]s and rapists—who have illegally come into

our country. Criminals will no longer be able to hide in America's . . . churches to avoid arrest." JA173. Neither the press release nor the policy provided any examples or data of criminals hiding in houses of worship. *See* JA173.

Later that month, Acting Director of ICE, Caleb Vitello, issued a similar memo explaining the newly reduced ICE enforcement requirements at sensitive locations and reiterating that DHS would not be issuing detailed guidance regarding where immigration laws are enforced. JA260. The memo stated that in lieu of the prior safeguards for protected areas, enforcement actions in or near protected areas could merely be approved by supervisors either verbally or in writing. JA261. Unlike the 2021 Policy, ICE's new policy does not outline circumstances in which enforcement at houses of worship is appropriate or provide supervisors guidance for when to approve enforcement at houses of worship. JA260-261. The ICE policy carves out additional procedural steps for enforcement actions at public demonstrations, but not at other previously protected areas, including houses of worship. JA260-261.

DHS's repudiation of decades of policy came against the backdrop of the Administration stating that it would conduct "the largest mass deportation operation in American history of illegal criminals"—a category that, according to DHS, includes anyone "who illegally enters the United States,"

11

JA197—and Defendant Secretary Noem publicizing immigration enforcement as "[g]etting the dirt bags off the streets." JA263.

### D. The district court's preliminary injunction

Plaintiffs challenged DHS's new policy, claiming that it violated the Administrative Procedure Act, the Religious Freedom Restoration Act, and the First Amendment right to expressive association. Plaintiffs moved for a preliminary injunction on their First Amendment and RFRA claims, showing, among other things, how DHS's new policy had immediately and irreparably harmed their ability to gather for communal worship and to provide ministry and community services.

1. Following the change in policy, CBF congregations experienced "immense harm" and saw immediate changes in behavior from congregants, with many members choosing to stay home. JA220. Congregations reported that "fewer people, especially immigrants, are attending worship" since the new policy went into effect. JA220. The reduction in attendance included immigrants and nonimmigrants alike. JA220.[2] The reduced attendance also impacted CBF financially, with much of CBF's budget coming from

---

[2] Research has shown that among all immigrants, regardless of immigration status, about one in four "worry they or a family member could be detained or deported." *See* JA165. And among immigrants in focus groups, "deportation fear seemed to affect all . . ., regardless of their documentation." JA258.

12

congregant giving. JA220. CBF also saw a decrease in community service volunteers and individuals seeking assistance from CBF, including at ESL classes, food pantries, clothing shelters, and legal services. JA218. For example, less than two weeks after the policy went into effect, a CBF congregation reported a 66 percent decrease in ESL class attendance due to fears of immigration enforcement "in response to DHS's new policy." JA221-222.

The change in policy also immediately impacted the Quakers' religious practice. As with CBF congregants, the new policy made members less likely to attend worship, because of the greater possibility of armed agents being in and around their meetings due to the change in policy. JA67, JA74, JA81, JA90. And decreased attendance leads to "financial loss in addition to loss of spiritual and denominational unity." JA110.

For the Gurdwara, DHS's policy change had "an immediate chilling effect on worship and fellowship," hindering the Sikh Temple's ability to carry out essential religious practices with the entire Sangat. JA202. Regardless of their immigration status, individuals stopped attending worship out of fear of government intrusion into the sanctity of the Gurdwara triggered by DHS's new policy. JA202. Decreases in attendance at the Sikh Temple directly hinder its ability to carry out essential religious practices, harming all members of the Gurdwara, not just those that do not

attend. JA202. Put simply, as "long as DHS's new policy is in effect, it will impair Sikhs' ability to practice [their] faith freely, openly, and without concern." JA203.

**2.** In response to Plaintiffs' motion for a preliminary injunction, DHS first argued that Plaintiffs lacked standing. JA279. DHS contended that Plaintiffs' injuries were speculative because there was no guarantee that DHS would undertake enforcement in their houses of worship. For that same reason, DHS argued, Plaintiffs could not show that the 2025 Policy interfered with their associational interests or burdened their religious practice. JA305, JA313. Resting on its arguments that Plaintiffs could not meet their burdens under the First Amendment or RFRA, DHS did not argue that the new policy satisfied exacting or strict scrutiny.[3]

**3.** The district court granted the preliminary injunction. At the outset, the court held that Plaintiffs successfully established standing. JA279. The court concluded that reduced attendance at Plaintiffs' religious worship was an injury in fact. JA285. The court highlighted Plaintiffs' uncontroverted declarations showing that the ongoing and imminent reductions in

---

[3] DHS also argued that the district court lacked jurisdiction to issue an injunction under 8 U.S.C. § 1252(f)(1). *See* DHS Opp'n Br. 14-15, Dkt. No. 34. The district court largely rejected that argument. *See* JA292-294. And DHS concedes that the district court's conclusion was "consistent" with § 1252(f)(1). DHS Br. 10.

14

attendance directly impacted Plaintiffs' ability to engage in ministry and financially harmed them. JA238. The court further found Plaintiffs' injury traceable to the challenged action, stating that attendance at worship services and ministry programs decreased "at least in part as a result of the 2025 policy." JA286. The court rejected DHS's argument that reduced attendance at Plaintiffs' houses of worship was due to generalized immigration enforcement, rather than the 2025 policy, because Plaintiffs' members had directly identified the 2025 policy as the cause of the reductions in attendance. JA286. Finally, the court stated that a return to the 2021 policy would redress Plaintiffs' injuries, noting that Plaintiffs did not experience these harms under the 2021 policy. JA291.

Turning to the preliminary-injunction factors, the court held that Plaintiffs were likely to succeed on the merits of both their First Amendment and RFRA claims. The court reasoned that DHS's new policy would significantly affect Plaintiffs' expressive-association rights by causing actual and imminent reductions in attendance for religious exercise—a conclusion bolstered by DHS's aggressive press rollout, which specifically mentioned the need to conduct immigration-enforcement operations at houses of worship. JA301-303. Likewise, the court determined that Plaintiffs were likely to succeed on their RFRA claim because they had successfully established that enforcement actions authorized by the new

15

DHS policy would substantially burden, at a minimum, Plaintiffs' communal worship, Quaker pacifist beliefs, and CBF's immigrant-focused services. JA311. As to DHS's burden, the court explained that DHS did not attempt to articulate any governmental interest or argue that the new policy was the least-restrictive means for furthering that interest. JA315-316. The court noted that even if DHS could show a sufficient government interest, it could not show why the 2021 policy—undoubtedly a less-restrictive means—could not satisfy that interest. JA315-316.

The court held that Plaintiffs satisfied the remaining preliminary injunction factors. First, the deprivation of either constitutional rights or rights under RFRA constitute irreparable harm. JA317. Second, the balance of the equities and the public interest weigh in favor of Plaintiffs because attendance had declined at worship and ministries, hindering Plaintiffs' religious exercise. JA317. On the other hand, DHS did not demonstrate how its interests would be materially and adversely affected by an injunction. JA317.

The district court enjoined DHS from applying the new DHS policy to Plaintiffs and ordered it to abide by the 2021 Policy when pursing enforcement actions in and around Plaintiffs' houses of worship. JA324-326.

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion in granting the preliminary injunction because Plaintiffs are likely to succeed on the merits and the remaining preliminary-injunction factors favor Plaintiffs.

