NO. 25-1512

_____

In the United States Court of Appeals for the Fourth Circuit

_____

PHILADELPHIA YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS, *et al.*

*Plaintiffs-Appellees,*

*v.*

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*

*Defendants-Appellants.*

_____

On Appeal from the United States District Court for the District of Maryland

No. 8:25-cv-00243-TDC

_____

BRIEF OF FAIR AND JUST PROSECUTION AND THE LAW ENFORCEMENT ACTION PARTNERSHIP AS AMICI CURIAE IN SUPPORT OF APPELLEES

_____

Miriam Airington-Fisher, VSB#78260
Jennifer Quezada, VSB#93716
Airington Law, PLLC
4050 Innslake Drive
Suite 190
Glen Allen, VA 23060
Telephone: (804)774-7117
Facsimile: (804) 597-5424
mairington@airingtonlaw.com
jquezada@airingtonlaw.com

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………...…iii

CORPORATE DISCLOSURE STATEMENT……………………..……1

RULE 29(A)(4) STATEMENT………………………………………..…..1

INTEREST OF *AMICI CURIAE*………...…………………………...……1

INTRODUCTION AND SUMMARY OF ARGUMENT……………….…3

ARGUMENT…………………………………………………..………..6

I.  IMMIGRATION ENFORCEMENT AT OR NEAR HOUSES OF WORSHIP AND OTHER SENSITIVE AREAS ERODES THE TRUST BETWEEN LAW ENFORCEMENT AND THEIR COMMUNITIES THAT IS ESSENTIAL TO PUBLIC SAFETY.……………………………6

   A.  Community Trust Is Essential to Law Enforcement Effectiveness and Legitimacy, and Prosecutors Must Build Trust with Immigrant Communities..……………………..……………………………6

   B.  The Pervasive Threat of Deportation Shatters this Fragile Trust and Sends Entire Communities into the Shadows, Thwarting Effective Law Enforcement………………………….……………10

   C.  Allowing Immigration Enforcement at or near Houses of Worship and Other Sensitive Areas Is a Unique Threat to Community Trust and Exacerbates the Public Safety Threat Posed by Increased Immigration Enforcement……………………………16

       1.  DHS's Aggressive Enforcement Actions are Creating an Atmosphere of Fear and Distrust Between Law Enforcement and Immigrant and Latino Communities….17

i

**2.    Expanding DHS's Enforcement to Areas at or near Houses of Worship and Other Sensitive Locations is Particularly Harmful………………………………………………20**

**II.    IMMIGRATION ENFORCEMENT AT OR NEAR HOUSES OF WORSHIP THREATENS PUBLIC SAFETY BY WEAKENING CIVIC INSTITUTIONS THAT PROMOTE STABLE AND HEALTHY COMMUNITIES………………………………………..……..24**

**CONCLUSION…………………………………………………29**

**CERTIFICATE OF COMPLIANCE…………………………………30**

**CERTIFICATE OF SERVICE……………………………………31**

**DISCLOSURE STATEMENT**

# TABLE OF AUTHORITIES

**Cases**

*City of Philadelphia v. Sessions*
    309 F. Supp. 3d 289 (E.D. Pa. 2018)…………………………………..…14

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021)………………………..……………………..…..25

*Noem v. Perdomo*,
    No. 25A169 (U.S. Sep. 8, 2025)…………………………………..…17

*Perdomo v. Noem*,
    No. 25-4312, 2025 U.S. App. LEXIS 19503, (9th Cir. Aug. 1, 2025)……………………………………….……………………………17, 20

*Obergefell v. Hodges*,
    576 U.S. 644 (2015)…………………………………………………22

*United States v. California*,
    314 F. Supp. 3d 1077(E.D. Cal. 2018)…………………………………..27

*United Farm Workers v. Noem*,
    No. 1:25-cv-00246 (E.D. Ca. Apr. 29, 2025)…………………….…..18

*Williams-Yulee v. Fla. Bar*,
    575 U.S. 433 (2015)……………………..…………………………6

**Other Authorities**

Anita Khashu, *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties* 25 (2009)………………15

*Acting Brooklyn District Attorney Eric Gonzalez Announces New Policy Regarding Handling of Cases against Non-Citizen Defendants*, Brooklyn Dist. Att'y's Off. (Apr. 24, 2017)…………………………………10

Aleja Hertzler-McCain, *Diocese of San Bernardino Issues Dispensation Saying Catholics Who Fear ICE Don't Have to Attend Mass*, NPR………………………………………………...……….……….22

Andrea Castillo & Queenie Wong, *L.A. Immigration Raids Force the Undocumented to Trade Their Freedom for Safety*, Los Angeles Times (June 26, 2025)……………….………………………….….…………26

Angelica S. Reina et al., *"He Said They'd Deport Me": Factors Influencing Domestic Violence Help-Seeking Practices Among Latina Immigrants*, 29 J. Interpersonal Violence 593, 601 (2013)………………………….……15

Bill Chappell, *Churches Have a Long History of Being Safe Havens—For Immigrants and Others*, NPR (Jan. 26, 2025)...........................................23

Boulder Cnty. Dist. Att'y's Off., *District Attorney Policy Regarding Immigration Collateral Consequences,* Boulder Cnty..............................10

Br. of 17 States and D.C. as Amici Curiae, Perdomo v. Noem, No. 2:25-cv-0560548 (Doc. 49-1)……………………………………..……………20

Cecilia Menjívar & Cynthia L. Bejarano, *Latino Immigrants' Perceptions of Crime and Police Authorities in the United States: A Case Study from the Phoenix Metropolitan Area*, 27 Ethnic and Racial Stud. 120, 129-30, 140-42 (2004)………………………………………………..………….11

Claire Moses & Orlando Mayorquin, *L.A.-Area Bishop Excuses Faithful From Mass Over Fear of Immigration Raids*, N.Y. Times (July 10, 2025)………………………………………………….………..27

David J. Bier, *One in Five ICE Arrests Are Latinos on the Streets with No Criminal Past or Removal Order*, CATO Institute (Aug. 5, 2025)………….……………………………………………...……….18

David S. Kirk et al., *The Paradox of Law Enforcement in Immigrant Communities: Does Tough Immigration Enforcement Undermine Public Safety?*, 641 Annals Am. Acad. Pol. & Soc. Sci. 79, 82, 91 (2012)………………………………………………........….…8, 12, 16

*District Attorney Nathan J. Hochman Statement on Recent Immigrant Enforcement Actions*, Los Angeles Cnty. Dist. Att'y's Off. (June 6, 2025)………………………………………………...…………….20

