No. 25-1512

_____

# In the United States Court of Appeals for the Fourth Circuit

PHILADELPHIA YEARLY MEETING OF THE RELIGIOUS
SOCIETY OF FRIENDS, ET AL.,

*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF HOMELAND
SECURITY, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Maryland

**BRIEF FOR AMICUS CURIAE THE RUTHERFORD INSTITUTE
IN SUPPORT OF PLAINTIFFS-APPELLEES**

JOHN W. WHITEHEAD
WILLIAM E. WINTERS
THE RUTHERFORD INSTITUTE
109 Deerwood Road
Charlottesville, VA 22911
(434) 978-3888
legal@rutherford.org

JOSHUA C. MCDANIEL
  *Counsel of Record*
PARKER W. KNIGHT III
KATHRYN F. MAHONEY
STEVEN W. BURNETT
HARVARD LAW SCHOOL
  RELIGIOUS FREEDOM CLINIC
6 Everett Street, Suite 5110
Cambridge, MA 02138
(617) 496-4383
jmcdaniel@law.harvard.edu

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................ i

TABLE OF AUTHORITIES ........................................................ ii

STATEMENT OF INTEREST ..................................................... 6

INTRODUCTION ...................................................................... 7

ARGUMENT ............................................................................. 8

    I.   DHS's prior policy had a long historical pedigree with origins in early Roman and European law ................................ 8

   II.  American practices during the Founding and Reconstruction eras reinforced the need to protect houses of worship. .............. 11

        A.   The American colonies were religious sanctuaries designed to be free from government abuse. ........................ 12

        B.   The Fourteenth Amendment further solidified protections for houses of worship. ........................................ 15

  III.  Giving officials broad discretion to decide when to disturb places of worship raises First Amendment concerns. ................. 18

CONCLUSION ........................................................................ 23

CERTIFICATE OF COMPLIANCE ......................................... 24

CERTIFICATE OF SERVICE ................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Bell v. Graham,*
  10 S.C.L. (1 Nott & McC.) 278 (1818)................................................. 16

*Cantwell v. Connecticut,*
  310 U.S. 296 (1940) ...................................................................... 19, 20

*Fowler v. Rhode Island,*
  345 U.S. 67 (1953) ............................................................................ 20

*Fulton v. City of Philadelphia,*
  593 U.S. 522 (2021) .......................................................................... 22

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) .......................................................................... 21

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
  565 U.S. 171 (2012) .......................................................................... 14

*Kunz v. New York,*
  340 U.S. 290 (1951) .......................................................................... 20

*Niemotko v. Maryland,*
  340 U.S. 268 (1951) .......................................................................... 20

*Schenck v. United States,*
  249 U.S. 47 (1919) ............................................................................ 18

*Sherbert v. Verner,*
  374 U.S. 398 (1963) .......................................................................... 22

*Shuttlesworth v. City of Birmingham,*
  394 U.S. 147 (1969) .......................................................................... 21

**Other Authorities**

Christian Edmonds, *The Religious Underpinnings of the Fourth Amendment*,
25 Tex. Rev. L. & Pol. 473 (2021) ...................................................... 13

*Code Just.* 1.12.3 (Theodosius II & Valentinian III A.D. 431)
(Fred H. Blume trans., 2d ed. 2008) .................................................. 10

*Code Theod.* 9.45.4 (Clyde Pharr trans., Princeton Univ. Press 1952).................................................................................................. 10

Convention of Virginia, *in 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 1
(Jonathan Elliott ed., 2d ed. 1836) (June 12, 1788)......................... 14

*George Washington to the Hebrew Congregation in Newport, Rhode Island* (Aug. 18, 1790),
Founders Online, Nat'l Archives, https://perma.cc/98F7-FEU4 ...... 15

Gerald R. Cragg, *Puritanism in the Period of the Great Persecution 1660–1688* (1957)............................................................. 12

