No. 25-1512

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PHILADELPHIA YEARLY MEETING OF THE RELIGIOUS SOCIETY
OF FRIENDS, *et al.*,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Maryland

## REPLY BRIEF FOR APPELLANTS

BRETT A. SHUMATE
  *Assistant Attorney General*

KELLY O. HAYES
  *United States Attorney*

MICHAEL S. RAAB
LOWELL V. STURGILL JR.
SARAH N. SMITH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7533*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-0173*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ........................................................1

ARGUMENT ......................................................................................3

    I.     Plaintiffs Are Unlikely to Succeed on the Merits..................3

           A.    Plaintiffs Lack Standing .................................................3

           B.    Plaintiffs Are Unlikely to Succeed on their RFRA Claim ...................................................................17

           C.    Plaintiffs Are Unlikely to Succeed on their Expressive Association Claim.....................................25

    II.    The Remaining Injunction Factors Weigh Against an Injunction .................................................................29

           A.    Plaintiffs Have Not Demonstrated Irreparable Harm Absent Preliminary Relief................................29

           B.    Plaintiffs Have Not Shown That the Balance of Equities Tips in their Favor .........................................29

    III.   The District Court Erred in Enjoining the Vitello Memorandum .......................................................32

CONCLUSION .....................................................................................33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Americans for Prosperity Found. v. Bonta,*
  594 U.S. 595 (2021) ........................................................ 28

*Apache Stronghold v. United States,*
  101 F.4th 1036 (9th Cir. 2024) ........................................ 20

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................ 4

*Benham v. City of Charlotte,*
  635 F.3d 129 (4th Cir. 2011) ........................................... 12

*Bethel World Outreach Ministries v. Montgomery Cnty. Council,*
  706 F.3d 548 (4th Cir. 2013) ....................................... 21, 22

*Bowen v. Roy,*
  476 U.S. 693 (1986) .................................................. 17, 18

*Boy Scouts of America v. Dale,*
  530 U.S. 640 (2000) ...................................................... 26

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) .................................................. 10, 11

*Cousins v. Wigoda,*
  419 U.S. 477 (1975) ...................................................... 27

*Department of Commerce v. New York,*
  588 U.S. 752 (2019) ..................................................... 8, 9

*Diamond Alternative Energy, LLC v. EPA,*
  606 U.S. 100 (2025) ..................................................... 8, 9

*FDA v. Alliance for Hippocratic Medicine,*
  602 U.S. 367 (2024) ............................................... 15, 16, 17

*Gibson v. Florida Legis. Investigation Comm.,*
  372 U.S. 539 (1963) ...................................................... 26

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*,
  565 U.S. 171 (2012) ............................................................ 28

*INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Labor*,
  510 U.S. 1301 (1993) .......................................................... 31

*Laird v. Tatum*,
  408 U.S. 1 (1972) ............................................................... 11

*Liberty Univ., Inc. v. Lew*,
  733 F.3d 72 (4th Cir. 2013) ................................................ 21

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................................. 4

*Lyng v. International Union, United Auto., Aerospace & Agric.
  Implement Workers of Am.*,
  485 U.S. 360 (1988) ............................................................ 26

*Lyng v. Northwest Indian Cemetery Protective Ass'n*,
  485 U.S. 439 (1988) ....................................................... 17, 18

*Mack v. Warden Loretto FCI*,
  839 F.3d 286 (3d Cir. 2016) ............................................... 21

*Mahmoud v. Taylor*,
  606 U.S. 522 (2025) ....................................................... 19, 20

*Mennonite Church USA v. U.S. Dep't of Homeland Sec.*,
  778 F. Supp. 3d 1 (D.D.C. 2025) ........................................ 14

*Moreno v. Bosholm*,
  151 F.4th 543 (4th Cir. 2025) ............................................. 25

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ......................................................... 3, 5, 7

*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958) ............................................................ 26

*New Doe Child #1 v. United States*,
  901 F.3d 1015 (8th Cir. 2018) ........................................ 19, 22

*New York v. U.S. Dep't of Homeland Sec.*, |
    969 F.3d 42 (2d Cir. 2020) ..................................................... 31

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ..................................................... 27, 28

*Roe v. Department of Def.*,
    947 F.3d 207 (4th Cir. 2020) ......................................... 29-30

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ............................................. 26, 27, 28

*Sherbert v. Verner*,
    374 U.S. 398 (1963) ........................................................ 21

*Tandon v. Newsom*,
    593 U.S. 61 (2021) ..................................................... 12, 13

*Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*,
    980 F.3d 821 (11th Cir. 2020) ....................................... 20

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ........................................................ 31

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ................................................... 24-25

*United States v. Texas*,
    599 U.S. 670 (2023) ........................................................ 15

*Presbyterian Church (U.S.A.) v. United States*,
    870 F.2d 518 (9th Cir. 1989) ......................................... 12

*Whitley v. Albers*,
    475 U.S. 312 (1986) ........................................................ 25

**Statutes:**

8 U.S.C. § 1252(f)(1) ................................................. 13, 14, 30

42 U.S.C. § 2000cc ............................................................ 21

iv

## INTRODUCTION AND SUMMARY

As explained in the government's opening brief, the district court erred in preliminarily enjoining the Department of Homeland Security (DHS) from acting in accordance with the Huffman Memorandum and the Vitello Memorandum. Those memoranda do not regulate plaintiffs or their congregants and do not direct enforcement activity at any location. They consequently inflict no injury on plaintiffs.

