**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 25-1512**

---

PHILADELPHIA YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; NEW ENGLAND YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; BALTIMORE YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS, INC.; ADELPHI FRIENDS MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; RICHMOND FRIENDS MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; NEW YORK YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS, INC.; SIKH TEMPLE SACRAMENTO; COOPERATIVE BAPTIST FELLOWSHIP,

Plaintiffs – Appellees,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security,

Defendants – Appellants.

------------------------------

FEDERATION FOR AMERICAN IMMIGRATION REFORM,

Amicus Supporting Appellants,

and

FAIR AND JUST PROSECUTION; LAW ENFORCEMENT ACTION PARTNERSHIP; ISAAC BARNES MAY, (Yale University); STEPHEN ANGELL, (Earlham College); JANE CALVERT, (University of Kentucky); THOMAS D. HAMM, (Earlham College (emeritus)); JULIE HOLCOMB, (Baylor University); ANDREW TAYLOR, (College of St. Scholastica); DAVID WATT, (Haverford College); 19 FAITH-BASED, IMMIGRANT JUSTICE, AND/OR CIVIL RIGHTS ORGANIZATIONS; THE RUTHERFORD INSTITUTE,

Amici Supporting Appellees.

---

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Theodore D. Chuang, District Judge. (8:25-cv-00243-TDC)

---

Argued: May 6, 2026 Decided: August 18, 2026

---

Before AGEE and HARRIS, Circuit Judges, and KEENAN, Senior Circuit Judge.

---

Affirmed by published opinion. Senior Judge Keenan wrote the opinion, in which Judge Agee and Judge Harris joined. Judge Agee wrote a concurring opinion.

---

**ARGUED:** Michael Everett Talent, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Bradley Scott Girard, DEMOCRACY FORWARD FOUNDATION, Washington, D.C., for Appellees. **ON BRIEF:** Brett A. Shumate, Assistant Attorney General, Michael S. Raab, Lowell V. Sturgill Jr., Sarah N. Smith, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Kelly O. Hayes, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellants. Sarah Goetz, J. Sterling Moore, Andrew Bookbinder, Ayesha Khan, DEMOCRACY FORWARD FOUNDATION, for Appellees. Christopher J. Hajec, Matt A. Crapo, Jonathon P. Hauenscheld, FEDERATION FOR AMERICAN IMMIGRATION REFORM, Washington, D.C., for Amicus Federation for American Immigration Reform. Miriam Airington-Fisher, Jennifer Quezada, AIRINGTON LAW, PLLC, Glen Allen, Virginia, for Amici Fair and Just Prosecution and the Law Enforcement Action Partnership. Zachary Antin, New York, New York, Andrew T. Tutt, Spencer Faber, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Amici Isaac Barnes May, Stephen Angell, Jane Calvert, Thomas D. Hamm, Julie Holcomb, Andrew Taylor, and David Watt. Golnaz Fakhimi, Sadaf Hasan, Reem Subei, MUSLIM ADVOCATES, Washington, D.C.; Mariam Azhar, Alexis Dyschkant, COVINGTON & BURLING LLP, Washington, D.C.; Lynn Damiano Pearson, Hilda Bonilla, Kevin Siegel, NATIONAL IMMIGRATION LAW CENTER, Washington, D.C., for Amici 19 Faith-Based, Immigrant Justice and/or Civil Rights Organizations. John W. Whitehead, William E. Winters, THE RUTHERFORD INSTITUTE, Charlottesville, Virginia; Joshua C. McDaniel, Parker W. Knight III, Kathryn F. Mahoney, Steven W. Burnett, Religious Freedom Clinic, HARVARD LAW SCHOOL, Cambridge, Massachusetts, for Amicus The Rutherford Institute.

---

BARBARA MILANO KEENAN, Senior Circuit Judge:

In January 2025, the Department of Homeland Security (DHS) rescinded a long-standing policy of limiting immigration enforcement actions at or near houses of worship. Among other things, DHS's new policy removed guidelines requiring that immigration officers weigh various considerations before conducting enforcement actions at these sensitive locations. Instead, the new policy requires only that the officials use their discretion and "common sense" in deciding where to conduct immigration enforcement actions.

The plaintiffs, houses of worship from the Quaker, Sikh, and Cooperative Baptist Fellowship religious traditions, filed suit to enjoin application of the new policy. They allege that DHS's new policy violates the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb–2000bb-4, and their First Amendment right to expressive association.[1] The plaintiffs assert, among other things, that the new policy has and will continue to chill immigrant attendance at the plaintiffs' worship services and other ministries. They further allege that this decline in attendance burdens their ability to worship communally and to minister to immigrant communities, both acts of which are fundamental to their religious exercise.

The district court granted the plaintiffs' motion for a preliminary injunction and ordered DHS to act in accordance with its prior guidelines, most recently articulated in

[1] The plaintiffs also claimed that the new policy violates the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–559, 701–706. The plaintiffs did not seek interim relief on their APA claims, and these claims are not at issue in this appeal.

2021, limiting immigration enforcement actions in or near the plaintiffs' houses of worship. The government now appeals and argues primarily that the plaintiffs lack standing and have failed to show that they are likely to succeed on the merits of their claims. We disagree with the government's position.

We hold that the plaintiffs have standing to pursue their claims. Based on the evidence before the district court, it reasonably can be predicted that many immigrants will decide not to attend the plaintiffs' houses of worship because of the new policy. So, the plaintiffs' asserted injury of a decline in attendance at worship services and other activities is fairly traceable to the new policy and likely will be redressed by an injunction limiting the policy's application. We also hold that the district court did not abuse its discretion in concluding that the plaintiffs are likely to succeed on the merits of their RFRA claim, because the plaintiffs adequately demonstrated that DHS's new policy substantially burdens their religious exercise.[2] Finally, we hold that the government waived its claim that the new policy satisfies the requirements of strict scrutiny by failing to present any legal argument or evidence before the district court. We therefore affirm the district court's order imposing the preliminary injunction.

---

[2] The government also challenges the district court's holding that the plaintiffs are likely to succeed on their First Amendment expressive association claim. However, because we affirm the district court's holding on RFRA, we need not reach the First Amendment claim. *See Pashby v. Delia*, 709 F.3d 307, 328 (4th Cir. 2013) *abrogated on other grounds by Stinnie v. Holcomb*, 37 F.4th 977 (4th Cir. 2022) (concluding that a preliminary injunction was appropriate when the plaintiffs had demonstrated a likelihood of success on some, but not all, of their claims.).

I.

A.