### I. Plaintiffs are likely to succeed on the merits.

### A. Standing

**1.** Plaintiffs have suffered a cognizable Article III injury because the 2025 policy has deterred attendance at worship services and ministry programs, which has undermined Plaintiffs' ability to engage in communal worship—a core element of their religious practice. DHS contests the adequacy of Plaintiffs' evidence on attendance declines, but it does not argue—nor could it—that the district court's assessment of that evidence was clear error. DHS also argues that a chilling effect on congregants cannot provide standing, but this argument misses the point. Plaintiffs are houses of worship, not congregants, and their injury is the reduction in attendance, which is a well-established Article III injury that they have experienced.

**2.** Plaintiffs' declarations established that their injuries are caused by DHS's recission of the 2021 Policy. Even if reduced attendance was attributable in part to DHS's broader aggressive immigration enforcement, Plaintiffs have successfully established through the record that the new policy is at least in part responsible for their injuries. Here too DHS disputes

17

uncontested record evidence—again, without showing a clear error—to argue that causation is speculative.

**3.** Redressability is the other side of the causation coin. Because the change in DHS policy caused reduced attendance, the preliminary injunction's return to the 2021 policy redressed the harm. The preliminary injunction does not intrude on the Executive's Article II authority to enforce immigration law; it merely requires DHS to abide by the same policy under which it had operated for decades.

## B. Likelihood of success on the expressive-association claim

**1.** DHS's new policy significantly burdened Plaintiffs' expressive-association rights by decreasing attendance at worship and ministry, which has interfered with religious exercise, Plaintiffs' internal organization and affairs, and how Plaintiffs interact with members and recruit new ones. The 2025 Policy also permits armed DHS agents to infiltrate Plaintiffs' houses of worship, which would violate Quaker and Sikh religious beliefs regarding nonviolence.

DHS argues that the right to expressive association is coextensive with the rights under the Free Exercise Clause. But the case DHS cites rejected that very premise. DHS's argument that the 2025 policy does not *directly* regulate Plaintiffs is beside the point, because indirect Government action can interfere with expressive association just as much as direct action can.

18

Finally, DHS is misguided in arguing that the 2025 Policy does not burden expressive association because it is a neutral and generally applicable government action—expressive-association challenges have never turned on whether a government action is neutral and generally applicable.

**2.** DHS waived its heightened-scrutiny arguments by failing to raise them in the district court. But even if this Court were to reach the issue, DHS has not come close to meeting that standard. DHS has failed to show that the 2025 policy's uncabined enforcement discretion is substantially related to the general interest in immigration enforcement and that, even if it was, the policy is narrowly tailored. Indeed, DHS failed to provide any evidence to the district court that the more limited 2021 policy had any deleterious effect on the Government's aims.

### C. Likelihood of Success on RFRA Claim

**1.** The district court correctly held that DHS's new policy substantially burdens Plaintiffs' religious exercise because the attendance declines undermined communal worship, Plaintiffs' ability to serve others, and Plaintiffs' financial support and volunteer capacity. Plaintiffs have also shown that the 2025 Policy substantially burdens their religious exercise because it would permit armed DHS agents to infiltrate their houses of worship, directly violating Quaker and Sikh nonviolent religious beliefs and impairing CBF members from worshipping with a clear mind.

19

DHS's argument that these burdens are merely "incidental" results of internal Government procedures overlooks that DHS's new policy changed how its agents interact *with the public*. None of the cases DHS cites support the proposition that policies of that kind are off-limits to scrutiny under RFRA. DHS's next argument—that RFRA protects against only direct coercion—is likewise unsupported by caselaw. And DHS's hypothetical fears of a free-exercise veto ignore that RFRA doesn't prohibit every burden to religious exercise, just substantial burdens, which Plaintiffs have shown.

**2.** DHS has waived the argument that the 2025 Policy withstands strict scrutiny because it did not make that argument before the district court. And if this Court were to reach that question nonetheless, DHS cannot meet that demanding standard, given that it failed to offer any evidence that the narrower 2021 Policy was prejudicial to the Government's immigration-enforcement agenda.

## II. The remaining factors support preliminary relief.

Because Plaintiffs are likely to succeed on the merits of their expressive-association and RFRA claims, they necessarily will be irreparably harmed absent an injunction. Furthermore, the public interest favors enjoining Government's violations of the law. And without the preliminary injunction Plaintiffs will face irreparable harm, while DHS does not suffer harm from an injunction that merely ends an unlawful practice.

## STANDARD OF REVIEW

A district court's decision to grant a preliminary injunction is committed to its "sound discretion." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013). Grounds for reversal include a mistake of law or a "clear error in factual findings." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020). This deferential abuse-of-discretion standard draws a line "between the unsupportable and the merely mistaken, between the legal error, disorder of reason, severe lapse of judgment, and procedural failure that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008). So even if this Court "would, in the first instance, have decided the matter differently," that is "no justification" to reverse. *Tepeyac*, 722 F.3d at 192.

Clear-error review "protects district courts' primacy as triers of fact." *Evans*, 514 F.3d at 321. Accordingly, reversal will not be granted "so long as 'the district court's account of the evidence is plausible in light of the record viewed in its entirety.'" *Roe*, 947 F.3d at 219 (quoting *Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 213 (4th Cir. 2019)).

## ARGUMENT

The district court correctly granted the preliminary injunction, and DHS fails to explain why doing so was an abuse of discretion. Plaintiffs are likely

21

to succeed on the merits because they have shown that DHS's new standardless policy significantly constrained their right to gather for religious exercise, causing immediate (and irreparable) harm. And the public interest and balance of equities strongly favor enjoining a policy that violates fundamental constitutional and statutory rights. DHS's arguments to the contrary rely on new disagreements with uncontested evidence and arguments DHS waived in the district court. This Court should affirm.

## I. Plaintiffs are likely to succeed on the merits.

### A. Plaintiffs have standing.

To establish standing, a plaintiff must show injury in fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). "Standing requirements are somewhat relaxed in First Amendment cases." *Davison v. Randall*, 912 F.3d 666, 678 (4th Cir. 2019) (quoting *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013)). And only one Plaintiff need establish standing. *See Bostic v. Schaefer*, 760 F.3d 352, 370-71 (4th Cir. 2014).

### 1. Plaintiffs are injured by DHS's policy.

a. An injury-in-fact must be "concrete and particularized"—it must be real, not abstract, and affect the plaintiff in a personal way—and it must be "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560-61 (internal quotation marks omitted). Plaintiffs, for whom communal

worship with allcomers and ministry for immigrants and refugees are core articles of faith and religious practice, have shown many interrelated ways in which their religious exercise is injured by DHS's new enforcement policy.

First, a reduction in the size of a congregation or an audience gathered for expressive association is a "readily cognizable First Amendment injury." *Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 135 (4th Cir. 2011). More specifically, houses of worship, "as organizations, suffer a cognizable injury when assertedly illegal government conduct deters their adherents from freely participating in religious activities protected by the First Amendment." *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 523 (9th Cir. 1989) (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 463-65 (1958)); *see also, e.g.*, *Tandon v. Newsom*, 593 U.S. 61, 64 (2021) (per curiam) (enjoining Covid-related restrictions on size of religious gatherings). That includes when government interferes with houses of worship's "ability to carry out their ministries*." Presbyterian Church*, 870 F.2d at 522.