Elizabeth Fussell, *The Deportation Threat Dynamic and Victimization of Latino Migrants: Wage Theft and Robbery*, 52 Soc. Q. 593, 604-05 (2011)……………………………………………………….…15, 16

*Ensuring Victims and Witnesses Feel Safe Coming Forward and Cooperating with the Justice System Ultimately Makes Our Communities Safer*, Phila. Dist. Att'y's Off.…………………………………………………….10

Fair and Just Prosecution, *U-Visa Best Practices for Prosecutors* 5-6 (2023)……………………………….………………………………………9

Hannah Rappleye et al., *Immigration Crackdown Makes Women Afraid to Testify Against Abusers, Experts Warn*, NBC News (Sept. 22, 2018)……………………………………………………………13

*Hennepin County Attorney Mary Moriarty Statement on Law Enforcement Action in Minneapolis*, Hennepin Cnty. Att'y's Off. (June 4, 2025)……………………………………………………….20

Human Rights Watch, *Immigrant Crime Fighters: How the U Visa Program Makes US Communities Safer* 14-15 (2018)..............................................9

Jacob Bucher et al., *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159, 164, 166 tbl.2 (2010)………………………………………………….…15

Jennifer Medina, *'I'm an American, Bro!': Latinos Report Raids in Which U.S. Citizenship Is Questioned*, N.Y. Times (June 15, 2025)……………………………………………………..19

Jennifer S. Vey & Hanna Love, *Transformative Placemaking: A Framework To Create Connected, Vibrant, and Inclusive Communities,* Brookings (Nov. 19, 2019)………………………………………………....24

Jessica M. Doucet & Matthew R. Lee, *Civic Communities and Urban Violence*, 52 Soc. Sci. Rsch. 303 (2015)…………………………………25

Jesus Jiménez & Emily Baumgaertner Nunn, *Church Leaders Shaken After a Man Was Detained in Their Parking Lot*, N.Y. Times (June 11, 2005)……………………………………………………..17

Jesus Jiménez, et al., *'Completely Disrupted': Fear Upends Life for Latinos in L.A.*, N.Y. Times (June 30, 2025)………………………………….……..19

Jill Blair & Malka Kopell, *21st Century Civil Infrastructure: Under Construction*, Aspen Institute (2015)……………………………………24

Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328, 334 (2015)…………………………..………………………………14, 15

Letter from Law Enforcement Immigration Task Force to Hon. Trey Gowdy & Hon. Zoe Lofgren (July 20, 2015)………………………………………27

Luis Noe-Bustamante, *Latinos Worry More Than Other U.S. Adults About Deportations*, Pew Rsch. Ctr. (Apr. 30, 2025)..........................................12

Margaret Kadifa, *ICE Arrests All Adults Without Children at S.F. Immigration Court Today*, Mission Local (July 25, 2025)……………….…..……..17

Min Xie & Eric P. Baumer, *Neighborhood Immigrant Concentration and Violent Crime Reporting to the Police: A Multilevel Analysis of Data from the National Crime Victimization Survey*, 57 Criminology 237, 254 (2019)……………………………………………………..…12, 13

Nat'l Immigrant Women's Advoc. Project, *Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey* 100-01 (2018)…………………………………………..…….14

Nathan Layne, *Immigrant Faithful Turn to Virtual Sermons and Home Communion Amid Trump Crackdown*, Reuters (Sept. 7, 2025).............26

Nicole Foy, *We Found More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged, and Detained for Days*, ProPublica (Oct. 16, 2025)………………………….…………19

Nik Theodore et al., *La Esquina (The Corner): Day Laborers on the Margins of New York's Formal Economy*, 9 Working USA: J. of Lab. & Soc'y 407, 417 & tbl. 8 (2006)………………………………………………16

Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 5-6 (2013)……………………13

Off. of Cmty. Oriented Policing Servs., U.S. Dep't of Just., *Enhancing Community Policing with Immigrant Populations: Recommendations from a Roundtable Meeting of Immigrant Advocates and Law Enforcement Leaders* 16 (2010)……………………………………….……………………15

Phila. Dist. Att'y's Off., *Philadelphia DAO Policy on Avoiding Unjust Immigration Outcomes* 1 (Nov. 27, 2018)……………...……………………9, 10

Philip Jankowski, *Travis DA: Witness' Deportation Fears Stall Domestic Violence Case*, Austin American-Statesman (Mar. 7, 2017)......................13

*Press Briefing by Press Secretary Karoline Leavitt*, White House (Jan. 29, 2025)……………………………………………………….……………………4

Robert C. Davis et al., *Access to Justice for Immigrants Who Are Victimized: The Perspectives of Police and Prosecutors*, 1 Crim. Just. Pol'y Rev. 183, 185, 189-191 (2001)……………………………………………….………11

S. Poverty L. Ctr., *Under Siege: Life for Low Income Latinos in the South* 6 (2009)……………………………………………….……………………16

Sergio Olmos & Wendy Fry, *Judge Restricts Border Patrol in California: 'You Just Can't Walk Up To People With Brown Skin"*, Cal Matters (Apr. 29, 2025)………………………………………………………………………18

Sonja Sharp, *Chokeholds, Bikers and 'Roving Patrols': Are Trump's ICE Tactics Legal?*, Los Angeles Times (July 28, 2025)………….……..17

*Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole*, Dept. of Homeland Sec. (Jan. 21, 2025)……………………………………......…..4

The Associated Press, *Immigration Crackdown Stokes Fear and Solidarity at a Catholic Church in D.C.*, NBC News (Oct. 28, 2025)............................26

Tom R. Tyler & Jeffrey Fagan, *Legitimacy and Cooperation: Why Do People Help the Police Fight Crime in Their Communities?*, 6 Ohio St. J. Crim. L. 231, 263 (2008)……………………….……………………………..……..7

## CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* Fair and Just Prosecution (FJP) is a project of the Tides Center, a nonprofit 501(c)(3) organization. The Tides Center has no parent company and does not issue stock. The Law Enforcement Action Partnership (LEAP) is a 501(c)(3) nonprofit organization. It has no parent company and does not issue stock.

## RULE 29(A)(4) STATEMENT

All of the parties in this case have communicated to *amici curiae* in writing that they consent to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person or entity, other than *amici curiae*, their members, or their counsel, have contributed money that was intended to  fund preparing or submitting this brief.