Gratian, *Decretum* (c. 1140), *quoted in* Camilo Umaña, *Impunity as a Sanctuary*, 12(4) Oñati Socio-Legal Series 981 (2022) ............. 10

H.M. Henry, *The Police Control of the Slave in South Carolina* (1914)................................................................................................... 15

Huw Pryce, *Ecclesiastical Sanctuary*, in *Native Law and the Church in Medieval Wales* 163 (1993).............................................. 10

Ignatius Bau, *This Ground Is Holy: Church Sanctuary and Central American Refugees* (1985)..................................................... 12

J. Dennis Willigan, *Sanctuary: A Communitarian Form of Counter-Culture*,
25 Union Seminary Q. Rev. 517 (1970) ............................................. 13

James Hugo Johnston, *The Participation of White Men in Virginia Negro Insurrections*,
16 J. Negro Hist. 158 (1931) ............................................................... 16

James Ireland, *The Life of the Rev. James Ireland* (1819) ..................... 15

John Calvin, *The Institutes of the Christian Religion* (Henry Beveridge trans., Christian Classics Ethereal Library 1845) (1536) ................................................................................................. 11

Joshua C. McDaniel, *Religious Minorities and Secular Rights*,
82 Wash. & Lee L. Rev. (forthcoming),
https://ssrn.com/abstract=5185065 ..................................................... 21

Kurt T. Lash & Stephanie Hall Barclay, *A Crust of Bread: Religious Resistance and the Fourteenth Amendment*,
78 Vand. L. Rev. 1203 (2025) ............................................................. 17

Leonard W. Levy, *Emergence of a Free Press* (1985) .............................. 19

*Letter of Pope Gelasius to Anastasius Augustus* (A.D. 494) (John S. Ott trans.), *reprinted in Epistolae Romanorum Pontificum Genuinae* 1:349–58 (Andreas Thiel ed., 1867) ..................................... 9

Linda Rabben, *Give Refuge to the Stranger: The Past, Present, and Future of Sanctuary* (2011) ..................................................... 13, 16

Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*,
103 Harv. L. Rev. 1409 (1989) ........................................................... 14

iv

Nicholas May, *Holy Rebellion: Religious Assembly Laws in Antebellum South Carolina and Virginia,* 49 Am. J. Legal Hist. 237 (2007) ................................................. 16, 17

Orville V. Burton, *In My Father's House Are Many Mansions: Family and Community in Edgefield, South Carolina* (Univ. of N.C. Press 1985) ............................................................. 16

Renny Golden & Michael McConnell, *Sanctuary: The New Underground Railroad* (1986) ............................................. 13

Sally E. Hadden, *Slave Patrols: Law and Violence in Virginia and the Carolinas* (2001) ..................................................... 13, 15

Samuel Rutherford, *Lex Rex* (Lonang Institute ed., 2005) (1644) ......... 11

Speech of John Bingham on the Meaning of the Privileges or Immunities Clause of Section One of the Fourteenth Amendment (Mar. 31, 1871), *in* 2 *Appendix to the Cong. Globe* 81 (1871) ............................................................................. 17

William J. Cuddihy, *The Fourth Amendment: Origins and Original Meaning* (2009) ................................................... 13

Winthrop Jordan, *White over Black: American Attitudes toward the Negro, 1550-1812* (1968) ............................................. 17

v

## STATEMENT OF INTEREST

The Rutherford Institute is a nonprofit civil liberties organization headquartered in Charlottesville, Virginia. Founded in 1982 by its President, John W. Whitehead, the Institute provides legal assistance at no charge to individuals whose constitutional rights have been threatened or violated and educates the public about constitutional and human rights issues affecting their freedoms. The Rutherford Institute works tirelessly to resist tyranny and threats to freedom by seeking to ensure that the government abides by the rule of law and is held accountable when it infringes on the rights guaranteed by the Constitution and laws of the United States.