Plaintiffs repeatedly argue that the Huffman Memorandum removed all meaningful restrictions on immigration enforcement at houses of worship, but that is not correct. All immigration enforcement actions must comply with applicable law, including the First Amendment and the Religious Freedom Restoration Act (RFRA). This suit does not challenge any particular enforcement action, however, and DHS has recognized for decades, including in the Huffman Memorandum itself, that enforcement actions at sensitive locations implicate special considerations that require careful balancing. The question here is whether the First Amendment and RFRA require DHS to perform that balancing in advance and at headquarters or whether the Department may entrust those decisions to its officers. This case

also concerns whether Article III, the First Amendment, and RFRA allow plaintiffs to dictate DHS's internal guidance and procedures. The answer to both questions is clearly no. The preliminary injunction should be vacated.

1. Plaintiffs have not shown that they are likely to establish standing to challenge the memoranda. Plaintiffs offered only vague and conclusory assertions to establish injury and causation, and the district court erred in accepting those assertions as sufficient at the preliminary-injunction stage. But even if plaintiffs have experienced attendance declines, such declines would be traceable to the speculative and subjective fears of their congregants, not to the government. For that reason, plaintiffs also cannot demonstrate that their alleged injuries will be redressed by the requested relief.

2. Plaintiffs have failed to show a likelihood of success on the substance of their RFRA claim because DHS's decision to revise the internal approval level for immigration enforcement activities at or near houses of worship does not substantially burden their exercise of religion. Plaintiffs fail to distinguish the Supreme Court cases that support that conclusion. And plaintiffs ignore how extensively their

2

overbroad understanding of RFRA would foreclose a broad range of important government activities, including the compelling government interests at issue here.  For similar reasons, plaintiffs also fail to explain why DHS's change in the internal approval level for immigration enforcement authority imposes a significant burden on plaintiffs' right to expressive association.  The cases plaintiffs invoke are inapposite, as the Huffman Memorandum neither prohibits plaintiffs from conducting worship or other ministries nor penalizes such activity.

3.  The remaining injunction factors also weigh against equitable relief.  Plaintiffs' alleged harms are too speculative and conclusory to support preliminary relief, and plaintiffs' misleading arguments as to the balance of hardships rely on concessions the government plainly has not made.

## ARGUMENT

## I.    Plaintiffs Are Unlikely to Succeed on the Merits

### A. Plaintiffs Lack Standing

Plaintiffs have not made a "clear showing" that they are "likely" to establish standing to challenge the Huffman and Vitello memoranda. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quotation marks omitted).

3

As explained in the government's opening brief (at 15-33), those
memoranda alter internal procedures and guidance within DHS and do
not target plaintiffs' houses of worship or their congregants.  Thus, even
if plaintiffs had presented sufficient evidence establishing that their
congregants avoided worship activities because of the challenged
memoranda—a point the government disputes—such declines in
attendance would be fairly traceable to the speculative and subjective
fears of plaintiffs' congregants, not to the memoranda challenged here.

1.  The district court erred in accepting plaintiffs' vague and
conclusory declarations as sufficient to establish standing at the
preliminary-injunction stage.  *See* Gov't Br. 17-18, 21-22.  The elements
of standing are "not mere pleading requirements" but "must be
supported . . . with the manner and degree of evidence required at" the
relevant stage of litigation.  *Lujan v. Defenders of Wildlife*, 504 U.S.
555, 561 (1992).  Conclusory statements are insufficient to establish
standing, even at the pleading stage.  *Ashcroft v. Iqbal*, 556 U.S. 662,
679 (2009).  They are necessarily insufficient at the preliminary-
injunction stage, where plaintiffs "must make a 'clear showing'" that

4

they are "'likely' to establish each element of standing." *Murthy*, 603 U.S. at 58.

The district court erred in accepting plaintiffs' conclusory assertions to establish both injury and causation.[1]  Plaintiffs' vague assertions that "fewer people . . . are attending worship," JA220, and that "there has been a noticeable decline" in ministry activities, JA221, are insufficient to establish injury.  Nor do plaintiffs carry their burden on causation by "attribut[ing]," without explication or support, declines in attendance to the Huffman Memorandum, as the district court believed.  JA286.