In recent decades, DHS, Immigration and Customs Enforcement (ICE), Customs and Border Protection (CBP), and their predecessor agencies have limited immigration enforcement actions at or near houses of worship. In 1993, the Immigration and Naturalization Service instructed federal immigration officials to "avoid apprehension of persons and to tightly control investigative operations [at] . . . places of worship, funerals and other religious ceremonies" and additional sensitive locations. J.A. 125. The agency also required officials to seek "advance written approval" from supervisors before conducting operations at these locations. *Id.* The supervisors were directed to consider the "availability of alternative measures," the "importance of the enforcement objective," and the ability of the agency "to minimize the impact on the operation of the . . . place of worship" before authorizing such actions. J.A. 126. Immigration officials reiterated this policy in 2001, 2004, and 2008. And ICE and CBP issued substantially similar policies in 2011 and 2013, respectively.

In 2021, then DHS Secretary Alejandro Mayorkas issued a memorandum superseding the 2011 and 2013 policies (the 2021 Policy). The 2021 Policy stated that "[t]o the fullest extent possible, [DHS] should not take an enforcement action in or near" protected areas and explained that DHS "can accomplish [its] enforcement mission without denying or limiting individuals' access" to these areas. J.A. 149. The 2021 Policy listed as an example of a protected area "place[s] of worship or religious study, whether in a structure dedicated to activities of faith . . . or location where such activities are taking

place." *Id*. The 2021 Policy also provided a non-exhaustive list of "enforcement actions" covered by that policy, including "arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance." J.A. 151.

In addition, the 2021 Policy required agents to seek approval from their agency or agency's delegates before taking an "enforcement action in or near a protected area" unless there were exigent circumstances. J.A. 150–51. The policy listed examples of exigent circumstances: "a national security threat," "imminent risk of death, violence, or physical harm to a person," "hot pursuit of a personally observed border-crosser," "imminent risk that evidence material to a criminal case will be destroyed," and when "a safe alternative location does not exist." J.A. 151. The policy also provided that regardless whether an action received prior approval, it "should be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the protected area." *Id.*

The 2021 Policy remained in place until January 20, 2025, when it was rescinded by DHS Acting Secretary Benjamine Huffman (Huffman Memo). In this directive, Secretary Huffman wrote,

> [O]fficers frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location. Going forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense. It is not necessary, however, for the head of the agency to create bright light rules regarding where our immigration laws are permitted to be enforced.

J.A. 195. In a press release announcing the new policy, a DHS spokesperson explained,

> This action empowers the brave men and women in CBP and ICE to enforce our immigration law and catch criminal aliens–including murders [sic] and rapists–who have illegally come into our country. Criminals will no longer be able to hide in America's schools and churches to avoid arrest. The Trump Administration will not tie the hands of our brave law enforcement, and instead trusts them to use common sense.

J.A. 173.

On January 31, 2025, ICE Acting Director Caleb Vitello implemented the new guidance in a further directive (Vitello Memo). This further directive does not include "bright line rules" or guidelines for conducting enforcement actions at houses of worship. Instead, it charges "Assistant Field Office Directors [] and Assistant Special Agents in Charge [] with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area." J.A. 261. Additionally, the further directive provides that when "a public demonstration is underway," ICE officials must "consult with local Office of the Principal Legal Advisor leadership for guidance on constitutional considerations" before authorizing "immigration enforcement action." J.A. 260. The Huffman and Vitello Memos will be collectively referred to as "the 2025 Policy" throughout this opinion.

B.

Houses of worship from the Quaker, Sikh, and Cooperative Baptist Fellowship religious traditions filed suit alleging that the new immigration enforcement policy violated their right to expressive association under (1) RFRA, 42 U.S. §§ 2000bb–2000bb-4, and (2) the First Amendment to the United States Constitution, U.S. Const. amend. I.

1.

The Quaker Plaintiffs are Quaker congregations or "meetings" located throughout the United States.[3] Their members believe that individuals experience God directly, and they do not have clergy to guide their spiritual development. Rather, when Quakers gather to worship, they sit silently until someone is moved to share a message from God. A member of one of the Quaker Plaintiffs stated in a declaration that even when no one speaks, he finds a "deep spiritual bond" that arises from worshiping together with other attendees. J.A. 59.

The communal aspect of worship is central to the exercise of the Quaker faith. Quakers encourage as many people as possible to attend their meetings, because "every individual who attends presents an opportunity for God to speak to [the meeting] through them." J.A. 27. Quakers believe that "one's life experience affects how one hears the spirit" and that "a diversity of worshippers[sic] allows [them] to experience God in a broader, more encompassing way." J.A. 65. In that context, many Quakers have developed connections to immigrant communities and, some, including members of the Quaker Plaintiffs, have attendees who are immigrants.

Quakers also have a set of values known as "Testimonies" that inform how they live and worship. One of these, the "Testimony of Equality," requires that Quakers welcome

[3] The meetings include Philadelphia Yearly Meeting of the Religious Society of Friends, New England Yearly Meeting of the Religious Society of Friends, Baltimore Yearly Meeting of the Religious Society of Friends, Adelphi Friends Meeting of the Religious Society of Friends, Richmond Friends Meeting of the Religious Society of Friends; and New York Yearly Meeting of the Religious Society of Friends.

all attendees "without regard to a person's background, immigration status, or how they arrived in the country." J.A. 78–79. Another, the "Testimony of Peace," includes a commitment to pacifism and non-violence. In practicing these "testimonies," some members of the Quaker Plaintiffs leave open the doors to their meeting houses during worship. Others support local immigrant communities through fundraising and direct services.

The implementation of the 2025 Policy has caused great concern in the Quaker Plaintiffs' communities. Members stated in their declarations that the threat of immigration enforcement may dissuade people from gathering to worship. Roni Kingsley, Clerk of one of the Quaker Plaintiffs, observed that the new policy "is already making . . . members less likely to attend." J.A. 90. Specifically, Kingsley noted that a "member of color expressed concern that he could be mistaken for being undocumented and feared the idea of enforcement actions in or around the meeting." *Id.* Kingsley also noted that an attendee responded to the suggestion that ICE could begin enforcement in or near a meeting by asking "whether [they] would need to start locking [their] doors during meetings." J.A. 89–90. Similarly, several members of the Quaker Plaintiffs attested that because immigration enforcement actions could take place at their meetings, this fact would make them less likely to encourage immigrants to join the community for worship because it might expose worshipers to personal harm. Finally, apart from the impact on attendance, multiple members of the Quaker Plaintiffs stated that the presence of armed law enforcement "would be a violation of [their] space" and would "make it more difficult to center and listen to the word of God." *E.g.*, J.A. 121.

2.

Like the Quaker Plaintiffs, members of the Cooperative Baptist Fellowship Plaintiff (CBF), a network of more than 1,400 individual Baptist congregations, have a commitment to communal worship. As Rev. Dr. Paul Baxley, the Executive Coordinator of CBF explained, "whether it means more people singing and praying together, or a heightened feeling of communal worship, having more people . . . is important for [the] exercise of our religion." J.A. 220. Moreover, CBF members believe that having "people from different backgrounds—including immigrants—as an integral part of [their] faith community transforms [their] faith body to look more like the body of Christ." J.A. 219. So, CBF's membership is diverse. For example, a CBF member, Temple Baptist, reported that ten percent of "active-worship attendance includes persons born outside the United States." J.A. 231.