The threat of DHS enforcement or surveillance in or near their houses of worship under the 2025 Policy caused congregants to cease attending worship services. *See* JA202, JA218, JA222. For example, CBF clergy declarations explained that CBF congregations had already seen reduced attendance at worship and "noticeable decline" in participation in ministries

23

for immigrant communities, including ESL programs, food pantries, and clothing shelters. JA221. For Plaintiff Sikh Temple Sacramento, the policy "had an immediate chilling effect on worship and fellowship," including "reducing Gurdwara attendance." JA202. And Quaker declarants explained that such injuries were imminent, as the threat of ICE enforcement was "already making . . . members less likely to attend" meetings and "will discourage attendance." *See* JA90-91.

Among other injuries, that decline in attendance impeded Plaintiffs' ability to carry out communal worship. Reduced attendance, particularly of immigrants, diminished their ability to "experience God" and worship with a body "resembling the body of Christ," JA221, and to "carry out essential religious practices," JA202. It interfered with the religious exercise of congregants too fearful to attend (and disrupted the practice of those who did attend). JA202. Less participation in Plaintiffs' other ministry activities—especially ministries that serve immigrant communities— likewise meant fewer people with whom Plaintiffs could "commune for worship and fellowship," further diminishing their ability to practice their faith. *See* JA218, JA222. And reduced attendance "means fewer contributions to CBF" and "less money for the congregations," JA220—"a classic and paradigmatic" Article III injury, *Air Evac EMS, Inc. v. Cheatham,* 910 F.3d 751, 760 (4th Cir. 2018) (citation omitted)—to the

24

Cooperative Baptists, who rely on congregant giving to keep the lights on, *see* JA220.

**b.** DHS contests the adequacy of Plaintiffs' evidence showing reduced attendance. And it argues that even if attendance was reduced, that is not an Article III injury because forgoing church attendance is not an objectively reasonable response to the new policy. DHS is wrong on the facts and the law.

First, DHS contends that Plaintiffs have failed to establish that "any reductions in attendance" occurred or were imminent when they filed suit. *See* DHS Br. 17-18. As just explained (at 23-24), the record includes significant declarant testimony regarding reductions in attendance experienced by Plaintiffs immediately after the policy was issued. DHS offered no evidence to the contrary. And the district court credited the declarants' statements not only about the reductions in attendance, but also about the effects of reduced attendance—the loss of money from donations and collections, reduced volunteers for ministry programs, harms to communal worship, and more. JA280-282.

DHS quotes from a handful of declarations and calls them "vague and conclusory." DHS Br. 18. But DHS fails to show (or even argue) that the district court committed clear error—which would require showing that the "entire evidence" before the Court demands "the definite and firm conviction

25

that a mistake has been committed," *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014) (citation omitted). Instead, DHS seeks to cast doubt on the veracity of those declarations, contending that such declines could not have occurred "in a single week." DHS Br. 18. But the immediacy of the impact bolsters, rather than undercuts, the seriousness (and cause) of Plaintiffs' injuries. Likewise, DHS argues that Plaintiffs failed to show "sustained" drops in attendance, *id.*, but DHS creates from whole cloth the requirement that an injury be sustained for an unspecified period of time before it becomes cognizable.

As for DHS's argument that the drops in attendance must be "substantial" (at 18), there is no such legal requirement. For example, a monetary harm does not need to be "substantial" to satisfy Article III; even one dollar is enough. *See Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025). But even if there were a requirement of substantiality, the evidence showed that the attendance declines were substantial enough to impede Plaintiffs' ability to worship communally, carry out their ministry activities, and otherwise engage in protected religious exercise and expressive association. DHS cannot second-guess the seriousness of those injuries as not "substantial"; after all, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit

26

First Amendment protection." *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981).

Second, DHS argues that reduced attendance at Plaintiffs' worship and ministries—even if established in the record—is not legally cognizable because a chilling effect caused by a policy that does not directly "regulate, constrain, or compel any action on [the plaintiffs'] part" is insufficient to establish standing. DHS Br. 24 (quoting *Clapper v. Amnesty International USA*, 568 U.S. 398, 419 (2013)). Furthermore, according to DHS, nonattendance cannot be a legally cognizable injury because it is not "objectively reasonable" for congregants' attendance to have been chilled when the 2025 Policy does not direct immigration enforcement officers to "target plaintiffs' places of worship." DHS. Br. 25-26.

But DHS conflates the injury experienced by houses of worship when their attendance declines and the injury experienced by someone who is deterred from exercising First Amendment rights. These are legally distinct injuries, and a "chilling effect"—which is an "*additional* cognizable injury under the First Amendment," *Benham*, 635 F.3d at 135 (emphasis added)—forms the basis of only the latter injury. As the district court made clear, mere chilling of First Amendment rights was not the injury upon which it based its standing analysis. JA283. Instead, Plaintiffs showed an imposition

on their right to gather for religious exercise, JA283, which, as already explained (at 23), is a distinct First Amendment injury.

So DHS's cases are irrelevant. *Laird v. Tatum*, for example, held that plaintiffs lacked standing because they failed to allege any "specific present objective harm or a threat of specific future harm" aside from subjective chilling. 408 U.S. 1, 14 (1972). Likewise, *United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984), held that a "chilling effect" standing alone does not create a cognizable injury where plaintiffs fail to allege any "past or immediately threatened" harm "apart from the 'chill' itself." And *Clapper* held that self-inflicted costs in response to subjective chilling are not Article III injuries. *See* 568 U.S. at 410. None of these cases involved the kind of distinct cognizable injuries Plaintiffs have shown here.[4]

### 2. *Plaintiffs' injuries are caused by DHS's recission of the sensitive-locations policy.*

**a.** Causation is satisfied where a plaintiff shows that "the challenged action is in part responsible for frustrating" their exercise of rights. *Sierra*

---

[4] Plaintiffs also experienced other injuries-in-fact beyond reduced attendance—including being forced to choose between religious edicts to welcome all comers and to avoid exposing congregants to an increased risk of harm, and representative associational injuries experienced by congregants. Because those injuries did not serve as a basis for the district court's injury-in-fact ruling, *see* JA279-285, they have not been teed up for appeal. Accordingly, even if this Court concludes that the district court's injury-in-fact analysis was flawed, Plaintiffs would remain free to pursue these other injuries as grounds for standing.

*Club v. U.S. Dep't of Interior*, 899 F.3d 260, 283 (4th Cir. 2018) (citation omitted). Causation does not require that the challenged action "be the sole or even immediate cause of the injury." *Id.* at 284 (citing *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013) (describing "concurrent causation"). And DHS's actions need not be "the very last step in the chain of causation." *Bennett*, 520 U.S. at 169.

When causation depends in part on the actions of a third party, the question is whether the third party "'will likely react in predictable ways' that in turn will likely injure the plaintiffs." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)). "When third party behavior is predictable, commonsense inferences may be drawn" to support causation. *Diamond Alt. Energy*, 606 U.S. at 116. And Plaintiffs are not required to "introduce evidence from expert[s]" or "from directly regulated third parties to show how third parties would likely respond." *Id.* at 120-21.

DHS's adoption of the new policy is a cause of Plaintiffs' injuries. As the district court found, JA286-287, the record evidence establishes that Plaintiffs' congregants and others they serve are aware of the new DHS policy and some have ceased attending worship and other ministry activities specifically because of it, *see* JA202-203, JA209, JA220-221, JA232-233.