## INTEREST OF *AMICI CURIAE*

Fair and Just Prosecution (FJP), a project of the Tides Center, is a national organization that brings together elected prosecutors from around the country as part of a nonpartisan network of leaders committed to a justice system grounded in fairness, equity, compassion, and fiscal responsibility. The leaders that FJP works with hail from over 60 jurisdictions—urban, suburban, and rural alike—and they collectively represent nearly 20% of our nation's population. Among its work, FJP develops and helps to implement policies that serve the two primary interests the prosecutors in our network are obligated to pursue: justice and public safety.

The Law Enforcement Action Partnership (LEAP) is a nonprofit organization whose members include police, prosecutors, judges, corrections officials, and other law enforcement officials advocating for criminal justice and drug policy reforms that will make our communities safer and more just. LEAP's speaker's bureau numbers more than 275 criminal justice professionals advising on police community relations, incarceration, harm reduction, drug policy, and global issues. Through speaking engagements, media appearances, testimony, and support of allied efforts, LEAP calls for more practical and ethical policies from a public safety perspective.

Many of the communities that FJP's network represents and LEAP's speakers hail from have large immigrant populations, with or without legal status. FJP and LEAP work with prosecutors and other law enforcement officials who serve communities in states and jurisdictions that have taken different approaches to immigration enforcement and have themselves implemented varying policies related to immigration, but are united behind the core principle that immigration enforcement must align with community safety and cannot impede it. To this end, FJP and LEAP are committed to ensuring that all members of the community feel protected, while building and maintaining a cooperative relationship between immigrant communities and local law enforcement based on trust and respect.

FJP and LEAP write to explain the public safety interests at stake here. Beyond the Appellees' injuries, the government's elimination of restrictions on

civil immigration enforcement in sensitive locations like churches, schools, and hospitals destroys the community trust and civic institutions that are essential for public safety. Appellants minimize the harms created by their policy and further argue that no harm can be traced to this policy so long as it is accompanied by other actions that also create fear within immigrant communities. Appellants' argument gives short shrift to the special role played by the civic institutions that are no longer shielded by the sensitive locations policy.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For over 30 years, the federal government imposed stringent limits on civil immigration enforcement in or near "protected" or "sensitive" locations. These places—including houses of worship, as well as schools, hospitals, and emergency relief providers—provide such essential services that overall community health and safety suffer if they cannot function or if people cannot safely access them. In these spaces, the government authorized enforcement actions only as a last resort, such as when there was "a national security threat" or "an imminent risk of death, violence, or physical harm to a person."[1]

But in an abrupt and dramatic policy change, in January, the government dispensed with those restrictions and granted discretion to individual Immigration and Customs Enforcement (ICE) and Border Patrol agents to seize people and conduct other enforcement actions in what had been protected areas. This was not a

---

[1] JA147 (Mayorkas Guidelines).

3

quiet policy change, but one that came with overt threats and bellicose rhetoric: "[c]riminals will no longer be able to hide in America's schools and churches to avoid arrest," the Department of Homeland Security (DHS) announced.[2] And the White House Press Secretary declared, on behalf the administration, that anyone who enters the U.S. without authorization is, "by definition, a criminal."[3]

Appellees have suffered and would continue to suffer concrete injuries traceable to the dissolution of protections for houses of worship in the absence of a preliminary injunction. FJP and LEAP ask this Court to consider the issue from another perspective: public safety. Law enforcement's main priority is the safety of their local communities. FJP and LEAP are committed to effective law enforcement and public safety strategies that reduce harm and serious crime.

In Amici's view, the challenged DHS enforcement policy presents a grave threat to public safety and crime reduction. The threat to public safety and crime reduction is two-fold. First, allowing immigration enforcement at or near places of worship—which have for centuries been understood as sacred places of sanctuary —is a profound betrayal that will shatter the hard-fought trust between law enforcement and immigrant communities. This trust is essential for public safety,

---

[2] *Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole*, Dept. of Homeland Sec. (Jan. 21, 2025), https://tinyurl.com/y75jyv8v.

[3] *Press Briefing by Press Secretary Karoline Leavitt*, White House (Jan. 29, 2025), https://tinyurl.com/2t3wd2sm.

as without it, law enforcement loses legitimacy and people will fear police and prosecutors rather than work with them to report, investigate, and prosecute crimes. As people retreat into the shadows, this breakdown will leave already vulnerable immigrant populations even more susceptible to victimization and reluctant to report crime and participate in the legal system.

Second, in abolishing protected areas, the new DHS enforcement policy will weaken core civic institutions that together promote stable and healthy communities and lower crime rates. The essential services that these once-protected institutions provide—including healthcare, education, spiritual guidance, and other social services—form the foundation of public safety and are all associated with crime reduction. Indeed, churches, synagogues, and other houses of worship often provide social welfare services such as support groups, meals, childcare, classes (e.g., ESL, drivers' education), and even shelter. When these services are compromised, people suffer, communities fray, and the resulting instability makes crime more likely and law enforcement's job to combat it more difficult.

When considering the issues on appeal, this Court should recognize the extraordinary threat to public safety and effective law enforcement that DHS's policy to abolish protected places represents.

## ARGUMENT

**I. IMMIGRATION ENFORCEMENT AT OR NEAR HOUSES OF WORSHIP AND OTHER SENSITIVE AREAS ERODES THE TRUST BETWEEN LAW ENFORCEMENT AND THEIR COMMUNITIES THAT IS ESSENTIAL TO PUBLIC SAFETY.**

As prosecutors and other law enforcement actors know, building trust within the communities they serve is essential to public safety because it builds systemic legitimacy and ensures that members of the community will feel confident and safe reporting crimes to law enforcement. Aggressive immigration enforcement undermines the careful efforts that prosecutors and law enforcement have made to build trust within these communities. DHS's policy rescinding protections against enforcement actions in and around houses of worship represents a unique and specific threat that will severely alienate immigrant communities and push them further away from prosecutors and other law enforcement actors and into the shadows, jeopardizing the safety of us all.

### A. Community Trust Is Essential to Law Enforcement Effectiveness and Legitimacy, and Prosecutors Must Build Trust with Immigrant Communities.