The Rutherford Institute submits this brief to underscore the historical and constitutional foundations that counsel against giving enforcement officials wide discretion to intrude into sacred spaces. The Rutherford Institute urges this Court to affirm the decision below and restore the prior policy that respected those limits.[1]

---

[1] No party or counsel for any party authored this brief in whole or in part, and no one other than amicus curiae, its members, or its counsel contributed money intended to fund preparing or submitting this brief. All parties consent to this brief's filing.

## INTRODUCTION

At its core, this case asks when it is appropriate for government enforcement agents to enter places of worship. But while this case arises in the context of present-day immigration policy, the tension between government enforcement and sacred space has been present for as long as government has existed. And for nearly as long, civil and church authorities alike have resolved that tension by recognizing the need in this context for special care.

As far back as the fifth century, Western legal systems have understood that unchecked state intrusion into religious affairs poses a unique threat to liberty. That tradition extended through medieval and post-Reformation regimes to the American Founding, which not only inherited that tradition but embedded its logic in the First Amendment's Religion Clauses. As a result, our Nation has long resisted the idea that individual officers may review ecclesiastical decisions, dictate religious obligations, or intrude into sacred spaces based solely on their own judgment. Applying this principle of church autonomy, the Supreme Court has repeatedly invalidated regimes that vest unfettered discretion in the hands of government agents when First Amendment liberties are at stake.

The Government's policy at issue here sits uneasily within that tradition. The prior DHS policy respected constitutional boundaries by limiting government intervention and requiring procedural safeguards and nondiscretionary criteria before officials enter church doors. The revised policy sheds those constraints and instead gives enforcement officials wide discretion to disturb peaceful worship. Yet that is precisely the kind of discretionary authority over religious affairs that raises a First Amendment red flag.

As the district court below recognized, such unbounded discretion invites arbitrary enforcement, chills the free exercise of religion, and places religious congregations at the mercy of individual officials whose personal views, rather than neutral law, determine when it is justified to disrupt their constitutionally protected religious practices.

**ARGUMENT**

## I. DHS's prior policy had a long historical pedigree with origins in early Roman and European law.

Until its recent change of policy, DHS treated houses of worship and places of religious study as protected areas that agents could access only in exigent circumstances or with prior agency headquarters approval.

*See, e.g.*, JA150-151. Such precaution did not emerge in a vacuum. It reflected a bedrock principle with deep historical roots—that sacred spaces are a distinct sphere of governance where secular power may intrude only in limited circumstances. This caution against arbitrary intrusion first developed in the ancient law of church sanctuary and persists in American law today.

The earliest expressions of this principle appear in Roman and early Christian legal thought. In a letter to Emperor Anastasius in A.D. 494, Pope Gelasius I distinguished "the sacred authority" of the priesthood from "the royal power" of the state. *Letter of Pope Gelasius to Anastasius Augustus* (A.D. 494) (John S. Ott trans.), *reprinted in Epistolae Romanorum Pontificum Genuinae* 1:349–58 (Andreas Thiel ed., 1867). He wrote that in matters concerning the "heavenly sacraments," the emperor "should be subordinate to the priestly order," just as clergy "obey [the emperor's] laws" in temporal affairs. *Id.* This mutual deference laid the groundwork for jurisdictional boundaries separating church and state.

That deference became codified in late antiquity as the law of sanctuary. In the Roman Empire, the Theodosian and Justinian Codes declared churches "open to those persons who are afraid" and required episcopal

permission before removing church refugees from church grounds. *Code Theod.* 9.45.4 (Clyde Pharr trans., Princeton Univ. Press 1952); *Code Just.* 1.12.3 (Theodosius II & Valentinian III A.D. 431) (Fred H. Blume trans., 2d ed. 2008). The Codes explicitly punished anyone who entered the church premises to take a refugee "without the decision or order of the bishop." *Id.*