It would be legal error to accept a plaintiff's bare assertion of causation in any case, but it is especially improper here, for two reasons.  First, the declarants who attributed declines in attendance to the Huffman Memorandum appear to misunderstand what the memorandum does.  As explained in the government's opening brief (at

---

[1] Plaintiffs incorrectly suggest (Br. 25-26, 31) that the government is challenging the factual findings of the district court.  The district court erred legally in accepting the conclusory statements put forth by plaintiffs as sufficient to establish injury and causation at the preliminary-injunction stage.

5

23), plaintiffs' declarants seem to believe, incorrectly, that immigration enforcement in or near houses of worship was prohibited prior to the Huffman Memorandum. *See, e.g.*, JA220 (Reverend Baxley stating that DHS's "new policy that allows immigration enforcement at or near houses of worship" has caused harm); JA201-202 (Sikh Temple declaration stating that "DHS's new policy allowing immigration enforcement at houses of worship" is "reducing Gurdwara attendance"); JA286 (district court decision relying on these declarations to establish causation). The district court erred in relying on declarants' "conclu[sion] that the reduced attendance is caused by the 2025 Policy," when those same declarants misunderstand the Huffman Memorandum's effect. JA286.

Second, it was inappropriate to defer to plaintiffs' conclusions as to causation given evidence in the record demonstrating an alternative cause of plaintiffs' purported attendance declines: the Administration's well-publicized plans to aggressively enforce immigration law. As explained in the government's opening brief, record evidence demonstrates that in the early days of the Administration, many people fearing encounters with immigration authorities stayed at home and

6

avoided many locations other than houses of worship, including barber shops, grocery stores, and shopping malls. Gov't Br. 19. In light of this evidence, plaintiffs needed to do more than simply "attribute" their attendance declines to the Huffman Memorandum. JA286.

Plaintiffs argue (Br. 31-32) that they need not demonstrate that the Huffman Memorandum is the only cause of the asserted declines in attendance, but it is their burden to make a "clear showing" that their injuries can be fairly traced to the Huffman Memorandum. *Murthy*, 603 U.S. at 58 (quotation marks omitted). Plaintiffs' bare attributions, premised on a mistaken belief that houses of worship were previously off-limits to immigration enforcement, are inadequate. Nor do plaintiffs carry their burden by arguing that other injuries, such as "discomfort during worship and injury to religious beliefs relating to pacifism," are "attributable exclusively" to the Huffman Memorandum. Pls.' Br. 31. The district court similarly reasoned that some of plaintiffs' concerns "relate specifically to the presence of immigration officers at places of worship," such as discomfort during worship due to the possibility of "armed law enforcement officers inside [plaintiffs'] places of worship." JA286. But such injuries would be fairly traceable to enforcement

7

actions at plaintiffs' houses of worship—which plaintiffs do not allege have occurred or are imminent—not to the Huffman Memorandum, which does not direct that enforcement action be taken at houses of worship or any other location.

2.  Even setting aside the insufficiency of plaintiffs' declarations, plaintiffs lack standing to challenge the Huffman Memorandum because any declines in attendance would be fairly traceable to the subjective and speculative fears of their congregants, not to the memorandum.  Plaintiffs acknowledge that they are not the objects of the memorandum and that their theory of standing depends on the actions of third parties.  Pls.' Br. 29.  They argue, however, that reduced attendance is a "'predictable'" reaction to the memorandum.  Pls.' Br. 30.  But the cases on which they rely, *Department of Commerce v. New York*, 588 U.S. 752 (2019), and *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100 (2025), are distinguishable.  The plaintiffs in those cases argued that they were harmed by the predictable responses of third parties who were the objects of the government's action.  In *Department of Commerce*, plaintiff States argued that they were harmed by the inclusion of a citizenship question on the census that

8

would predictably decrease the response rate of noncitizen households. 588 U.S. at 767-68. And in *Diamond Alternative Energy*, plaintiff fuel producers argued that they were harmed by regulations that would predictably cause vehicle manufacturers, the objects of the regulations, to produce fewer gas-powered vehicles, which would drive down demand for plaintiffs' product. 606 U.S. at 112-14.

The chain of causation here is far more attenuated. The objects of the Huffman Memorandum are DHS officers; the memorandum alters the guidance given to those officers and changes the internal procedures they must observe before taking action in or near a sensitive location. Plaintiffs claim to be harmed by the decisions of different third parties: their congregants, who fear that immigration officers may exercise the discretion granted to them by the Huffman Memorandum in such a way that leads to enforcement actions at plaintiffs' locations. Plaintiffs insist that it is "'commonsense'" that "announcing that houses of worship are no longer protected areas will cause people to forgo" those locations, but it is not clear why a memorandum that does not single out any location for potential enforcement would evoke that response. Pls.' Br. 30. The unstated link in plaintiffs' chain of causation is their

9

congregants' speculative fears regarding how and where immigration officers will exercise their enforcement discretion.  But a theory of standing that rests on "only speculat[ion] as to how" law enforcement officers "will exercise their discretion" does not satisfy Article III. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013).