In addition to communal worship, members of CBF believe that their faith obligates them to minister to immigrants and refugees. As a result, some of CBF's congregations offer direct services to immigrants and provide related non-profit activities. These services include offering "English as a Second Language" (ESL) classes, resettling refugees, and providing legal counseling or translation services. Members of CBF view this work as "an expression of [their] religious beliefs" and the fulfillment of Christ's mission. J.A. 218.

According to CBF, DHS's new policy has led to a decline in attendance at church services and in engagement with CBF's ministry. Rev. Dr. Jeff Hayes of Oakland Baptist reported that "congregants who are immigrants, both documented and undocumented . . . are now afraid to come to our sacred space . . . since DHS's policy

means they might be targeted." J.A. 209. Another CBF congregation reported that attendance at its ESL program has declined 66 percent. And another CBF congregation noted that "fewer people are engaging with the congregation's food pantry and clothing shelter, among other things." J.A. 222. Also, fear of enforcement actions has led CBF leadership to advise some congregations that they can lock church doors contrary to their belief that "doors should be open." J.A. 224.

Members of CBF stressed that the decline in immigrant attendance impedes their exercise of religion in a variety of ways. Rev. Dr. Randall Carter, Senior Pastor at Temple Baptist, noted that declining attendance has impacted the church's budget and has resulted in less money and fewer volunteers to "serve out its religious mission through worship and ministry." J.A. 233–34. Moreover, Rev. Dr. Carter stated that if immigrants do not attend the church's programs, Temple Baptist's congregation cannot fully serve its mission. Rev. Dr. Hayes suggested that the 2025 policy forces his congregants to choose between (1) their commitment to welcoming and encouraging all attendees to join the congregation, and (2) their responsibility to avoid placing immigrant attendees in danger because they might be targeted by ICE during worship.

3.

Plaintiff Sikh Temple Sacramento is a gurdwara or Sikh place of worship (the Sikh Temple). The Sikh Temple serves the Sikh population of about 30,000 people in the Greater Sacramento area. Ninety percent of the Sikh Plaintiff's congregation are first- or second-generation immigrants and about half are first-generation immigrants.

Sikh worship, like that of Quakers, is fundamentally communal. The Sikh faith revolves around the Guru Granth Sahib (Sikh scripture) that is written in prose and poetry, allowing part of services to be conducted with communal singing. The faith does not have ordained clergy, and any person from the congregation may lead religious services or help prepare langar, a communal meal shared at the gurdwara. As a result, the act of "fully and meaningfully practicing the Sikh faith requires joining the community . . . for worship and communal meals." J.A. 201.

According to Sikh Temple members, DHS's new policy has caused a decline in attendance at worship services. The Temple has heard from members, both documented and undocumented, who are concerned that participation in Sikh religious life will put them at risk. This concern is particularly acute among members of the Sikh Temple, because Sikhs historically have been the target of government intrusion into their houses of worship. Given the centrality of communal worship and fellowship to their religious exercise, members of the Sikh Plaintiff have expressed that decreased attendance at Sikh Temple of Sacramento "hinders [the] ability to carry out essential religious practices" within the entire community. J.A. 201.

C.

In February 2025, following the issuance of the Vitello Memo, the Quakers, the Sikh Temple, and CBF (collectively, the plaintiffs) moved for a temporary restraining order and a preliminary injunction based on their rights under RFRA and the First

Amendment. The district court granted the motion in part and denied the motion in part.[4] The court's preliminary injunction required DHS to abide by the 2021 Policy when "pursuing enforcement actions in or near the [p]laintiffs' places of worship." J.A. 320. The government challenges the district court's issuance of the preliminary injunction in this appeal.

II.

A.

We initially consider whether the plaintiffs have standing to pursue a preliminary injunction. We review this question of law de novo. *See Peterson v. Nat'l Telecomms. & Info. Admin.*, 478 F.3d 626, 631 (4th Cir. 2007).

At the preliminary injunction stage, a plaintiff first must make a "clear showing" that it is "likely" to establish the elements of standing. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). These elements are: (1) an "injury-in-fact;" (2) that is "fairly traceable" to the defendant's challenged conduct; and (3) that is redressable by a favorable decision of the court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). In the present case, the government argues that the plaintiffs failed to carry this burden regarding each element. We disagree and affirm the district court's holding that plaintiffs have standing to pursue a preliminary injunction. We address the standing elements in turn.

---

[4] The district court denied the plaintiffs' request for a nationwide injunction. The court also denied the plaintiffs' request that the injunction require DHS to obtain judicial warrants before undertaking enforcement actions near or at the plaintiffs' places of worship. Neither of these rulings is at issue in this appeal.

1.

The plaintiffs allege that they have been injured by the 2025 Policy because it has resulted in a decline in attendance at their houses of worship. The government makes only a passing challenge to this first element of the standing inquiry, contending that the plaintiffs' allegations of "actual or imminent" injury are vague and conclusory.[5] *See Lujan*, 504 U.S. at 560 (explaining that an "injury in fact" must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"). We find no merit in this argument.

The plaintiffs' declarations cite concrete instances of decreased attendance and specific statements from congregants indicating that they are likely to stop attending the houses of worship because of the 2025 Policy. For example, Rev. Dr. Baxley attested that one CBF congregation reported a 66 percent drop in attendance at its ESL classes. Likewise, Rev. Drs. Hayes and Carter reported that their churches already have seen fewer immigrants willing to attend worship or engage in church ministries. Similarly, Amar Singh Shergill, a member of the Sikh Temple Sacramento Executive Management Committee, stated that the Temple has "already heard from members of our Sangat who are concerned that participation in Sikh religious life at the Gurdwara may put them at risk,

[5] Citing *United States v. Texas*, 599 U.S. 670 (2023), the government also argues that plaintiffs lack a cognizable interest in the "downstream effects of the government's immigration enforcement policies." Opening Br. 29. However, that decision addressed whether a plaintiff had standing to challenge the government's decision to arrest and prosecute immigrants. 599 U.S. at 677. Here, plaintiffs do not challenge the government's authority to arrest and prosecute immigrants. Instead, the plaintiffs seek only to limit those arrests from occurring at or near their houses of worship.

because of the new policy." J.A. 202. And Roni J. Kingsley, Clerk of the Richmond Monthly Meeting Quaker Plaintiffs, stated that "[t]he knowledge that ICE agents can interrupt our worship is also already making our members less likely to attend." J.A. 90.