29

Alongside reduced attendance, the district court also credited Plaintiffs' evidence that the new policy caused Plaintiffs' other, related injuries, including damaging congregants' ability to worship. JA286-287.

This evidence is more than enough to establish the plain connection between the new DHS policy and the harms that Plaintiffs allege. But even absent that evidence, it is a "commonsense inference[]," *Diamond Alt. Energy*, 606 U.S. at 116, that announcing that houses of worship are no longer protected areas will cause people to forgo worship or related ministries there.

*Department of Commerce v. New York*, 588 U.S. 752 (2019), is instructive on this point. There, the Court rejected the Government's argument that any harm to the plaintiff states resulting from the addition of a citizenship question on the census was not fairly traceable to the Government because it "depend[ed] on the independent action of third parties"—those who were likely to abstain from responding to the census, even though they had a legal obligation to do so. *Id.* at 767. That chain of causation sufficed because the record evidence showed that the third parties in question were "likely [to] react in predictable ways to the citizenship question." *Id.* at 768. So too here.

**b.** DHS speculates that Plaintiffs' injuries cannot be traced to the new DHS policy in particular—only to the Administration's increased immigration enforcement generally. DHS Br. 18-22. Here too, DHS fails to

30

meaningfully controvert the only evidence in the record and misunderstands the law.

First, as just described, Plaintiffs' declarations expressly attributed decreases in attendance to the new DHS policy on enforcement in and around sensitive locations. And they described other injuries, like discomfort during worship and injury to religious beliefs relating to pacifism, as attributable exclusively to the 2025 Policy. *See, e.g.*, JA89-91, JA113-114, JA201-203, JA222-224. Not only does this amply support the district court's ruling on causation, but DHS hasn't come close to demonstrating that this ruling was "so suspect as to be clearly erroneous." *Dep't of Com.*, 588 U.S. at 767. Instead, DHS points to the findings of another district court on a separate record. *See* DHS Br. 21-22 (citing *Mennonite Church USA v. DHS*, 778 F. Supp. 3d 1, 11 (D.D.C. 2025), *appeal docketed*, No. 25-5209 (D.C. Cir. June 5, 2025)). But as DHS itself pointed out in that case, the district court's opinion here was "based on an entirely different record" than the district court's opinion there. *See* Appellee's Br., *Mennonite Church USA v. DHS*, No. 25-5209, at 57 n.6 (D.C. Cir. Dec. 12, 2025).

Second, Plaintiffs would satisfy the traceability requirement even if reduced attendance at worship and other ministries *is* attributable in part to DHS's broader aggressive immigration enforcement. The traceability

31

analysis accommodates multiple sources of injury, so Plaintiffs need not establish that the new DHS policy is the only, the latest, or the last step in the chain of causation. *See Judd*, 718 F.3d at 316. Plaintiffs have established that the new policy is "at least in part responsible" for their injuries, *id.*, and that is enough. DHS's admission (at 19) that "it is not surprising that people fearing encounters with immigration enforcement avoided houses of worship" along with other locations where immigration raids may be carried out only underscores that DHS's removal of protections for houses of worship is a cause of Plaintiffs' injuries.

DHS also maintains that a decline in attendance is not a "predictable effect" of its new policy, DHS Br. 22-23 (quoting *Dep't of Com.*, 588 U.S. at 768), because the policy is only a "modest change in internal DHS guidance" that treats houses of worship "no differently than any other location," DHS Br. 20-22. But the 2025 Policy did not make minor tweaks; it upended a three-decade policy of avoiding immigration enforcement in or near houses of worship "[t]o the fullest extent possible." JA149. Now, DHS agents are free to carry out enforcement activities at houses of worship limited by nothing more than their own "common sense." JA260.

The Court does not need to take Plaintiffs' word for it. DHS's announcement explained that the new policy "will not tie the hands of" DHS agents as the former policy did. JA173. And DHS's own brief insists that the

32

2021 Policy was "unduly restrictive and far less timely and effective" compared to the 2025 Policy. DHS Br. 43.

Nor, finally, is the new policy too attenuated because the reactions of third parties are so far removed from its "distant (even if predictable) ripple effects." DHS Br. 27 (quoting *All. for Hippocratic Med.*, 602 U.S. at 383). In *Alliance for Hippocratic Medicine*, the Court held that a group of doctors' challenge to the FDA's approval of a drug relied on a speculative chain: approval of the drug would lead to the drug being prescribed, which could lead to some people having adverse reactions, which could lead to a future increase in patient visits to emergency rooms or doctors' offices, which could then cause harms to the doctors. 602 U.S. at 390-91. Likewise, *Clapper* rejected a "highly attenuated chain of possibilities," which included statutory requirements and judicial oversight, among other things. 568 U.S. at 410.

No such speculative chain of causation exists here: DHS's new policy caused congregants to stay home from worship and other ministries and Plaintiffs are harmed by that reduction in attendance. That is far from the "unprecedented and limitless approach" rejected by *Alliance for Hippocratic Medicine*. *See* 602 U.S. at 391. Instead, this case is akin to *Department of Commerce*, where the Court rejected the Government's argument that causation was too attenuated because it relied on future violations of the

33

law by both noncitizen households *and* the Government. 588 U.S. at 767. Indeed, as the district court correctly reasoned, Plaintiffs here have a stronger showing of causation than in *Department of Commerce*. That case relied on *future* actions of third parties, *see id.*, but Plaintiffs' evidence shows that people had already stopped attending worship and ministry, JA290.

### 3. Plaintiffs' injuries are redressable.

**a.** Causation and redressability go hand in hand: "If a defendant's action causes an injury, enjoining the action . . . will typically redress that injury." *Diamond Alt. Energy*, 606 U.S. at 111 (quoting *All. for Hippocratic Med.*, 602 U.S. at 380-81). Redressability is satisfied if "granting the requested relief would at least mitigate, if not eliminate, the alleged harm." *Sierra Club*, 899 F.3d at 285. "[R]emoval of even one obstacle to the exercise of one's rights, even if other barriers remain," suffices. *Id.*

For reasons already explained, enjoining DHS's new policy resulted in "meaningfully narrower" opportunities for enforcement at Plaintiffs' houses of worship. JA291. DHS must now avoid enforcement actions at Plaintiffs' houses of worship "to the fullest extent possible." JA149. No more is needed to satisfy the redressability requirement. Plaintiffs do not need to establish that DHS will now cease enforcement actions at houses of worship, or that every last congregant will return to the pews. It is enough to show a "non-speculative likelihood," *Frank Krasner Enters. v. Montgomery Cnty.*, 401

F.3d 230, 234 (4th Cir. 2005) (citing *Lujan*, 504 U.S. at 560-61), that restoring the 2021 Policy will result in some reduction in enforcement at houses of worship and some congregants returning to worship and ministries.

**b.** DHS argues that Plaintiffs cannot satisfy redressability because they challenge "downstream effects of the government's immigration enforcement policies," so any relief would "run up against the Executive's Article II authority to enforce federal law." DHS Br. 29 (quoting *United States v. Texas*, 599 U.S. 670, 678 (2023)). But in *Texas*—an "extraordinarily unusual lawsuit," 599 U.S. at 686—the plaintiffs lacked standing "to order the Executive Branch to alter its arrest policy so as to make more arrests" of noncitizens. 599 U.S. at 674. Plaintiffs do not ask DHS to take more enforcement actions or challenge the volume or prioritization of specific enforcement actions. So this case does not implicate courts' ability to weigh the "propriety of enforcement choices" based on considerations about resource allocation and public policy. *Id.* at 679. The district court's preliminary injunction makes that clear: the court merely required DHS to abide by the same policy under which DHS had operated for decades.