Our legal system "depends in large measure on the public's willingness to respect and follow its decisions." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 445-46 (2015). In particular, prosecutors' and law enforcement's work to solve and prosecute crimes is acutely dependent on community members' confidence in the system. The willingness of victims and witnesses to report crimes to law

enforcement, cooperate with prosecutors, show up for court proceedings, and testify truthfully depends on their trust in the system and their belief that it is fair. Indeed, research supports that when people have trust in legal authorities and view the police, the courts, and the law as legitimate, they are more likely to report crimes, cooperate as witnesses, and accept police and judicial system authority.[4] Conversely, when people perceive law enforcement as biased or as a threat to, rather than a protector of, their community, they are more likely to distrust and therefore avoid the legal system (and other government institutions) as a whole—severely undermining the ability of police and prosecutors to work effectively.[5]

This trust in law enforcement is both especially vital and fragile in communities of marginalized people, including immigrant communities. It matters little that ICE is distinct from local law enforcement. Even where local law enforcement is not involved in immigration enforcement, one cannot assume that immigrant communities know or recognize the distinction between local law enforcement officers and ICE agents, especially because many ICE agents hide their identities. As more fully described below, aggressive immigration enforcement will inevitably reduce immigrants' willingness to report crimes and

---

[4] *See* Tom R. Tyler & Jeffrey Fagan, *Legitimacy and Cooperation: Why Do People Help the Police Fight Crime in Their Communities?*, 6 Ohio St. J. Crim. L. 231, 263 (2008); Tom R. Tyler & Jonathan Jackson, *Popular Legitimacy and the Exercise of Legal Authority: Motivating Compliance, Cooperation and Engagement*, 20 Psych., Pub. Pol'y & L. 78, 78-79 (2014).

[5] *See* Tyler & Fagan, *supra* note 4; Tyler & Jackson, *supra* note 4.

cooperate with law enforcement investigations, thereby undermining the ability of police and prosecutors to combat crime;[6] expanding aggressive immigration enforcement into the community's most protected and important public spaces is especially destructive to this trust and supercharges this effect.

In recognition of the link between community trust and public safety, prosecutors and law enforcement have taken proactive steps to obtain the trust of immigrant communities, protect immigrant crime victims, and encourage witness cooperation in immigrant communities. For example, prosecutors have regularly served as the local official empowered to certify U-Visas. Created by Congress in 2000 as part of the Violence Against Women Act, U-Visas grant temporary legal status to qualifying survivors of crime who can be helpful to law enforcement.[7] U-Visas can strengthen fraught relationships between law enforcement and immigrant communities and increase the likelihood that immigrants will report crime because they help ensure that undocumented community members feel protected by the law. They also work as a deterrent to those who might prey on vulnerable communities by sending a message that victims will have recourse in a legal

---

[6] *See* David S. Kirk et al., *The Paradox of Law Enforcement in Immigrant Communities: Does Tough Immigration Enforcement Undermine Public Safety?*, 641 Annals Am. Acad. Pol. & Soc. Sci. 79, 82, 91 (2012).

[7] *See Victims of Criminal Activity: U Nonimmigrant Status*, USCIS (May 16, 2025), https://tinyurl.com/4m75wsau.

system that will protect them.[8] Law enforcement officials report that the U-Visa program has "immediate practical benefits of ensuring that victims are able to assist with investigations," and long term benefits, like building confidence among immigrant communities to trust that "going to law enforcement will help rather than hurt them."[9]

Prosecutors around the country have also attempted to bolster community trust by implementing policies designed specifically to protect immigrant crime victims and provide equal justice to all people involved in the criminal legal system—whether victim, witness, defendant, or a combination thereof—regardless of immigration status. For example, the Philadelphia District Attorney explicitly seeks "immigration neutrality" whenever possible by minimizing collateral immigration consequences (including deportation) that would amount to excessive punishment and create cascading harm to a defendant's family, friends, and community.[10] As the policy explains, "[d]eportation following a criminal conviction has significant and often devastating impacts on the emotional and financial well-being of innocent community members, including victims of crimes. Such impacts can include separation of families; significantly increased risks of

---

[8] *See* Fair and Just Prosecution, *U-Visa Best Practices for Prosecutors* 5-6 (2023), https://tinyurl.com/2uaaxmz6.

[9] Human Rights Watch, *Immigrant Crime Fighters: How the U Visa Program Makes US Communities Safer* 14-15 (2018), https://tinyurl.com/yc6t4m8d.

[10] Phila. Dist. Att'y's Off., *Philadelphia DAO Policy on Avoiding Unjust Immigration Outcomes* 1 (Nov. 27, 2018), https://tinyurl.com/4mz2a6cc.

involvement of children in criminal behavior; victims left without marital or child support; and families facing economic crises" including "food instability, loss of housing, and greater reliance on government assistance programs[]."[11] The elected prosecutors in Brooklyn and[12] Boulder[13] have expressed similar concerns and have consequently enacted similar policies.

The overarching goal of these policies "is to create better relationships between law enforcement agencies and immigrant communities by encouraging victims and witnesses of crime to speak out, no matter their legal status."[14] Because when that happens, law enforcement is more effective and communities are safer.

**B. The Pervasive Threat of Deportation Shatters this Fragile Trust and Sends Entire Communities into the Shadows, Thwarting Effective Law Enforcement.**

When community members live in constant fear that law enforcement is targeting them wherever they go—including at or near houses of worship—and interactions with law enforcement will result in arrest and deportation, there is a

---

[11] *Id.*

[12] *Acting Brooklyn District Attorney Eric Gonzalez Announces New Policy Regarding Handling of Cases against Non-Citizen Defendants*, Brooklyn Dist. Att'y's Off. (Apr. 24, 2017), https://tinyurl.com/mvt35euk.

[13] Boulder Cnty. Dist. Att'y's Off., *District Attorney Policy Regarding Immigration Collateral Consequences,* Boulder Cnty., https://tinyurl.com/4exs4hak.

[14] *Ensuring Victims and Witnesses Feel Safe Coming Forward and Cooperating with the Justice System Ultimately Makes Our Communities Safer*, Phila. Dist. Att'y's Off., https://tinyurl.com/3nrkkpjd.

fundamental breakdown in trust that threatens public safety and impedes justice system leaders from doing their jobs. Extensive evidence shows that, in such circumstances, undocumented immigrants—and their lawfully present families and neighbors—fear that turning to the police and cooperating with prosecutors could bring adverse immigration consequences. This dynamic poses a major challenge to both the investigation and prosecution of individual crimes as well as the proper allocation of public safety resources.

Given that many immigrants had hostile experiences with the legal system in their home countries, they are already prone to distrust authorities in the U.S.[15] This can be exacerbated by other hurdles such as language barriers and unfamiliarity with the American legal system.[16] In addition, they often face heightened police scrutiny, whether because of racial profiling or because of increasingly aggressive federal immigration enforcement that can sometimes include local authorities. Research and experience show that "the development of trusting relationships between citizens and the police is often challenged by the

---

[15] Cecilia Menjívar & Cynthia L. Bejarano, *Latino Immigrants' Perceptions of Crime and Police Authorities in the United States: A Case Study from the Phoenix Metropolitan Area*, 27 Ethnic and Racial Stud. 120, 129-30, 140-42 (2004); Robert C. Davis et al., *Access to Justice for Immigrants Who Are Victimized: The Perspectives of Police and Prosecutors*, 1 Crim. Just. Pol'y Rev. 183, 185, 189-191 (2001).