Medieval canon law refined sanctuary law further. Gratian's Decretum set out the basic rule that no one could "drag forth" a fugitive on church grounds, "that the honor of churches may be preserved." Gratian, *Decretum* C.17 q.4 c.8 (c. 1140), *quoted in* Camilo Umaña, *Impunity as a Sanctuary*, 12(4) Oñati Socio-Legal Series 981, 988 (2022). Even fugitives fleeing *to* a church were protected if they made it to within 30 to 40 paces of the chapel or church. *See* Huw Pryce, *Ecclesiastical Sanctuary*, *in Native Law and the Church in Medieval Wales* 163, 163–64 (1993). And the decretals of Popes Innocent III and Gregory IX added further refinements, elaborating some exceptions while maintaining the church's right to protect sanctuary seekers "from loss of life or limb." *Id.* These rules solidified a principle of restraint, ensuring that civil enforcement respected religious spaces.

The same principle became a broader Reformation-era distinction: the church as a self-governing polity under Christ, independent of the magistrate. *See, e.g.*, John Calvin, *The Institutes of the Christian Religion* 1004 (Henry Beveridge trans., Christian Classics Ethereal Library 1845) (1536) (reasoning that the "ecclesiastical power" of the Church of God must be "altogether distinct from civil government"); Samuel Rutherford, *Lex Rex* 305 (Lonang Institute ed., 2005) (1644) (pastors have a "ministerial power" in spiritual things distinct from the power of kings). The reformers insisted that while civil authorities owe a responsibility toward religion, Christ's spiritual kingdom and civil government "are things very widely separated." Calvin, *supra*, at 1215.

Thus, from its earliest history, European law—at least in principle—respected the separate sphere of religious authority and understood the need to tread carefully in religious spaces.

## II. American practices during the Founding and Reconstruction eras reinforced the need to protect houses of worship.

These early European principles crossed the Atlantic, shaping colonial thought and early American constitutionalism. Indeed, it was in part Europe's failure to live up to those principles that motivated the

11

American experiment. As a result, nearly four centuries of American practice has continued to adapt and recognize long-held practices protecting religious spaces.

## A. The American colonies were religious sanctuaries designed to be free from government abuse.

Though European law historically protected religious spaces, its laws and practices leading up to the American Founding often failed to do so. For instance, a 1624 English law dismantled "at least eleven centuries" of sanctuary by allowing unchecked discretionary arrest in churches. Ignatius Bau, *This Ground Is Holy: Church Sanctuary and Central American Refugees* 157 (1985). That change let civil officers wield their own enforcement discretion to persecute religious congregants—and the results were attacks "with sticks and staves" and arrests for unfavorable beliefs. Gerald R. Cragg, *Puritanism in the Period of the Great Persecution 1660–1688*, at 38–41 (1957).

In the face of such persecution, American colonists turned to the centuries-old principles protecting religious spaces. Indeed, it was the Old World practice of religious sanctuary that inspired the colonists' vision of the New World "as a refuge." J. Dennis Willigan, *Sanctuary: A*

12

*Communitarian Form of Counter-Culture*, 25 Union Seminary Q. Rev. 517, 520 (1970). Colonial churches, particularly Quaker congregations, embraced that ideal of "refuge" against British overreach, offering protection to fleeing political and "religious dissenters." Renny Golden & Michael McConnell, *Sanctuary: The New Underground Railroad* 4 (1986). In one famous example, English officers who had crossed the monarchy found safety for years in a New Haven, Connecticut church. Linda Rabben, *Give Refuge to the Stranger: The Past, Present, and Future of Sanctuary* 72–73 (2011).