Plaintiffs do not avoid these problems by insisting that they have already suffered injury from attendance declines, Pls.' Br. 27-28, 34, because those declines were driven by the speculative fears of their congregants.  The Supreme Court confronted a similar situation in *Clapper*, where the plaintiffs argued that measures they had taken to avoid governmental surveillance constituted ongoing injuries traceable to the challenged statute.  *Clapper*, 568 U.S. at 416.  The Court rejected that argument because the harm the plaintiffs sought to avoid was "not certainly impending," and a plaintiff does not obtain standing "by inflicting harm on themselves based on their fears of hypothetical future harm."  *Id.*  The injuries alleged by plaintiffs here are not self-inflicted but that makes no difference: because their congregants' decision to avoid worship is "based on their fears of hypothetical future harm"— not any actual or imminent enforcement action by the

government, which plaintiffs have not shown—plaintiffs' alleged injuries are fairly traceable to the congregants, not to the government. *Id.* Indeed, for this reason, the Court in *Clapper* also rejected the plaintiffs' argument that they were injured because "third parties might be disinclined to speak with them due to a fear of surveillance." *Id.* at 417 n.7. The Court explained that even if that were true, the plaintiffs would still lack standing because such injuries would be "based on third parties' subjective fear of surveillance," not the challenged statute. *Id.*

Put differently, plaintiffs cannot establish standing because their harms are simply downstream consequences of the "subjective chill" experienced by their congregants. *Laird v. Tatum*, 408 U.S. 1, 13 (1972) (quotation marks omitted). Plaintiffs respond (Br. 27) that the injury experienced by houses of worship when their attendance declines is distinct from the chill experienced by congregants, but that is beside the point. The point is that because the Huffman Memorandum is not "regulatory, proscriptive, or compulsory in nature," decisions by congregants to stay at home are not traceable to the government, but to the congregants themselves. *Laird*, 408 U.S. at 11.

11

The fact that the Huffman Memorandum is not regulatory or compulsory distinguishes this case from *Presbyterian Church (U.S.A.) v. United States,* 870 F.2d 518 (9th Cir. 1989), where the Ninth Circuit recognized an organizational injury to churches that experienced reduced attendance and participation in services after it was publicly revealed that government agents had secretly recorded their services over a 10-month period.  870 F.2d at 520-22.  As previously explained, the Huffman Memorandum does not direct such surveillance—or any other enforcement activities—toward plaintiffs' churches, and plaintiffs have not demonstrated that any such enforcement actions have occurred at their locations.

Finally, because the Huffman Memorandum does not regulate plaintiffs or their gatherings, their reliance on *Benham v. City of Charlotte*, 635 F.3d 129 (4th Cir. 2011) and *Tandon v. Newsom*, 593 U.S. 61 (2021) (per curiam) is misplaced.  *See* Pls.' Br. 23.  In *Benham*, this Court explained that "when a permitting system is at issue," a First Amendment injury may occur when "[a] regulation . . . reduces the size of a speaker's audience."  635 F.3d at 135 (alteration in original) (quotation marks omitted).  The Huffman Memorandum, however, does

12

not regulate the size of plaintiffs' gatherings. And *Tandon*—which did
not even address standing—likewise concerned regulations that directly
restricted the size of plaintiffs' gatherings. 593 U.S. at 61. Neither case
supports standing here.

3. Plaintiffs also lack standing because vacating the challenged
memoranda will not redress their asserted injuries. As explained in the
government's opening brief, the district court correctly held that it could
not enjoin DHS from conducting enforcement actions in or near houses
of worship absent a judicial warrant or exigent circumstances, as
plaintiffs requested, because such an injunction would run afoul of
8 U.S.C. § 1252(f)(1). Gov't Br. 30-31; JA319. Plaintiffs do not
challenge that holding here.

Plaintiffs therefore must show that the other relief they
requested—enjoining the Huffman Memorandum—will redress their
injuries. They argue that enjoining the memorandum will reinstate the
prior guidance, which will result in "meaningfully narrower
opportunities for enforcement" at their houses of worship. Pls.' Br. 34
(quotation marks omitted).

But plaintiffs do not dispute that lower courts cannot require DHS to comply with the Mayorkas Memorandum when it acts pursuant to an administrative warrant. 8 U.S.C. § 1252(f)(1); *see* Gov't Br. 32; JA294. And, in any event, "the Mayorkas Memorandum creates no legally enforceable rights and confers only limited protections against immigration officers' exercise of discretion." *Mennonite Church USA v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 1, 12 (D.D.C. 2025). Immigration enforcement actions in or near houses of worship were thus allowed under the prior guidance, JA150-152, and plaintiffs do not argue otherwise. Plaintiffs, therefore, can only speculate that their requested relief will have any impact on whether enforcement actions in or near their locations occur. And it is even more speculative that a modest change in internal DHS guidance will cause congregants who fear immigration authorities to return to services. Plaintiffs recognized as much below, arguing that in light of the Administration's aggressive immigration enforcement, reinstating the Mayorkas Memorandum alone would "provide cold comfort to Plaintiffs." Reply in Supp. of Mot. for Prelim. Inj., Dkt. No. 45, at 15.