At this stage of the proceedings, the preliminary injunction phase, the plaintiffs only are required to show that they are *likely* to establish an injury-in-fact. *See Murthy*, 603 U.S. at 58. As illustrated by the examples cited above, the plaintiffs' declarations have identified the 2025 Policy as causing the decreased attendance that the plaintiffs have suffered at worship services and other programs. These descriptions of the impact of the 2025 Policy also include the negative effect that reduced attendance has had on their communal worship, which is central to the plaintiffs' practice of their religion. So, these declarations easily meet the first requirement of the standing inquiry, that the plaintiffs have made a clear showing that they are likely to establish an injury-in-fact. *See Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 110 (10th Cir. 2024) (holding, in the context of a preliminary injunction, that "granular specificity" was unnecessary when plaintiffs provided enough detail to establish that their alleged injury was imminent).

2.

In contesting the plaintiffs' standing, the government focuses the great weight of its argument on the requirement of traceability. Essentially challenging the causation content of the plaintiffs' declarations, the government argues that the drop in attendance at plaintiffs' houses of worship is not "fairly traceable" to the 2025 Policy. The government contends that it is unlikely immigrants will respond to the new policy by choosing not to

attend the plaintiffs' services. This argument, however, is not supported by established principles of traceability or by evidence in the record.

"For an injury to be traceable, there must be a causal connection between the injury and the conduct complained of by the plaintiff." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (citation omitted). When multiple actors are involved, a plaintiff can establish causation if the defendant's conduct had a "determinative or coercive effect upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 169 (1997). By establishing such a connection, a plaintiff can satisfy the requirement of traceability notwithstanding the general rule that traceability typically excludes any independent acts of third parties not joined in the action. *See Sheppheard v. Morrisey*, 143 F.4th 232, 243 (4th Cir. 2025) (citation omitted).

Of special relevance here, the requirement of traceability has been satisfied when a plaintiff's injury results from the "predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (*Department of Commerce*); *see Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 120–21 (2025). In *Department of Commerce*, a group of states, counties, and cities challenged the federal government's decision to add to the 2020 census a question about the census participants' citizenship. 588 U.S. at 768. These plaintiffs alleged that a citizenship question would discourage noncitizens from responding to the census due to fear that their responses would be used for immigration enforcement. *Id.* at 766–67. According to the plaintiffs, this reduction in census participation would lead to a less accurate population count, which would result in "a diminishment of [plaintiffs'] political representation, [a]

loss of federal funds . . . and [a] diversion of resources." *Id.* The federal government argued in response that the plaintiffs' contentions were too speculative to satisfy the traceability requirement, because any harm to the plaintiffs "depend[ed] on the independent action of third parties choosing to violate their legal duty to respond to the census." *Id.* at 767.

In rejecting the government's argument, the Supreme Court observed that the plaintiffs had established that noncitizen households have historically responded to the census at lower rates. *Id.* at 768. The evidence from Census Bureau personnel showed that this decreased response was due, at least in part, to the presence of a citizenship question on prior census forms. *Id.* So, the Court concluded that the plaintiffs "met their burden of showing that third parties will likely react in predictable ways to the citizenship question." *Id.*

The government's argument in the present case about the predictable effect of the 2025 Policy is even weaker than its losing argument in *Department of Commerce*. As noted above, the government asserts that it is not reasonably predictable that immigrants will respond to the 2025 Policy by deciding not to attend the plaintiffs' houses of worship, because the new policy does not "regulate, constrain or compel any action on [the plaintiffs' part]." Opening Br. 24–25 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 419 (2013)). But this argument misses the point of the holding in *Department of Commerce*. In confirming traceability in that case, the Supreme Court accepted the fact that immigrants were third parties, rather than actors before the Court. The Court explained that the traceability analysis is satisfied when the plaintiffs show that they will be injured

by the acts of third parties reacting in predictable ways in response to government action. *Department of Commerce*, 588 U.S. at 768. So, even though the plaintiffs before us are not direct targets of the 2025 Policy, their injuries cannot be rejected on this basis as lacking traceability.[6] *See Diamond Alt. Energy*, 606 U.S. at 114 (holding that the plaintiff fuel producers' injuries were fairly traceable to California regulations on vehicle manufacturers, even though the fuel producers were not themselves subject to the regulations).

In another argument challenging traceability, the government contends that the plaintiffs' "theory of causation is too attenuated." Opening Br. 27. In support of its argument, the government relies on *Food and Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 383 (2024), in which the Supreme Court held that certain doctors did not have standing to challenge the FDA's decision relaxing regulation of the drug mifepristone used to aid in medical abortion. The physician plaintiffs had alleged that the new regulations would increase their risk of liability and their insurance costs, because the purportedly greater number of pregnant women seeking treatment for

[6] In framing its traceability argument, the government also relies on *Laird v. Tatum*, 408 U.S. 1 (1972), in which the plaintiffs challenged an Army program collecting information about "public activities that were thought to have . . . some potential for civil disorder." 408 U.S. at 6. The plaintiffs alleged that the mere existence of the program had a "chilling effect upon the exercise of their First Amendment rights." *Id.* at 13. The Supreme Court rejected the plaintiffs' claim, finding that "[a]llegations of a subjective 'chill' [were] not an adequate substitute for a . . . specific present objective harm" when the plaintiffs themselves were not subject to the challenged government policy. *Id.* at 14*; see also United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984) (holding that the plaintiffs' lacked standing based on a "chilling effect"). Notably, however, the plaintiffs' injuries in the present case are not comparable to the injuries alleged and rejected in *Laird*. The present plaintiffs produced ample evidence that they have experienced, and are likely to continue experiencing, an objective and verifiable decline in attendance at their houses of worship.

mifepristone-related complications would cause the doctors to divert resources and time necessary to treat other patients. *See id.* at 390–91. In holding that the plaintiff doctors lacked standing to challenge the government action, the Court explained that "to establish causation, the plaintiff must show a predictable chain of events leading from the government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the plaintiff." *Id.* at 385.

Unlike the plaintiff doctors in *Alliance for Hippocratic Medicine*, however, the plaintiffs' theory of causation here is direct and straightforward. The plaintiffs allege that the 2025 Policy has discouraged, and will continue to discourage, immigrants from attending worship services, with the result that fewer congregants will attend and support the plaintiffs' communal worship. The record evidence of this effect, as described throughout this opinion, is more than sufficient to negate the government's allegation of "attenuation." *See Department of Commerce*, 588 U.S. at 767.

We also find no merit in the government's assertion that the plaintiffs cannot show that the decline in attendance is due to the 2025 Policy, rather than to the administration's broader focus on immigration enforcement. Notably, the plaintiffs' declarations expressly attribute their decline in attendance, and their congregants' fear of attending services, to the 2025 Policy. Moreover, to establish traceability, the plaintiffs are not required to show that the 2025 Policy is the *sole* cause of their injury. *See Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013). Rather, the plaintiffs need only show that the 2025 Policy is "in part responsible for" the decline in attendance at their houses of worship. *See id.* The present plaintiffs have done so and more.