### B.   Plaintiffs are likely to succeed on their First Amendment claim.

The First Amendment's right to expressive association guarantees that "an individual's freedom . . . to worship" includes a right to gather with others for that purpose. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). If Government action "significantly affect[s]" an organization's expressive activity, it must satisfy heightened scrutiny. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 650 (2000). The district court correctly held that DHS's new policy significantly affects Plaintiffs' expressive-association rights and that DHS failed to demonstrate (or even to argue) that the policy satisfies heightened scrutiny.

### 1.   DHS's policy significantly affects Plaintiffs' expressive activity.

**a.** Infringements on the right to expressive association "can take a number of forms," *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (quoting *Roberts*, 468 U.S. at 622), including state action having "the practical effect of discouraging the exercise" of constitutionally protected rights, *NAACP*, 357 U.S. at 461 (cleaned up), making "group membership less attractive," *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 69 (2006), or interfering with an organization's internal structure or operations, *id.* The right to expressive association protects "not only against heavy-handed frontal attack, but also from being stifled by

36

more subtle governmental interference." *Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 544 (1963) (quoting *Bates v. Little Rock*, 361 U.S. 516, 523 (1960)). This is true of government action that "*may* have the effect of curtailing the freedom to associate," even if that effect is uncertain. *Ams. for Prosperity*, 594 U.S. at 616 (quoting *NAACP*, 357 U.S. at 460-61).

The district court did not abuse its discretion in concluding that DHS's new policy significantly burdened Plaintiffs' expressive-association rights by decreasing attendance at worship and ministry activities. Cooperative Baptists, Quakers, and Sikhs have immigrant members (of all legal statuses) and serve non-member immigrant populations. *See* JA120, JA202, JA214, JA219. Prior to the preliminary injunction, the threat of immigration enforcement at their houses of worship had reduced (or imminently would reduce) attendance at worship and ministry events. *See* JA66, JA113, JA202, JA220-23, JA232-33, JA238-39, JA246, JA253.

These reductions in attendance represent a significant hit to the associational rights of the Plaintiffs and their congregants, present and absent alike, because of their religious traditions' emphasis on communal religious practice. Quaker worship is "rooted in a communal experience," JA65, of gathering together silently and sharing vocal ministry when moved by God. JA62-63; *see also* JA243. Because a "diversity of worshippers" allows them to "experience God in a broader, more encompassing way," JA65, any

37

member's absence affects all other members' worship. *See* JA245-246, JA252. Sikh religious services are "fundamentally a communal effort." JA201. Preventing members "from attending the Gurdwara harms not just those who are too fearful to attend but also everyone else at the Gurdwara." JA202. Cooperative Baptists live out their faith "in active participation in the community of believers." JA229. And that faith "requires [them] to know and serve [their] neighbors, including immigrants and refugees." JA207-208; *see also* JA217, JA230, JA237. In Cooperative Baptist life, immigrants are integral members of both the worshipping community that runs church ministry programs and the communities whom those programs serve. *See* JA220-221. A reduction in immigrant attendance therefore restricts CBF's ability to worship and to serve. *See* JA221-222, JA233-234.

The 2025 Policy also interferes with Plaintiffs' internal organization and affairs. *See Roberts*, 468 U.S. at 622-23. Sikhs and Quakers do not ordain clergy, *see* JA86, JA201, JA245, and rely on their membership to lead worship, *see* JA89, JA97, JA201, JA245. For them, fewer immigrants attending means fewer unique contributions to the religious exercise of everyone present. For Quakers, the 2025 Policy further burdens their religious associational practice of intervisitation, which involves Quakers from outside the United States traveling to worship with their U.S. co-religionists. *See* JA73, JA79. And Cooperative Baptists' goal of worshipping

38

in a community that looks "more like the body of Christ" is thwarted when there are fewer immigrants present to serve as members and leaders. JA219; *see also* JA221, JA234.

In that same vein, the 2025 Policy has interfered with Plaintiffs' membership practices by changing the way they recruit new members and communicate with existing ones. Where Quakers' religious practice is to remain open to all comers, *see* JA81, JA88, JA97, JA103-104, JA105, JA111, the 2025 Policy has forced them to be less encouraging of immigrants to associate with them than they would otherwise be, *see* JA66, JA74, JA90, JA105, JA113, JA253. The Policy has similarly diminished some Cooperative Baptists' willingness to encourage attendance, *see* JA209, JA235, or enthusiastically greet co-religionists, *see* JA222. And the Policy has forced some Quakers and Cooperative Baptists to confront the possibility of closing or locking their doors, traditionally left open in a symbolic message of welcome. *See* JA89-91, JA223-224, JA239.

Finally, the knowledge that the 2025 Policy would permit armed ICE agents to infiltrate Quaker and Sikh houses of worship, and thereby impede the maintenance of houses of worship as places of nonviolence, has likewise made membership less attractive. *See* JA301-302.

**b.** Instead of addressing this evidence, DHS tries to cabin the right to expressive association in three unavailing ways.

First, DHS cites *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012), for the proposition that "the right of expressive association to engage in religious activity is no broader than plaintiffs' rights to engage in similar activity under the Free Exercise Clause" and that Plaintiffs have failed to demonstrate that the 2025 Policy substantially burdens their free exercise of religion. DHS Br. 44. But *Hosanna-Tabor* held that the free-exercise and free-association rights are not coextensive and that the former right "gives special solicitude to the rights of religious organizations" with respect to selecting ministers. 565 U.S. at 189. The decision did not hold, as DHS asserts, that a religious organization cannot make out a free-association claim unless it also makes out a free-exercise one. In all events, as explained below (at 47-50), Plaintiffs have shown that the 2025 Policy substantially burdens their religious exercise.

Changing tack, DHS argues that the 2025 Policy does not interfere with the right of free association in a "direct and substantial" way because it does not impose a penalty on Plaintiffs, withhold benefits from them, require disclosure of their membership, or interfere with their internal organization or affairs. DHS Br. 44-45. But as DHS acknowledges, "direct" burdens are not the only ones that count: "the interference with associational rights must be 'direct and substantial' *or* 'significant.'" DHS Br. 43-44 (quoting

40

*Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996) (emphasis added)). That DHS arguably has "taken no direct action" to restrict Plaintiffs' rights "does not end the inquiry" because the abridgement of "indispensable liberties," "even though unintended, may inevitably follow from varied forms of governmental action." *NAACP*, 357 U.S. at 461. After all, "[w]hat the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly." *Rutan v. Repub. Party of Ill.*, 497 U.S. 62, 77-78 (1990).

DHS asserts that the 2025 Policy does not impose a "significant" burden either, because it is a "neutral and generally applicable government action" that is not "directed at" churches and does not "single out houses of worship for enhanced law enforcement activity." DHS Br. 45-47. But DHS cites no case limiting free-association challenges to neutral and generally applicable government action. *Cf. Boy Scouts*, 530 U.S. at 659 (holding that neutral and generally applicable state public-accommodations law violated group's expressive association rights). And in any event, DHS *did* target and single out houses of worship when it announced that its new policy meant "[c]riminals" would "no longer be able to hide in America's schools and churches to avoid arrest." JA173.