[16] Menjívar & Bejarano, *supra* note 15, at 126.

presence and application of local and federal immigration enforcement programs."[17]

The fear of arrest and deportation that immigrant and Hispanic communities live under predictably hinders cooperation and communication with police and prosecutors. According to a recent Pew survey, 51% of Latino immigrants and 42% of all Latino adults in the U.S. worry about forced removal of themselves, family members, or close friends.[18] Immigrants often assume that interaction with law enforcement officials could have adverse consequences for themselves or a loved one.[19] As a consequence, people in communities of recent immigrants are less likely to report violent crime: in neighborhoods where 65% of residents are immigrants, there is only a 5% chance that a victim will report a violent crime, compared with a 48% chance in a neighborhood where only 10% of residents are born outside the U.S., according to one study.[20] Another survey of Latinos in four major cities found that 70% of undocumented immigrants and 44% of all Latinos would be less likely to contact law enforcement authorities if they were victims of a crime for fear that the police would ask about their immigration status or the

---

[17] Min Xie & Eric P. Baumer, *Neighborhood Immigrant Concentration and Violent Crime Reporting to the Police: A Multilevel Analysis of Data from the National Crime Victimization Survey*, 57 Criminology 237, 254 (2019).

[18] Luis Noe-Bustamante, *Latinos Worry More Than Other U.S. Adults About Deportations*, Pew Rsch. Ctr. (Apr. 30, 2025), https://tinyurl.com/ynevhsyc.

[19] Kirk et al., *supra* note 6, at 79-80.

[20] Xie & Baumer, *supra* note 17, at 249.

immigration status of people they know, and 67% of undocumented immigrants and 45% of all Latinos would be less likely to voluntarily offer information about, or report, crimes because of the same fear.[21] These fears are illustrated in tragic statistics showing a significant drop in sexual assault reporting at times of increased immigration enforcement and confirmed by prosecutors' testimony.[22] In one recent tragic incident, a victim delayed reporting a sexual assault out of fear of being deported; the man who assaulted her had impersonated a police officer and threatened to turn her over to immigration enforcement.[23] Thus, as researchers conclude, "the presence and application of local and federal immigration enforcement programs" can impede or demolish trust of law enforcement, and thus "may dissuade residents from calling on the police to help address crime problems."[24]

Law enforcement is keenly aware of this. In a national survey, one-fifth of police officers reported that increased immigration enforcement made immigrants

---

[21] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 5-6 (2013), https://tinyurl.com/vudutpr9.

[22] Philip Jankowski, *Travis DA: Witness' Deportation Fears Stall Domestic Violence Case*, Austin American-Statesman (Mar. 7, 2017), https://tinyurl.com/ym9hjzrk; Hannah Rappleye et al., *Immigration Crackdown Makes Women Afraid to Testify Against Abusers, Experts Warn*, NBC News (Sept. 22, 2018), https://tinyurl.com/9n5b7s3v.

[23] Zak Sos, *Santa Rosa man accused of impersonating officer, threatening to call ICE and sexually assaulting woman*, KTVU Fox 2 (Aug. 2025), https://tinyurl.com/35m62a3e.

[24] Xie & Baumer, *supra* note 17, at 254.

13

less willing to make police reports, less likely to help police when they arrived at the scene of the crime, less likely to assist with subsequent investigations, and less willing to work with prosecutors.[25] In another survey of law enforcement agencies, 71% of respondents believed that when immigrant victims do not cooperate with law enforcement, it adversely affects the ability to hold violent perpetrators accountable; 64% of respondents found that it affects officer safety; and 69% reported that it affects community safety.[26]

The fear of immigration enforcement and the resulting damage to cooperation with law enforcement affect not just undocumented community members but also individuals with citizenship or lawful status, particularly in "mixed-status" households.[27] People would simply not want law enforcement lurking near their family, close to a mother, a father, or a grandparent who could be at risk of deportation, and potentially questioning their status.

---

[25] Nat'l Immigrant Women's Advoc. Project, *Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey* 100-01 (2018), https://perma.cc/52MV-X8TG; *see also City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 341 (E.D. Pa. 2018) (noting police commissioner's "testimony that the City's ability to fight crime is impaired when victims and witnesses are afraid to report crimes for fear of immigration consequences").

[26] Nat'l Immigrant Women's Advoc. Project, *supra* note 25, at 54, 103.

[27] *See*, *e.g.*, Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328, 334 (2015) (study indicating "that for each 1-point increase in fear of deportation, Latina participants were 15% less willing to report being victim of a violent crime to police").

14

The public safety implications of this breakdown are dire. Undocumented people are already susceptible to victimization, and since people who prey on the most vulnerable know that immigrant communities are reluctant to report crimes, these communities face a range of criminal conduct.[28] For example, in one study, nearly two-thirds of undocumented migrant workers reported being the victim of at least one crime, with the most common being theft and robbery.[29] Undocumented immigrants are especially vulnerable to robbery and theft because they typically lack a bank account and carry cash.[30] Similarly, undocumented immigrants are also vulnerable to domestic violence, with abusive partners exploiting the threat of removal and financial dependence to maintain power and control.[31] In the workplace, between 40-80% of mostly undocumented immigrants reported being

---

[28] *See, e.g.*, Off. of Cmty. Oriented Policing Servs., U.S. Dep't of Just., *Enhancing Community Policing with Immigrant Populations: Recommendations from a Roundtable Meeting of Immigrant Advocates and Law Enforcement Leaders* 16 (2010), https://tinyurl.com/dfcnrtxe.

[29] Jacob Bucher et al., *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159, 164, 166 tbl.2 (2010).

[30] *See* Elizabeth Fussell, *The Deportation Threat Dynamic and Victimization of Latino Migrants: Wage Theft and Robbery*, 52 Soc. Q. 593, 604-05 (2011); Anita Khashu, *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties* 25 (2009), https://perma.cc/KL5A-EQWR.

[31] *See, e.g.*, Messing et al., *supra* note 27, at 330 (citing several studies); Angelica S. Reina et al., *"He Said They'd Deport Me": Factors Influencing Domestic Violence Help-Seeking Practices Among Latina Immigrants*, 29 J. Interpersonal Violence 593, 601 (2013).

victims of wage theft,[32] and other immigrants report facing violence at work.[33] Thus, paradoxically, "harsh legal sanctions against immigrants … framed as a means to keep communities 'safe' … in fact have the opposite effect," pushing people outside the law's protection and cultivating crime.[34] Expanding that aggressive enforcement into areas at or near houses of worship magnifies this negative effect by disconnecting immigrants from their faith communities, which are often their most important social support networks.