Still, without formal protection for religious spaces and beliefs, persecution lived on in the colonies, especially against disfavored groups. In Virginia, executive orders instructed officers to patrol Black churches every few days to stop fugitive slaves from gathering. Sally E. Hadden, *Slave Patrols: Law and Violence in Virginia and the Carolinas* 30–31 (2001). And in New England, Quakers "bore the brunt of general searches and seizures for religious control" at their religious meeting houses. Christian Edmonds, *The Religious Underpinnings of the Fourth Amendment*, 25 Tex. Rev. L. & Pol. 473, 485 (2021) (quoting William J. Cuddihy, *The Fourth Amendment: Origins and Original Meaning* 199 (2009)).

It was in response to discriminatory uses of force like these that the Founders adopted the First Amendment, which protected against unfettered federal power. In debates over the Constitution's ratification, for example, James Madison noted that the government would not be permitted to "intermeddle with religion." Convention of Virginia, *in 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 1, 330 (Jonathan Elliott ed., 2d ed. 1836) (June 12, 1788). As relevant here, the Founders also worried that plenary immigration authority "could, with little imagination, be expected to affect the exercise of religion." Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1478 (1989).

More broadly, the Religion Clauses the Founders adopted protect religious organizations' "independence from secular control or manipulation." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012) (citation omitted). One core aspect of that church-autonomy protection was the right of every faith community to gather and worship without civil intimidation—so that, in Washington's words, "every one shall sit in safety under his own vine and fig tree" with "none to make him afraid." *George Washington to the Hebrew Congregation in*

14

*Newport, Rhode Island* (Aug. 18, 1790), Founders Online, Nat'l Archives, https://perma.cc/98F7-FEU4.

**B. The Fourteenth Amendment further solidified protections for houses of worship.**

The need to further protect religious spaces became apparent in the lead up to the Civil War as state and local officers in the South targeted religious congregations. All too often, these efforts devolved into "abusive behavior to harass congregations . . . of faiths [the officers] did not respect." Hadden, *supra*, at 126.

In Virginia, for example, Baptist ministers were shocked to see officers "seizing and whipping" their congregants, while carrying others off likely "to subject them to a more severe punishment." *Id.* (quoting James Ireland, *The Life of the Rev. James Ireland* 135 (1819)). Similarly, in South Carolina, officers targeted biracial Methodist churches so frequently that many "ministers refused to preach there." H.M. Henry, *The Police Control of the Slave in South Carolina* 135 (1914).

At the same time, many balked at these abuses, invoking the "general English common law privilege of peaceful worship." Nicholas May, *Holy Rebellion: Religious Assembly Laws in Antebellum South Carolina and*

*Virginia*, 49 Am. J. Legal Hist. 237, 239 (2007). Some plantation owners granted sanctuary for religious services held on their property, even when expressly prohibited by state law. *See, e.g.*, Orville V. Burton, *In My Father's House Are Many Mansions: Family and Community in Edgefield, South Carolina* 156 (Univ. of N.C. Press 1985); James Hugo Johnston, *The Participation of White Men in Virginia Negro Insurrections*, 16 J. Negro Hist. 158, 159–60 (1931) (describing a failed attempt to break up an unlawful religious gathering of slaves). And when the federal Fugitive Slave Act was passed, some churches violated it to exercise their "traditional religious beliefs about providing sanctuary to escaped slaves." Rabben, *supra*, at 97.

Courts often backed up these efforts. In South Carolina, fears of a slave insurrection prompted the state legislature to enact laws prohibiting majority-black religious assembly. But South Carolina's courts resisted enforcing the provision, *see Bell v. Graham*, 10 S.C.L. (1 Nott & McC.) 278, 281 (1818), and by the mid-eighteenth century many courts treated the laws as "dead letters," May, *supra*, at 247. The courts' "overt flouting" of the laws even in a pro-slavery state shows just how deeply rooted the concept of religious sanctuary was across American society. *Id.*

16

(quoting Winthrop Jordan, *White over Black: American Attitudes toward the Negro, 1550-1812*, at 404 (1968)).