14

4. Finally, even if plaintiffs had established injury, traceability, and redressability, the government's opening brief offered two reasons why their theory of standing is nevertheless not cognizable. First, the Supreme Court's decision in *United States v. Texas*, 599 U.S. 670 (2023), explains that federal courts lack jurisdiction to hear suits challenging downstream consequences of the government's immigration enforcement policies, because such suits "run up against the Executive's Article II authority to enforce federal law" and because courts "lack meaningful standards for assessing the propriety" of the government's enforcement choices. 599 U.S. at 678-79. Plaintiffs attempt (Br. 35) to limit *Texas* to cases where plaintiffs seek to compel the government to increase its enforcement. But the Court's reasoning applies equally here, where plaintiffs seek to dictate what guidance DHS gives its officers and who within DHS may approve enforcement actions in or near sensitive locations.

Second, the Court in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), warned against recognizing standing based on "attenuated links" and "distant (even if predictable) ripple effects," where doing so would lead to "limitless" results. 602 U.S. at 383, 391.

15

Plaintiffs respond (Br. 33) by arguing that their chain of causation is not speculative, but the issue in *Alliance for Hippocratic Medicine* was not only that the plaintiffs' alleged injuries were too speculative. The Court also explained that the plaintiffs' alleged injuries were too attenuated and that allowing doctors to challenge a drug approval on the ground that approving the drug would cause increased doctor visits would lead to "unprecedented and limitless" results. 602 U.S. at 390-91. Not only could doctors challenge "almost any policy affecting public health," but police officers, firefighters, and teachers would also have standing to challenge policies that affect their work, "until virtually every citizen ha[s] standing to challenge virtually every government action that they do not like." *Id.* at 392.

Those concerns apply equally here. The Huffman Memorandum does not regulate plaintiffs or their congregants, and it does not direct that immigration enforcement actions occur at houses of worship or any other location. To recognize standing based on plaintiffs' highly attenuated chain of causation would allow houses of worship—as well as other organizations—to challenge virtually any governmental action that indirectly reduces attendance at their gatherings. Plaintiffs offer

16

no "principled way to cabin" their theory of standing, *Alliance for Hippocratic Medicine*, 602 U.S. at 392, and they do not dispute that accepting their arguments would mean that houses of worship would have standing to challenge, for example, a military deployment or federal highway project if it decreases attendance at their services, *see* Gov't Br. 28-29. That result is "flatly inconsistent with Article III." *Alliance for Hippocratic Medicine*, 602 U.S. at 392.

### B.  Plaintiffs Are Unlikely to Succeed on their RFRA Claim

#### 1.  The Huffman Memorandum Does Not Impose a Substantial Burden on Plaintiffs' Exercise of Religion

The Huffman Memorandum provides that law enforcement actions in or near sensitive locations (including houses of worship) may occur without approval from agency headquarters (or a designee). As our opening brief (at 36-37) explained, determining approval levels for government action is the kind of internal government affair that does not substantially burden the exercise of religion under *Bowen v. Roy*, 476 U.S. 693, 700 (1986), and *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 448 (1988).

17

Plaintiffs argue that *Bowen* and *Lyng* are inapposite because the Huffman Memorandum "changed how [DHS] agents interact with members of the public," Pls.' Br. 51, but the government action challenged in both *Bowen* and *Lyng* also changed how the government interacted with the public. *See Lyng*, 485 U.S. at 448 (noting that the government's plan to construct a road on National Forest land interfered with the "religious experience of individuals using [sites within] the area for personal medicine and growth" (alteration in original) (quotation marks omitted)); *Bowen*, 476 U.S. at 699 (noting that the law at issue required state agencies to use social security numbers in the administration of a public benefits program (citing 42 U.S.C. § 602(a)(25))).

Plaintiffs also do not meaningfully confront the breadth of their substantial-burden theory. As the Supreme Court emphasized in *Lyng*, the government "simply could not operate" if strict scrutiny were applied to the government's conduct of its own internal affairs. 485 U.S. at 452 (noting that "[a] broad range of government activities—from social welfare programs to foreign aid to conservation projects—will always be considered essential to the spiritual well-being of some

18

citizens, often on the basis of sincerely held religious beliefs"). Under
plaintiffs' substantial-burden theory, for example, "a religious entity
that distributes illegal substances to its congregants for use during
religious ceremonies could challenge stepped-up government
enforcement of the drug laws by reciting that fear of enforcement has
caused some participants to forgo attending those services." Gov't Br.
38-39; *see also New Doe Child #1 v. United States*, 901 F.3d 1015, 1026
(8th Cir. 2018) (because statutes requiring national motto on U.S. coins
and currency "do not direct the Plaintiffs to *do* anything," "it is not clear
that the Plaintiffs have alleged a substantial burden under RFRA").