Additionally, we observe that the evidence here is stronger than the evidence presented in *Department of Commerce*. The present plaintiffs showed that they already have experienced a decline in immigrant attendance at their houses of worship after issuance of the 2025 Policy, and that immigrants, as well as other congregants, have stated that they are less likely to attend future services because of this Policy. In contrast, the plaintiffs in *Department of Commerce* did not present evidence from noncitizens about how they would respond to the addition of a citizenship question to the census, or evidence that the government intended to use the census data for law enforcement purposes. Moreover, here, DHS's statement announcing the 2025 Policy made clear that the agency intends to conduct enforcement operations at houses of worship: "Criminals will no longer be able to hide in America's schools and churches to avoid arrest." J.A. 173. This comment supports the plaintiffs' contention that immigrants have a basis for fearing that attendance at plaintiffs' houses of worship will put them at risk. Given the strong evidence presented by the plaintiffs in the case before us, we hold that the plaintiffs have met their burden of showing traceability at this stage of the proceedings, namely, that they have made a clear showing they are likely to establish that a decline in attendance is the "predictable effect" of the 2025 Policy. *See Department of Commerce*, 588 U.S. at 768.

3.

The government next argues that the plaintiffs have not satisfied the redressability requirement of standing, because rescinding the 2025 Policy would not completely bar the government from conducting enforcement actions at or near the plaintiffs' houses of worship. This argument, however, overstates the redressability requirement.

To satisfy the redressability requirement, a plaintiff "must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable [judicial] decision." *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018) (citation omitted). The "burden imposed by this requirement is not onerous." *Id.* at 189. The plaintiffs "need not show that a favorable decision will relieve [their] every injury." *Id.* (citation omitted). "Rather, plaintiffs need only show that they personally would benefit in a tangible way from the court's intervention." *Id.* (citation omitted). Notably, causation and redressability are often "flip sides of the same coin." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Food & Drug Admin.*, 602 U.S. at 381.

The government is correct that rescinding the 2025 Policy would not completely prevent immigration enforcement actions at or near the plaintiffs' houses of worship. But, as set forth in the district court's order, such action would restore the guidelines that previously limited the circumstances under which enforcement activities at sensitive locations could occur. As a matter of logic, at least some of the immigrants, who report that they will not visit houses of worship because of the new directive articulated in the 2025 Policy, will return to the plaintiffs' houses of worship if DHS reinstates its old policy limiting enforcement actions at those locations. This is sufficient to satisfy the low bar of redressability. *See Diamond Alt. Energy*, 606 U.S. at 116 ("When third party behavior is predictable, commonsense inferences may be drawn.").

* * *

For these reasons, we conclude that the plaintiffs have satisfied their evidentiary burden at this stage of the litigation, namely, that they are likely to establish standing to pursue their claims. *See Murthy*, 603 U.S. at 58.

B.

We next consider whether the district court abused its discretion in granting the plaintiffs a preliminary injunction. We review the district court's legal rulings de novo, its factual findings for clear error, *see Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 213 (4th Cir. 2019), and its "ultimate decision to issue the preliminary injunction for abuse of discretion," *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006). Only "[a] clear error in factual findings or a mistake of law [are] grounds for reversal." *Mountain Valley Pipeline*, 915 F.3d at 213; *see Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (citation omitted).

Plaintiffs seeking a preliminary injunction must show "[1] that [they are] likely to succeed on the merits, [2] that [they are] likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tip[] in [their] favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The government argues that the district court erred in holding that each of the *Winter* factors favored granting a preliminary injunction. We address the *Winter* factors in order.

1.

We first address the district court's holding that plaintiffs are likely to prevail on the merits of their RFRA claim. Congress enacted RFRA in 1993 "to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). In addition, RFRA was designed to ensure "greater protection for religious exercise than is available under the First Amendment." *Ramirez v. Collier*, 595 U.S. 411, 424 (2022) (citation omitted).

A plaintiff asserting a RFRA claim must establish that "a substantial burden has been imposed on the exercise of sincerely [] held religious beliefs." *Goodall ex rel. Goodall v. Stafford Cty. Sch. Bd.*, 60 F.3d 168, 171 (4th Cir. 1995). Under RFRA, the "substantial burden" standard is met when governmental action has created "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Liberty Univ. Inc. v. Lew*, 733 F.3d 72, 100 (4th Cir. 2013) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)). And, importantly, RFRA prohibits the "[g]overnment" from "substantially burden[ing]" "a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a).

When a RFRA plaintiff demonstrates a substantial burden on the plaintiff's exercise of religious beliefs, the government is required to show that its action satisfies the test of strict scrutiny because the action (1) furthers "a compelling governmental interest;" and (2) employs "the least restrictive means" of furthering that interest. *See Goodall*, 60 F.3d at 171; 42 U.S.C. § 2000bb-1(a), (b). RFRA defines the "exercise of religion" to include

"any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A).

a.

In challenging the merits of the plaintiffs' RFRA claim, the government primarily argues that the 2025 Policy does not "substantially burden" the plaintiffs' religious exercise, because it does not "prohibit[] plaintiffs from conducting worship or ministry services" and does not impose "any financial or other penalty on plaintiffs for engaging in such activity." Opening Br. 36. Also, relying on *Bowen v. Roy*, 476 U.S. 693 (1986), the government contends that the plaintiffs may not dictate the government's internal operating procedures. We disagree with the government's position.

RFRA proscribes not only outright governmental prohibition of the free exercise of religion but also forbids indirect coercion, substantial pressure, or penalties being placed on such free exercise. *See Thomas*, 450 U.S. at 718 ("While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial."). Governmental action meeting this test creates a substantial burden on free exercise, rendering that action subject to strict scrutiny. *See Goodall*, 60 F.3d at 171–73.

In the present case, a primary effect of the 2025 Policy is to remove the prior limitations on DHS enforcement actions at or near places of worship. Immigration officials previously were required to avoid taking enforcement actions at or near places of worship "to the fullest extent possible." Under the 2025 Policy, however, immigration officials in most situations are permitted to rely on "common sense" in deciding whether to take enforcement action at such sensitive locations. By this change in directive, the 2025 Policy

necessarily increases the likelihood that DHS will engage in immigration enforcement actions at or near houses of worship.

And, manifestly, DHS has made clear that it intends to target houses of worship in future immigration enforcement actions. As recounted above, a DHS spokesperson explained in January 2025 that the new policy expands the reach of law enforcement in sensitive locations so that "[c]riminals will no longer be able to hide in America's schools and churches to avoid arrest." J.A. 173. For the plaintiffs, who welcome immigrant worshipers and have locations in or near immigrant communities, DHS's statement emphasizing the rationale for this policy change shows that the threat of immigration enforcement at their houses of worship is real and substantial.