*Lyng v. International Union*, 485 U.S. 360 (1988) (cited at DHS Br. 48), is not to the contrary. There, the Court concluded that a statute withholding

food stamps during a strike did not prevent strikers from exercising their rights to free association "in any significant manner," *id.* at 366. What DHS omits is that the Court came to that conclusion because it was "exceedingly unlikely" that the food-stamp statute would "prevent individuals from continuing to associate together." *Id.* The district court came to the opposite conclusion here. JA299-303. On that score, DHS is silent.

Finally, DHS's argument that the government "simply could not operate" if a court concluded that "law enforcement activity prevent[ed] expressive association merely by discouraging attendance," DHS Br. 48 (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 452 (1988)), is wrong for two reasons. First, the preliminary injunction returned the enforcement parameters under which DHS has been operating for several decades, so there is little doubt that the government can operate under that regime. Second, the district court concluded, based on the unrebutted record, that DHS's new policy is a significant burden because it meaningfully reduces attendance among members of a community for whom attendance has expressive value. *See* JA299-303. So this simply is not a case in which the Court needs to address whether *any* amount of discouragement violates the right to associate.

42

### 2. *DHS cannot satisfy exacting scrutiny.*

The 2025 Policy cannot survive exacting scrutiny. For starters, DHS is barred from arguing that it can, having failed to so argue below. Even if it hadn't waived the argument, the compelling interest DHS claims in general immigration enforcement is not substantially related to an interest in unfettered enforcement at houses of worship. And the 2025 Policy cannot be narrowly tailored to any claimed enforcement interest at all, since that interest has been adequately served for decades without the need to sweep away the necessary protections for sensitive locations.

**a.** As a threshold matter, DHS has waived any argument here that the 2025 Policy met exacting scrutiny since it failed to raise that argument below. "Waiver is the intentional relinquishment or abandonment of a known right." *Wood v. Milyard*, 566 U.S. 463, 474 (2012) (cleaned up). "[A]bsent exceptional circumstances," *Richardson v. Clarke*, 52 F.4th 614, 625 (4th Cir. 2022), parties "may not raise arguments on appeal that were not first presented below to the district court." *Bell v. Brockett*, 922 F.3d 502, 513 (4th Cir. 2019). Exceptions to this rule "are made only in very limited circumstances," such as when failing to consider waived arguments "would be plain error or would result in a fundamental miscarriage of justice," *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993), or when an argument calls the Court's subject-matter jurisdiction into question. *See Jesus Christ Is the*

43

*Answer Ministries, Inc. v. Baltimore Cnty., Md.*, 915 F.3d 256, 260 n.2 (4th Cir. 2019).

DHS waived its heightened-scrutiny arguments by failing to raise them below. Plaintiffs' opening brief in support of a preliminary injunction argued that the Policy did not meet either strict or exacting scrutiny. *See* Pls.' PI Br. at 17-19, 23-25, Dkt. No. 26-1. In its response, DHS "offered no argument," JA305, and made no "attempt[ ] to satisfy," JA315, either heightened-scrutiny standard, so it knowingly relinquished these arguments. DHS has not made any effort to demonstrate that "exceptional circumstances," *Richardson*, 52 F.4th at 625, excuse its waiver. The district court's conclusions on these issues are not jurisdictional, were not plain error, and letting them stand would not result in a miscarriage of justice.

**b.** Nonetheless, the 2025 Policy cannot satisfy exacting scrutiny. Government infringement on expressive-association rights is permitted only where (1) there is a "substantial relation" between that infringement "and a sufficiently important governmental interest," *Ams. for Prosperity*, 594 U.S. at 607 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)), and (2) that infringement is "narrowly tailored to the interest it promotes," *id.* at 609-10. The 2025 Policy fails at both steps.

First, when it issued the 2025 Policy, DHS contended that it was designed to allow agents to arrest criminals—"including murder[er]s and

44

rapists"—hiding in schools and churches. JA173. But DHS has never pointed to a single criminal taking refuge in a house of worship. And in its appellate brief, DHS abandons that justification. Instead, DHS argues that its general interest in immigration enforcement is sufficiently important. *See* DHS Br. 49 (citing DHS Br. 40-43). For the first time, DHS points to executive orders and presidential proclamations regarding "[d]eadly narcotics and other illicit materials [flowing] across the border," DHS Br. 42 (internal quotation marks omitted) (quoting Exec. Order No. 14165, 90 Fed. Reg. 8467 (Jan. 20, 2025)), and the "influence" of "[f]oreign criminal gangs and cartels," *id.* (internal quotation marks omitted) (quoting Proclamation 10886, 90 Fed. Reg. 8327 (Jan. 20, 2025)). Even granting that enforcing immigration laws and pursuing criminals are sufficiently important government interests, DHS has not shown how a grant of uncabined discretion to enter houses of worship bears a substantial relationship to— or even furthers—those aims.

DHS also argues that Congress did not affirmatively exempt houses of worship from immigration enforcement. DHS Br. 41. But even if Congress's silence could be read as approval for immigration enforcement at houses of worship, that would not satisfy the required substantial relation to an important government interest. After all, Congress's determination would

45

itself be subject to the Constitution (and need to be reconciled with other congressional enactments, including RFRA).

Second, even assuming a substantial relation to a sufficiently important government interest, the 2025 Policy is not narrowly tailored. As the 2021 Policy explained, and as was DHS's policy for more than 30 years, DHS "can accomplish [its] enforcement mission without denying or limiting . . . people of faith access to their places of worship." JA149. So the district court did not abuse its discretion when it relied on DHS's own words to conclude that DHS has "less drastic means," *Shelton v. Tucker*, 364 U.S. 479, 488 (1960), of enforcing immigration laws.

DHS argues that its interest in immigration enforcement can no longer be accomplished through the 2021 Policy's less-drastic means. DHS Br. 42-43. Again, the agency had its chance to raise that argument—and produce relevant factual support—before the district court. It declined that opportunity. This Court should not accept at face value DHS's unsupported argument that the 2021 Policy was "unduly restrictive and far less timely and effective" compared to the 2025 Policy, *id.* at 43, especially considering that earlier in its brief, DHS argues that the 2025 Policy only "represents a modest change in DHS's internal guidance," *id.* at 20. Contradictions aside, DHS's objection boils down to an argument that the 2025 Policy provides greater "ease of administration," *Ams. for Prosperity*, 594 U.S. at 614. That

46

interest fails to justify an infringement on the right to association, since the "prime objective of the First Amendment is not efficiency." *Id.* at 614-15 (quoting *McCullen v. Coakley*, 573 U.S. 464, 495 (2014)). "Mere administrative convenience does not remotely reflect the seriousness of the actual burden," *id.* (cleaned up), that the 2025 Policy imposes on Plaintiffs' associational rights.

### C.   Plaintiffs are likely to succeed on their RFRA claim.

Under the Religious Freedom Restoration Act, the "Government may substantially burden a person's exercise of religion only if" the burden "is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1(b). DHS's new policy substantially burdens Plaintiffs' religious exercise by impairing communal worship, impeding Plaintiffs' ability to fulfill religious obligations of service, undermining the structures that sustain their faith communities, and allowing encroachment into sacred, nonviolent spaces. And DHS cannot show that its policy is the least restrictive means of fulfilling a compelling interest.