### C. Allowing Immigration Enforcement at or near Houses of Worship and Other Sensitive Areas Is a Unique Threat to Community Trust and Exacerbates the Public Safety Threat Posed by Increased Immigration Enforcement.

DHS's new policy to allow immigration enforcement at or near houses of worship and other sensitive areas threatens community trust in law enforcement, and therefore public safety, in two ways: First, it magnifies the overall atmosphere of fear and distrust that has been exacerbated by excessive and sometimes unlawful enforcement tactics. Second, inviting ICE and Border Patrol agents to transgress once-protected places—places that form the backbone of a strong and stable civil society and that provide services both spiritually sacred and essential to survival—

---

[32] *See* S. Poverty L. Ctr., *Under Siege: Life for Low Income Latinos in the South* 6 (2009), https://tinyurl.com/c9esjftn; *see also* Fussell, *supra* note 32; Nik Theodore et al., *La Esquina (The Corner): Day Laborers on the Margins of New York's Formal Economy*, 9 Working USA: J. of Lab. & Soc'y 407, 417 & tbl. 8 (2006) (finding a wage theft rate of approximately 50% in New York); .

[33] S. Poverty Law Ctr., *supra* note 32, at 7.

[34] Kirk et al., *supra* note 6, at 82-83.

permits uniquely destructive actions that will deeply wound community trust in, and the legitimacy of, all of law enforcement.

### 1. DHS's Aggressive Enforcement Actions are Creating an Atmosphere of Fear and Distrust Between Law Enforcement and Immigrant and Latino Communities.

Since January 2025, DHS has dramatically scaled up immigration enforcement using tactics that have sowed fear and distrust in law enforcement, including but not limited to conducting enforcement actions in sensitive spaces. ICE agents have waited outside courthouses, ultimately arresting people who appear for their court dates while seeking asylum;[35] they have conducted massive workplace raids and "roving patrols" admittedly based on racial profiling;[36] they have stepped outside their civil enforcement role to arrest and detain U.S. citizen protestors; and agents have consistently concealed their faces (including during an arrest in a church parking lot) and even failed to identify as law enforcement at all, leading some people to believe they are heavily armed and masked kidnappers.[37]

---

[35] *See, e.g.,* Margaret Kadifa, *ICE Arrests All Adults Without Children at S.F. Immigration Court Today*, Mission Local (July 25, 2025), https://tinyurl.com/4566wusk.

[36] Sonja Sharp, *Chokeholds, Bikers and 'Roving Patrols': Are Trump's ICE Tactics Legal?*, Los Angeles Times (July 28, 2025), https://tinyurl.com/7adz6eun.

[37] *See Perdomo v. Noem*, No. 25-4312, 2025 U.S. App. LEXIS 19503, at 16-19 (9th Cir. Aug. 1, 2025), stayed pending disposition of appeal, *Noem v. Perdomo*, No. 25A169 (U.S. Sep. 8, 2025); Jesus Jiménez & Emily Baumgaertner Nunn, *Church Leaders Shaken After a Man Was Detained in Their Parking Lot*, N.Y. Times (June 11, 2005), https://tinyurl.com/mp522mjt.

DHS's apparent reliance on and expansion of racial profiling—an unconstitutional and ultimately unhelpful tactic—will prove a major setback for law enforcement and public safety, alarming and alienating people particularly in Latino communities that have borne the brunt of this enforcement. After reviewing ICE arrest records, the CATO Institute found that "[i]llegal profiling accounts for a substantial portion of [ICE] arrests in 2025," with one in five arrests being Latinos with no criminal record or removal order.[38] "ICE is arresting thousands of people in random locations … who had no prior contact with law enforcement," CATO reported, "the telltale sign of illegal profiling."[39]

Court decisions bear this out. For example, in April, the U.S. District Court for the Eastern District of California issued a preliminary injunction barring Border Patrol from conducting warrantless immigration stops throughout the Eastern District of California.[40] At the hearing, the judge explained, "You just can't walk up to people with brown skin and say, 'give me your papers'."[41]

---

[38] David J. Bier, *One in Five ICE Arrests Are Latinos on the Streets with No Criminal Past or Removal Order*, CATO Institute (Aug. 5, 2025), https://tinyurl.com/mujfbamh.

[39] *Id*.

[40] *United Farm Workers v. Noem*, No. 1:25-cv-00246 (Doc. 47) (E.D. Ca. Apr. 29, 2025), https://bit.ly/3Jxjtru.

[41] Sergio Olmos & Wendy Fry, *Judge Restricts Border Patrol in California: 'You Just Can't Walk Up To People With Brown Skin"*, Cal Matters (Apr. 29, 2025), https://tinyurl.com/47dt9wu2.

The possibility that through these sweeping raids DHS will violently harass and detain U.S. citizens is not theoretical. News outlets have reported chilling accounts of ICE aggressively arresting and detaining law-abiding citizens at work[42] or local community businesses.[43] A recent report documented that immigration agents detained over 170 citizens since January during raids or protests; the report also found immigration agents wrongfully detained over 50 citizens, most of whom were Latino, after agents questioned their citizenship.[44] As a result, some people now always carry passports or other identification with them. One citizen told *the New York Times*: "I'm a boring senior that lives in [Los Angeles] that likes to go for walks, and for the first time in history, I don't feel safe."[45]

Both state and local prosecutors have publicly condemned these tactics while explaining how they threaten community trust and public safety. In Los Angeles, District Attorney Nathan Hochman said even though "immigration enforcement is under federal jurisdiction and not within the authority of our office, we recognize the real and profound impact these operations have on the trust

---

[42] *Perdomo*, 2025 U.S. App. LEXIS 19503, at 17-18.

[43] Jennifer Medina, *'I'm an American, Bro!': Latinos Report Raids in Which U.S. Citizenship Is Questioned*, N.Y. Times (June 15, 2025), https://tinyurl.com/bdz9d3by.

[44] Nicole Foy, *We Found More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged, and Detained for Days*, ProPublica (Oct. 16, 2025), https://tinyurl.com/ds632u3r.