Against this backdrop, the Framers of the Fourteenth Amendment lamented the lack of express constitutional protections against state enforcement actions targeting houses of worship. John Bingham, the primary author of section one of the Fourteenth Amendment, hoped that the new Amendment would ensure that no state could punish acts done "in obedience to the injunction of our Divine Master, to help a slave who was ready to perish to give him shelter, or break with him his crust of bread." Kurt T. Lash & Stephanie Hall Barclay, *A Crust of Bread: Religious Resistance and the Fourteenth Amendment*, 78 Vand. L. Rev. 1203, 1240–41 (2025) (quoting Speech of John Bingham on the Meaning of the Privileges or Immunities Clause of Section One of the Fourteenth Amendment (Mar. 31, 1871), *in* 2 *Appendix to the Cong. Globe* 81 (1871)).

Centuries of colonial and post-Founding American practice thus recognize the need to let faith communities worship in peace, free from unchecked government interference.

## III. Giving officials broad discretion to decide when to disturb places of worship raises First Amendment concerns.

A common thread running through many of these historical episodes is that, without some form of safeguard, religious congregations often bear the brunt of the government's discretionary enforcement decisions. Yet DHS claims here that its policy revision does nothing more than entrust decisions about enforcement actions at houses of worship to agents' "discretion" and "common sense." DHS Br. 2, ECF No. 21; *see also id.* at 43 (arguing that the government has reasonably determined that "the Huffman Memorandum's turn toward common sense and discretion is essential"). But such a change is not a selling point. From a First Amendment perspective, vesting broad discretion in officials to decide when to enter religious spaces is not a feature, but a bug.

Motivated by abuses of discretionary censorship in England and colonial America, the Founding Generation hoped that the First Amendment would be a safeguard against "previous restraints" on speech (whether religious or not). *See Schenck v. United States*, 249 U.S. 47, 51–52 (1919) (protection against prior restraints was likely a "main purpose" of the Free Speech Clause). After the invention of the printing press, prior

restraints in England had often taken the form of licensing systems, which empowered royal officials to block the publication of undesirable views. Leonard W. Levy, *Emergence of a Free Press* 6 (1985). Even after this licensing regime lapsed, the Crown indirectly censored speech by giving officials unfettered discretion to prosecute dissidents under criminal libel laws. *Id.* at 6–7. With this history in mind, the Founders disfavored any system that would grant officials discretionary power to suppress disfavored viewpoints.

Despite the passage of the First and Fourteenth Amendments, history repeated itself in the first half of the twentieth century. And this time, it was disfavored religious viewpoints that were targeted, as towns and villages across America used discretionary licensing schemes to target Jehovah's Witnesses. Witnesses challenged these actions in court, and their cases led to a string of Supreme Court precedents striking down licensing regimes that gave unfettered discretion to officials.

In *Cantwell v. Connecticut*, the Supreme Court invalidated a law that conditioned the ability to solicit aid for religious purposes on securing a permit from the secretary of the state public welfare council. 310 U.S. 296, 305 (1940). The statute had been used to arrest a family of Witnesses

proselytizing in New Haven, Connecticut. *Id.* at 301–03. The problem, as the Court explained, was that the law gave the secretary discretion to decide when to grant a permit according to his own "appraisal of facts" and "formation of opinion." *Id.* at 305. For the Court, conditioning religious freedom on a state official's discretion was "to lay a forbidden burden upon the exercise of liberty protected by the Constitution." *Id.* at 307.

The following decade, the Court again invalidated a series of convictions on similar grounds. In two cases, the Court ruled for a Baptist minister and two Witnesses convicted for holding religious meetings in parks without a permit. *Kunz v. New York*, 340 U.S. 290 (1951); *Niemotko v. Maryland*, 340 U.S. 268 (1951). And in a third case, *Fowler v. Rhode Island*, the Court invalidated another conviction of a Jehovah's Witness for holding a religious meeting in a park. 345 U.S. 67 (1953). In all three cases, the Court found the ordinances unconstitutional precisely because they granted officials the discretion to allow or deny religious meetings. As the Court noted in one of the cases, the ordinance had "no standards," "no narrowly drawn limitations," and "no circumscribing of this absolute power." *Niemotko*, 340 U.S. at 272.