Plaintiffs (Br. 55) attempt to brush off these hypotheticals as
"marginal." But plaintiffs do not contest that their substantial-burden
theory would lead to the results we identify, and they cite no case
suggesting that RFRA provides a cause of action in that scenario.
*Mahmoud v. Taylor*, 606 U.S. 522 (2025), for example, reaffirmed that
"the government is generally free to place incidental burdens on
religious exercise so long as it does so pursuant to a neutral policy that
is generally applicable." *Id.* at 564. The burdens plaintiffs allege here
are incidental, as shown, and this case does not involve the kind of

19

"direct, coercive interactions," *id.* at 557, that were present in *Mahmoud*, *see id.* (noting that public schools "impose[] rules and standards of conduct on [their] students and hold[] a limited power to discipline them for misconduct").

Other cases plaintiffs cite also support the government's understanding of *Bowen* and *Lyng*. *Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir. 2024) (en banc) (per curiam), for example, held that a transfer of federally owned land to a copper-mining company did not substantially burden the religious exercise of Indians who had been conducting religious ceremonies there. *See id.* at 1055. The Ninth Circuit applied our reading of *Lyng*, noting that a substantial burden under RFRA does not include "government action that [merely] frustrates or inhibits religious practice." *Id.* at 1053 (emphasis omitted) (quoting *Lyng*, 485 U.S. at 456); *see also Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 829 (11th Cir. 2020) (noting that "a substantial burden 'requires something more than an incidental effect on religious exercise'" (quoting *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004))).

20

Three other cases plaintiffs cite did not address *Bowen* or *Lyng* at all. *See Liberty Univ., Inc. v. Lew*, 733 F.3d 72 (4th Cir. 2013); *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548 (4th Cir. 2013); *Mack v. Warden Loretto FCI*, 839 F.3d 286 (3d Cir. 2016). *Bethel* is additionally inapposite because that case involved the land-use provisions of the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, which adopted a "[]modified," less-stringent version of RFRA's substantial-burden test, 706 F.3d at 555, than in RFRA.

Plaintiffs also misstate the substantial-burden test this Court applies where *Bowen* and *Lyng* are inapplicable, wrongly asserting that a substantial burden exists where the government "considerably deters or diminishes religious exercise, even without prohibiting it."  Pls.' Br. 47 (first citing *Sherbert v. Verner*, 374 U.S. 398, 405 (1963); and then citing *Bethel*, 706 F.3d at 553-54).  Neither *Sherbert* nor *Bethel* adopted that test.  *Sherbert* held that a substantial burden flows from "pressure . . . to forego [a religious] practice," 374 U.S. at 404, and *Bethel* asked whether government action imposed "substantial pressure on a[ religious] adherent to modify his behavior and to violate his

beliefs," 706 F.3d at 555 (quoting *Lovelace v. Lee*, 472 U.S. 707, 718 (4th Cir. 2006)).

The Huffman Memorandum exerts no such pressure on plaintiffs, is not directed at plaintiffs, and "does not direct [them] to do anything" or refrain from doing anything. *New Doe Child #1*, 901 F.3d at 1026 (emphasis omitted). Moreover, while the district court relied on plaintiffs' claims of reduced attendance at their worship services, such reductions, even assuming they occurred, would not be traceable to the Huffman Memorandum. *See supra* pp. 8-13. Other burdens plaintiffs allege, including declining financial contributions, flow from plaintiffs' claims of reduced attendance. *See* Pls.' Br. 54.

Plaintiffs' fear that the Huffman Memorandum will allow "armed DHS agents to enter into Plaintiffs' sacred spaces of worship," Pls.' Br. 50, is too speculative to show a RFRA substantial burden. Plaintiffs have not shown that any such activity has occurred or is imminent, and as previously discussed, the Huffman Memorandum does not direct officers to take enforcement actions at any location. Moreover, both plaintiffs and the district court err in suggesting that the Huffman Memorandum allows "armed law enforcement to enter houses of

22

worship 'without any specific limitations or safeguards other than "common sense."'" Pls.' Br. 50 (quoting JA311). All enforcement actions, whether taken under the Huffman Memorandum or the Mayorkas Memorandum, must comply with applicable law, including the First Amendment and RFRA. The Huffman Memorandum simply alters the internal procedures DHS officers must observe before taking enforcement action at a sensitive location.

> **2.    The Huffman Memorandum is the Least Restrictive Means to Further a Compelling Government Interest**

The Huffman Memorandum serves multiple compelling government interests, including addressing the overwhelming surge in illegal immigration to the United States in recent years, *see* Gov't Br. 41-42, and does so more capably than the prior guidance, which required prior high-level approval of immigration enforcement at or near sensitive locations (including houses of worship), *see id.* at 42-43.