The evidence showed that this increased threat of immigration enforcement at the plaintiffs' houses of worship has resulted in substantial pressure on the plaintiffs to violate numerous beliefs. For example, implementation of the 2025 Policy has put substantial pressure on members of the Quaker Plaintiffs and CBF to abandon their commitment to welcoming all attendees regardless of their immigration status. Several members of the Quaker Plaintiffs stated that they "would not be as encouraging of any immigrant joining [them] for worship," because they fear exposing them to law enforcement. *E.g.*, J.A. 74. Likewise, Rev. Dr. Hayes stated that the new policy forces CBF congregants to choose between inviting immigrants to join the congregation and the feeling that doing so would place attendees in danger of being targeted by immigration enforcement. Similarly, the threat of immigration enforcement at CBF houses of worship has led CBF leadership to

advise some congregations that they can lock church doors even though doing so is contrary to their belief that the doors should remain open and unlocked.

The increased threat of law enforcement also violates the Quaker Plaintiffs' "deeply ingrained" commitment to pacifism. J.A. 90. The presence of "weapons or armed people in or around [a Quaker] meeting is . . . contrary to [their] faith." J.A. 90. Multiple members of the Quaker Plaintiffs stated in their declarations that the presence of armed law enforcement "would be a violation of [their] space" and would "make it more difficult to center and listen to the word of God." *E.g.*, J.A. 121. One member stated that the mere "idea of there being weapons at meeting is distressing enough to make it difficult to engage in . . . worship." J.A. 91. So, the Quaker Plaintiffs and CBF have presented strong evidence that the 2025 Policy creates a substantial burden, significantly pressuring them to acquiesce to intrusions that violate their religious beliefs.

Also, as explained above, the threat of enforcement actions at or near the plaintiffs' houses of worship has led and is likely to continue to lead to a decline in attendance at their worship and ministry services. This imposes a separate burden on plaintiffs' exercise of religion by undermining their ability to worship communally and CBF's ability to provide immigrant-focused services. For the Quaker Plaintiffs, communal worship is central to the exercise of their faith. As previously related, Quakers do not have ordained clergy, and they worship by sharing the messages individual congregants receive from God. By reducing the number of worshipers, particularly immigrant worshipers, the 2025 Policy denies the congregants the opportunity to hear from a "diversity of worshippers[sic]" that allows them to "experience God in a broader more encompassing way." J.A. 65.

Similarly, the act of "fully and meaningfully practicing the Sikh faith requires joining the community . . . for worship and communal meals." J.A. 201. Like Quakers, Sikhs do not have ordained clergy, and any person from the congregation may lead religious services and help prepare a community meal. Due to the 2025 Policy, Temple members are now concerned that they will place themselves at risk if they continue to participate in Sikh religious life. The decreased attendance at the Sikh Temple "hinders [its members] ability to carry out essential religious practices." J.A. 202.

Communal worship is also "important for the exercise of [CBF members'] religion." J.A. 220. As one CBF member explained in a declaration, "[h]aving people from different backgrounds—including immigrants—as an integral part of [their] faith community transforms [their] faith body to look more like the body of Christ." J.A. 219. According to Rev. Dr. Carter, the reduction in attendance caused by the 2025 Policy moves the congregation away from "resembling the body of Christ." J.A. 234. Also, members of CBF believe that their faith obligates them to minister to immigrants and refugees. Members of CBF attested that the new policy already has decreased attendance at their church programs, thereby impeding them from carrying out their mission. For these many reasons, we conclude that the 2025 Policy, although not directly prohibiting the plaintiffs' worship or ministry services, imposes a substantial burden on the plaintiffs' religious exercise. This burden is based on the increased risk of immigration enforcement actions at or near their places of worship, which limits attendance at services and ministries and impairs the plaintiffs' ability to worship communally.

The government's reliance on *Bowen v. Roy*, 476 U.S. 693 (1986) does not affect our conclusion.[7] In *Bowen*, a father alleged that the government's use of a social security number to identify his daughter injured his daughter's spirit and, so, violated the father's First Amendment rights under the Free Exercise Clause. *See* 476 U.S. at 695–98. The Supreme Court rejected the challenge, concluding that the First Amendment "cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Id.* at 699. But this holding in *Bowen* is not applicable here, because the 2025 Policy is not merely a matter of government record keeping. The 2025 Policy is intended to deprive churches (along with other sensitive locations) of substantial protection from immigration enforcement operations. Unlike the assignment of a social security number, the 2025 Policy "implicates direct, coercive interactions" between government agents and churchgoers. *See Mahmoud v. Taylor*, 606 U.S. 522, 557 (2025) (distinguishing *Bowen*). Already, it has pressured the Quaker Plaintiffs and CBF to violate their religious commitment to openly welcoming all persons and has limited the ability of all the plaintiffs to express their religious beliefs through communal worship that includes members of immigrant

[7] The decision in *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988), also does not affect our holding because that case addressed the government's ability to make decisions about the use of federal land. *See Lyng*, 485 U.S. at 453 (holding that the plaintiffs' First Amendment rights "do not divest the Government of its right to use what is, after all, *its* land" (emphasis in original)).

communities.[8] Accordingly, we hold that the record supports the district court's conclusion that the plaintiffs have demonstrated a likelihood of success in proving that the 2025 Policy substantially burdens the plaintiffs' free exercise of religion.

b.

Because the plaintiffs have shown that they are likely to succeed in proving that the 2025 Policy substantially burdens the free exercise of their religion, we turn to consider whether the government has shown that it is likely to satisfy the standard of strict scrutiny in this case. Under this standard, the government must show that the 2025 Policy is the "least restrictive means" of furthering a "compelling governmental interest." *Goodall*, 60 F.3d at 171; 42 U.S.C. § 2000bb-1(a), (b). The "least-restrictive-means standard is exceptionally demanding." *See Burwell*, 573 U.S. at 728. This standard requires the government to "show[] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties." *Id.* "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt v. Hobbs*, 574 U.S. 352, 364–65 (2015) (citation omitted). We easily conclude that the government did not satisfy its burden in this case.

---

[8] We also reject as meritless the government's argument that finding a substantial burden in the present case would cause any governmental act affecting attendance at houses of worship, even a temporary traffic closure, to be subject to strict scrutiny. We disagree. Any incidental inconvenience caused by a governmental decision to temporarily alter traffic patterns near a house of worship is unlikely to meet this proof burden. Moreover, each challenged government action must be examined under the rigorous substantial burden test, and we will not speculate here regarding whether other sets of facts may meet this test.

Most notably, although the government argues on appeal that the 2025 Policy furthers a "compelling interest in the uniform enforcement of the Nation's immigration laws," Opening Br. 40, the government did not raise this argument in the district court. Nor did the government present *any* evidence in the district court that the 2025 Policy is the least restrictive means of furthering that interest. So, we find that the government has waived its contention that the burden imposed on the plaintiffs by the 2025 Policy is permissible under RFRA. *Bell v. Brockett*, 922 F.3d 502, 513 (4th Cir. 2019) ("Appellants may not raise arguments on appeal that were not first presented below to the district court."). In view of the government's failure in the district court to meet its proof burden regarding strict scrutiny, we conclude that the plaintiffs have satisfied the first *Winter* factor of showing that they are likely to succeed on the merits of their RFRA claim.