### 1.   *DHS's new policy substantially burdens Plaintiffs' religious exercise.*

**a.** Government action substantially burdens religious exercise if it considerably deters or diminishes religious exercise, even without prohibiting it. *See Sherbert v. Verner*, 374 U.S. 398, 405 (1963); *Bethel World*

*Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 553-54 (4th Cir. 2013). In *Bethel*, a church experienced a substantial burden under RLUIPA when zoning restrictions prevented it from expanding on its own property because the resulting delay, uncertainty, and expense forced the congregation to restrict important religious practices—even though those practices weren't prohibited. *Id.* at 555-57.[5] DHS's new policy restricts Plaintiffs' religious practices—even though it does not prohibit them—in two ways.

First, Plaintiffs reported fewer attendees to both worship and ministry as a result of DHS's 2025 Policy, JA220, JA202, JA232, JA239, which made congregants "too afraid to come," JA208; *see, e.g.*, JA223. And it was not only the specter of being investigated or detained that deterred (and harmed) congregants; the threat of armed agents in and near sacred, peaceful spaces likewise discouraged attendance. *See* JA90, JA202.

As the district court correctly concluded, reductions in attendance impair communal worship, which is fundamental for each Plaintiff. *See* JA312 (citing *Sabir v. Williams*, 52 F.4th 51 (2d Cir. 2022)). Quakers believe that every person is a source of the divine, so fewer attendees means fewer

---

[5] Because RLUIPA and RFRA both rely on whether Government action creates a substantial burden, courts apply the same standard under both. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006).

48

opportunities for Quakers to access God. JA58. Similarly, because the Sikh faith does not ordain clergy, each individual's participation is vital to the community's shared spiritual experience and its opportunity to learn from one another. JA201. For Baptists too, worshipping communally with other believers is central to the relationship with God. JA219, JA221, JA234.

Declines in attendance also inhibit Plaintiffs' ability to fulfill their religious obligation to serve others. Baptists view ministry to those in need as a core religious obligation—fulfilling Jesus' mission by being "the hands and feet of Christ" through ministry. JA230. Fewer attendees at ministries, including ESL classes, food pantries, and job-training programs, means that CBF members have fewer opportunities to live out their faith through service, an essential expression of their commitment as followers of Jesus. JA215. In one instance, after DHS's new policy was announced, attendance at an ESL class held in a CBF church decreased by 66%. JA220. In other communities too, attendance at ministry offerings declined significantly. JA220. Sikhs and Quakers are similarly burdened by reduced opportunities to serve others. Sikhs view service as a sacred religious duty and a central expression of devotion, JA201, and Quakers understand service to others as a direct manifestation of the Inner Light within each person, JA80.

Declines in attendance caused by the 2025 Policy reduce both financial support and volunteer capacity too. JA233, JA234. Plaintiffs' ability to

49

sustain their religious institutions and fulfill their ministries depends on active membership and community participation, which provide both the financial support and volunteer involvement necessary for their religious and service work. With fewer worshippers, there are fewer hands and fewer resources to sustain the work that keeps CBF communities, and their religious missions, alive. JA234. Likewise, both Sikh and Quaker communities depend on active member involvement to sustain their congregational life. JA71-72.

Second, and apart from reductions in attendance, the 2025 Policy substantially burdens religious exercise by allowing armed DHS agents to enter into Plaintiffs' sacred spaces of worship. JA311. As the district court concluded, the ability for armed law enforcement to enter houses of worship "without any specific limitations or safeguards other than 'common sense,'" would, at a minimum, "directly violate" the Quakers' pacifist beliefs. JA311. Likewise for Sikhs. JA202. And for CBF, under the 2025 Policy, "many worshippers" could not "attend services or ministry with a clear mind, ready to worship." JA223.

**b.** DHS glosses over (or ignores) the record and the district court's reasoning. Instead, DHS recasts its new policy as a purely internal matter, erroneously contends that a burden can be substantial only if it involves a

50

penalty or prohibition on the plaintiffs' conduct, and concocts an unrealistic parade of horribles.

**1.** DHS's primary argument is that the burdens to Plaintiffs' religious exercise are merely incidental, stemming from "the conduct of the Government's internal procedures." DHS Br. 34 (quoting *Bowen v. Roy*, 476 U.S. 693, 700 (1986)). That makes no sense. DHS's new policy changed how its agents interact with members of the public. For more than 30 years, agents were substantially restricted from immigration-enforcement actions at houses of worship. And DHS's own website used to explain the policy to the public and directed where to file complaints if DHS agents violated it. JA163. Now, agents can surveil, investigate, and raid houses of worship as long as they follow their "common sense." Categorizing that change merely as "conduct by government of its own affairs," *Lyng*, 485 U.S. at 451, stretches the word "internal" beyond its breaking point.

The cases on which DHS relies prove the point. In *Bowen,* a father argued that the issuance and internal-government use of a social-security number for his child was a substantial burden on his religious beliefs. *Bowen*, 476 U.S. at 697. That objection to the Government's internal use of a social-security number was akin to "a sincere religious objection to the size or color of the Government's filing cabinets." *Id.* at 700. Beyond *Bowen*, "internal" government affairs has applied to the government's use of its own

51

land. *See Lyng*, 485 U.S. at 458.[6] DHS does not point to a single case in which the way that Government agents were directed to engage *with the public* was treated as an internal matter.

**2.** DHS argues next that there is no substantial burden because its new policy "neither prohibits" worship nor "imposes any financial or other penalty" on plaintiffs. DHS Br. 36. But as just explained (at 47-48), a substantial burden can arise even absent a prohibition of or penalty on religious exercise. *See* Douglas Laycock & Oliver S. Thomas, *Interpreting the Religious Freedom Restoration Act*, 73 Tex. L. Rev. 209, 229-30 (1994) (government behavior need not "regulate or coerce" to impose a substantial burden); *Bethel*, 706 F.3d at 555 (noting that experiencing "substantial pressure" to modify or violate religious beliefs, without the force of penalty or legal compulsion, suffices as a substantial burden); *cf. Mahmoud v. Taylor*, 606 U.S. 522, 524, 563 (2025) (finding public-school curricula to impose a substantial burden, because religious exercise can be burdened by "more subtle forms of interference" than "compulsion or coercion").

---

[6] *See also Apache Stronghold v. United States*, 101 F.4th 1036, 1103 (9th Cir. 2024) (en banc) (per curiam), *cert. denied*, 145 S. Ct. 1480 (2025); *United States v. Hardman*, 297 F.3d 1116 (10th Cir. 2002); *Warner v. City of Boca Raton*, 420 F.3d 1308 (11th Cir. 2005); *Miccosukee Tribe of Indians v. United States*, 163 F.3d 1359 (11th Cir. 1998).

DHS's narrow interpretation of substantial burden has been squarely rejected by other circuits. A burden can be substantial "if it involves indirect coercion to betray one's religious beliefs." *Mack v. Warden Loretto FCI*, 839 F.3d 286, 304 (3d Cir. 2016); *see also Thai Meditation Ass'n of Ala. v. City of Mobile*, 980 F.3d 821, 831 (11th Cir. 2020). And just last year, the Ninth Circuit overruled a prior holding that only direct governmental prohibition or coercion could be a substantial burden. *See Apache Stronghold v. United States,* 101 F.4th 1036, 1043 (9th Cir. 2024) (en banc) (per curiam), *cert. denied*, 145 S. Ct. 1480 (2025). Using the natural meaning of "substantial," Chief Judge Murguia reasoned that RFRA must include indirect burdens and that the term substantial burden could not plausibly be "shackled" to the type of coercive choice DHS argues for here. *See id.* at 1138 (Murguia, C.J., dissenting). And noting that no other circuit had adopted the Ninth Circuit's earlier narrow interpretation, Judge Nelson explained that a substantial burden is a Government action that "requires the plaintiff to participate in an activity prohibited by a sincerely held religious belief . . . prevents the plaintiff from participating in an activity motivated by a sincerely held religious belief, or . . . places considerable pressure on the plaintiff to violate a sincerely held religious belief." *Id.* at 1091 (Nelson, J., concurring). DHS is wrong to ask this Court to reach a contrary conclusion.