[45] Jesus Jiménez, et al., *'Completely Disrupted': Fear Upends Life for Latinos in L.A.*, N.Y. Times (June 30, 2025), https://tinyurl.com/yeyssm3f.

between immigrant communities and local law enforcement."[46] In Hennepin County, Minnesota, home to Minneapolis and Saint Paul, County Attorney Mary Moriarty emphasized her "singular focus … on the safety of the people who live here," and said that "ICE showing up in the heart of one of our vibrant immigrant communities alongside local law enforcement causes grievous and irreparable harm. … ICE's presence will keep people from reporting crimes, from testifying as witnesses, and from seeking help."[47] And 18 state attorneys general, in a brief challenging the administration's suspicion-less stops and racial profiling in Los Angeles, argued that such tactics have "undermined the trust, built over years, between local law enforcement and the immigrant community," thus "creat[ing] a culture of fear that has disrupted community life" and "impeded the daily operations of local law enforcement."[48]

### 2. Expanding DHS's Enforcement to Areas at or near Houses of Worship and Other Sensitive Locations is Particularly Harmful.

DHS's new policy that allows enforcement at or near houses of worship and other sensitive locations exacerbates this very serious public safety problem, and

---

[46] *District Attorney Nathan J. Hochman Statement on Recent Immigrant Enforcement Actions*, Los Angeles Cnty. Dist. Att'y's Off. (June 6, 2025), https://tinyurl.com/5cu6mpa5.

[47] *Hennepin County Attorney Mary Moriarty Statement on Law Enforcement Action in Minneapolis*, Hennepin Cnty. Att'y's Off. (June 4, 2025), https://tinyurl.com/y5fsvbyp .

[48] Br. of 17 States and D.C. as Amici Curiae, *Perdomo v. Noem*, No. 2:25-cv-05605 (Doc. 49-1) at 1, 13, https://tinyurl.com/4d7et57e.

uniquely so. The rescission memo, and the threats that accompanied it, strike at the core of human existence and send a clear message that nowhere is safe—that law enforcement and the legal system will punish you, your family, and your friends merely for exercising core constitutional rights and seeking essential services, including spiritual well-being. Facing this threat, people will view law enforcement not as a trusted protector of public safety, but as an institution to be feared and avoided.

First, this policy marks a dramatic departure from the decades-long tradition of authorizing immigration enforcement in "protected areas" only as last resort, such as when there is "a national security threat" or "an imminent risk of death, violence, or physical harm to a person."[49] Now individual agents retain "discretion," based on their own "common sense," to arrest and search people in these spaces.[50] Codifying the "common sense" of agents is, we submit, a near-limitless standard, and a marked shift from requiring agents to "seek prior approval from their Agency's headquarters[] before taking an enforcement action in or near a protected area."[51] Indeed, DHS issued a statement emphasizing that the new policy "empowers" and does not "tie the hands" of ICE agents.[52]

---

[49] JA150-51 (Mayorkas Guidelines).

[50] JA171.

[51] JA151 (Mayorkas Guidelines).

[52] JA173.

Second, houses of worship have long been protected precisely because the activities held there are so important "to the well-being of people and the communities of which they are a part."[53] For many community members, the practice of religion is a deeply personal exercise in understanding their lives and place in the world, and many congregants view in-person worship as a religious mandate that they cannot abandon without spiritual consequences.[54] As a matter of constitutional law, the "First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths[.]" *Obergefell v. Hodges*, 576 U.S. 644, 679-80 (2015). Beyond providing for religious activities, houses of worship are often the only locations available where members of community groups can meet and support one another: from public service organizations like Kiwanis and Rotary clubs, to support groups for those wrestling with addiction, cancer, and grief.

While the specific prohibition on immigration enforcement endured for 30 years, the legal and cultural norms recognizing houses of worship as protected spaces of sanctuary and refuge date back centuries. In the 1800s U.S. churches

---

[53] JA149 (Mayorkas Guidelines).

[54] Aleja Hertzler-McCain, *Diocese of San Bernardino Issues Dispensation Saying Catholics Who Fear ICE Don't Have to Attend Mass*, NPR, https://tinyurl.com/3v9bzc32 (diocese issuing dispensations for members who cannot attend services due to fear of immigration enforcement at or near churches).

gave safe harbor to enslaved people, and later to people resisting military conscription during the Vietnam war. These practices followed centuries-old traditions—dating back to the earliest years of Christianity—holding that churches were sacred and protected spaces.[55] Eliminating the protections against state interference by immigration enforcement in and around these sensitive spaces is thus uniquely destructive to the community's trust and faith in law enforcement.

To dispense with these longstanding, cross-cultural norms not for the sake of public safety, but to find and deport immigrant members of the community, shatters law enforcement legitimacy and tells people to avoid the legal system rather than work within it. There are unique harms resulting from law enforcement not respecting these sacred spaces. Contrary to Appellants' argument, it can't be the case that the government's actions become immune from challenge the more unlawful enforcement tactics they pile on top of one another. That reasoning only generates incentives to take ever more actions that destroy community trust in law enforcement, which harms us all.

---

[55] Bill Chappell, *Churches Have a Long History of Being Safe Havens—For Immigrants and Others*, NPR (Jan. 26, 2025), https://tinyurl.com/ffab3bsj; *see also* Valerie J. Munson, *On Holy Ground: Church Sanctuary In the Trump Era*, 47 Sw. L. Rev. 49 (2017).

## II.   IMMIGRATION ENFORCEMENT AT OR NEAR HOUSES OF WORSHIP THREATENS PUBLIC SAFETY BY WEAKENING CIVIC INSTITUTIONS THAT PROMOTE STABLE AND HEALTHY COMMUNITIES.

Ensuring community-wide access to sensitive places like houses of worship promotes the overall "well-being of … the communities of which they are a part[.]"[56] More specifically, it promotes a stable, healthy, and well-connected civil society with lower crime rates. That is especially true as places of worship house programs designed to address the root causes of—and thereby reduce—community violence. The new DHS policy will have the opposite effect; it weakens houses of worship as core civic institutions by effectively excluding people from them, diminishing their public-safety benefit and thus burdening the limited resources of local law enforcement.

"Civic infrastructure—or the organizations and institutions that help people connect with one another, address shared concerns, and solve public problems— forms the backbone of a healthy community."[57] Ample research shows that "more civically robust communities will be better off and have lower crime rates than civically weak communities," in particular those with "a strong matrix of religious

---

[56] JA149.