The problem of official discretion wasn't confined to religious exercise. Like the arbitrary enforcement suffered by Jehovah's Witnesses, advocates for the Black civil rights movement of the 1950s and 60s suffered similar treatment at the hands of government officials. *See* Joshua C. McDaniel, *Religious Minorities and Secular Rights*, 82 Wash. & Lee L. Rev. (forthcoming) (manuscript at 30–43), https://ssrn.com/abstract=5185065 (tracing how favorable precedents won by Witnesses provided legal support for the Black civil rights movement). In *Shuttlesworth v. City of Birmingham*, the Court observed that protesters' free speech had been infringed when they were subjected to the "uncontrolled will of an official." 394 U.S. 147, 151 (1969). And in *Grayned v. City of Rockford,* the Court noted the peril of "vague laws" that "delegate[] basic policy matters to policemen" and risk "arbitrary and discriminatory enforcement." 408 U.S. 104, 108–09 (1972). The peril is particularly grave, the Court explained, when vague laws "abut[] upon sensitive areas of basic First Amendment freedoms," thereby chilling the exercise of those constitutional rights. *Id.* at 109.

Today's free-exercise doctrine recognizes the same principle. In a leading free-exercise case, *Sherbert v. Verner,* the Court invalidated a

state unemployment scheme that allowed state officials to reject unemployment compensation claims if they deemed that the claimant failed to show "good cause" for turning down a suitable job. 374 U.S. 398, 401–02 (1963). The state officials found that a Seventh-day Adventist's refusal to work on Saturdays did not constitute "good cause," so they denied her claim. *Id.* at 401. But again, the Court recognized that such discretion was a reason for constitutional concern because it invited an individualized assessment of the plaintiff's religious belief. *Id.* at 404.

Ever since *Sherbert*, the Court has followed the "longstanding tenet" of its free exercise jurisprudence that a law "must satisfy strict scrutiny" if it gives government officials "discretion" to decide when to enforce a law against religious exercise. *Fulton v. City of Philadelphia*, 593 U.S. 522, 544 (2021) (Barrett, J., concurring). In other words, broad official discretion is precisely what triggers heightened scrutiny.

The same principle should guide this Court's decision here. The government's decision to vest immigration officers with discretion to decide whether to disturb peaceful worship according to the official's own "common sense" is a reason for greater—not lesser—constitutional scrutiny.

**CONCLUSION**

The panel should affirm the district court's decision granting a preliminary injunction.

Respectfully submitted,

/s/ *Joshua C. McDaniel*

JOHN W. WHITEHEAD
WILLIAM E. WINTERS
THE RUTHERFORD INSTITUTE
109 Deerwood Road
Charlottesville, VA 22911
(434) 978-3888
legal@rutherford.org

JOSHUA C. MCDANIEL
   *Counsel of Record*
PARKER W. KNIGHT III
KATHRYN F. MAHONEY
STEVEN W. BURNETT
HARVARD LAW SCHOOL
   RELIGIOUS FREEDOM CLINIC
6 Everett Street, Suite 5110
Cambridge, MA 02138
(617) 496-4383
jmcdaniel@law.harvard.edu

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with Fed. R. App. P. 29(a)(5) because it contains 3,269 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a) because it has been prepared in a proportionally spaced, 14-point Century Schoolbook font.

Dated: January 5, 2026

/s/ *Joshua C. McDaniel*
Joshua C. McDaniel

## CERTIFICATE OF SERVICE

I certify that on January 5, 2026, I served this document on all parties or their counsel of record via CM/ECF.

Dated: January 5, 2026

/s/ *Joshua C. McDaniel*
Joshua C. McDaniel