Plaintiffs (Br. 46) contend that the Mayorkas Memorandum adequately protected the government's compelling interests. Plaintiffs ignore the recent events that necessitated defendants' change in guidance, however, which include the recent influx of aliens (some of

23

whom are dangerous) into the United States, *see* Gov't Br. 41-42.  Given those events, and in light of the fact that DHS officers "frequently apply enforcement discretion to balance a variety of interests," including the extent to which any enforcement action occurs in a sensitive location, DHS reasonably determined that it would be more effective to entrust decisions regarding whether to take an enforcement action in or near a sensitive location to officers' common sense and law enforcement discretion, subject to any further guidance provided by leaders of U.S. Immigration and Customs Enforcement (ICE) or U.S. Customs and Border Protection (CBP), rather than have the "head of the agency . . . create bright line rules" ex ante.  JA195.  Defendants' judgment is entitled to due deference, *see* Gov't Br. 43, and RFRA does not require the government to adopt an alternative that is less effective than the action challenged, *id*. at 40-42.

Plaintiffs complain (Br. 45) that defendants have not identified any instance in which an alien has taken refuge in a house of worship. In "sensitive and weighty" contexts such as immigration, however, the government is not required to wait until a threat has actually materialized before acting to address that threat.  *Trump v. Hawaii*,

24

585 U.S. 667, 708 (2018) (quotation marks omitted) (noting the President's right to make "predictive judgments" regarding immigration, national security, and foreign affairs); *cf. Whitley v. Albers*, 475 U.S. 312, 322 (1986) (noting that officials are entitled to take prophylactic measures to prevent breaches of prison discipline).

Plaintiffs also ask this Court to ignore the government's compelling interests here because defendants did not adequately present them below. *See* Pls.' Br. 55. This Court has discretion to consider arguments raised for the first time on appeal, *see Moreno v. Bosholm*, 151 F.4th 543, 558 (4th Cir. 2025) (noting the Court's "charge as jurists 'to decide cases correctly'" (quoting *Meyers v. Lamer*, 743 F.3d 908, 912 (4th Cir. 2014))), and should do so here, given the importance of the issue to national security and public safety.

### C. Plaintiffs Are Unlikely to Succeed on their Expressive Association Claim

Plaintiffs fail to demonstrate how they could prevail on their expressive association claim when they are unlikely to succeed on their RFRA claim. For example, the Huffman Memorandum imposes at most an incidental burden on plaintiffs, *see supra* pp.17-22, and plaintiffs have failed to explain why that kind of burden should be considered

25

more "substantial" in the expressive association context, *Lyng v. International Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 485 U.S. 360, 367 & n.5 (1988), than it is under RFRA.

Plaintiffs have cited no case holding that a change in the level of government approval authority for enforcement activity can impose a substantial burden on expressive association. That kind of internal government affair bears no resemblance to the government action in the cases plaintiffs cite, such as requiring organizations to disclose names of their members, *see NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958); *see also Gibson v. Florida Legis. Investigation Comm.*, 372 U.S. 539 (1963), or forcing groups to admit members, *see Boy Scouts of America v. Dale*, 530 U.S. 640 (2000).

Nor does the Huffman Memorandum's reallocation of responsibility within DHS for approving enforcement actions in or near sensitive locations make membership in plaintiffs' houses of worship "less attractive" as discussed in *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 69 (2006). *Rumsfeld* cited laws requiring disclosure of membership lists, *see id.* (citing *Brown v. Socialist Worker '74 Campaign Comm. (Ohio)*, 459 U.S. 87 (1982)), and

26

laws imposing penalties or withholding benefits based on membership in a disfavored group, *see id.* (citing *Healy v. James*, 408 U.S. 169 (1972)).  The Huffman Memorandum has no such impacts.

Plaintiffs, addressing an argument the district court did not reach, also contend that the memorandum substantially burdens their expressive association by interfering with their internal structure or organization.  *See* Pls.' Br. 38 (citing *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984)).  In that respect, *Roberts* referred to a state law that required the Jaycees to admit women as full voting members.  *See Roberts*, 468 U.S. at 623.[2]

The Huffman Memorandum has no such coercive effects on plaintiffs' associational interests, and neither prohibits plaintiffs from conducting worship or ministry services nor imposes any penalty on plaintiffs for engaging in such activity.  Thus, the memorandum does not force plaintiffs to cease communicating or associating with immigrants as they wish, *cf.* Pls.' Br. 39, and plaintiffs' worries about

---

[2] Similarly, *Cousins v. Wigoda*, 419 U.S. 477 (1975), which *Roberts* cited in that respect, *see Roberts*, 468 U.S. at 623, involved a state court order enjoining defendants from participating as delegates to a political convention.

ICE agents "infiltrat[ing]" houses of worship, *id.*, are similarly
unsubstantiated.  Plaintiffs do not allege any such activity has occurred,
and common sense would plainly allow such action where necessary to
further compelling government interests, such as public safety.

Plaintiffs (Br. 41) fault DHS for pointing out that the Huffman
Memorandum does not target houses of worship but treats them the
same as other protected areas (like schools), but that is an important
point under the Supreme Court's jurisprudence.  *See Rumsfeld*, 547
U.S. at 69, 70 ("incidental[]" effects on expression did not implicate
associational rights, unlike in *Healy*, which involved penalties "based on
membership in a disfavored group").