2.

We next consider the second *Winter* factor of irreparable harm. The government contends that the district court erred in holding that the plaintiffs showed that they would suffer irreparable harm unless they were granted a preliminary injunction. Essentially recasting part of its standing argument, the government contends that the plaintiffs did not meet their burden of showing irreparable harm because their alleged injury is too speculative. But, as we have found, the plaintiffs have established that they and their constituent congregations already have experienced, and will likely continue to experience, declines in attendance at their services and their ministries because of the 2025 Policy. The plaintiffs also have established, through the government's own words, the increased likelihood of immigration enforcement actions occurring at or near their houses of worship.

The present record is replete with evidence that the 2025 Policy has caused a reduction in attendance at the plaintiffs' houses of worship. This uncontested fact is strong evidence that the 2025 Policy has placed a substantial burden on the plaintiffs' exercise of their religion. Such a burden, even if limited in time, constitutes irreparable injury. *See Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) *superseded on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997) ("Courts have persuasively found that irreparable harm accompanies a substantial burden on an individual's rights to the free exercise of religion under RFRA."); *see also Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520–21 (4th Cir. 2002) ("[L]oss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." (citation omitted)). So, we agree with the district court's conclusion that the plaintiffs have satisfied their burden of proving the second *Winter* factor of irreparable harm.

3.

Finally, we consider the third and fourth *Winter* factors. Under the third *Winter* factor, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). When considering the fourth *Winter* factor, the public interest, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* And generally, the public interest is served by preventing the government from implementing policies that are likely to be found illegal. *See Giovani Carandola*, 303 F.3d at 521.

We find no merit in the government's argument regarding the third and fourth *Winter* factors. Initially, we reject the notion that the district court has "intrud[ed]" in "the internal workings of DHS," thereby causing harm to the government. Opening Br. at 52. As we already have explained, the focus of the 2025 Policy is not the "internal affairs" of DHS, but the largely unrestricted discretion given to immigration enforcement officers to conduct their operations at or near houses of worship.

The government contends, nevertheless, that the district court's decision enjoining the 2025 Policy prevents the government from "effectuating statutes enacted by representatives of its people." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (citation omitted). Citing certain statutes in which Congress has directed DHS to enforce immigration laws with "very few location-based restrictions," the government asserts that courts should not act contrary to this legislative directive. Opening Br. 51. But fatally, the government offers no facts showing that the enforcement of immigration laws likely would be materially impaired by such an injunction. So, we must reject the government's blanket contention on this point.

The evidence in the present record clearly supports the district court's determination that the balance of equities and considerations of public interest favor the plaintiffs. As recounted above, the plaintiffs have presented evidence showing that the 2025 Policy is having a chilling effect on their congregations and already has caused declines in attendance among members of CBF and the Sikh Plaintiffs. And our preceding analysis makes clear that this decline in attendance and the increased threat of immigration enforcement at all the plaintiffs' houses of worship already has imposed a substantial

burden on the ability of all the plaintiffs to express their religion through communal worship. So, we easily conclude that the district court did not err in determining that the balance of equities and the public interest support granting the preliminary injunction.

* * *

In sum, after reviewing the evidence and the argument in this case, we hold that the district court did not abuse its discretion in granting the plaintiffs a preliminary injunction. *See Mountain Valley Pipeline*, 915 F.3d at 213.

## III.

For these reasons, we affirm the district court's order granting in part, and denying in part, the plaintiffs' motion for a preliminary injunction.

*AFFIRMED*

AGEE, Circuit Judge, concurring:

I am pleased to join Judge Keenan's well-reasoned opinion. As she explains, the district court correctly concluded that—on the record developed thus far—the plaintiffs have met the high burden to obtain a preliminary injunction enjoining DHS from relying on the 2025 Policy at their places of worship. I write separately to emphasize the limited scope of the district court's preliminary injunction and the fact-dependent nature of today's decision. I also articulate an additional reason why I conclude the plaintiffs have sufficiently shown at this stage that they likely have standing to bring this suit.

I.

I agree that the plaintiffs have adequately shown for purposes of obtaining a preliminary injunction that they are likely to establish all three necessary components to establish Article III standing. Decreased attendance, which the plaintiffs have set forth with sufficient specificity here to withstand review at this stage, may constitute a cognizable injury in fact under our caselaw in appropriate cases. *See ante* pp. 13–15; *see also Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 135 (4th Cir. 2011).

In addition, the plaintiffs have alleged an even clearer Article III injury in fact, which is the reduction in monetary contributions to them and their related entities. That financial injury is itself a quintessential injury in fact. As one of the CBF declarants explained, "much of CBF's budget comes from contributions from our congregations. Fewer worshippers means less money for the congregations, and it means fewer contributions to CBF." J.A. 220. That in turn "diminishe[s] [their congregations'] ability

to serve out [their] religious mission through worship and ministry." J.A. 233. Such a "pocketbook injury" is the "classic" Article III injury in fact. *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636 (2023); *see also Diamond Alt. Energy, LLC, v. EPA*, 606 U.S. 100, 114 (2025). Further, the "risk of future [monetary loss] can establish an injury in fact sufficient to support standing for injunctive relief." *Penegar v. Liberty Mut. Ins.*, 115 F.4th 294, 302 (4th Cir. 2024) (emphasis omitted). Thus, the plaintiffs' representations that the 2025 Policy led them to receive fewer financial contributions is an independent injury in fact sufficient to demonstrate that they are likely to establish Article III standing to challenge the 2025 Policy.

The other components of standing are also readily met. For the same reasons that the plaintiffs' alleged decrease in attendance is fairly traceable to DHS, *see ante*, pp. 15–20, so too is their alleged pocketbook injury. In short, the plaintiffs "have made a clear showing they are likely to establish that [reduced contributions stemming from] a decline in attendance is the 'predictable effect' of the 2025 Policy." *Ante*, p. 20 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)). Likewise, their alleged financial injury is likely redressable by a favorable decision. Just as rescinding the 2025 Policy is likely to result in at least some individuals returning to the plaintiffs' houses of worship, *ante*, p. 21, it is also likely there would be a resumption of financial contributions. As explained elsewhere, redressability is not an onerous burden and when economic injury is alleged, "[e]ven 'one dollar' of additional revenue for the [plaintiffs] would satisfy the redressability component of Article III standing." *Diamond Alt. Energy, LLC*, 606 U.S. at 114 (quoting *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021)).