Building on its error, DHS argues (at 37) that because no immigration enforcement activities occurred at Plaintiffs' houses of worship, there can be no substantial burden. That argument misconstrues Plaintiffs' claims, which arise from the effects of the change in DHS policy—not from individual enforcement actions. When DHS overturned thirty years of policy and authorized immigration enforcement at houses of worship, Plaintiffs immediately experienced diminished attendance at services and reduced participation in ministry work, which will lead to lower financial contributions to their religious activities, among other things. Those harms flowed directly from the policy change itself, not from isolated enforcement actions.

**3.** Finally, DHS contends that protecting Plaintiffs from the burden imposed on their religious exercise would "provide plaintiffs with a free-exercise veto over otherwise permissible law enforcement activity." DHS Br. 37. Not so.

A substantial burden is not merely *any* inconvenience or incidental effect on religion. The word "substantial" in RFRA indicates obstacles to religious exercise that are significant in degree—that is in amount or extent—rather than minor, incidental, or insubstantial effects. *See The New Shorter Oxford English Dictionary* (1993) (defining "substantial" as "of ample or considerable amount or size"). Thus, a substantial burden exists where

54

government action leads religious practitioners to modify their behavior in a way that considerably deters, diminishes, or meaningfully obstructs religious exercise, *Sherbert*, 374 U.S. at 405. On the other hand, if religious behavior remains unchanged, that can be an indicator that there is no substantial burden. *See Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 100-01 (4th Cir. 2013); *see also Real Alts., Inc. v. Sec'y of Health & Human Servs.*, 867 F.3d 338, 364 (3d Cir. 2017). Here, DHS's policy significantly impeded Plaintiffs' ability to engage in core religious exercise—including communal worship and ministry. So this Court can find that the district court did not abuse its discretion without weighing in on DHS's marginal hypotheticals.

### 2. *DHS cannot satisfy strict scrutiny.*

As already explained (at 43-44), DHS waived any argument that the 2025 policy satisfies heightened scrutiny because it opted not to make the argument in district court. Likewise, as explained above (at 44-47), the new policy cannot satisfy exacting scrutiny because it does not serve a substantial government interest and it is not narrowly tailored. Because it fails exacting scrutiny, it necessarily fails the more-demanding strict-scrutiny test. *Cf. Billups v. City of Charleston, S.C.*, 961 F.3d 673, 680 (4th Cir. 2020) ("Because the court concluded that the Ordinance cannot survive intermediate scrutiny, it was unnecessary to consider whether the Ordinance . . . would trigger strict scrutiny.").

## II. The remaining preliminary-injunction factors favor Plaintiffs.

### A.    DHS's new policy irreparably harms Plaintiffs.

Irreparable harm occurs "when the threatened injury impairs the court's ability to grant an effective remedy," *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 270 (4th Cir. 2018), *vacated on other grounds*, 585 U.S. 1028 (2018), especially when the harm suffered cannot be remedied by monetary damages, *see Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994). Because Plaintiffs are likely to succeed on the merits of their expressive-association and RFRA claims, they will be irreparably harmed absent an injunction.

"[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). So "a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of [the] plaintiff's First Amendment claim," *W. Va. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009).

So too under RFRA. Given that "Congress enacted RFRA in order to provide greater protection for religious exercise than is available under the First Amendment," *Holt v. Hobbs*, 574 U.S. 352, 357 (2015), "[c]ourts have persuasively found that irreparable harm accompanies a substantial burden on an individual's rights to the free exercise of religion under RFRA,"

56

*Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 609 (8th Cir. 2022) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996)). "Other circuits are in agreement that 'establishing a likely RFRA violation satisfies the irreparable harm factor,'" *Religious Sisters of Mercy*, 55 F.4th at 609 (quoting *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013)). This Court should not become an outlier on this point.

DHS does not argue that First Amendment and RFRA harms are not irreparable. Instead, DHS rehashes its standing and merits arguments— contending yet again that any reductions in attendance are not traceable to DHS's new policy and do not substantially burden Plaintiffs' ability to gather for religious exercise. But as already explained (at 47-55), that's wrong. So even by DHS's logic, if Plaintiffs have standing and have shown they are likely to succeed on the merits of their First Amendment and RFRA claims (which they have), they are irreparably harmed.

## B. The balance of the equities and public interest support Plaintiffs.

When the government defends a lawsuit, determination of the public interest and balance of the equities merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The public has a substantial interest in "seeing its governmental institutions follow the law." *Roe*, 947 F.3d at 230-31. That is especially true when an injunction protects core constitutional rights. *See Centro Tepeyac*,

722 F.3d at 191. "If anything, the system is improved by such an injunction." *Id.* The district court was correct—and certainly did not abuse its discretion—in concluding that these factors favor an injunction here.

Without an injunction, Plaintiffs will once again face irreparable harms to their core First Amendment and RFRA rights. On the other side of the scale, agencies like DHS do not suffer harm from "an injunction that merely ends an unlawful practice." *Open Cmtys. All. v. Carson*, 286 F.Supp.3d 148, 179 (D.D.C. 2017) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). That is even truer here because the district court's injunction merely reinstated a policy that was in place for more than 30 years, one that DHS has said allows it to "accomplish [its] enforcement mission without denying . . . people of faith access to their places of worship." JA149.

DHS insists that there is nothing on Plaintiffs' side of the scale by rehashing its incorrect arguments about standing and the merits of Plaintiffs' claims. DHS Br. 51. DHS then insists that the scales tip in its favor because Congress has given DHS broad immigration-enforcement authority and an injunction interferes with DHS's internal workings. *Id.* at 51-52. Yet DHS earlier concedes that the district court's injunction is "consistent" with the limits Congress put on judicial review of immigration-enforcement actions. *Id.* at 10. So all that is left for DHS is the alleged injury of "being prevented from enacting its preferred policy." *See New York v.*

58

*DHS*, 969 F.3d 42, 87 (2d Cir. 2020). But that "is, to some extent, inevitable in the preliminary injunction context." *See id.* And it is not enough to outweigh the public interest and equities served by enjoining DHS's unlawful policy.

## CONCLUSION

The order of the district court should be affirmed.

Respectfully submitted,

/s/ *Bradley Girard*

Bradley Girard
Sarah Goetz
J. Sterling Moore
Andrew Bookbinder
Ayesha Khan
Democracy Forward Foundation
P.O. Box 34556
Washington, D.C. 20043
(202) 448-9090

*Counsel for Appellees*

December 29, 2025

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 12,810 words including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word 365, set in Century Schoolbook font in a size measuring 14 points or larger.

*/s/ Bradley Girard*

## CERTIFICATE OF SERVICE

I certify that on December 29, 2025 this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.


_/s/ Bradley Girard_