[57] Jennifer S. Vey & Hanna Love, *Transformative Placemaking: A Framework To Create Connected, Vibrant, and Inclusive Communities,* Brookings (Nov. 19, 2019),  https://tinyurl.com/2e8stsuv; *see also* Jill Blair & Malka Kopell, *21st Century Civil Infrastructure: Under Construction*, Aspen Institute (2015), https://tinyurl.com/yck5jdhk.

and secular institutions to facilitate civic engagement and a locally invested and stable population."[58] Each of these "component[s] theoretically contributes to the ability of communities to foster cohesion and efficacy, secure and manage local municipal resources, and prevent a host of crime and public health related problems."[59]

Houses of worship are an important component of this civic infrastructure that provide multiple public safety benefits. They not only foster opportunities to build community and seek spiritual guidance, they often provide critical social services, from meals to shelter to childcare, that are essential to community well-being and ultimately, public safety. For example, the Appellees in this case offer multiple community services to their congregants and communities, including English classes, food pantries, clothing distribution, job-training programs, housing and child-care assistance, health clinics, and more.[60] *See also Fulton v. City of Philadelphia*, 593 U.S. 522, 547-48 (2021) (Alito, J., concurring) (recounting history and unique role of religious charities caring for children via orphanages and foster care placement). Such services are central not just to religious practice, implicating constitutional and statutory free exercise rights when threatened, but to social stability and public safety.

---

[58] Jessica M. Doucet & Matthew R. Lee, *Civic Communities and Urban Violence*, 52 Soc. Sci. Rsch. 303 (2015), https://tinyurl.com/4tyab7n6.

[59] *Id*.

[60] *See, e.g.*, JA 28-30; JA 32.

DHS's enforcement policy has already impeded these functions. In addition to the reduced attendance at Appellees' services outlined by the District Court,[61] houses of worship across the country have similarly experienced a decline in attendance and participation since DHS announced the new policy. For example, in East Los Angeles, Pastor Carlos Rincon said that the threat of immigration enforcement has cut attendance at his Pentecostal church by half.[62] Five miles away, at Our Lady of Lourdes Church, Father Ricardo Gonzalez reports that attendance is down at least 30%.[63] In Washington D.C., near the White House, a Catholic church pastor stated that half of his congregation was afraid to go to church.[64] Interviews with more than two dozen pastors and other religious leaders across the country also indicated that fear has driven down attendance at services and hindered their ability to conduct their community service activities.[65]

---

[61] JA 280-81.

[62] Andrea Castillo & Queenie Wong, *L.A. Immigration Raids Force the Undocumented to Trade Their Freedom for Safety*, Los Angeles Times (June 26, 2025), https://tinyurl.com/5ezrufr6.

[63] *Id*.

[64] The Associated Press, *Immigration Crackdown Stokes Fear and Solidarity at a Catholic Church in D.C.*, NBC News (Oct. 28, 2025), https://tinyurl.com/5bwtj9n7.

[65] Nathan Layne, *Immigrant Faithful Turn to Virtual Sermons and Home Communion Amid Trump Crackdown*, Reuters (Sept. 7, 2025), https://tinyurl.com/53as9sdr.

Elsewhere, the Diocese of San Bernardino took the extraordinary step of absolving parishioners of their obligation to attend mass, citing fear of immigration raids.[66]

These are only a few examples of how DHS's enforcement policy has undermined houses of worship. DHS's policy creates real and substantial injuries to communities of worship, undermines the special role that these institutions play in the community, and magnifies the fear—and the complete breakdown of trust—generated by aggressive immigration enforcement tactics in immigrant communities.

It will ultimately be local prosecutors and law enforcement in high-immigrant jurisdictions and the communities they serve—not federal officials—who will bear the brunt of this breakdown in civil society. As this enforcement policy further erodes houses of worship and other core civic institutions, it will demand greater amounts of already scarce and carefully allocated local law enforcement resources to protect public safety.[67] Thus, in addition to delegitimizing law enforcement—itself a grave public safety threat—DHS's enforcement policy

---

[66] Claire Moses & Orlando Mayorquin, *L.A.-Area Bishop Excuses Faithful From Mass Over Fear of Immigration Raids*, N.Y. Times (July 10, 2025), https://tinyurl.com/44tf9te3.

[67] *See* Letter from Law Enforcement Immigration Task Force to Hon. Trey Gowdy & Hon. Zoe Lofgren (July 20, 2015), https://perma.cc/V7MX-VCAF; *United States v. California*, 314 F. Supp. 3d 1077, 1108 (E.D. Cal. 2018), *aff'd in part*, 921 F.3d 865 (9th Cir. 2019) (explaining that it is "entirely reasonable for the State to determine that assisting immigration enforcement in any way . . . is a detrimental use of state law enforcement resources.").

will weaken local enforcement and other civic institutions that form the foundation of effective public safety policy.

\* \* \* \* \*

In addition to burdening religious exercise, the DHS policy to abolish protected areas and permit immigration enforcement at or near places of worship and other sensitive locations will severely undermine effective law enforcement and public safety. Rescinding the sensitive locations policy in the context of other aggressive and discriminatory enforcement tactics makes the harm from the rescission worse, not better—and it should not make the rescission immune from review. The pending threat to arrest people for attending their church, synagogue, mosque, or other religious institution will shatter any remaining trust between immigrant communities and law enforcement. In addition, it will keep people from seeking essential services that, along with law enforcement, promote public health and safety. In short, the DHS policy is not a public safety measure. It is a public safety threat.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,


_____/s/_____
Miriam Airington-Fisher, VSB#78260
Jennifer Quezada, VSB#93716

Airington Law, PLLC
4050 Innslake Drive
Suite 190
Glen Allen, VA 23060
Telelphone: (804)774-7117
Facsimile: (804)597-5424
mairington@airingtonlaw.com
jquezada@airingtonlaw.com

*Counsel for* Amici Curiae

December 17, 2025

## CERTIFICATE OF COMPLIANCE

This amicus curiae brief is in 14-point Times New Roman proportional font and contains 6,482 words as counted by Microsoft Word, excluding the items that may be excluded. The brief thus complies with the type-face, style, and volume limitations set forth in Rule 29(a)(5) and 32(a)(5)–(7)(B) of the Federal Rules of Appellate Procedure.

/s/
_____
Miriam Airington-Fisher, Esq.
Jennifer Quezada, Esq.

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 17, 2025, I served the foregoing brief upon all counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.

/s/

_____
Miriam Airington-Fisher, Esq.
Jennifer Quezada, Esq.

31

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>25-1512</u>    Caption: <u>Yearly Meeting of the Religious Society of Friends et al v. DHS et al</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Fair and Just Prosecution, a Project of the Tides Center, and Law Enforcement Action Partnership</u>
(name of party/amicus)

_____

who is _____<u>Amicus</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____  Date: 12/17/2025

Counsel for: Amicus Fair and Just Prosecution

- 2 -

Print to PDF for Filing