Moreover, *Hosanna-Tabor Evangelical Lutheran Church and
School v. EEOC*, 565 U.S. 171 (2012), did hold that the Free Exercise
Clause "gives special solicitude to the rights of religious organizations"
exceeding that secured by the right to expressive association.  *Id.* at
189.  For example, the "exacting scrutiny" applicable to an expressive
association claim is less demanding than strict scrutiny, *see Americans
for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021), which both the
Free Exercise Clause and RFRA require.  Thus, for the same reasons

the Huffman Memorandum satisfies RFRA strict scrutiny, it all the more satisfies expressive-association exacting scrutiny.

## II. The Remaining Injunction Factors Weigh Against an Injunction

Even if plaintiffs could establish a likelihood of success on the merits, they are not entitled to a preliminary injunction because the equitable factors weigh against injunctive relief.  *See* Gov't Br. 49-53.

### A. Plaintiffs Have Not Demonstrated Irreparable Harm Absent Preliminary Relief

As our opening brief (at 49-51) explained, the harms plaintiffs allege are too speculative and insufficiently immediate to support preliminary relief for the same reasons those harms do not provide Article III standing.  In discussing the equitable factors (Br. 58), plaintiffs provide no additional arguments on this issue beyond those that are inadequate to demonstrate standing.

### B. Plaintiffs Have Not Shown That the Balance of Equities Tips in their Favor

Because plaintiffs have failed to prove a likelihood of success on the merits, their observation (Br. 57) that the public has a substantial interest in "'seeing its governmental institutions follow the law,'" *Roe v.*

29

*Department of Def.*, 947 F.3d 207, 230-31 (4th Cir. 2020), does not impact the balance of hardships here.

Plaintiffs also misleadingly contend that "DHS has said [its prior guidance] allows it to 'accomplish [its] enforcement mission without denying . . . people of faith access to their places of worship.'" Pls.' Br. 58 (second and third alterations in original) (quoting JA149). Plaintiffs quote the Mayorkas Memorandum, but the Huffman Memorandum is based on DHS's determination that its former guidance did *not* adequately allow the government to accomplish its enforcement mission.

Plaintiffs further argue that the balance of hardships tips in their favor because DHS "concedes that the district court's injunction is 'consistent' with the limits Congress put on judicial review of immigration enforcement actions." Pls.' Br. 58 (quoting Gov't Br. 10). But the government made no such concession. Rather, the government merely indicated that the district court properly declined to enjoin DHS when the Department acted pursuant to an administrative or judicial warrant, which is consistent with 8 U.S.C. § 1252(f)(1). *See* Gov't Br. 10. That is not a concession about the respects in which the court

wrongly enjoined DHS from acting based on the Huffman Memorandum.

Plaintiffs (Br. 58-59) also erroneously contend that "[a]ny time the government is subject to a preliminary injunction, it necessarily suffers the injury of being prevented from enacting its preferred policy." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 87 (2d Cir. 2020). The government is irreparably injured whenever it "is enjoined by a court from effectuating statutes enacted by representatives of its people," *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (quotation marks omitted) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)), and to our knowledge, neither the Supreme Court nor this Court has ever said that this harm is entitled to less than full weight in balancing the hardships. Finally, the injunction at issue here is particularly harmful because it intrudes on the internal workings of DHS. *See INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Labor*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers).

31

## III.  The District Court Erred in Enjoining the Vitello Memorandum

The Vitello Memorandum, which was issued as follow-on guidance after the Huffman Memorandum, charges ICE Assistant Field Office Directors and Assistant Special Agents in Charge with responsibility to decide whether, where, and when to conduct an immigration enforcement action near a protected area.  *See* JA260-261.  Our opening brief (at 53) argued that the district court incorrectly enjoined the Vitello Memorandum because it only offers "further guidance to assist" officers "in exercising appropriate enforcement discretion," JA260, and therefore does not impose an Article III injury or violate RFRA or the First Amendment.  Plaintiffs do not make any argument specific to the Vitello Memorandum or argue that the memorandum should remain enjoined if the Court vacates the injunction as to the Huffman Memorandum.

32

## CONCLUSION

For the foregoing reasons and those in the government's opening brief, the district court's preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

KELLY O. HAYES
  *United States Attorney*

MICHAEL S. RAAB
LOWELL V. STURGILL JR.

*s/ Sarah N. Smith*

SARAH N. SMITH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7533*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-0173*
  *Sarah.N.Smith@usdoj.gov*

February 2026

33

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5833 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Sarah N. Smith*
Sarah N. Smith

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2026, I electronically filed
the foregoing brief with the Clerk of the Court for the United States
Court of Appeals for the Fourth Circuit by using the appellate CM/ECF
system.  Service will be accomplished by the appellate CM/ECF system.


*s/ Sarah N. Smith*
Sarah N. Smith