For these reasons, in addition to those set out in Judge Keenan's opinion, I conclude that the plaintiffs have shown a clear likelihood that they have standing to bring suit. That's sufficient to carry their burden on this threshold issue on the road to obtaining preliminary relief. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024).

II.

Turning away from jurisdiction, it's also important to keep in mind the narrow scope of the preliminary injunction in this case and the Court's affirmance of it.

First, the preliminary injunction enjoins "potential or actual immigration enforcement actions in or near" the identified list of places of worship connected to the plaintiffs. J.A. 323–26. Neither the preliminary injunction nor this Court's decision affirming it restrict DHS's actions at any other places that the 2021 Policy itself identified as sensitive locations or even at other places of worship. *See* Oral Argument at 1:40–1:47; 19:51–55, *Phila. Yearly Meeting of the Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, No. 25-1512 (4th Cir. May 6, 2026) (hereinafter "Oral Argument"). Our decision is based on the record in this case, which shows—at this stage—that plaintiffs have satisfied the exacting requirements to obtain a preliminary injunction, including demonstrating a likelihood of success on the merits of plaintiffs' claim the 2025 Policy infringes *their rights* under RFRA. *See, e.g.*, *ante*, pp. 3–4. Members of other places of worship would need to bring their own proceeding and develop relevant evidence

independently to obtain similar relief under *Winter*.[*] Along the same line, locations that are not places of worship, but included in the 2021 Policy as other "protected area[s]" would need to proceed on their own merits in bringing any challenge to the 2025 Policy. *See* J.A. 329–30. In other words, the only entities affected here are the plaintiffs, and the only places subject to the preliminary injunction are those the plaintiffs identified to the district court as being affiliated with them.

Second, a host of DHS immigration enforcement actions are expressly permitted by the preliminary injunction. It states, for example, that "[c]onsistent with 8 U.S.C. § 1252(f)(1), [it] does not enjoin or restrict [DHS] from conducting arrests in or near places of worship when authorized by an administrative or judicial warrant." J.A. 325. Both parties acknowledged as much at oral argument. Oral Argument at 1:48–1:55, 19:55–20:00. Further, by enjoining enforcement of the 2025 Policy and requiring DHS to adhere to the 2021 Policy, the preliminary injunction incorporates the provisions of the 2021 Policy, which itself did not ban *all* immigration enforcement actions at or near a place of worship. To the contrary, the 2021 Policy (and thus the preliminary injunction) "recognize[d] that there might be limited circumstances under which an enforcement action needs to be taken in or near" plaintiffs' places of worship without a warrant. J.A. 330; *accord* J.A. 325 (incorporating these circumstances into the preliminary injunction). The non-exhaustive list of "examples" of such exceptions where DHS can act include actions "involv[ing] a national security threat"; "an imminent risk of death, violence, or physical

[*] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

harm to a person"; "hot pursuit of an individual who poses a public safety threat"; and "an imminent risk that evidence material to a criminal case will be destroyed." J.A. 331. The 2021 Policy (and thus the preliminary injunction) further explained that when such circumstances present "exigent circumstances," then enforcement actions do not need prior approval, only post-action consultation. J.A. 331; *accord* J.A. 325. But where exigent circumstances do not exist, then "prior approval from . . . headquarters, or as [] otherwise delegate[d]" must be obtained. J.A. 331; *accord* J.A. 325. Plainly, nothing in this Court's decision or the preliminary injunction could be construed as limiting DHS's ability to act in accord with these directives.

Third, as Judge Keenan's opinion observes, *ante* p. 30, our analysis of the merits of plaintiffs' likelihood to succeed on their RFRA claim is partially driven by DHS's inexplicable failure in the district court to advance *any* relevant evidence or legal argument pertaining to the existence of a compelling government interest and use of the least restrictive means to secure it. After the plaintiffs came forward with evidence of how the 2025 Policy substantially burdened their religious activities, DHS bore the burden of showing that the policy furthered a compelling interest and used the least restrictive means of furthering that interest. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 423 (2006) (observing that under RFRA, the Federal Government is prohibited "from substantially burdening a person's exercise of religion, unless the Government 'demonstrates that application of the burden to the person' represents the least restrictive means of advancing a compelling interest" (quoting 42 U.S.C. § 2000bb-1(b))).

Instead of trying to satisfy that burden, DHS persisted in its generic assertion that the plaintiffs lacked standing and that strict scrutiny analysis simply did not apply to internal decisions about approval of immigration enforcement actions. That approach made up the sum total of its argument before the district court. *See* Dist. Ct. Docket No. 34 (Memorandum in Opposition to Plaintiffs' Motion). Further, DHS (for reasons known only to it) repeatedly refused the district court's invitation to state a position on these issues as arguments in the alternative should the court find that the plaintiffs had standing. Rather than engaging in that discourse and proffering any evidence or a responsive argument or alternative position related to the salient analysis, DHS—as Judge Harris put it at oral argument—"stubbornly" refused to engage on that question. Oral Argument at 14:29–16:02. Whether that was its calculated litigation strategy or simply negligence does not change the result that DHS has waived (not forfeited) any new arguments on this point for purposes of this appeal. *See Richardson v. Clarke*, 52 F.4th 614, 625 (4th Cir. 2022) ("Generally, parties may not raise new arguments on appeal that were not first presented to the district court below, absent exceptional circumstances.").

When questioned on these points extensively during oral argument, DHS doubled down on its primary view that plaintiffs lacked standing and that the compelling government interest test simply doesn't apply to the challenged government action. Oral Argument at 2:15–6:00, 12:29–17:00. To be sure, DHS did ask this Court to overlook its preservation failures before the district court, and posited that "uniform enforcement of the Nation's immigration laws in light of the overwhelming surge of illegal immigration over the past several years" constitutes a compelling interest and that the 2025 Policy "is the

least restrictive means of advancing those interests." Opening Br. 40. Even so, its arguments assert—from a bird's eye view and asking the Court to blindly accept as self-evident truths—for example, that national security and public safety are best met through the 2025 Policy. *E.g.*, Oral Argument at 17:00–17:20. Such conclusory and "categorial" arguments would be insufficient to meet its burden even if they were properly before us. *See Gonzales*, 546 U.S. at 431–32 ("RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened. . . . Under the more focused inquiry required by RFRA and the compelling interest test, the Government's mere invocation of the general characteristics of Schedule I substances, as set forth in the Controlled Substances Act, cannot carry the day."). And also for reasons (if there are any) known only to DHS, it has never explained why the 2021 Policy inhibited its ability to effectively engage in immigration enforcement actions at or near the plaintiffs' places of worship or why the 2025 Policy presents the least restrictive means of advancing its interests under present conditions.

In short, DHS abdicated its burden of proof at a crucial juncture of the merits analysis. Today's decision stems directly from the record that the plaintiffs marshaled and left untouched by DHS. As observed at oral argument, "It's very hard to win a case without evidence or legal argument." Oral Argument at 7:26–7:29.